```
                                              Page 1

 1            IN THE UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF ILLINOIS

 3                     EASTERN DIVISION

 4

 5    SHANE EDWARD LIMBACHER,            )

 6              Plaintiff,               )

 7         vs.                           ) 19-cv-07509

 8    SHERIFF THOMAS J. DART, et al.,)

 9              Defendants.              )

10

11

12

13                 DEPOSITION OF YAN YU, D.O.,

14                   APPEARING REMOTELY

15

16                   DECEMBER 13, 2022

17                COMMENCING AT 10:25 A.M.

18

19

20

21

22

23

24    REPORTED BY:  Linda S. Idrizi, CSR NO. 84-3704.
```

Page 2

1    PRESENT VIA VIDEOCONFERENCE:

2

3         LOCKE LORD, LLP,

4         (111 South Wacker Drive, Suite 4100,

5         Chicago, Illinois  60606,

6         312-443-0676), by:

7         MR. BRIAN HAYS,

8         bhays@lockelord.com,

9             appeared on behalf of the Plaintiff;

10

11        COOK COUNTY STATE'S ATTORNEY,

12        (500 Richard J. Daley, Center,

13        Chicago, Illinois  60602), by:

14        MR. ALEXANDER PREBER,

15        alexander.preber@cookcountyil.gov,

16                and

17        MS. MIA BUNTIC,

18        mia.buntic@cookcountyil.gov,

19            representing the Defendants.

20

21

22

23

24

Page 3

1                    WITNESS INDEX

2    WITNESS:                              PAGE

3    YAN YU, D.O.,

4       Examination by Mr. Hays            4, 56

5       Examination by Mr. Preber          54

6

7

8                     EXHIBITS

9    NUMBER                               PAGE

10   No. 1   UpToDate article             19

11   No. 2   Flow chart                   24

12   No. 3   Medical record               34

13   No. 4   Medical record               37

14

15

16

17

18

19

20

21

22

23

24

Page 4

1                    (WHEREUPON, the witness was duly
2                    remotely sworn by stipulation of
3                    the parties.)
4        MR. HAYS:  Good morning, again, Dr. Yu.  I'm
5    Brian Hays.  I represent Mr. Limbacher in this
6    case.  Why don't we start with the appearance of
7    other counsel.
8        MR. PREBER:  Alexander Preber, Assistant
9    State's Attorney on behalf of Defendants and the
10   witness, Dr. Yan Yu.
11       MS. BUNTIC:  Mia Buntic on behalf of
12   Dr. Kahn.
13                    YAN YU, D.O.,
14   called as a witness herein, having been first duly
15   sworn, was examined and testified as follows:
16                    EXAMINATION
17   BY MR. HAYS:
18       Q.     And, Dr. Yu, if you would please state
19   and spell your name for the record?
20       A.     My name is Yan Yu, Y-A-N, last name is
21   Yu, Y-U.
22       Q.     And we had started off your deposition
23   a couple weeks ago -- a week or so ago and the
24   court reporter had some technical issues.

```
                                                    Page 5
```

1          So I am not going to pick up and go

2   through the whole spiel about depositions and not

3   talking over one another, but we will do our best

4   to get a clear record today and to get moving.

5          We talked about your background before

6   the court reporter dropped off.  So where I think

7   we left off we were talking about the protocol in

8   the Urgent Care Clinic at Cermac.

9          And as I understand or from my notes,

10  when a patient comes into the Urgent Care, they are

11  first met by a nurse who does triage; is that

12  right?

13       A.    Yes, that's correct.

14       Q.    And the nurse is really just

15  determining whether the person's condition is

16  something that is urgent that needs to be seen now

17  or if they wait in line with the other patients; is

18  that correct?

19       A.    Correct.

20       Q.    And when the patient finally comes to

21  see you, you are the person that would take the

22  full history of the patient to find out what is

23  going on with them; correct?

24       A.    Correct.

1      Q.      And then you enter that information

2   into the computer system that you use at Cermac and

3   it's called Cerner?

4      A.      Yes, correct.

5      Q.      And that's C-E-R-N-E-R.  And if you

6   could tell me how does that work?  Do you have a

7   laptop or a tablet?  Is there a computer in the

8   room?  Do you take handwritten notes?

9              When you are taking a patient's

10  history how do you record that information?

11     A.      We have a computer in the room.  We

12  have a computer.  Can you hear me?

13     Q.      Yes.  Okay.  So you type it directly

14  into the computer as the patient is giving you the

15  information?

16     A.      Yes.  Correct.

17     Q.      And I believe we also touched on it,

18  but you are able to refer patients to the

19  orthopedic surgeon that comes into Cermac; is that

20  correct?

21     A.      If needed, yes.

22     Q.      And what is the process for referring

23  a patient to see the orthopedic surgeon?

24     A.      I just put in the order in the

1  computer, refer to orthopedic.  And then that will

2  populate in the clinic queue.  And then they

3  schedule the patient accordingly.

4       Q.    And in November of 2017 that

5  orthopedic surgeon was Dr. Kapotas; is that right?

6       A.    I don't know.  Too long ago.  I think

7  so, yes.

8       Q.    And what standards do you apply when

9  making a decision about whether or not to refer a

10 patient to an orthopedic surgeon?

11      A.    Okay.  If a patient has a fracture, a

12 ligament injury, if I think the patient needs

13 surgery or something is beyond my scope of

14 practice, then I would refer him to an orthopedic

15 surgeon.

16      Q.    And then you are also able to refer

17 patients to Stroger Hospital for treatment; is that

18 right?

19      A.    Yes.  Correct.

20      Q.    And are you able to refer patients to

21 an orthopedic specialist at Stroger directly or do

22 you have to go through the orthopedic surgeon who

23 comes to Cermac first?

24      A.    It depends on the urgency and the

1   degree of complex situation.  If I see an open

2   fracture, then I can send them to Stroger Emergency

3   Room and they will get the orthopedic surgeon to

4   see them over there at that time.

5             If it's not an emergency, then I will

6   refer him to our clinic in the basement.  And if

7   it's Dr. Kapotas, he will come and see the patient.

8        Q.    Okay.  And you gave one example, but

9   what were the standards or -- that you would apply

10  when making a decision about referring somebody to

11  Stroger directly?

12       A.    Like I said, if it is, like, I see an

13  obvious deformity or the guy has -- obviously, if I

14  have an x-ray and he has a fracture, if we can't do

15  it here, then we send him to Stroger.

16       Q.    What about if a patient needed an MRI?

17       A.    MRI have to be scheduled.  And that

18  would be up to the orthopedic surgeon to decide

19  whether the patient needed it or not.

20       Q.    So --

21       A.    A Stroger ER doctor determines that.

22       Q.    So if I understand it then, if there

23  is a patient that came into the Urgent Care Clinic

24  that you thought might need an MRI, your procedure

1  would be to first refer that person, if it was

2  non-emergency, to the orthopedic surgeon at Cermac?

3  And then the orthopedic at Cermac would make the

4  decision about whether an MRI was necessary?

5          A.      Yes.   Correct.

6          Q.      And I just want to get a sense about

7  the treatment that you all provide at Cermac.  What

8  is your understanding of the standard of care that

9  you owe or the duty that you owe to the patients at

10 Cermac?

11         A.      Can you repeat your question one more

12 time?

13         Q.      Sure.   What is your understanding of

14 the standard of care or the duty that you owe to

15 patients that you are treating at Cermac?

16         A.      The patient comes to see me and I try

17 my best of my knowledge to treat the patient and to

18 take care of the patient.   I don't know what you

19 mean by standard.

20         Q.      Well, would you agree with me that

21 incarcerated persons are entitled to receive

22 quality health care?

23         MR. PREBER:   Objection to form.

24 BY THE WITNESS:

Page 10

```
 1        A.     Yes.

 2   BY MR. HAYS:

 3        Q.     And would you agree with me that

 4   incarcerated persons should not endure unnecessary

 5   suffering?

 6        MR. PREBER:  Objection to form.

 7   BY THE WITNESS:

 8        A.     Yes.  Correct.

 9   BY MR. HAYS:

10        Q.     And would you agree with me that if a

11   patient presents to you with a treatable condition

12   that's causing them pain and suffering and that

13   person reports those symptoms to you that you have

14   an obligation to identify and treat that underlying

15   condition?

16        MR. PREBER:  Objection to form.

17   BY THE WITNESS:

18        A.     I work in the Urgent Care.  If it's an

19   acute injury, I treat it.  If it's chronic, I will

20   refer him to the proper -- if he needs a

21   specialist, we would refer him back to the clinic

22   for evaluation and treatment.

23   BY MR. HAYS:

24        Q.     Okay.  So would you agree with me then
```

1  that if you are aware of a serious condition that a

2  patient has, that you have a responsibility to

3  address that condition, either yourself or by

4  referring them to another doctor?

5        MR. PREBER:  Objection to form, speculation

6  and vagueness of the question.

7  BY THE WITNESS:

8        A.    It depends on acute or chronic.  Like

9  I said, I work in the Urgent Care.  I take care of

10  urgent medical problems and then I refer the

11  chronic medical problem to the clinic in each

12  division.

13  BY MR. HAYS:

14        Q.    And how would you characterize a

15  dislocated shoulder?  Is that an urgent situation

16  or is that a chronic problem?

17        MR. PREBER:  Objection to leading.

18  BY THE WITNESS:

19        A.    A dislocated shoulder is an urgent

20  medical problem.

21  BY MR. HAYS:

22        Q.    And is there any limitations on your

23  ability to provide the necessary medical care to

24  patients that come and see you?

Page 12

1       A.      Can you repeat your question?

2       Q.      Sure.   Is there any limitations placed

3   on you in your ability to provide the necessary

4   medical care to patients that come to see you at

5   Cermac?

6       A.      I don't think I have a limitation and

7   I will do my best to treat the patient.  If not

8   successful, then I will refer them to Stroger

9   Hospital Emergency Room, if needed.

10      Q.      So patients who are incarcerated are

11  entitled to get the same care that would be

12  available to patients if they were to, say, go to a

13  private hospital?

14      A.      Yes.

15      Q.      And you would agree with me that

16  incarcerated individuals are entitled to receive

17  timely care?

18      MR. PREBER:  Objection to form.

19  BY THE WITNESS:

20      A.      Yes.

21  BY MR. HAYS:

22      Q.      And that the doctors and other

23  providers at Cermac should do their best to avoid

24  unnecessary delay in providing treatment to

Page 13

1   patients?

2        A.    If it's acute, yes.  Chronic needs

3   work-up and further study and testing to determine

4   what is the best treatment for the patient.

5        Q.    But even in situations of chronic

6   care, you would agree with me that Cermac has an

7   obligation to avoid unnecessary delay in treating

8   chronic conditions?

9        MR. PREBER:  Objection to form and leading.

10  BY THE WITNESS:

11       A.    It depends on the situation.  I can't

12  speculate on that.

13  BY MR. HAYS:

14       Q.    So in what circumstances would it be

15  appropriate to delay treatment of a patient?

16       A.    I don't think delay of treatment is

17  proper procedure.  And you need to make the

18  diagnosis to treat.

19       Q.    Would you agree that a delay in

20  treating a serious condition can sometimes

21  exacerbate that condition?

22       MR. PREBER:  Objection to form and

23  speculation.

24  BY THE WITNESS:

Page 14

1      A.      I can't speculate on that.  It would

2  have to be a specific case for me to answer that.

3  BY MR. HAYS:

4      Q.      Would you agree with me that a delay

5  in treating a dislocated shoulder can lead to

6  exacerbated conditions?

7      MR. PREBER:  Objection to form and

8  speculation.

9  BY THE WITNESS:

10      A.      Explain to me what conditions.

11  BY MR. HAYS:

12      Q.      A delay in treating somebody with a

13  dislocated shoulder could lead to a more serious

14  problem?

15      A.      Yes.

16      Q.      Would you agree with me that chronic

17  pain can be a sign of a serious condition?

18      MR. PREBER:  Object to form and speculation.

19  BY THE WITNESS:

20      A.      That is speculation.  I can't

21  speculate.  I have to have a concrete case.  I have

22  to combine my physical exam and the complaint and

23  then I have to make a decision.  So I can't

24  speculate on that.

```
                                                     Page 15
 1    BY MR. HAYS:

 2         Q.     Well, part of your job as a medical

 3    professional is to be able to recognize signs and

 4    symptoms of problems with the shoulder; is that

 5    right?

 6         MR. PREBER:  Objection to form.

 7    BY THE WITNESS:

 8         A.     That's correct.

 9    BY MR. HAYS:

10         Q.     And you would agree with me that it's

11    important to take an accurate and complete history

12    of your patients, their trauma and their symptoms?

13         MR. PREBER:  Objection to form.  Leading.

14    BY THE WITNESS:

15         A.     Like I said, I work in the Urgent

16    Care.  And a patient comes to me with a specific

17    injury and problem and my obligation is to treat

18    that acute problem.

19              And I don't -- and if the patient

20    doesn't tell me any chronic problem, I would refer

21    them back to the clinic for evaluation and

22    treatment.

23         Q.     Okay.  But would you agree with me it

24    is important that you take an accurate history of
```

Page 16

1    the trauma and injuries of the patient that

2    presents to you in the Urgent Care?

3         MR. PREBER:  Objection, form.

4    BY THE WITNESS:

5         A.    For the acute problem, yes.  I do get

6    a history.

7    BY MR. HAYS:

8         Q.    And when treating an acute problem it

9    is important that you make a thorough and complete

10   physical examination; is that right?

11        MR. PREBER:  Objection to leading.

12   BY THE WITNESS:

13        A.    Yes.  Correct.

14   BY MR. HAYS:

15        Q.    And would you agree with me that it's

16   important to order the necessary tests or images to

17   get an accurate picture and make an accurate

18   diagnosis of a patient's condition?

19        MR. PREBER:  Objection to form and

20   speculation.

21   BY THE WITNESS:

22        A.    Can you repeat your question one more

23   time?

24   BY MR. HAYS:

Page 17

1      Q.      Would you agree with me that it is
2  important to order the necessary tests or images to
3  get an accurate picture and make an accurate
4  diagnosis of a patient's condition?
5      A.      To get a accurate history and physical
6  exam and then make a necessary decision to see if I
7  need x-rays or CT scan or other testing to prove my
8  suspicions.
9              So not all cases need x-rays all of
10  the time.  A physical exam and history is the most
11  important part.  And with all of that information
12  then I make a decision of whether to get an x-ray
13  or not.
14      Q.      If you believe that if an x-ray or an
15  MRI is medically necessary, you would agree with me
16  that that should be done then; correct?
17      A.      If an x-ray is needed, yes.  And if I
18  think that I need an MRI, I will refer this patient
19  properly.  I would have to refer him to Stroger
20  Emergency Room.  And over there they have an
21  orthopedic resident and they can evaluate the
22  patient of whether he needs an MRI or not.
23      Q.      And if you feel like you are not able
24  to make a diagnosis or you are not confident in

1    your diagnosis, do you believe you have an

2    obligation to refer the patient to the right

3    specialist with expertise that can make that

4    diagnosis?

5            A.      Yes.

6            Q.      So do you have any textbooks or other

7    medical treatises that are available to you to

8    consult as necessary in the Urgent Care Clinic?

9            A.      We don't have textbooks, but we have a

10   computer and we have UpToDate.  And then if we need

11   it, we can go there.

12           Q.      And have you ever consulted the

13   UpToDate website?

14           A.      I work in Urgent Care.  Most of the

15   stuff that I see in the Urgent Care that I already

16   have been doing it for the last 30 years and I

17   seldom use UpToDate.

18           Q.      Could you give me sort of what your

19   understanding of seldom is.  Is that once a month?

20   Once every six months?

21           A.      Two or three times a month.

22           Q.      Have you ever consulted UpToDate for a

23   shoulder injury?

24           A.      Not lately.

1     Q.    Do you recall approximately when the

2  last time it was that you consulted UpToDate for a

3  shoulder injury?

4     A.    Two or three months ago.

5     Q.    And what were you looking up?  What

6  was the particular injury or condition?

7     A.    Treatment of a shoulder -- not

8  shoulder fracture.  Ankle fracture, what is the

9  best testing for that specific problem.

10     Q.    I'm sorry.  Did you say ankle

11  fracture?

12     A.    Yes.  Ankle, yes.

13     Q.    And what about the last time you

14  consulted UpToDate for a shoulder injury?  What

15  were you looking up?

16     A.    I don't remember.

17     (WHEREUPON, said document was marked

18     Deposition Exhibit No. 1,

19     for identification, as of 12/13/22.)

20  BY MR. HAYS:

21     Q.    I would now like to direct your

22  attention to Exhibit 1 that has already been

23  shared.  And, for the record, Exhibit 1 is a

24  printout of an article from UpToDate.

1    A.    I've got a question.  This is a

2  shoulder exam.  It's not related to the case that

3  I'm -- the patient is suing me for.  So why am I

4  answering these questions?

5    THE WITNESS:  Do I need to answer it,

6  Counselor?

7    MR. PREBER:  Dr. Yu, during the deposition

8  please answer Mr. Hays' questions.  Please leave

9  the objections up to me, sir.

10    THE WITNESS:  Okay.

11  BY MR. HAYS:

12    Q.    The article here is entitled,

13  "Evaluation of the Adult With Shoulder Complaints."

14    A.    Okay.  Yes, I see it.

15    Q.    And just when I'm scrolling, do you

16  see the pages change or do you need to change the

17  pages on your screen?

18    A.    No.  I can scroll down.

19    Q.    If you could go to Page 6 of the

20  document?

21    A.    Okay.  The top is "Cervical Nerve Root

22  Impingement"?

23    Q.    Yes.  So if you go down, there is a

24  section on physical examination?

Page 21

1          A.     Okay.  I got that.

2          Q.     When would you perform a physical

3   examination of a shoulder?

4          A.     When?

5          Q.     Yes.

6          A.     When a patient complains of shoulder

7   injury.

8          Q.     And then on Page 7 it has got a

9   diagnostic approach?

10         A.     Page 7?  Okay.  I see that.

11         Q.     So it says here, would you agree with

12  this assessment, that the first step for an

13  examination of somebody with a -- complaining of a

14  shoulder injury would be to determine what the

15  cause was, whether it was traumatic or

16  nontraumatic?

17         MR. PREBER:  Objection to form.

18  BY THE WITNESS:

19         A.     Yes.

20  BY MR. HAYS:

21         Q.     Okay.  And if a person complained that

22  their shoulder was hurt when they fell from a chair

23  or a table and braced themselves with their arm,

24  would you agree with me that that would

Page 22

1    typically -- one would need to order x-rays?

2           MR. PREBER:  Objection to form and leading.

3    BY THE WITNESS:

4           A.    Say your question one more time.

5    BY MR. HAYS:

6           Q.    Sure.  So if a patient presented to

7    you complaining of a shoulder injury from a fall

8    where they braced themselves with their arm as they

9    were falling, would you agree with me that that

10   patient should probably be sent for x-rays?

11          MR. PREBER:  Same objections to form,

12   leading, and also for speculation.

13   BY THE WITNESS:

14          A.    No.  It would depend on what I find on

15   physical finding and then I determine whether he

16   needed an x-ray or not.  I don't like to expose

17   patients to unnecessary radiation.

18   BY MR. HAYS:

19          Q.    Okay.  So what would you need to see

20   in order to refer somebody for an x-ray of their

21   shoulder?

22          A.    If there is a deformity, if there is a

23   deformity in their musculature, if I suspect there

24   is a fracture, if I suspect that there is

Page 23

1    dislocations, and then I would order an x-ray.

2          Q.    And what would you do to determine

3    whether or not you believe there might be a

4    fracture?

5          A.    Of the shoulder?

6          Q.    Yes.

7          A.    They would have severe swelling.  I'll

8    say it one more time.  A lot of swelling, a lot of

9    pain, and then very limited with the motion.  And

10   if there is obvious deformity on the shoulder or

11   their upper extremity.

12         Q.    Okay.  And would you agree with me

13   that if after an x-ray -- I'm sorry.  Strike that.

14   Would you agree with me that the first step if you

15   thought that there might be a fracture or something

16   wrong with the shoulder, the first step would be to

17   take an x-ray?

18         MR. PREBER:  Object to form.

19   BY THE WITNESS:

20         A.    Yes.

21   BY MR. HAYS:

22         Q.    And if the x-ray came back and showed

23   that there was no fracture, would you agree with me

24   then that the next step would be to order an MRI to

Page 24

1  determine whether or not there was a torn rotator

2  cuff or a torn labrum?

3      MR. PREBER:  Objection to form, leading and

4  speculation.

5  BY THE WITNESS:

6      A.    If the x-ray is negative and we are

7  going to treat the normal way, if there is no

8  neurological deficit or musculature deficit, then

9  the normal course of treatment is to treat it with

10  anti-inflammatories, ice.

11          And if it's persistent pain, have the

12  patient follow up in clinic.  And then they will be

13  referred to an orthopedic surgeon for further

14  evaluation.

15  BY MR. HAYS:

16      Q.    I'm sorry.  Could you read back that

17  answer again.  I want to make sure I heard it

18  correctly.

19              (WHEREUPON, the record was read

20               by the reporter as requested.)

21          (WHEREUPON, said document was marked

22          Deposition Exhibit No. 2,

23          for identification, as of 12/13/22.)

24  BY MR. HAYS:

Page 25

1        Q.      Okay.  I have marked what is going to
2  be Yu Exhibit 2.  If you could refresh your
3  Veritext screen and let me know if that exhibit is
4  up?
5        A.      I have a question.  Do I go back?
6  Okay.  So I got Exhibit 1.
7        Q.      Refresh your screen.  You should see
8  an Exhibit 2.
9        MR. PREBER:  I only see Exhibit 1, as well,
10  Counsel.
11        THE WITNESS:  I only see 1.
12        MR. HAYS:  It may have popped up in a new
13  screen, at least it did on mine -- sorry, in a new
14  tab I should say.
15        MR. PREBER:  Did you put it under marked
16  exhibits?
17        MR. HAYS:  It is in marked exhibits.  So if
18  you go to that folder, maybe it will be in there
19  and then refresh.
20        MR. PREBER:  The only one I am seeing is
21  under depositions under Dr. Yan Yu for marked
22  exhibits, I am only seeing Exhibit 1 as of right
23  now.  And I am refreshing.  That was the one that
24  was uploaded six days ago.

Page 26

1       THE WITNESS:  I see Exhibit 2 now.

2   BY MR. HAYS:

3       Q.     Dr. Yu, you see Exhibit 2 now?

4       A.     Yes.

5       Q.     Okay.

6       MR. HAYS:  I just want to check.  Alex, you

7   may or may not be in the right folder.  There

8   should be two Dr. Yu deposition folders.  So if you

9   are in the one that's dated today?

10      MR. PREBER:  Got it.  Never mind.  Sorry

11  about that.  All good.

12      MR. HAYS:  That's okay.

13  BY MR. HAYS:

14      Q.     For the record, this is another

15  printout from UpToDate and the title is,

16  "Evaluation of an Adult With Shoulder Complaints."

17  And this is a flow chart.  So I am showing sort of

18  what the diagnostic steps would be.  If you could

19  take a look at this for me, Dr. Yu?

20      A.     Okay.

21      Q.     And I just want to see if you agree

22  this would be the approach that a provider should

23  take with somebody who is complaining about

24  shoulder injuries, is that first you determine

Page 27

1    whether or not it's caused by a traumatic event;

2    correct?

3          A.    Correct.

4          Q.    And if the answer is yes, then you

5    would obtain the history of the trauma, perform an

6    examination and if necessary or appropriate obtain

7    an x-ray as indicated; correct?

8          A.    Correct.

9          Q.    And then the next step would be then

10   to look at the image to reveal to see if there is a

11   fracture or a dislocation or a sprain; correct?

12         A.    Correct.

13         Q.    And if there is no fracture, then the

14   next step would be to evaluate of whether or not

15   there is soft tissue injury?

16         A.    Correct.

17         Q.    And if you believe that there is

18   soft -- potential soft tissue injury to the

19   glenohumeral, you would then refer that for MRI for

20   potential rotator cuff tear or labral tear?

21         A.    I would assess.  If I think the

22   patient have a rotator cuff tear or other soft

23   tissue injury that is beyond the scope of my

24   practice, I will refer them to an orthopedic

Page 28

1    surgeon.

2         Q.    So once you rule out a facture --

3    correct me if I am wrong.  I want to make sure I

4    understand your answer.

5              So once you rule out that there is no

6    fracture, the next step to treat or to diagnose the

7    injury would be to refer them to the orthopedic to

8    determine whether or not there is soft tissue

9    injury?

10        A.    No.  If I get an x-ray, the x-ray is

11   negative and if there is no neurological deficit,

12   there is no muscular weakness and all the muscle is

13   intact and the patient have full range of motion,

14   then I don't need to refer them to orthopedic

15   surgeon.

16        Q.    Okay.

17        A.    You have to remember sometimes when we

18   see a rotator cuff tear, it could be partial.  It's

19   not complete.  And you won't know until -- because

20   there is so much swelling and so much pain, you

21   can't do a real good, complete physical exam.

22              You have to wait until the patient

23   calms down and the swelling calms down and then you

24   can do a real good physical exam and you can

Page 29

1   determine whether this needs to be referred to an

2   orthopedic surgeon right away or not.

3          Q.    Okay.  So if I understand you

4   correctly then, if a patient came in with --

5   complaining of a shoulder injury, did not have a

6   full range of motion.  You ordered the x-ray to

7   confirm that there is no fracture.  You would then

8   wait or refer them for a follow-up with their

9   primary physician to wait to see if the injury and

10  such improved before referring them to the

11  orthopedic to check for soft tissue injury?

12         A.    Yes.

13         Q.    Do you ever refer patients to the

14  orthopedic surgeon for potential -- directly for

15  potential soft tissue injuries?

16         A.    Directly from the Urgent Care to the

17  clinic or directly to Stroger ER?

18         Q.    To the clinic?

19         A.    To the clinic, yes.

20         Q.    And when would you refer a patient to

21  the orthopedic surgeon at Cermac based on the

22  suspected soft tissue injury?

23         MR. PREBER:  Objection to speculation.

24  BY THE WITNESS:

1      A.      I refer a patient to the orthopedic

2    surgeon -- if the patient has a fracture, we splint

3    it.  And if the patient needs casting, that will be

4    done one to two weeks from the time that we

5    diagnose the fracture.

6              So you need to let the swelling come

7    down first before you put it in a cast.  So that's

8    when I refer the patient to an orthopedic surgeon

9    or if the patient has this problem and let's say he

10   injures his hand two weeks ago and the x-ray is

11   negative and it's still persistent in swelling,

12   then I would refer him to an orthopedic surgeon for

13   further testing and evaluation.

14      Q.      So my question was --

15      A.      Okay.  Go ahead.

16      Q.      My question was specific to the

17   shoulder.  What are the indications of soft tissue

18   damage where you would refer a patient directly to

19   the orthopedic surgeon rather than just for a

20   follow-up with their primary care doctor?

21      MR. PREBER:  Objection, speculation.

22   BY THE WITNESS:

23      A.      If the patient let's say have a

24   dislocation, I would reduce it or Stroger ER

Page 31

```
 1   reduced it, then that patient needs to be followed

 2   up with an orthopedic surgeon to make sure it is

 3   healing properly.

 4   BY MR. HAYS:

 5       Q.      Thank you for that clarification.

 6   Other than the UpToDate website, are there any

 7   other medical treatises or journals available to

 8   you at Cermac?

 9       A.      In the Urgent Care, no, or Internet.

10       Q.      I'm sorry.  I didn't hear the second

11   part.

12       A.      Or Internet.  Or if I really want a

13   second opinion, I can call the orthopedic resident

14   at Stroger because if I need to refer them to the

15   clinic, I will talk to them first and see what the

16   best way to speed up the referral.

17       Q.      And what are the symptoms of a

18   shoulder dislocation?

19       A.      It's obvious deformity and patients

20   have severe pain and have no range of motion.

21       Q.      Is it possible when somebody

22   dislocates their shoulder that it will slide back

23   in on its own before they get to the exam room?

24       MR. PREBER:  Objection, speculation.
```

Page 32

1   BY THE WITNESS:

2       A.    Yes.  In that case that means the

3   patient have a very -- many, many dislocations

4   before and the capsule is already loose.  And they

5   can slide in and out easy.

6   BY MR. HAYS:

7       Q.    So what would be the symptoms then or

8   the indicators that would make you suspect a

9   shoulder dislocation if it had already popped back

10  in?

11      A.    Only come from the history.  And if I

12  feel the range of motion, if I feel the capsule is

13  loose, that's another indication that there may

14  have been a dislocation earlier and then it slide

15  back in.

16      Q.    And would agree with me that shoulder

17  dislocations are most often the result of a fall

18  onto the affected arm?

19      MR. PREBER:  Objection to form.

20  BY THE WITNESS:

21      A.    Say it one more than time.

22  BY MR. HAYS:

23      Q.    Sure.  Would you agree with me that

24  shoulder dislocations are most often the result

Page 33

1    from a fall onto the affected arm?

2          MR. PREBER:  Objection to form, speculation,

3    leading.

4    BY THE WITNESS:

5          A.     Not necessarily.  Trauma can cause

6    that, not that's from a fall.  If a patient have

7    chronic dislocations, just a normal range of

8    motion, he can dislocate his shoulder.

9    BY MR. HAYS:

10         Q.     Okay, but a fall onto the affected arm

11   is a common cause of a dislocation?

12         A.     Yes.

13         Q.     And would you agree with me that

14   Hill-Sachs lesions are associated with shoulder

15   dislocations which may be caused by a fall?

16         MR. PREBER:  Objection to form, speculation

17   and leading.

18   BY THE WITNESS:

19         A.     I can't speculate on that.  I'm not an

20   orthopedic surgeon.

21   BY MR. HAYS:

22         Q.     Do you know what a Hill-Sachs lesion

23   is?

24         A.     No.

Page 34

1        Q.      Do you know what a McLaughlin lesion

2   is?

3        A.      Can you say it one more time.

4        Q.      Sure.  A McLaughlin lesion?

5        A.      No.  I'm not an orthopedic surgeon.

6   I'm a primary care physician.

7            (WHEREUPON, said document was marked

8            Deposition Exhibit No. 3,

9            for identification, as of 12/13/22.)

10  BY MR. HAYS:

11       Q.      I'm introducing the next exhibit.  And

12  this will be Yu Exhibit No. 3.  And, for the

13  record, the title at the top is, "Cook County

14  Health and Hospital System."  And then it's

15  O-U-T-P-T Nursing CHS.  And the Bates label is

16  19C7509 Limbacher 002888?

17       A.      Okay.

18       Q.      And is this an example then of the

19  type of records that are kept in the Cerner

20  system?

21       A.      Yes.

22       Q.      And this one shows the service date of

23  November 13th, 2017 at 12:57 Central standard time.

24  And do you know who Jahkeem Wilson is?

Page 35

1    A.    No.

2    Q.    And that's J-A-H-K-E-E-M, Wilson.

3    A.    No, I don't know him.

4    Q.    Okay.  So the note here says that,

5    "Mr. Wilson responded to a call over the radio for

6    medical emergency.  Upon arrival to dispensary

7    patient found on floor.  Patient A/O times 3.

8    Patient stated that he fell on floor and bumped his

9    head.  Nurse stated that she witnessed it.

10   C-collar placed onto patient by nurse.  Patient

11   vital signs taken.  Patient then log rolled onto

12   backboard without incident.  Patient loaded and

13   secured onto stretcher without incident.  Patient

14   transported to Urgent Care by medical staff,

15   escorted by DOC staff for further evaluation

16   without incident."

17            Is this then the history that would be

18   in Cerner that you would look at?  In this case it

19   was for Mr. Limbacher when he first came into the

20   Urgent Care Clinic?

21   A.    Probably, but I cannot tell you.  It

22   is too long ago if I did look at it or not.

23   Q.    Okay.  What is your practice in terms

24   of when a patient comes into the Urgent Care when

Page 36

1  it comes to looking at prior reports in Cerner?

2       A.    So when I see a patient like this and

3  the nurse is there, so the nurse will give me a

4  history about what happened.  And then I go ahead

5  and evaluate the patient and do my physical exam.

6       Q.    Okay.  When you say the nurses would

7  give you a history, you mean they would just give

8  you the basics, person fell and hit their head?

9       A.    Something like that, yes.

10      Q.    Okay.  And when a patient or in the

11 case of Mr. Limbacher, if you could walk me

12 through.  So he comes into the Urgent Care Clinic.

13 He is on the board.  His neck has the C-collar

14 placed on it.  What would be the first thing that

15 would happen after you spoke with the nurse and

16 explained that he fell and hit his head and

17 explained what other parts of him were hurting to

18 the nurse?

19      A.    So I would ask him is his neck hurt.

20 Is there numbness or weakness in his upper or lower

21 extremity.  And then I will get an x-ray and make

22 sure there is no cervical fracture before I do a

23 physical exam of this patient.

24      Q.    Okay.  And approximately how long does

Page 37

1    that take to run through those questions before you

2    send the patient to x-ray?

3            A.      Five to ten minutes.

4            (WHEREUPON, said document was marked

5            Deposition Exhibit No. 4,

6            for identification, as of 12/13/22.)

7    BY MR. HAYS:

8            Q.      I am going to mark the next exhibit.

9    So this will be Yu 4.

10           A.      Okay.  I see it.

11           Q.      This is another document, Cook County

12   Health and Hospital System."  Its title is, "ER

13   CHS."  It's showing date of service of November

14   13th, 2017.  12:52 Central standard time.  And the

15   Bates label on the first page is 19C7509 Limbacher

16   001764.  Do you have that in front of you now,

17   Dr. Yu?

18           A.      Yes.

19           Q.      If you could review this and let me

20   know if the information here is familiar to you?

21           A.      Okay.

22           Q.      And at the top of the first page of

23   Exhibit 4 it says, "Perform Information."  Then it

24   has Yu D.O. Yan K.  What does that indicate?

```
                                                    Page 38
 1          A.      That is my last name.  It is my D.O.
 2     Yan is my first name.  K is my middle initial.
 3          Q.      I'm sorry.  Perform information, does
 4     that indicate that you were the medical provider
 5     that saw this patient?
 6          A.      Yes.
 7          Q.      Okay.  And then "Sign Information"
 8     also has your name.  That means you signed the
 9     report in Cerner; is that correct?
10          A.      Yes.  Correct.
11          Q.      And the perform information indicates
12     a time of 12:56 Central standard time.  What does
13     that indicate?
14          A.      That is probably my time I signed the
15     note.  And then I think 12:15 -- no, that is when I
16     first seen the patient.  The second is when I
17     signed the note, I think.
18          Q.      So 10:56 would be the time that you
19     first opened the Cerner file for Mr. Limbacher and
20     then 15:23 would be the time that you signed the
21     report as final; is that right?
22          A.      Correct.
23          Q.      And in terms of the information that
24     you would have entered into the system, presumably
```

Page 39

1   you don't enter all of this information into

2   Cerner, do you?

3          A.     Some of them autopopulate.  And the

4   history of present illness is mine and the physical

5   exam.  And then the x-ray report and I insert it

6   into my note.

7          Q.     So --

8          A.     So then the medication I order and

9   my assessment and plan, that would be in it, too.

10         Q.     Okay.  So the section on history of

11  present illness, that language is what you would

12  have entered into the system?

13         A.     Yes.

14         Q.     And then on the next page where it

15  says physical examination, would you have taken all

16  of that or would the nurse have taken that as part

17  of triage?

18         A.     No, this is mine.

19         Q.     Yours, okay.  And under general it

20  says, "Appearance in no apparent distress."  I am

21  just trying to understand what that means because

22  as I understand it Mr. Limbacher came in with a

23  C-collar on on a board, which to a layperson would

24  be apparent distress.  So I am trying to understand

Page 40

1   what that indicates?

2           A.      If he is not complaining of severe

3   pain and he looked calm, that's no apparent

4   distress.

5           Q.      And, "Musculoskeletal neck," it says,

6   "No swelling.  Good range of motion" --

7           A.      "Plus tenderness," but that's only --

8   I do the physical exam after the x-ray is

9   completed.  And then the official report is in

10  before I do the next evaluation.

11          Q.      Okay.  So he came in.  You sent him

12  off for x-rays.  And then when he came back from

13  the x-rays and you saw that there was no indication

14  of a fracture, that's when you did the

15  musculoskeletal exam of the neck and the head;

16  correct?

17          A.      Yes.

18          Q.      And the head indicated no swelling, no

19  abrasion; correct?

20          A.      Yes.

21          Q.      And then it looks like you looked at

22  his left hip, as well?

23          A.      Yes.  He was complaining of left hip

24  pain.  And I ordered the x-ray to make sure there

1  is no fracture before I do my physical exam on

2  trauma patients.

3      Q.    And in this case the x-rays were of

4  the spine; correct?

5      A.    Yes, the LS spine, the lumbosacral.

6  And you can also see the femur of the patient.

7      Q.    Of the hip.  So when you take the

8  lower spine, you also get the hip?

9      A.    Yes.

10      Q.    Okay.  And on the next page it's the

11  results from the x-ray?

12      A.    Yes.

13      Q.    And it says, "Findings.  2 views of

14  the cervical spine were obtained.  The C-7

15  vertebral body is partially obscured on the lateral

16  view."  Can you explain to me what that means by

17  partially obscured?

18      A.    That means the radiologist cannot see

19  it clearly.

20      Q.    And is it normal procedure then if the

21  x-ray is obscured, that you would then take a

22  second x-ray to see the full spine or the C-7

23  vertebrae anyway?

24      A.    In a patient trauma like this, we are

Page 42

1    looking for fracture.  If there is a fracture, the
2    radiologist can see it from other views.  So just
3    because it's obscure doesn't mean you cannot
4    diagnose if that's a fracture or not.  So it's down
5    to the radiologist to make a decision if he wants
6    another view or not.

7              So if he says that the patient doesn't
8    need it, then the patient doesn't need it.  If he
9    thinks that he will miss something, he will call us
10   and we are going to do another x-ray at a different
11   angle.

12        Q.    Okay.  And then how would you then
13   rule out a fracture with a partially obscured
14   x-ray?

15        A.    What I said, the radiologist didn't
16   say that that's a fracture.  If he thinks that is
17   obscured and obstructing him from making a
18   decision, he will call us and we will get another
19   angle of the x-ray.  So that's up to the
20   radiologist.  I am not a radiologist so I cannot
21   tell you the decision they have to make.

22        Q.    Okay.  Do you read the x-rays yourself
23   or do you rely on the radiologist to read the
24   x-rays?

```
                                              Page 43

 1        A.     I read them myself, but I rely on the

 2   radiologist to give me the actual diagnosis.

 3        Q.     And then going to the second to last

 4   page, there is a section entitled, "Impression and

 5   Plan."

 6        A.     Yes.

 7        Q.     And here the diagnosis is trauma to

 8   head, neck and left hip.  X-rays showed

 9   degenerative but no acute fracture; correct?

10        A.     Correct.

11        Q.     So that was your diagnosis of

12   Mr. Limbacher on the day he presented to you?

13        A.     Yes.

14        Q.     It says, "Degree of control good."

15   What does that reference?

16        A.     I don't put it in.  I don't know why.

17   It autopopulates.

18        Q.     "Clinical status, progressing as

19   expected."  What does that mean?

20        A.     It means the patient clinically is

21   stable and as expected.

22        Q.     And then you had already taken the two

23   x-rays; correct?

24        A.     Correct.
```

Page 44

1      Q.     And then pharmacy, is this pain

2  medication and anti-inflammatories?  What does the

3  pharmacy indicate?

4      A.     Pharmacy is medicine that I ordered

5  for the patient.

6      Q.     Okay.  What do these medicines, what

7  were they intended to do?

8      A.     Naproxen is an anti-inflammatory and

9  also a pain killer.  And the first one is a generic

10 for Robaxin, 750 milligrams.  It's a muscle

11 relaxant.

12     Q.     And then the final thing it says is

13 referrals.  You referred him to primary care in the

14 next 7 to 14 days; is that correct?

15     A.     Yes.

16     Q.     And then the last thing is the

17 disposition is, "Return to Urgent Care if" -- I'm

18 sorry.  What does plus N/V stand for?

19     A.     I instruct the patient with head

20 trauma to go to Urgent Care if patient is nauseous

21 and vomiting, severe dizziness and severe

22 headaches, to come back so that we can do a

23 re-evaluation in case that happens.

24     Q.     When you were examining Mr. Limbacher

Page 45

1   was there anybody else present in the exam room

2   with you ?  A nurse?  A P.A.?

3       A.    I don't think so.

4       Q.    If there was somebody present, would

5   they be indicated somewhere in the record as also

6   being present?

7       A.    I only need a chaperone if I do a

8   genital exam or a breast exam.  Other than that, I

9   do the physical exam alone with the patient for

10  privacy.

11      Q.    And to the best of your recollection

12  when Mr. Limbacher came in initially what do you

13  recall him saying about what his problems were?

14      A.    I don't recall.  It was too long ago.

15      Q.    Do you have any memory of him

16  mentioning that he had shoulder pains from the

17  fall?

18      A.    No.

19      Q.    So it's possible, you just don't have

20  a memory one way or the other?

21      A.    If he complained to me, I will put it

22  in my note, but I am sure he didn't complain about

23  his shoulder pain to me.

24      Q.    And why do you say you are sure of

Page 46

1    that?

2         A.    Because if the patient complained to

3    me, I would put it in the note.  If I didn't put it

4    down, he didn't complain of it to me.

5         Q.    Just so I understand, your practice is

6    that you do your best to write down all of the

7    details about what a patient says hurts or how they

8    are feeling ill; is that right?

9         A.    Yes.

10        Q.    And on a normal day how busy is the

11   Urgent Care clinic?

12        MR. PREBER:  Objection, speculation.

13   BY THE WITNESS:

14        A.    I can't give you a number, but we

15   normally see 20 to 30 patients in the daytime and

16   then another 20 at nighttime, but that depends.

17   BY MR. HAYS:

18        Q.    So 20 to 30 patients, that's over a

19   12-hour period and then 20 patients over the

20   12-hour period at night?

21        A.    Between two doctors.

22        MR. HAYS:  Why don't we take a ten-minute

23   break.  I'm just going to see if I have covered --

24   some of these questions I see are duplicative or he

Page 47

1  has already answered in the context of other

2  questions.  So let's take a ten-minute break and

3  come back at 11:40.

4          MR. PREBER:  Sounds good.

5          MS. BUNTIC:  Sounds good.  See you then.

6                  (WHEREUPON, a recess was had.)

7  BY MR. HAYS:

8          Q.    Dr. Yu, what are the most common

9  injuries from a fall?

10         MR. PREBER:  Objection, speculation.

11 BY THE WITNESS:

12         A.    Wrist fracture or hand.

13 BY MR. HAYS:

14         Q.    The wrist fracture is because they are

15 bracing themselves as they are falling; is that

16 right?

17         A.    Yes.  Correct.

18         Q.    And then from your notes you had

19 indicated that Mr. Limbacher presented with a

20 trauma to the left neck, head and left hip.  Would

21 that be an indication of somebody that fell onto

22 their left side?

23         A.    I can't speculate.  Probably.

24         Q.    When somebody comes in to you, do you

Page 48

1    ask them, like, how did you fall?  Where did you

2    fall?  What types of questions do you ask somebody

3    when they come in?

4            A.     I do.

5            Q.     So what would be the series of

6    questions you would ask when somebody comes in

7    after a fall?

8            A.     I want to know how far, you know, how

9    high he fell, if he said he fell off of a chair.

10   And then I will ask -- make sure that he does not

11   have any neurological deficits.  Some people say I

12   can move my hand.  I can move my leg and stuff like

13   that.  That is more important than anything else.

14           Q.     When somebody comes in with a C-collar

15   on on a board, is it fair to say that the most

16   important issue to address is whether or not there

17   is a spinal fracture?

18           MR. PREBER:  Objection, form and leading.

19   BY THE WITNESS:

20           A.     A cervical fracture.  That's why I get

21   an x-ray done immediately before exam.

22   BY MR. HAYS:

23           Q.     And then do you run through and ask

24   the patient, like, you know, did you hurt your arm?

Page 49

1    Did you hurt your shoulder or do you just ask what

2    hurts?  What is your process?

3           A.    I ask him does he have any pain.  Does

4    he have any numbness.  Does he have any weakness.

5    And can he move all of his extremities.

6           Q.    And I have seen in some of the other

7    medical reports from Mr. Limbacher where they will

8    take a notation that his pain is on a scale of one

9    to ten.

10          Do you ask patients to give you sort

11   of -- to rate their pain?

12          A.    Yes.

13          Q.    And do you record that when you ask

14   that question in your notes then?

15          A.    If I think that is important, I put it

16   in my notes.  If he says he doesn't have much pain,

17   then I don't put it in.

18          Q.    So on a scale of one to ten, when

19   would you put in your notes the answer to that

20   question and when would you leave it out of your

21   notes?

22          A.    If he does not complain of any pain,

23   then you don't need to put the scale.

24          Q.    And do you recall any of the details

Page 50

1    of your conversation with Mr. Limbacher when you

2    saw him on November 13th of 2017?

3         A.    I don't recall.

4         Q.    Do you have any memory of him towards

5    the end of the examination asking you about other

6    problems or asking you to look at other things?

7         A.    I don't recall.

8         Q.    Is it fair to say then once you have

9    sort of eliminated the urgent nature of a patient's

10   condition, then it's time for you to move on to the

11   next patient rather than treating other issues that

12   they may have?

13        MR. PREBER:  Objection --

14        MR. HAYS:  Let me rephase that.  That was a

15   bad question.  Let me rephrase that one.

16   BY MR. HAYS:

17        Q.    We talked earlier about the protocols

18   in the Urgent Care.  And is it fair to say that

19   when patients come to see you in the Urgent Care

20   your focus is simply addressing the issue that led

21   them to be at the Urgent Care Clinic; is that

22   right?

23        MR. PREBER:  Objection to form and misstates

24   testimony slightly.

Page 51

1    BY THE WITNESS:

2         A.    Yes.

3    BY MR. HAYS:

4         Q.    So if somebody starts asking you about

5    other conditions that aren't urgent, you would say

6    that's something to take up with the primary

7    doctors; right?

8         A.    Depends on how urgent the medical

9    problem is.

10         Q.    Okay.  So if it was -- in your opinion

11    it wasn't an urgent condition, you would tell them

12    to take that up with the primary care physician?

13         A.    If it's urgent, I take care of him

14    now.  If it's something he say I have arthritis of

15    my hand, then if I don't see any obvious

16    dislocation or atrophy of the muscle, then I -- the

17    patient will be seen by the doctor in the near

18    future after I see them anyway.

19              Like I said, if the patient have other

20    medical problems, if it's urgent, I will take care

21    of the problem.  I will evaluate the patient and

22    treat.  If it isn't, I will refer him back to the

23    clinic for their primary care doctor in the clinic

24    to take care of the problem.  It depends on the

Page 52

1    urgency.

2        Q.     And I just want -- just a few wrap up

3    topics here.  I just want to confirm that you do

4    have all of the necessary licenses to practice

5    medicine in the state of Illinois?

6        A.     Yes.  Correct.

7        Q.     And how long have you held your

8    medical license?

9        A.     I got it during my second year of

10   residency.  So I have been practicing for -- so

11   about 30 years.

12       Q.     And other than your work at Cermac do

13   you have medical privileges at any other hospital

14   or medical clinic?

15       A.     No, only at Stroger Hospital.

16       Q.     For Stroger, you can admit them at

17   Stroger, but you don't actually do -- or do you

18   treat any patients at Stroger yourself?

19       A.     No.

20       Q.     And here are the awkward questions I

21   don't like to ask, but I have to.  Have you ever

22   been involved in any disciplinary proceedings with

23   the medical associations?

24       A.     No.

Page 53

```
 1        Q.      Have you ever had your license

 2   suspended?

 3        A.      No.

 4        Q.      Have you ever been named as a

 5   Defendant in any other lawsuits?

 6        A.      Yes.

 7        Q.      And how many times have you been a

 8   Defendant in a lawsuit?

 9        A.      I don't remember.

10        Q.      Is it something --

11        A.      Two or three per year, I think, but

12   normally I am not being sued, I am just a witness

13   because of police brutality.

14        Q.      Okay.  How many times have you

15   personally been named as the Defendant and sued?

16        A.      One or two.

17        Q.      And what was the nature of those

18   lawsuits?

19        A.      I don't remember.  That was a long

20   time ago.

21        Q.      Do you remember the outcome of those

22   lawsuits?

23        A.      I don't remember.

24        Q.      Do you recall did you have to testify
```

Page 54

1  at a trial?

2       A.    I testify many times in a trial as a

3  witness, not as the fact of being sued.

4       Q.    Okay.  So your best recollection, the

5  two times -- one or two times that you were named

6  as a Defendant, those didn't go to trial that

7  required you to testify in court?

8       A.    Correct.

9       MR. HAYS:  So I appreciate you spending your

10  time today.  I don't have any further questions.  I

11  don't know if your lawyer might have some

12  follow-ups, but I don't have any further questions

13  at this time.

14                    EXAMINATION

15  BY MR. PREBER:

16       Q.    Dr. Yu, I just have a few questions.

17       A.    Okay.

18       Q.    Dr. Yu, looking at Exhibit 4, with

19  your interaction with Plaintiff, Mr. Limbacher.

20  Doctor, when you are conducting your examination or

21  asking the Plaintiff questions about why he is

22  there, you do try to take down everything that they

23  are saying; correct?

24       A.    Correct.

Page 55

1          Q.     Do you take down the information that
2     is important to you treating them?
3          A.     Yes.
4          MR. HAYS:  Objection, speculation and
5     foundation.
6     BY THE WITNESS:
7          A.     Yes.
8     BY MR. PREBER:
9          Q.     And then if a Plaintiff -- if a
10    patient came in complaining of a shoulder injury,
11    would you take that down?
12         MR. HAYS:  Objection, calls for speculation,
13    incomplete hypothetical.
14    BY THE WITNESS:
15         A.     Yes.
16    BY MR. PREBER:
17         Q.     And then from the medical record did
18    Mr. Limbacher complain of a shoulder injury to you,
19    Dr. Yu?
20         MR. HAYS:  Object to the form of the
21    question.
22    BY THE WITNESS:
23         A.     If I didn't write it down, the patient
24    they never complained to me.

Page 56

1   BY MR. PREBER:

2       Q.    Okay.  So to the best of your

3   knowledge you were never told that Mr. Limbacher

4   had a shoulder injury; correct?

5       MR. HAYS:  Objection, calls for speculation,

6   lack of foundation and mischaracterizes prior

7   testimony about his memory of conversations.

8   BY THE WITNESS:

9       A.    Yes.

10  BY MR. PREBER:

11      Q.    And then, Dr. Yu, looking at the

12  medical evidence, is there anything that you would

13  change with your treatment with Mr. Limbacher at

14  this time?

15      A.    No.

16      MR. PREBER:  I have no further questions.

17      MR. HAYS:  Mia, did you have any questions?

18      MS. BUNTIC:  I do not, no.

19              FURTHER EXAMINATION

20  BY MR. HAYS:

21      Q.    Okay.  So I just want to follow up,

22  Dr. Yu, on that last question then.  So knowing as

23  we do today that Mr. Limbacher suffered a shoulder

24  dislocation, that he continued to have repeat

Page 57

1    shoulder dislocations, that he has a torn labrum,

2    that he has small fractures in both the humerus

3    bone and in the cuff itself, you would not change

4    your treatment of or your decision to not refer him

5    to the orthopedic doctor?

6         A.    I can't speculate.

7         Q.    So then when Mr. Preber asked if you

8    would change anything and you said no, weren't you

9    speculating in that case?

10        A.    No.  I won't change anything from my

11   physical exam, from my x-ray report and my

12   assessment and then my treatment.  And this is

13   what I mean I won't change anything.

14        Q.    Okay.  So even when confronted with

15   new facts and new evidence, you still don't change

16   your opinion?

17        A.    For this case, for this visit.

18        MR. HAYS:  Okay.  Nothing further.

19        MR. PREBER:  Nothing further, either.

20             One second, Dr. Yu.  So, Dr. Yu, at

21   the very end of the deposition there is going to be

22   two things.  It's basically, essentially called

23   signature.

24             You have two options.  Number one is

Page 58

1  you can do something called waiving signature,

2  which means that to the best of your knowledge you

3  believe that the court reporter took down

4  everything fairly and accurately.  We would advise

5  that you do this.

6              If you do not choose to waive your

7  signature, what you can do is you can review the

8  transcript that the court reporter will eventually

9  get out to us.

10             The only thing that you would be

11  looking at editing would be essentially grammatical

12  errors.  And essentially you would make those

13  changes of those grammatical errors on the

14  transcript.  You would sign off and then you would

15  send the transcript back to the court reporter to

16  officially type up.

17             The decision is up to you, but, like I

18  said, we generally advise that you waive your

19  signature.

20        THE WITNESS:  I waive my signature.

21        MR. PREBER:  Okay.  Perfect.

22        MR. HAYS:  Okay:  So thank you again for your

23  time and we are off the record.

24             FURTHER DEPONENT SAITH NOT.

Page 59

1              (Signature waived.)

2          (Deposition concluded at 12:00 p.m.)

3                  *****   *****

4   STATE OF ILLINOIS   )

5                       ) :

6   COUNTY OF COOK      )

7

8

9              I, LINDA S. IDRIZI, a Certified

10  Shorthand Reporter, CSR No. 084-003704, of the

11  State of Illinois, do hereby certify:

12              That previous to the commencement of

13  the examination of the witness herein, the witness

14  was duly sworn to testify the whole truth

15  concerning the matters herein;

16              That the foregoing deposition

17  transcript was reported stenographically by me, was

18  thereafter transcribed under my personal direction

19  and constitutes a true, complete and correct record

20  of the testimony given and the proceedings had;

21              That the said deposition was taken

22  before me at the time and place specified;

23              That I am not a relative or employee or

24  attorney or counsel, nor a relative or employee of

Page 60

1    such attorney or counsel for any of the parties

2    hereto, nor interested directly or indirectly in

3    the outcome of this action.

4              IN WITNESS WHEREOF, I do hereunto set

5    my hand and affix my seal of office at Chicago,

6    Illinois, this 28th day of December 2022.

7

8

9

10             LINDA S. IDRIZI

11             Certified Shorthand Reporter

12             Certificate No. 084-003704

13

14

15

16

17

18

19

20

21

22

23

24

**[001764 - anyway]**

| 0 |
| --- |
| **001764** 37:16 |
| **002888** 34:16 |
| **07509** 1:7 |
| **084-003704** |
| 59:10 60:12 |

| 1 |
| --- |
| **1** 3:10 19:18,22 |
| 19:23 25:6,9 |
| 25:11,22 |
| **10:25** 1:17 |
| **10:56** 38:18 |
| **111** 2:4 |
| **11:40** 47:3 |
| **12** 46:19,20 |
| **12/13/22** 19:19 |
| 24:23 34:9 |
| 37:6 |
| **12:00** 59:2 |
| **12:15** 38:15 |
| **12:52** 37:14 |
| **12:56** 38:12 |
| **12:57** 34:23 |
| **13** 1:16 |
| **13th** 34:23 |
| 37:14 50:2 |
| **14** 44:14 |
| **15:23** 38:20 |
| **1746** 60:9 |
| **19** 1:7 3:10 |
| **19c7509** 34:16 |
| 37:15 |

| 2 |
| --- |
| **2** 3:11 24:22 |
| 25:2,8 26:1,3 |
| 41:13 |
| **20** 46:15,16,18 |
| 46:19 |
| **2017** 7:4 34:23 |
| 37:14 50:2 |
| **2022** 1:16 60:6 |
| **24** 3:11 |
| **28th** 60:6 |

| 3 |
| --- |
| **3** 3:12 34:8,12 |
| 35:7 |
| **30** 18:16 46:15 |
| 46:18 52:11 |
| **312-443-0676** |
| 2:6 |
| **34** 3:12 |
| **37** 3:13 |

| 4 |
| --- |
| **4** 3:4,13 37:5,9 |
| 37:23 54:18 |
| **4100** 2:4 |

| 5 |
| --- |
| **500** 2:12 |
| **54** 3:5 |
| **56** 3:4 |

| 6 |
| --- |
| **6** 20:19 |
| **60602** 2:13 |
| **60606** 2:5 |

| 7 |
| --- |
| **7** 21:8,10 41:14 |
| 41:22 44:14 |
| **750** 44:10 |

| 8 |
| --- |
| **84-3704** 1:24 |

| a |
| --- |
| **a.m.** 1:17 |
| **ability** 11:23 |
| 12:3 |
| **able** 6:18 7:16 |
| 7:20 15:3 |
| 17:23 |
| **abrasion** 40:19 |
| **accurate** 15:11 |
| 15:24 16:17,17 |
| 17:3,3,5 |
| **accurately** 58:4 |
| **action** 60:3 |
| **actual** 43:2 |
| **acute** 10:19 |
| 11:8 13:2 |
| 15:18 16:5,8 |
| 43:9 |
| **address** 11:3 |
| 48:16 |
| **addressing** |
| 50:20 |
| **admit** 52:16 |
| **adult** 20:13 |
| 26:16 |
| **advise** 58:4,18 |
| **affix** 60:5 |

**ago** 4:23,23 7:6
19:4 25:24
30:10 35:22
45:14 53:20
**agree** 9:20 10:3
10:10,24 12:15
13:6,19 14:4
14:16 15:10,23
16:15 17:1,15
21:11,24 22:9
23:12,14,23
26:21 32:16,23
33:13
**ahead** 30:15
36:4
**al** 1:8
**alex** 26:6
**alexander** 2:14
4:8
**alexander.pre...**
2:15
**angle** 42:11,19
**ankle** 19:8,10
19:12
**answer** 14:2
20:5,8 24:17
27:4 28:4
49:19
**answered** 47:1
**answering** 20:4
**anti** 24:10 44:2
44:8
**anybody** 45:1
**anyway** 41:23
51:18

**apparent** 39:20
39:24 40:3
**appearance** 4:6
39:20
**appeared** 2:9
**appearing** 1:14
**apply** 7:8 8:9
**appreciate** 54:9
**approach** 21:9
26:22
**appropriate**
13:15 27:6
**approximately**
19:1 36:24
**arm** 21:23 22:8
32:18 33:1,10
48:24
**arrival** 35:6
**arthritis** 51:14
**article** 3:10
19:24 20:12
**asked** 57:7
**asking** 50:5,6
51:4 54:21
**assess** 27:21
**assessment**
21:12 39:9
57:12
**assistant** 4:8
**associated**
33:14
**associations**
52:23
**atrophy** 51:16

**attention** 19:22
**attorney** 2:11
4:9 59:24 60:1
**autopopulate**
39:3
**autopopulates**
43:17
**available** 12:12
18:7 31:7
**avoid** 12:23
13:7
**aware** 11:1
**awkward** 52:20

**b**

**back** 10:21
15:21 23:22
24:16 25:5
31:22 32:9,15
40:12 44:22
47:3 51:22
58:15
**backboard**
35:12
**background**
5:5
**bad** 50:15
**based** 29:21
**basement** 8:6
**basically** 57:22
**basics** 36:8
**bates** 34:15
37:15
**behalf** 2:9 4:9
4:11

**believe** 6:17
17:14 18:1
23:3 27:17
58:3
**best** 5:3 9:17
12:7,23 13:4
19:9 31:16
45:11 46:6
54:4 56:2 58:2
**beyond** 7:13
27:23
**bhays** 2:8
**board** 36:13
39:23 48:15
**body** 41:15
**bone** 57:3
**braced** 21:23
22:8
**bracing** 47:15
**break** 46:23
47:2
**breast** 45:8
**brian** 2:7 4:5
**brutality** 53:13
**bumped** 35:8
**buntic** 2:17
4:11,11 47:5
56:18
**busy** 46:10

**c**

**c** 6:5 35:10
36:13 39:23
41:14,22 48:14
**call** 31:13 35:5
42:9,18

**called** 4:14 6:3
57:22 58:1
**calls** 55:12 56:5
**calm** 40:3
**calms** 28:23,23
**capsule** 32:4,12
**care** 5:8,10
8:23 9:8,14,18
9:22 10:18
11:9,9,23 12:4
12:11,17 13:6
15:16 16:2
18:8,14,15
29:16 30:20
31:9 34:6
35:14,20,24
36:12 44:13,17
44:20 46:11
50:18,19,21
51:12,13,20,23
51:24
**case** 4:6 14:2
14:21 20:2
32:2 35:18
36:11 41:3
44:23 57:9,17
**cases** 17:9
**cast** 30:7
**casting** 30:3
**cause** 21:15
33:5,11
**caused** 27:1
33:15
**causing** 10:12

**center** 2:12
**central** 34:23
  37:14 38:12
**cermac** 5:8 6:2
  6:19 7:23 9:2,3
  9:7,10,15 12:5
  12:23 13:6
  29:21 31:8
  52:12
**cerner** 6:3
  34:19 35:18
  36:1 38:9,19
  39:2
**certificate**
  60:12
**certified** 59:9
  60:11
**certify** 59:11
**cervical** 20:21
  36:22 41:14
  48:20
**chair** 21:22
  48:9
**change** 20:16
  20:16 56:13
  57:3,8,10,13,15
**changes** 58:13
**chaperone** 45:7
**characterize**
  11:14
**chart** 3:11
  26:17
**check** 26:6
  29:11

**chicago** 2:5,13
  60:5
**choose** 58:6
**chronic** 10:19
  11:8,11,16
  13:2,5,8 14:16
  15:20 33:7
**chs** 34:15 37:13
**circumstances**
  13:14
**clarification**
  31:5
**clear** 5:4
**clearly** 41:19
**clinic** 5:8 7:2
  8:6,23 10:21
  11:11 15:21
  18:8 24:12
  29:17,18,19
  31:15 35:20
  36:12 46:11
  50:21 51:23,23
  52:14
**clinical** 43:18
**clinically** 43:20
**collar** 35:10
  36:13 39:23
  48:14
**combine** 14:22
**come** 8:7 11:24
  12:4 30:6
  32:11 44:22
  47:3 48:3
  50:19

**comes** 5:10,20
  6:19 7:23 9:16
  15:16 35:24
  36:1,12 47:24
  48:6,14
**commencem...**
  59:12
**commencing**
  1:17
**common** 33:11
  47:8
**complain** 45:22
  46:4 49:22
  55:18
**complained**
  21:21 45:21
  46:2 55:24
**complaining**
  21:13 22:7
  26:23 29:5
  40:2,23 55:10
**complains** 21:6
**complaint**
  14:22
**complaints**
  20:13 26:16
**complete** 15:11
  16:9 28:19,21
  59:19
**completed** 40:9
**complex** 8:1
**computer** 6:2,7
  6:11,12,14 7:1
  18:10

**concerning**
  59:15
**concluded** 59:2
**concrete** 14:21
**condition** 5:15
  10:11,15 11:1
  11:3 13:20,21
  14:17 16:18
  17:4 19:6
  50:10 51:11
**conditions** 13:8
  14:6,10 51:5
**conducting**
  54:20
**confident** 17:24
**confirm** 29:7
  52:3
**confronted**
  57:14
**constitutes**
  59:19
**consult** 18:8
**consulted**
  18:12,22 19:2
  19:14
**context** 47:1
**continued**
  56:24
**control** 43:14
**conversation**
  50:1
**conversations**
  56:7
**cook** 2:11 34:13
  37:11 59:6

**[cookcountyil.gov - distress]**                                      Page 4

**cookcountyil...**
2:15,18
**correct** 5:13,18
5:19,23,24 6:4
6:16,20 7:19
9:5 10:8 15:8
16:13 17:16
27:2,3,7,8,11
27:12,16 28:3
38:9,10,22
40:16,19 41:4
43:9,10,23,24
44:14 47:17
52:6 54:8,23
54:24 56:4
59:19
**correctly** 24:18
29:4
**counsel** 4:7
25:10 59:24
60:1
**counselor** 20:6
**county** 2:11
34:13 37:11
59:6
**couple** 4:23
**course** 24:9
**court** 1:1 4:24
5:6 54:7 58:3,8
58:15
**covered** 46:23
**csr** 1:24 59:10
**ct** 17:7
**cuff** 24:2 27:20
27:22 28:18

57:3
**cv** 1:7

**d**

**d.o.** 1:13 3:3
4:13 37:24
38:1
**daley** 2:12
**damage** 30:18
**dart** 1:8
**date** 34:22
37:13
**dated** 26:9
**day** 43:12
46:10 60:6
**days** 25:24
44:14
**daytime** 46:15
**december** 1:16
60:6
**decide** 8:18
**decision** 7:9
8:10 9:4 14:23
17:6,12 42:5
42:18,21 57:4
58:17
**defendant** 53:5
53:8,15 54:6
**defendants** 1:9
2:19 4:9
**deficit** 24:8,8
28:11
**deficits** 48:11
**deformity** 8:13
22:22,23 23:10
31:19

**degenerative**
43:9
**degree** 8:1
43:14
**delay** 12:24
13:7,15,16,19
14:4,12
**depend** 22:14
**depends** 7:24
11:8 13:11
46:16 51:8,24
**deponent** 58:24
**deposition** 1:13
4:22 19:18
20:7 24:22
26:8 34:8 37:5
57:21 59:2,16
59:21
**depositions** 5:2
25:21
**details** 46:7
49:24
**determine** 13:3
21:14 22:15
23:2 24:1
26:24 28:8
29:1
**determines**
8:21
**determining**
5:15
**diagnose** 28:6
30:5 42:4
**diagnosis** 13:18
16:18 17:4,24

18:1,4 43:2,7
43:11
**diagnostic** 21:9
26:18
**different** 42:10
**direct** 19:21
**direction** 59:18
**directly** 6:13
7:21 8:11
29:14,16,17
30:18 60:2
**disciplinary**
52:22
**dislocate** 33:8
**dislocated**
11:15,19 14:5
14:13
**dislocates**
31:22
**dislocation**
27:11 30:24
31:18 32:9,14
33:11 51:16
56:24
**dislocations**
23:1 32:3,17
32:24 33:7,15
57:1
**dispensary**
35:6
**disposition**
44:17
**distress** 39:20
39:24 40:4

**[district - femur]**

**district**  1:1,2
**division**  1:3
  11:12
**dizziness**  44:21
**doc**  35:15
**doctor**  8:21
  11:4 30:20
  51:17,23 54:20
  57:5
**doctors**  12:22
  46:21 51:7
**document**
  19:17 20:20
  24:21 34:7
  37:4,11
**doing**  18:16
**dr**  4:4,10,12,18
  7:5 8:7 20:7
  25:21 26:3,8
  26:19 37:17
  47:8 54:16,18
  55:19 56:11,22
  57:20,20
**drive**  2:4
**dropped**  5:6
**duly**  4:1,14
  59:14
**duplicative**
  46:24
**duty**  9:9,14

**e**

**e**  6:5,5 35:2,2
**earlier**  32:14
  50:17

**eastern**  1:3
**easy**  32:5
**editing**  58:11
**edward**  1:5
**either**  11:3
  57:19
**eliminated**  50:9
**emergency**  8:2
  8:5 9:2 12:9
  17:20 35:6
**employee**  59:23
  59:24
**endure**  10:4
**enter**  6:1 39:1
**entered**  38:24
  39:12
**entitled**  9:21
  12:11,16 20:12
  43:4
**er**  8:21 29:17
  30:24 37:12
**errors**  58:12,13
**escorted**  35:15
**essentially**
  57:22 58:11,12
**et**  1:8
**evaluate**  17:21
  27:14 36:5
  51:21
**evaluation**
  10:22 15:21
  20:13 24:14
  26:16 30:13
  35:15 40:10
  44:23

**event**  27:1
**eventually**  58:8
**evidence**  56:12
  57:15
**exacerbate**
  13:21
**exacerbated**
  14:6
**exam**  14:22
  17:6,10 20:2
  28:21,24 31:23
  36:5,23 39:5
  40:8,15 41:1
  45:1,8,8,9
  48:21 57:11
**examination**
  3:4,5 4:16
  16:10 20:24
  21:3,13 27:6
  39:15 50:5
  54:14,20 56:19
  59:13
**examined**  4:15
**examining**
  44:24
**example**  8:8
  34:18
**exhibit**  19:18
  19:22,23 24:22
  25:2,3,6,8,9,22
  26:1,3 34:8,11
  34:12 37:5,8
  37:23 54:18
**exhibits**  3:8
  25:16,17,22

**expected**  43:19
  43:21
**expertise**  18:3
**explain**  14:10
  41:16
**explained**
  36:16,17
**expose**  22:16
**extremities**
  49:5
**extremity**
  23:11 36:21

**f**

**fact**  54:3
**facts**  57:15
**facture**  28:2
**fair**  48:15 50:8
  50:18
**fairly**  58:4
**fall**  22:7 32:17
  33:1,6,10,15
  45:17 47:9
  48:1,2,7
**falling**  22:9
  47:15
**familiar**  37:20
**far**  48:8
**feel**  17:23 32:12
  32:12
**feeling**  46:8
**fell**  21:22 35:8
  36:8,16 47:21
  48:9,9
**femur**  41:6

file   38:19
final   38:21
    44:12
finally   5:20
find   5:22 22:14
finding   22:15
findings   41:13
first   4:14 5:11
    7:23 9:1 21:12
    23:14,16 26:24
    30:7 31:15
    35:19 36:14
    37:15,22 38:2
    38:16,19 44:9
five   37:3
floor   35:7,8
flow   3:11 26:17
focus   50:20
folder   25:18
    26:7
folders   26:8
follow   24:12
    29:8 30:20
    54:12 56:21
followed   31:1
follows   4:15
foregoing
    59:16
form   9:23 10:6
    10:16 11:5
    12:18 13:9,22
    14:7,18 15:6
    15:13 16:3,19
    21:17 22:2,11
    23:18 24:3

32:19 33:2,16
    48:18 50:23
    55:20
found   35:7
foundation
    55:5 56:6
fracture   7:11
    8:2,14 19:8,8
    19:11 22:24
    23:4,15,23
    27:11,13 28:6
    29:7 30:2,5
    36:22 40:14
    41:1 42:1,1,4
    42:13,16 43:9
    47:12,14 48:17
    48:20
fractures   57:2
front   37:16
full   5:22 28:13
    29:6 41:22
further   13:3
    24:13 30:13
    35:15 54:10,12
    56:16,19 57:18
    57:19 58:24
future   51:18

g

general   39:19
generally   58:18
generic   44:9
genital   45:8
give   18:18 36:3
    36:7,7 43:2
    46:14 49:10

given   59:20
giving   6:14
glenohumeral
    27:19
go   5:1 7:22
    12:12 18:11
    20:19,23 25:5
    25:18 30:15
    36:4 44:20
    54:6
going   5:1,23
    24:7 25:1 37:8
    42:10 43:3
    46:23 57:21
good   4:4 26:11
    28:21,24 40:6
    43:14 47:4,5
grammatical
    58:11,13
guy   8:13

h

h   35:2
hand   30:10
    47:12 48:12
    51:15 60:5
handwritten
    6:8
happen   36:15
happened   36:4
happens   44:23
hays   2:7 3:4 4:4
    4:5,17 10:2,9
    10:23 11:13,21
    12:21 13:13
    14:3,11 15:1,9

16:7,14,24
    19:20 20:8,11
    21:20 22:5,18
    23:21 24:15,24
    25:12,17 26:2
    26:6,12,13
    31:4 32:6,22
    33:9,21 34:10
    37:7 46:17,22
    47:7,13 48:22
    50:14,16 51:3
    54:9 55:4,12
    55:20 56:5,17
    56:20 57:18
    58:22
head   35:9 36:8
    36:16 40:15,18
    43:8 44:19
    47:20
headaches
    44:22
healing   31:3
health   9:22
    34:14 37:12
hear   6:12 31:10
heard   24:17
held   52:7
hereto   60:2
hereunto   60:4
high   48:9
hill   33:14,22
hip   40:22,23
    41:7,8 43:8
    47:20

**history** 5:22
6:10 15:11,24
16:6 17:5,10
27:5 32:11
35:17 36:4,7
39:4,10
**hit** 36:8,16
**hospital** 7:17
12:9,13 34:14
37:12 52:13,15
**hour** 46:19,20
**humerus** 57:2
**hurt** 21:22
36:19 48:24
49:1
**hurting** 36:17
**hurts** 46:7 49:2
**hypothetical**
55:13

**i**

**ice** 24:10
**identification**
19:19 24:23
34:9 37:6
**identify** 10:14
**idrizi** 1:24 59:9
60:10
**illinois** 1:2 2:5
2:13 52:5 59:4
59:11 60:6
**illness** 39:4,11
**image** 27:10
**images** 16:16
17:2

**immediately**
48:21
**impingement**
20:22
**important**
15:11,24 16:9
16:16 17:2,11
48:13,16 49:15
55:2
**impression**
43:4
**improved**
29:10
**incarcerated**
9:21 10:4
12:10,16
**incident** 35:12
35:13,16
**incomplete**
55:13
**index** 3:1
**indicate** 37:24
38:4,13 44:3
**indicated** 27:7
40:18 45:5
47:19
**indicates** 38:11
40:1
**indication**
32:13 40:13
47:21
**indications**
30:17
**indicators** 32:8

**indirectly** 60:2
**individuals**
12:16
**inflammatories**
24:10 44:2
**inflammatory**
44:8
**information**
6:1,10,15
17:11 37:20,23
38:3,7,11,23
39:1 55:1
**initial** 38:2
**initially** 45:12
**injures** 30:10
**injuries** 16:1
26:24 29:15
47:9
**injury** 7:12
10:19 15:17
18:23 19:3,6
19:14 21:7,14
22:7 27:15,18
27:23 28:7,9
29:5,9,11,22
55:10,18 56:4
**insert** 39:5
**instruct** 44:19
**intact** 28:13
**intended** 44:7
**interaction**
54:19
**interested** 60:2
**internet** 31:9
31:12

**introducing**
34:11
**involved** 52:22
**issue** 48:16
50:20
**issues** 4:24
50:11

**j**

**j** 1:8 2:12 35:2
**jahkeem** 34:24
**job** 15:2
**journals** 31:7

**k**

**k** 35:2 37:24
38:2
**kahn** 4:12
**kapotas** 7:5 8:7
**kept** 34:19
**killer** 44:9
**know** 7:6 9:18
25:3 28:19
33:22 34:1,24
35:3 37:20
43:16 48:8,8
48:24 54:11
**knowing** 56:22
**knowledge**
9:17 56:3 58:2

**l**

**label** 34:15
37:15
**labral** 27:20
**labrum** 24:2
57:1

**[lack - motion]**                                                    Page 8

lack   56:6
language   39:11
laptop   6:7
lately   18:24
lateral   41:15
lawsuit   53:8
lawsuits   53:5
  53:18,22
lawyer   54:11
layperson
  39:23
lead   14:5,13
leading   11:17
  13:9 15:13
  16:11 22:2,12
  24:3 33:3,17
  48:18
leave   20:8
  49:20
led   50:20
left   5:7 40:22
  40:23 43:8
  47:20,20,22
leg   48:12
lesion   33:22
  34:1,4
lesions   33:14
license   52:8
  53:1
licenses   52:4
ligament   7:12
limbacher   1:5
  4:5 34:16
  35:19 36:11
  37:15 38:19

39:22 43:12
44:24 45:12
47:19 49:7
50:1 54:19
55:18 56:3,13
56:23
limitation   12:6
limitations
  11:22 12:2
limited   23:9
linda   1:24 59:9
  60:10
line   5:17
llp   2:3
loaded   35:12
locke   2:3
lockelord.com
  2:8
log   35:11
long   7:6 35:22
  36:24 45:14
  52:7 53:19
look   26:19
  27:10 35:18,22
  50:6
looked   40:3,21
looking   19:5,15
  36:1 42:1
  54:18 56:11
  58:11
looks   40:21
loose   32:4,13
lord   2:3
lot   23:8,8

lower   36:20
  41:8
ls   41:5
lumbosacral
  41:5

**m**

m   35:2
making   7:9
  8:10 42:17
mark   37:8
marked   19:17
  24:21 25:1,15
  25:17,21 34:7
  37:4
matters   59:15
mclaughlin
  34:1,4
mean   9:19 36:7
  42:3 43:19
  57:13
means   32:2
  38:8 39:21
  41:16,18 43:20
  58:2
medical   3:12
  3:13 11:10,11
  11:20,23 12:4
  15:2 18:7 31:7
  35:6,14 38:4
  49:7 51:8,20
  52:8,13,14,23
  55:17 56:12
medically
  17:15

medication
  39:8 44:2
medicine   44:4
  52:5
medicines   44:6
memory   45:15
  45:20 50:4
  56:7
mentioning
  45:16
met   5:11
mia   2:17 4:11
  56:17
mia.buntic
  2:18
middle   38:2
milligrams
  44:10
mind   26:10
mine   25:13
  39:4,18
minute   46:22
  47:2
minutes   37:3
mischaracteri...
  56:6
misstates   50:23
month   18:19,21
months   18:20
  19:4
morning   4:4
motion   23:9
  28:13 29:6
  31:20 32:12
  33:8 40:6

**[move - okay]**                                                    Page 9

| | | | |
|---|---|---|---|
| **move** 48:12,12 | 47:20 | **normally** 46:15 | 31:24 32:19 |
| 49:5 50:10 | **need** 8:24 13:17 | 53:12 | 33:2,16 46:12 |
| **moving** 5:4 | 17:7,9,18 | **northern** 1:2 | 47:10 48:18 |
| **mri** 8:16,17,24 | 18:10 20:5,16 | **notation** 49:8 | 50:13,23 55:4 |
| 9:4 17:15,18 | 22:1,19 28:14 | **note** 35:4 38:15 | 55:12 56:5 |
| 17:22 23:24 | 30:6 31:14 | 38:17 39:6 | **objections** 20:9 |
| 27:19 | 42:8,8 45:7 | 45:22 46:3 | 22:11 |
| **muscle** 28:12 | 49:23 | **notes** 5:9 6:8 | **obligation** |
| 44:10 51:16 | **needed** 6:21 | 47:18 49:14,16 | 10:14 13:7 |
| **muscular** 28:12 | 8:16,19 12:9 | 49:19,21 | 15:17 18:2 |
| **musculature** | 17:17 22:16 | **november** 7:4 | **obscure** 42:3 |
| 22:23 24:8 | **needs** 5:16 7:12 | 34:23 37:13 | **obscured** 41:15 |
| **musculoskele...** | 10:20 13:2 | 50:2 | 41:17,21 42:13 |
| 40:5,15 | 17:22 29:1 | **number** 3:9 | 42:17 |
| | 30:3 31:1 | 46:14 57:24 | **obstructing** |
| **n** | **negative** 24:6 | **numbness** | 42:17 |
| **n** 4:20 6:5 | 28:11 30:11 | 36:20 49:4 | **obtain** 27:5,6 |
| 44:18 | **nerve** 20:21 | **nurse** 5:11,14 | **obtained** 41:14 |
| **name** 4:19,20 | **neurological** | 35:9,10 36:3,3 | **obvious** 8:13 |
| 4:20 38:1,2,8 | 24:8 28:11 | 36:15,18 39:16 | 23:10 31:19 |
| **named** 53:4,15 | 48:11 | 45:2 | 51:15 |
| 54:5 | **never** 26:10 | **nurses** 36:6 | **obviously** 8:13 |
| **naproxen** 44:8 | 55:24 56:3 | **nursing** 34:15 | **office** 60:5 |
| **nature** 50:9 | **new** 25:12,13 | | **official** 40:9 |
| 53:17 | 57:15,15 | **o** | **officially** 58:16 |
| **nauseous** 44:20 | **night** 46:20 | **o** 34:15 35:7 | **okay** 6:13 7:11 |
| **near** 51:17 | **nighttime** | **object** 14:18 | 8:8 10:24 |
| **necessarily** | 46:16 | 23:18 55:20 | 15:23 20:10,14 |
| 33:5 | **non** 9:2 | **objection** 9:23 | 20:21 21:1,10 |
| **necessary** 9:4 | **nontraumatic** | 10:6,16 11:5 | 21:21 22:19 |
| 11:23 12:3 | 21:16 | 11:17 12:18 | 23:12 25:1,6 |
| 16:16 17:2,6 | **normal** 24:7,9 | 13:9,22 14:7 | 26:5,12,20 |
| 17:15 18:8 | 33:7 41:20 | 15:6,13 16:3 | 28:16 29:3 |
| 27:6 52:4 | 46:10 | 16:11,19 21:17 | 30:15 33:10 |
| **neck** 36:13,19 | | 22:2 24:3 | 34:17 35:4,23 |
| 40:5,15 43:8 | | 29:23 30:21 | |

**[okay - police]**

36:6,10,24
37:10,21 38:7
39:10,19 40:11
41:10 42:12,22
44:6 51:10
53:14 54:4,17
56:2,21 57:14
57:18 58:21,22
**once** 18:19,20
28:2,5 50:8
**open** 8:1
**opened** 38:19
**opinion** 31:13
51:10 57:16
**options** 57:24
**order** 6:24
16:16 17:2
22:1,20 23:1
23:24 39:8
**ordered** 29:6
40:24 44:4
**orthopedic**
6:19,23 7:1,5
7:10,14,21,22
8:3,18 9:2,3
17:21 24:13
27:24 28:7,14
29:2,11,14,21
30:1,8,12,19
31:2,13 33:20
34:5 57:5
**outcome** 53:21
60:3
**owe** 9:9,9,14

## p

**p** 34:15
**p.a.** 45:2
**p.m.** 59:2
**page** 3:2,9
20:19 21:8,10
37:15,22 39:14
41:10 43:4
**pages** 20:16,17
**pain** 10:12
14:17 23:9
24:11 28:20
31:20 40:3,24
44:1,9 45:23
49:3,8,11,16,22
**pains** 45:16
**part** 15:2 17:11
31:11 39:16
**partial** 28:18
**partially** 41:15
41:17 42:13
**particular** 19:6
**parties** 4:3 60:1
**parts** 36:17
**patient** 5:10,20
5:22 6:14,23
7:3,10,11,12
8:7,16,19,23
9:16,17,18
10:11 11:2
12:7 13:4,15
15:16,19 16:1
17:18,22 18:2
20:3 21:6 22:6
22:10 24:12

27:22 28:13,22
29:4,20 30:1,2
30:3,8,9,18,23
31:1 32:3 33:6
35:7,7,8,10,10
35:11,12,13,24
36:2,5,10,23
37:2 38:5,16
41:6,24 42:7,8
43:20 44:5,19
44:20 45:9
46:2,7 48:24
50:11 51:17,19
51:21 55:10,23
**patient's** 6:9
16:18 17:4
50:9
**patients** 5:17
6:18 7:17,20
9:9,15 11:24
12:4,10,12
13:1 15:12
22:17 29:13
31:19 41:2
46:15,18,19
49:10 50:19
52:18
**people** 48:11
**perfect** 58:21
**perform** 21:2
27:5 37:23
38:3,11
**period** 46:19,20
**persistent**
24:11 30:11

**person** 5:21 9:1
10:13 21:21
36:8
**person's** 5:15
**personal** 59:18
**personally**
53:15
**persons** 9:21
10:4
**pharmacy** 44:1
44:3,4
**physical** 14:22
16:10 17:5,10
20:24 21:2
22:15 28:21,24
36:5,23 39:4
39:15 40:8
41:1 45:9
57:11
**physician** 29:9
34:6 51:12
**pick** 5:1
**picture** 16:17
17:3
**place** 59:22
**placed** 12:2
35:10 36:14
**plaintiff** 1:6 2:9
54:19,21 55:9
**plan** 39:9 43:5
**please** 4:18
20:8,8
**plus** 40:7 44:18
**police** 53:13

**popped** 25:12
32:9
**populate** 7:2
**possible** 31:21
45:19
**potential** 27:18
27:20 29:14,15
**practice** 7:14
27:24 35:23
46:5 52:4
**practicing**
52:10
**preber** 2:14 3:5
4:8,8 9:23 10:6
10:16 11:5,17
12:18 13:9,22
14:7,18 15:6
15:13 16:3,11
16:19 20:7
21:17 22:2,11
23:18 24:3
25:9,15,20
26:10 29:23
30:21 31:24
32:19 33:2,16
46:12 47:4,10
48:18 50:13,23
54:15 55:8,16
56:1,10,16
57:7,19 58:21
**present** 2:1
39:4,11 45:1,4
45:6
**presented** 22:6
43:12 47:19

**presents** 10:11
16:2
**presumably**
38:24
**previous** 59:12
**primary** 29:9
30:20 34:6
44:13 51:6,12
51:23
**printout** 19:24
26:15
**prior** 36:1 56:6
**privacy** 45:10
**private** 12:13
**privileges**
52:13
**probably** 22:10
35:21 38:14
47:23
**problem** 11:11
11:16,20 14:14
15:17,18,20
16:5,8 19:9
30:9 51:9,21
51:24
**problems** 11:10
15:4 45:13
50:6 51:20
**procedure** 8:24
13:17 41:20
**proceedings**
52:22 59:20
**process** 6:22
49:2

**professional**
15:3
**progressing**
43:18
**proper** 10:20
13:17
**properly** 17:19
31:3
**protocol** 5:7
**protocols** 50:17
**prove** 17:7
**provide** 9:7
11:23 12:3
**provider** 26:22
38:4
**providers**
12:23
**providing**
12:24
**put** 6:24 25:15
30:7 43:16
45:21 46:3,3
49:15,17,19,23

**q**

**quality** 9:22
**question** 9:11
11:6 12:1
16:22 20:1
22:4 25:5
30:14,16 49:14
49:20 50:15
55:21 56:22
**questions** 20:4
20:8 37:1
46:24 47:2

48:2,6 52:20
54:10,12,16,21
56:16,17
**queue** 7:2

**r**

**r** 6:5,5
**radiation** 22:17
**radio** 35:5
**radiologist**
41:18 42:2,5
42:15,20,20,23
43:2
**range** 28:13
29:6 31:20
32:12 33:7
40:6
**rate** 49:11
**ray** 8:14 17:12
17:14,17 22:16
22:20 23:1,13
23:17,22 24:6
27:7 28:10,10
29:6 30:10
36:21 37:2
39:5 40:8,24
41:11,21,22
42:10,14,19
48:21 57:11
**rays** 17:7,9
22:1,10 40:12
40:13 41:3
42:22,24 43:8
43:23
**read** 24:16,19
42:22,23 43:1

**[real - second]** Page 12

**real** 28:21,24
**really** 5:14
  31:12
**recall** 19:1
  45:13,14 49:24
  50:3,7 53:24
**receive** 9:21
  12:16
**recess** 47:6
**recognize** 15:3
**recollection**
  45:11 54:4
**record** 3:12,13
  4:19 5:4 6:10
  19:23 24:19
  26:14 34:13
  45:5 49:13
  55:17 58:23
  59:19
**records** 34:19
**reduce** 30:24
**reduced** 31:1
**refer** 6:18 7:1,9
  7:14,16,20 8:6
  9:1 10:20,21
  11:10 12:8
  15:20 17:18,19
  18:2 22:20
  27:19,24 28:7
  28:14 29:8,13
  29:20 30:1,8
  30:12,18 31:14
  51:22 57:4
**reference** 43:15

**referral** 31:16
**referrals** 44:13
**referred** 24:13
  29:1 44:13
**referring** 6:22
  8:10 11:4
  29:10
**refresh** 25:2,7
  25:19
**refreshing**
  25:23
**related** 20:2
**relative** 59:23
  59:24
**relaxant** 44:11
**rely** 42:23 43:1
**remember**
  19:16 28:17
  53:9,19,21,23
**remotely** 1:14
  4:2
**repeat** 9:11
  12:1 16:22
  56:24
**rephase** 50:14
**rephrase** 50:15
**report** 38:9,21
  39:5 40:9
  57:11
**reported** 1:24
  59:17
**reporter** 4:24
  5:6 24:20 58:3
  58:8,15 59:10
  60:11

**reports** 10:13
  36:1 49:7
**represent** 4:5
**representing**
  2:19
**requested**
  24:20
**required** 54:7
**residency**
  52:10
**resident** 17:21
  31:13
**responded** 35:5
**responsibility**
  11:2
**result** 32:17,24
**results** 41:11
**return** 44:17
**reveal** 27:10
**review** 37:19
  58:7
**richard** 2:12
**right** 5:12 7:5
  7:18 15:5
  16:10 18:2
  25:22 26:7
  29:2 38:21
  46:8 47:16
  50:22 51:7
**robaxin** 44:10
**rolled** 35:11
**room** 6:8,11
  8:3 12:9 17:20
  31:23 45:1

**root** 20:21
**rotator** 24:1
  27:20,22 28:18
**rule** 28:2,5
  42:13
**run** 37:1 48:23

**s**

**s** 1:24 59:9
  60:10
**sachs** 33:14,22
**saith** 58:24
**saw** 38:5 40:13
  50:2
**saying** 45:13
  54:23
**says** 21:11 35:4
  37:23 39:15,20
  40:5 41:13
  42:7 43:14
  44:12 46:7
  49:16
**scale** 49:8,18
  49:23
**scan** 17:7
**schedule** 7:3
**scheduled** 8:17
**scope** 7:13
  27:23
**screen** 20:17
  25:3,7,13
**scroll** 20:18
**scrolling** 20:15
**seal** 60:5
**second** 31:10
  31:13 38:16

41:22 43:3
52:9 57:20
**section** 20:24
39:10 43:4
**secured** 35:13
**see** 5:21 6:23
8:1,4,7,12 9:16
11:24 12:4
17:6 18:15
20:14,16 21:10
22:19 25:7,9
25:11 26:1,3
26:21 27:10
28:18 29:9
31:15 36:2
37:10 41:6,18
41:22 42:2
46:15,23,24
47:5 50:19
51:15,18
**seeing** 25:20,22
**seen** 5:16 38:16
49:6 51:17
**seldom** 18:17
18:19
**send** 8:2,15
37:2 58:15
**sense** 9:6
**sent** 22:10
40:11
**series** 48:5
**serious** 11:1
13:20 14:13,17
**service** 34:22
37:13

**set** 60:4
**severe** 23:7
31:20 40:2
44:21,21
**shane** 1:5
**shared** 19:23
**sheriff** 1:8
**shorthand**
59:10 60:11
**shoulder** 11:15
11:19 14:5,13
15:4 18:23
19:3,7,8,14
20:2,13 21:3,6
21:14,22 22:7
22:21 23:5,10
23:16 26:16,24
29:5 30:17
31:18,22 32:9
32:16,24 33:8
33:14 45:16,23
49:1 55:10,18
56:4,23 57:1
**showed** 23:22
43:8
**showing** 26:17
37:13
**shows** 34:22
**side** 47:22
**sign** 14:17 38:7
58:14
**signature** 57:23
58:1,7,19,20
59:1 60:9

**signed** 38:8,14
38:17,20
**signs** 15:3
35:11
**simply** 50:20
**sir** 20:9
**situation** 8:1
11:15 13:11
**situations** 13:5
**six** 18:20 25:24
**slide** 31:22 32:5
32:14
**slightly** 50:24
**small** 57:2
**soft** 27:15,18
27:18,22 28:8
29:11,15,22
30:17
**somebody** 8:10
14:12 21:13
22:20 26:23
31:21 45:4
47:21,24 48:2
48:6,14 51:4
**sorry** 19:10
23:13 24:16
25:13 26:10
31:10 38:3
44:18
**sort** 18:18
26:17 49:10
50:9
**sounds** 47:4,5
**south** 2:4

**specialist** 7:21
10:21 18:3
**specific** 14:2
15:16 19:9
30:16
**specified** 59:22
**speculate** 13:12
14:1,21,24
33:19 47:23
57:6
**speculating**
57:9
**speculation**
11:5 13:23
14:8,18,20
16:20 22:12
24:4 29:23
30:21 31:24
33:2,16 46:12
47:10 55:4,12
56:5
**speed** 31:16
**spell** 4:19
**spending** 54:9
**spiel** 5:2
**spinal** 48:17
**spine** 41:4,5,8
41:14,22
**splint** 30:2
**spoke** 36:15
**sprain** 27:11
**stable** 43:21
**staff** 35:14,15
**stand** 44:18

**standard** 9:8
9:14,19 34:23
37:14 38:12
**standards** 7:8
8:9
**start** 4:6
**started** 4:22
**starts** 51:4
**state** 4:18 52:5
59:4,11
**state's** 2:11 4:9
**stated** 35:8,9
**states** 1:1
**status** 43:18
**stenographic...**
59:17
**step** 21:12
23:14,16,24
27:9,14 28:6
**steps** 26:18
**stipulation** 4:2
**stretcher** 35:13
**strike** 23:13
**stroger** 7:17,21
8:2,11,15,21
12:8 17:19
29:17 30:24
31:14 52:15,16
52:17,18
**study** 13:3
**stuff** 18:15
48:12
**successful** 12:8
**sued** 53:12,15
54:3

**suffered** 56:23
**suffering** 10:5
10:12
**suing** 20:3
**suite** 2:4
**sure** 9:13 12:2
22:6 24:17
28:3 31:2
32:23 34:4
36:22 40:24
45:22,24 48:10
**surgeon** 6:19
6:23 7:5,10,15
7:22 8:3,18 9:2
24:13 28:1,15
29:2,14,21
30:2,8,12,19
31:2 33:20
34:5
**surgery** 7:13
**suspect** 22:23
22:24 32:8
**suspected**
29:22
**suspended** 53:2
**suspicions** 17:8
**swelling** 23:7,8
28:20,23 30:6
30:11 40:6,18
**sworn** 4:2,15
59:14
**symptoms**
10:13 15:4,12
31:17 32:7

**system** 6:2
34:14,20 37:12
38:24 39:12

**t**

**t** 34:15,15
**tab** 25:14
**table** 21:23
**tablet** 6:7
**take** 5:21 6:8
9:18 11:9
15:11,24 23:17
26:19,23 37:1
41:7,21 46:22
47:2 49:8 51:6
51:12,13,20,24
54:22 55:1,11
**taken** 35:11
39:15,16 43:22
59:21
**talk** 31:15
**talked** 5:5
50:17
**talking** 5:3,7
**tear** 27:20,20
27:22 28:18
**technical** 4:24
**tell** 6:6 15:20
35:21 42:21
51:11
**ten** 37:3 46:22
47:2 49:9,18
**tenderness**
40:7
**terms** 35:23
38:23

**testified** 4:15
**testify** 53:24
54:2,7 59:14
**testimony**
50:24 56:7
59:20
**testing** 13:3
17:7 19:9
30:13
**tests** 16:16 17:2
**textbooks** 18:6
18:9
**thank** 31:5
58:22
**thing** 36:14
44:12,16 58:10
**things** 50:6
57:22
**think** 5:6 7:6
7:12 12:6
13:16 17:18
27:21 38:15,17
45:3 49:15
53:11
**thinks** 42:9,16
**thomas** 1:8
**thorough** 16:9
**thought** 8:24
23:15
**three** 18:21
19:4 53:11
**time** 8:4 9:12
16:23 17:10
19:2,13 22:4
23:8 30:4

32:21 34:3,23
37:14 38:12,12
38:14,18,20
50:10 53:20
54:10,13 56:14
58:23 59:22
**timely** 12:17
**times** 18:21
35:7 53:7,14
54:2,5,5
**tissue** 27:15,18
27:23 28:8
29:11,15,22
30:17
**title** 26:15
34:13 37:12
**today** 5:4 26:9
54:10 56:23
**told** 56:3
**top** 20:21 34:13
37:22
**topics** 52:3
**torn** 24:1,2
57:1
**touched** 6:17
**transcribed**
59:18
**transcript** 58:8
58:14,15 59:17
**transported**
35:14
**trauma** 15:12
16:1 27:5 33:5
41:2,24 43:7
44:20 47:20

**traumatic**
21:15 27:1
**treat** 9:17
10:14,19 12:7
13:18 15:17
24:7,9 28:6
51:22 52:18
**treatable** 10:11
**treating** 9:15
13:7,20 14:5
14:12 16:8
50:11 55:2
**treatises** 18:7
31:7
**treatment** 7:17
9:7 10:22
12:24 13:4,15
13:16 15:22
19:7 24:9
56:13 57:4,12
**triage** 5:11
39:17
**trial** 54:1,2,6
**true** 59:19
**truth** 59:14
**try** 9:16 54:22
**trying** 39:21,24
**two** 18:21 19:4
26:8 30:4,10
43:22 46:21
53:11,16 54:5
54:5 57:22,24
**type** 6:13 34:19
58:16

**types** 48:2
**typically** 22:1

**u**

**u** 4:21 34:15
**underlying**
10:14
**understand** 5:9
8:22 28:4 29:3
39:21,22,24
46:5
**understanding**
9:8,13 18:19
**united** 1:1
**unnecessary**
10:4 12:24
13:7 22:17
**uploaded** 25:24
**upper** 23:11
36:20
**ups** 54:12
**uptodate** 3:10
18:10,13,17,22
19:2,14,24
26:15 31:6
**urgency** 7:24
52:1
**urgent** 5:8,10
5:16 8:23
10:18 11:9,10
11:15,19 15:15
16:2 18:8,14
18:15 29:16
31:9 35:14,20
35:24 36:12
44:17,20 46:11

50:9,18,19,21
51:5,8,11,13,20
**use** 6:2 18:17

**v**

**v** 44:18
**vagueness** 11:6
**veritext** 25:3
**vertebrae**
41:23
**vertebral** 41:15
**videoconfere...**
2:1
**view** 41:16 42:6
**views** 41:13
42:2
**visit** 57:17
**vital** 35:11
**vomiting** 44:21
**vs** 1:7

**w**

**wacker** 2:4
**wait** 5:17 28:22
29:8,9
**waive** 58:6,18
58:20
**waived** 59:1
**waiving** 58:1
**walk** 36:11
**want** 9:6 24:17
26:6,21 28:3
31:12 48:8
52:2,3 56:21
**wants** 42:5

**way**   24:7 31:16
45:20
**weakness**   28:12
36:20 49:4
**website**   18:13
31:6
**week**   4:23
**weeks**   4:23
30:4,10
**whereof**   60:4
**wilson**   34:24
35:2,5
**witness**   3:1,2
4:1,10,14 9:24
10:7,17 11:7
11:18 12:19
13:10,24 14:9
14:19 15:7,14
16:4,12,21
20:5,10 21:18
22:3,13 23:19
24:5 25:11
26:1 29:24
30:22 32:1,20
33:4,18 46:13
47:11 48:19
51:1 53:12
54:3 55:6,14
55:22 56:8
58:20 59:13,13
60:4
**witnessed**   35:9
**work**   6:6 10:18
11:9 13:3
15:15 18:14

52:12
**wrap**   52:2
**wrist**   47:12,14
**write**   46:6
55:23
**wrong**   23:16
28:3

| x |
|---|

**x**   8:14 17:7,9
17:12,14,17
22:1,10,16,20
23:1,13,17,22
24:6 27:7
28:10,10 29:6
30:10 36:21
37:2 39:5 40:8
40:12,13,24
41:3,11,21,22
42:10,14,19,22
42:24 43:8,23
48:21 57:11

| y |
|---|

**y**   4:20,21
**yan**   1:13 3:3
4:10,13,20
25:21 37:24
38:2
**year**   52:9 53:11
**years**   18:16
52:11
**yu**   1:13 3:3 4:4
4:10,13,18,20
4:21 20:7 25:2
25:21 26:3,8

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.