# Exhibit A

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| Shane Edward Limbacher, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-07509 |
| | ) | |
| vs. | ) | Honorable District Court Judge |
| | ) | John J. Tharp Jr. |
| Sheriff Thomas J. Dart, et. al., | ) | |
| | ) | Honorable Magistrate Judge |
| Defendants. | ) | Jeffery Cole |
| | ) | |

**PLAINTIFF SHANE EDWARD LIMBACHER'S
<u>OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................................1

II. ADDITIONAL MATERIAL FACTS.................................................................................3

III. THE SUMMARY JUDGMENT ANALYSIS IS HIGHLY FACT-DEPENDENT............3

IV. ARGUMENT.......................................................................................................................4

    A.    Defendants Failed to Meet the Standard of Care for Diagnosis and Treatment of a
Traumatic Shoulder Injury and Chronic Shoulder Pain and Dysfunction. .....................4

    B.    Dr. Yu's Treatment Was Objectively Unreasonable. ........................................................5

    C.    The Remaining Defendants Each Provided Objectively Unreasonable Care in
Responding to Mr. Limbacher's Chronic and Acute Shoulder Problems. ......................9

        i.    Defendant Physician Assistant Glenn Trammell's Treatment Was Objectively
Unreasonable.................................................................................................................10

        ii.    Dr. Theresa McCarthy's Treatment Was Objectively Unreasonable. .......................12

        iii.    Defendant Physician Assistant Barbra Davis' Treatment Was Objectively
Unreasonable.................................................................................................................16

        iv.    Defendant Physician Assistant Kevin Sims' Treatment Was Objectively
Unreasonable.................................................................................................................18

V. CONCLUSION..................................................................................................................20

134991540v.8

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Besecker v. Loop*,
  No. 4:21-cv-00112-TWP-KMB, 2023 WL 2587307 (S.D. Ind. Mar. 20, 2023) ....................... 3

*Berry v. Peterman*,
  604 F.3d 435 (7th Cir. 2010) ......................................................................................... 11, 15

*Conley v. Birch*,
  796 F.3d 742 (7th Cir. 2015) ............................................................................................ 3, 18

*Cooper v. Casey*,
  97 F.3d 914 (7th Cir. 1996) ................................................................................................. 17

*Cumbee v. Ghosh*,
  No. 11-CV-3511, 2016 WL 5404597 (N.D. Ill. Sept. 28, 2016) .................................... *passim*

*Greeno v. Daley*,
  414 F.3d 645 (7th Cir. 2005) .......................................................................................... 15, 17

*Harper v. Bolton*,
  57 F. Supp. 3d 889 (N.D. Ill. 2014) .................................................................................... 17

*Hayes v. Snyder*,
  546 F.3d 516 (7th Cir. 2008) .......................................................................................... 15, 19

*Hernandez v. Hain*,
  No. 19 C 5147, 2021 WL 3618276 (N.D. Ill. Aug. 16, 2021) ............................................. 15

*Hill v. Lakin*,
  No. 19-cv-00405-JPG, 2022 WL 672464 (S.D. Ill. Mar. 7, 2022) ....................................... 15

*Leger v. Jaimet*,
  No. 3:15-cv-00080-SMY-RJD, 2017 WL 5069334 (S.D. Ill. Nov. 2, 2017) ......................... 15

*Mandel v. Doe*,
  888 F.2d 783 (11th Cir. 1989) ............................................................................................. 11

*McWilliams v. Cook Cty.*,
  No. 15 C 53, 2018 WL 3970145 (N.D. Ill. Aug. 20, 2018) .............................................. 4, 19

*Miranda v. Cnty. of Lake*,
  900 F.3d 335 (7th Cir. 2018) ........................................................................................ 3, 4, 8

134991540v.8

*Perez v. Fenoglio*,
    792 F.3d 768 (7th Cir. 2015) ...........................................................................2, 18

*Peters v. Bailey*,
    2020 WL 5593754 (N.D. Ill. Sept. 18, 2020) ...................................................8, 19

*Petties v. Carter*,
    836 F.3d 722 (7th Cir. 2016) ...........................................................................8, 15

*Sherrod v. Linge*,
    223 F.3d 605 (7th Cir. 2000) ...............................................................................18

*Smith v. Kapotas*,
    No. 18 C 4260, 2020 WL 553619 (N.D. Ill. Feb. 4, 2020).................................3, 18

*Williams v. Ortiz*,
    937 F.3d 936 (7th Cir. 2019) .................................................................................3

**Statutes**

42 U.S.C. §1983.................................................................................................1, 8, 20

## I.    INTRODUCTION

This is an action under 42 U.S.C. §1983 against medical personnel who, in violation of the Fourteenth Amendment, provided objectively unreasonable medical care to Plaintiff Shane Edward Limbacher while he was incarcerated as a pretrial detainee at the Cook County Department of Corrections. During a medical appointment on November 13, 2017, Mr. Limbacher took a hard fall in which he dislocated his shoulder and tore his labrum. The nurse called for emergency help and Mr. Limbacher was strapped to a gurney and taken to urgent care. The fall resulted in immediate, severe pain and distress. Thus began a years-long and ultimately futile effort by Mr. Limbacher to receive adequate medical care for his shoulder injury.

The standard of care for treating a traumatic shoulder injury mandates that the provider conduct a thorough physical examination of the shoulder. X-rays should be taken to determine if there is a fracture, dislocation, or torn rotator cuff. If there is no fracture or rotator cuff tear, an MRI should be ordered to determine if there is a soft tissue injury such as a torn labrum. While a provider may in some circumstances start patients with conservative treatments, if a patient has not improved in three to six months, the patient should be referred to an orthopedic surgeon.

Defendants Dr. Yan Yu, Dr. Theresa McCarthy, P.A. Kevin Sims, P.A. Barbara Davis, and P.A. Glenn Trammell, P.A. failed, among other things, to follow the well-accepted protocol for diagnosing or treating Mr. Limbacher's shoulder injury. A jury could reasonably find (and should so find at trial) that Defendants' deficient care was objectively unreasonable. Indeed, from the injury date through his release from custody years later, Mr. Limbacher lived with debilitating shoulder pain and a lack of function, which significantly impaired his ability to sleep, exercise, dress and to otherwise engage in daily activities free from pain and discomfort. Defendants failed to refer Mr. Limbacher for advanced imaging or to an orthopedic specialist despite having multiple

1

reasons and opportunities to do so. The deficiencies in Defendants' care are underscored by a report from an expert in custodial medicine and a report from Mr. Limbacher's treating orthopedic surgeon. This expert opinion evidence is uncontradicted and unchallenged. (Defendants submitted **no** expert opinion report or evidence.) The two medical experts explain the standard of care for traumatic shoulder injuries and detail the consequences of Defendants' inadequate treatment. Mr. Limbacher faces long-term post-traumatic glenohumeral arthritis, a condition that now requires full shoulder replacement surgery.

Defendants' Motion for Summary Judgment presents a terribly selective, artificial, and incomplete narrative of Defendants' interactions with Mr. Limbacher. Each Defendant claims to have provided some type of minimal treatment to Mr. Limbacher, including some treatments unrelated to his shoulder. These minimal treatments do not excuse a failure to meet the standard of care for treating Mr. Limbacher's shoulder injuries. *See Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) (prison medical providers cannot avoid liability with "perfunctory medical appointments wherein no meaningful treatment is dispensed"); *Cumbee v. Ghosh*, No. 11-CV-3511, 2016 WL 5404597, at *4 (N.D. Ill. Sept. 28, 2016) (Tharp, J.) ("[T]he mere provision of treatment is insufficient to insulate a provider from a claim of deliberate indifference. The treatment must also be reasonably timely, so as not to cause the plaintiff unnecessary pain for even a few days."). Not one of the Defendants took effective action in response to Mr. Limbacher's shoulder injury and his repeated requests for medical treatment, including specific requests for an MRI and for an orthopedic referral. Defendants simply left Mr. Limbacher's painful injury to linger, unresolved and untreated.

Given the deposition testimony, documentary evidence, and expert witness reports, coupled with the inferences that can be drawn therefrom, a jury must resolve the central questions

of whether each Defendant provided objectively unreasonable service in response to Mr. Limbacher's serious medical needs. For the reasons more completely addressed below, Defendants' Motion for Summary Judgment should be denied in all respects.

## II.    ADDITIONAL MATERIAL FACTS

Mr. Limbacher's Statement of Additional Undisputed Material Facts is attached pursuant to Local Rule 56.1(b)(3).

## III.    THE SUMMARY JUDGMENT ANALYSIS IS HIGHLY FACT-DEPENDENT

Courts will only "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court "must examine the record in the light most favorable to…the nonmoving party, resolving all evidentiary conflicts and drawing all reasonable inferences in his favor." *Conley v. Birch*, 796 F.3d 742, 746 (7th Cir. 2015) (citation omitted).

Deficient medical care for a serious condition violates a pretrial detainee's Fourteenth Amendment due process rights if it is "objectively unreasonable" in the totality of the facts and circumstances, and if medical personnel act "purposefully, knowingly, or perhaps even recklessly when they consider[] the consequences of their handling of [the detainee's] case." *Miranda v. Cnty. of Lake*, 900 F.3d 335, 352–54 (7th Cir. 2018). A plaintiff detainee "can prove that a medical professional defendant had the requisite mental state by proving that the plaintiff received treatment so inadequate that . . . no minimally competent professional would have so responded under those circumstances." *Smith v. Kapotas*, No. 18 C 4260, 2020 WL 553619, at *4 (internal citations and quotations omitted). "This inquiry is very fact-intensive, taking into account all of the facts and circumstances at the time of the alleged conduct." *Besecker v. Loop*, No. 4:21-cv-00112-TWP-KMB, 2023 WL 2587307, at *9 (S.D. Ind. Mar. 20, 2023) (citing *Williams v. Ortiz*, 937 F.3d 936, 942 (7th Cir. 2019)). Further, "[i]f a need for specialized expertise either was known

3

by the treating physicians or would have been obvious to a lay person, then the obdurate refusal to engage specialists permits an inference that a medical provider was deliberately indifferent to the inmate's condition." *McWilliams v. Cook Cty.*, No. 15 C 53, 2018 WL 3970145, at *10 (N.D. Ill. Aug. 20, 2018).

## IV. ARGUMENT

### A. Defendants Failed to Meet the Standard of Care for Diagnosis and Treatment of a Traumatic Shoulder Injury and Chronic Shoulder Pain and Dysfunction.

Defendants failed to meet the baseline standard of care in treating Mr. Limbacher's left shoulder injury by failing to examine or provide any treatment at all, refusing to order an MRI, refusing to refer him to an orthopedic specialist, and refusing to alter his course of treatment despite years of debilitating pain and limited shoulder function with no material improvement.

For a medical provider treating an individual who has fallen and is reporting sharp shoulder pain, the standard of care demands a methodical evaluation and analysis of the injury from the get-go. Mr. Limbacher has presented two expert witnesses who outline the standard of care for an adult presenting with a traumatic shoulder injury and subsequent pain and lack of function. These experts establish the Defendants' substantial deviation from that standard. *See Miranda*, 900 F.3d at 353.

Dr. Ryan Herrington is a physician and expert in custodial medicine. As he explains in his Report, the "standard of care has to do with outcomes and how the best outcome for a particular patient, confronted with a particular set of clinical circumstances, can be realized as much as possible by the patient's providers and the system in which those providers are practicing." (PSOF ¶ 66.) Dr. Herrington reviewed all Mr. Limbacher's medical records to determine whether Defendants satisfied the required standard of care. After his review, Dr. Herrington concluded that

each of the Defendants "deviated from accepted and prevailing standards of care." (Ex. S, at 12–13.)

Dr. Sebastian Ko is Mr. Limbacher's treating orthopedic surgeon. For suspected shoulder injuries after a fall, Dr. Ko's Report explains "[t]he appropriate standard of care for a patient complaining of head, neck, back, and shoulder pain from a fall is to address all four areas of complaint." (PSOF, Ex. R, at 2.) The standard of care demands that "the provider must address the shoulder injury…after confirming there are no injuries to the spine." (*Id.*) Then, "[i]f a patient reports pain and loss of motion after a traumatic injury, X-rays should be taken to determine whether the patient has any fractures or dislocations." (*Id.*) Next, "[i]f the X-rays do not confirm any fractures or dislocations, ***and the patient continues to have pain and loss of motion***, an MRI should be performed to determine whether the patient has any occult fractures, rotator cuff tear, labral tear, or other intra-articular pathology." (*Id.*) (emphasis added). Importantly, and applicable here, if a patient continues to experience chronic shoulder pain (pain for over three to six months), a patient should be referred to an orthopedic specialist. (*Id*. at 3.)

The standard of care for a traumatic shoulder injury is also outlined in the UpToDate system, an electronic clinical resource tool that was readily available to the Defendants on their computers. (PSOF ¶ 69.). An UpToDate flow chart shows the diagnostic steps for a shoulder injury. (PSOF ¶ 69, at 26:21–28:1; Ex. O.)

**B.     Dr. Yu's Treatment Was Objectively Unreasonable.**

As addressed above, when a patient has suffered traumatic shoulder injuries from a fall, the standard of care requires an examination of "the shoulder injury…after confirming there are no injuries to the spine," (PSOF ¶ 68) Dr. Yu admitted that if a patient complains of a shoulder injury, he should perform a physical examination of the shoulder. (PSOF ¶ 9.) He also admitted

5

that if his physical examination led him to suspect a dislocation, he would order an x-ray. (*Id.*) In Dr. Yu's own words, if a patient disclosed their shoulder pain, he would reduce it and "then the patient needs to be followed up with an orthopedic surgeon to make sure it is healing properly." (PSOF ¶ 9; Ex. U, at 30:16–31:4.)

Per the UpToDate guidance on "Evaluation of adult with shoulder complaints," Dr. Yu should have obtained Mr. Limbacher's history of trauma, conducted an exam of the shoulder, and ordered x-rays; confirmed the existence of a dislocation or strain, and then referred Mr. Limbacher to orthopedics as appropriate. (PSOF, Ex, O.)

When he saw Mr. Limbacher on November 13, 2017, Dr. Yu did not undertake the methodical approach demanded by the standard of care for a post-fall shoulder injury. He did not examine the shoulder or order any x-rays of the shoulder to determine whether Mr. Limbacher suffered a fracture or dislocation. (PSOF, Ex. R, at 2; PSOF, ¶¶ 7–9.) Dr. Yu did not order an MRI. (PSOF, Ex. S, at 19.) His medical notes show no referral to an orthopedic specialist. Dr. Yu's failure to examine Mr. Limbacher's left shoulder set the course for three years of poor treatment and subsequent pathology in the joint. As Dr. Herrington explained:

> [A]ppropriate attention to the left shoulder by Dr. Yu on 11/13/17, as required by standard of care, on a more likely than not basis would have resulted in a left shoulder dislocation being either confirmed or at least clinically suspected. This in turn on a more likely than not basis would have influenced clinical decision making by subsequent providers and would have put Mr. Limbacher in a better position of having his shoulder dislocation timely treated with the development of glenohumeral arthritis potentially delayed or even prevented.

(PSOF ¶ 11.)

Dr. Yu's excuse for not examining or treating Mr. Limbacher's shoulder injury is that Mr. Limbacher supposedly did not complain of a shoulder injury. Dr. Yu argues that because his medical notes do not refer to Mr. Limbacher's shoulder injury, the court apparently is required to

6

find that Mr. Limbacher did not mention the injury. (Def. Mot. at 7). Mr. Limbacher remembers

the day of his injury vividly. He testified without equivocation that he told Dr. Yu about the pain

in his left shoulder and specifically asked Dr. Yu to examine the joint:

> Q. Okay. And then when you showed up and when you saw Dr. Yu, what did you tell Dr. Yu?
> A. He already had known about it, and he asked me, "What happened?" I told him that I fell.
> Q. Did you tell him -- Did he ask you what hurt?
> A. He asked me if I hit my head.
> Q. Okay. And then what did you say to him?
> A. I said, "Yes."
> Q. Did he ask you anything else?
> A. He -- I think he asked me if I lost
> consciousness. And I said, "No."
> Q. Okay. But he didn't ask you if anything else was hurting other than just your head?
> A. He -- Well, I told him that my neck and shoulder hurts as well.
> * * *
> Q. Okay. So did you say anything else to Dr. Yu after you told him that your shoulder was hurting and he did not -- and he didn't do anything about it? Did you say anything else?
> A. I did. Actually, when I returned from the x-rays, I said, "I need my shoulder looked at."
> Q. And then what did Dr. Yu say?
> A. He said, "I'm done with him," and he put his hand like this (gesturing) and he walked away. It was very busy in the ER that day, and he seemed overwhelmed. He was dismissive.

(PSOF, Ex. BB, at 35:5–22, 39:19–37:5.)

Dr. Yu's medical notes are not dispositive of anything. Dr. Yu conceded that his notes do

not contain all details from patient examinations. (PSOF, Ex. U, at 49:13–23.) Dr. Yu testified that

he saw his role in Urgent Care as limited – If he did not perceive an urgent condition, his practice

was to leave the patient's problem for another time and another provider. (*Id.* at 51:4–52:1.) Mr.

Limbacher testified that Dr. Yu dismissed the shoulder injury without bothering to perform an

examination. (PSOF, ¶¶ 7–9.) From the conflicting testimony, and its determination of credibility,

a jury could reasonably credit Mr. Limbacher's testimony that he asked Dr. Yu to examine his left

shoulder. Judge Kennelly's opinion in *Peters v. Bailey* speaks directly to the materiality of conflicting deposition testimony in the context of §1983 cases for inadequate medical care:

> [Plaintiff's] deposition testimony thwarts defendants' argument that [plaintiff] has pointed to no evidence supporting his allegations against [medical provider defendants]. [Plaintiff] testified that he informed all three of these defendants about his persistent, painful shoulder condition. This is sufficient to permit a reasonable jury to find that each of these defendants knew yet disregarded a substantial risk to [plaintiff's] health.

No. 17 C 4809, 2020 WL 5593754, at *6 (N.D. Ill. Sept. 18, 2020).

A document that Mr. Limbacher prepared the very next day supports his recounting of the events on November 13, 2017. Mr. Limbacher submitted a Health Services Request Form that reads, "My…left shoulder…[is] in severe pain from the fall I took in Ms. Jardine's chair yesterday. I do not feel that all my injuries were treated and looked at properly (sic)." (PSOF ¶ 16.)

Dr. Yu's failure to examine Mr. Limbacher's shoulder, order an x-ray, and refer Mr. Limbacher to an orthopedic specialist fell below the standard of care required from a minimally competent urgent care doctor in the circumstances presented. Given the record of material factual disputes over communications with Dr. Yu, the scope of his examination, whether he disregarded an express request to examine Mr. Limabacher's left shoulder, the completeness of Dr. Yu's medical notes, and undisputed expert testimony detailing how Dr. Yu should have conducted his urgent care treatment of Mr. Limbacher, the jury must consider and decide whether and to what extent Dr. Yu's care was objectively unreasonable. *Miranda*, 900 F.3d at 353; *see Petties v. Carter*, 836 F.3d 722, 733 (7th Cir. 2016) (Eighth Amendment plaintiff had "the right for a jury to hear [doctor's] justification for his treatment decisions (or lack thereof) and to determine if [doctor] was deliberately indifferent, rather than simply incompetent"); *see also Peters*, 2020 WL 5593754, at *6.

134991540v.8

### C. The Remaining Defendants Each Provided Objectively Unreasonable Care in Responding to Mr. Limbacher's Chronic and Acute Shoulder Problems.

From the time of his initial injury on November 13, 2017, through his release from custody, Mr. Limbacher experienced debilitating, recurring shoulder pain and limited use and function in the shoulder joint. (PSOF, Ex. BB, at 99:8–24, 100:1–24, 101:1–5. 103:21–24, 104:1–10.) Mr. Limbacher submitted over twenty Health Services Request Forms complaining of acute left shoulder pain and limitations on the function of that joint. (PSOF ¶¶ 13, 16–18, 20–24, 26–32.) All of these Request Forms and other medical records were available to the treating providers on their electronic medical record system. (PSOF, Ex. Y, at 38:3–14; 43:15–22.)[1]

Here are just some of the excerpts from Mr. Limbacher's Request Forms contemporaneously recording the symptoms in his left shoulder:

- November 15, 2017: "I'm still having severe neck, shoulder and pack pain…PLEASE HELP!" (PSOF ¶ 17.)

- November 22, 2017: "I still have pain in my neck, left shoulder and back, left leg and knee. My left arm goes numb." (PSOF ¶ 18.)

- January 8, 2018: "I need to see a doctor for my neck, back, shoulder and knee pain that is a result of the accident that occurred on Nov. 13th, [20]17." (PSOF ¶ 21.)

- August 3, 2018: "My left shoulder pain is unbearable, I need to see an orthopedic…" (PSOF ¶ M.)

- September 28, 2018: "Neck & shoulder has severe pain." (PSOF ¶ N.)

Despite Mr. Limbacher's numerous reports of severe shoulder pain, disability, and impaired function in his shoulder, none of the Defendants took it upon themselves to make an accurate diagnosis or to provide adequate treatment. Not one of the Defendants who treated Mr. Limbacher after the date of the injury timely referred Mr. Limbacher for further imaging tests or

---

[1] The text of each Request Form is copied and made part of the medical record. (PSOF, Ex. Y, at 42:8–43:22.)

9

to an orthopedic specialist. Each of the Defendants kicked the can of Mr. Limbacher's damaged shoulder and accompanying pain and disability down the proverbial road to another future date and some unknown provider.

The Request Forms, coupled with Mr. Limbacher's testimony and the opinions of Drs. Herrington and Ko, readily support a jury's conclusion that each Defendant who saw Mr. Limbacher after Dr. Yu was fully aware that Mr. Limbacher was experiencing serious and recurring shoulder pain, that he could not use his impaired left arm, and that his shoulder injury was not responding to the minimal treatment provided. On this record, a jury can reasonably conclude that Defendants' failure to provide effective treatment or refer Mr. Limbacher for imaging and specialist treatment was a Constitutional violation. *Cumbee*, 2016 WL 5404597, at *5 (Tharp, J.) ("The inference that earlier surgery would have provided earlier pain relief is compelling…A reasonable juror could accept the doctor's testimony in whole and come to the conclusion that arthritis may have been advanced due in part to the delays in providing the surgery, which is a known treatment for this kind of arthritis.")

### i. Defendant Physician Assistant Glenn Trammell's Treatment Was Objectively Unreasonable.

Defendant Physician Assistant Glenn Trammell treated Mr. Limbacher on multiple occasions. At each interaction, Mr. Limbacher alerted P.A. Trammell to the continued pain and disfunction in his left shoulder. (PSOF, Ex. BB, at 43:24–44:3). Starting with P.A. Trammell's first interaction with Mr. Limbacher on November 29, 2017, roughly two weeks after Mr. Limbacher's fall, the standard of care required him to, at a minimum, examine the shoulder, order x-rays, and refer Mr. Limbacher for physical therapy. (PSOF, Ex. R, at 2–3.) P.A. Trammel did none of those things. While P.A. Trammel told Mr. Limbacher that he would schedule Mr. Limbacher for an orthopedic appointment, he did not. (PSOF ¶ 19.)

10

On subsequent interactions with P.A. Trammell on March 2 and May 7, 2018, Mr. Limbacher reported severe shoulder pain, reminded P.A. Trammel of his prior commitment to refer Mr. Limbacher to an orthopedic specialist, and requested to see a specialist. (*Id.* at ¶ 27.) Additionally, P.A. Trammel had access to prior reports from Mr. Limbacher of pain, dislocation, and limited function in his shoulder. (*See Id.* at ¶ 30.) Still, he did not schedule Mr. Limbacher for an orthopedic appointment. (*Id.* at ¶ 19.)

Surely by May 7, 2018, too much time had passed since Mr. Limbacher's shoulder injury for P.A. Trammell to leave Mr. Limbacher's injury untreated. Yet, despite the many indications that Mr. Limbacher needed to see an orthopedist, and P.A. Trammell's verbal acknowledgements that Mr. Limbacher needed a specialist referral, P.A. Trammel never made a referral or followed-up to assure that Mr. Limbacher saw a specialist. The minimum standard of care for a patient presenting with a chronic shoulder injury from a traumatic fall that has not improved after three months is to refer the patient to an orthopedic specialist for advanced imaging and diagnosis. (PSOF, Ex. S, at 18; Ex. R, at 2–3.)

A jury could reasonably conclude from the record that P.A. Trammell provided objectively unreasonable care by allowing Mr. Limbacher's shoulder injury to linger for months without advanced imaging and intervention by a specialist. *See Berry v. Peterman*, 604 F.3d 435, 442 (7th Cir. 2010) (plaintiff's complaints and medical records showing escalating pain indicated that the delay in treatment prolonged plaintiff's suffering and made summary judgment inappropriate). The delay and refusal to refer, per the expert opinions of Drs. Herrington and Ko, created the risk that Mr. Limbacher's shoulder problem would progressively worsen and that full recovery would entail invasive shoulder replacement surgery with a long recovery time. *See Mandel v. Doe*, 888 F.2d 783, 790 (11th Cir. 1989) (delay by physician assistant in ordering x-ray and referring plaintiff

"to a doctor or a hospital for more experienced and knowledgeable treatment" raised jury question of deliberate indifference); *Cumbee*, 2016 WL 5404597, at *5 (Tharp, J.) ("[A] reasonable juror could conclude that [defendant] disregarded an excessive risk to [plaintiff's] health by failing to timely address his medical tests or send him for follow up.").

        **ii.**    **Dr. Theresa McCarthy's Treatment Was Objectively Unreasonable.**

When Mr. Limbacher met with Dr. Theresa McCarthy in October and December of 2018, roughly a year after the triggering injury, he complained of shoulder pain and limited movement in his arm. (PSOF ¶ 30.) With his shoulder condition now chronic and without improvement for 12 months, Mr. Limbacher's circumstances required an adequate medical response, including advanced imaging and a referral for orthopedic evaluation and possible surgery. (PSOF, Ex. S, at 18; Ex. R, at 3.)

Dr. McCarthy's treatment of Mr. Limbacher was anything but adequate. Dr. McCarthy admitted that by the time she saw Mr. Limbacher, he presented with a "chronic injury." (PSOF ¶ 31.) She admitted that, if a patient reported that their shoulder was "making noise and creaking" (PSOF, Ex. Z, at 32:2–13; 121:20–122:2), it would be a serious complaint that she would "try to get to the bottom of what might be causing that perception." (*Id.* at 33:6–14.) Her examination revealed limited left shoulder range of motion and "'catching and cracking' between 80 to 100 degrees." (PSOF ¶ 32.) She observed indications of a possible shoulder impingement, tendinopathy or rotator cuff injury (PSOF ¶ 33.)

Despite the signs that something was seriously wrong with Mr. Limbacher's left shoulder, Dr. McCarthy did not "get to the bottom" of the cause and come to a conclusive diagnosis of the reasons for Mr. Limbacher's severe symptoms. (PSOF ¶ 34.) Dr. McCarthy knew full well that "getting an accurate diagnosis of somebody who is at risk of further injury" can be an "important

part of delivering high quality medical care." (PSOF ¶ 35.) That is because "any traumatic injury can cause issues down the line," including that "a patient might need surgery to repair the pathology they might not have needed had it been treated promptly when [it] was first injured." (*Id.*) Dr. McCarthy's "knowledge and experience as a physician" was that "the sooner anything can be evaluated…you could say that it would be better for the patient." (*Id.*) Yet, Dr. McCarthy did not order a shoulder MRI. (*Id.*)[2]

Mr. Limbacher requested that Dr. McCarthy refer him to an orthopedist. (PSOF ¶ 37.) "Orthopedists are available at Cermak." (PSOF ¶ 38; Ex. FF, at 27:18–29:16 (detainees may be referred from Cermak Health Services to Stroger Hospital, which provides full range of orthopedic services including shoulder replacement).)

Dr. McCarthy testified that, if she is "not sure about the diagnosis of a patient," that "can be" a factor that she considers "in deciding whether to refer a patient for consultation to another doctor." (PSOF ¶ 41.) Despite signs of chronic shoulder pathology, no definitive diagnosis, no MRI, and an express request for a referral, Dr. McCarthy did not refer Mr. Limbacher to an orthopedist supposedly because he could have made the request himself. (PSOF ¶ 40.) Instead of identifying and addressing the root cause of Mr. Limbacher's recurring shoulder problems herself or referring Mr. Limbacher to a specialist who could do so, Dr. McCarthy offered only a cortisone injection that she knew would—at best—offer temporary relief to Mr. Limbacher. (PSOF ¶ 42.)

Mr. Limbacher had reasons to decline the cortisone injection, including that it would not solve the main problem and he wanted to discuss the injection with an orthopedic surgeon. Dr.

---

[2] When Codefendant Physician Assistant Barbara Davis asked if Dr. McCarthy wanted an MRI of Mr. Limbacher's shoulder, Dr. McCarthy rejected the suggestion. McCarthy Dep. 64:11–65:5 [CITE 11/20/18 email addendum] Dr. McCarthy never asked P.A. Davis any questions about the MRI. Davis Dep. 70:6–16.

McCarthy insisted that she would not make an orthopedic referral unless and until Mr. Limbacher had the injection. (PSOF ¶ 44.)

No record evidence suggests that a cortisone shot would have significantly resolved Mr. Limbacher's shoulder condition. Nothing suggests that a physician's duty of care is satisfied by recommending a treatment that at best would have masked temporarily an underlying medical condition. (Def. Mot. 12.) Dr. McCarthy admitted that the injection was at most a temporary fix and was not a permanent solution to the problems she observed in Mr. Limbacher's shoulder. (PSOF ¶ 45.)

Too much time had passed since Mr. Limbacher's shoulder injury for band aids and half-measures. As Dr. Herrington explained, offering a shoulder injection after the passage of almost a year where a patient is not recovering and continues to experience feelings of "catching and cracking" was objectively unreasonable and violated the standard of care for treating shoulder injuries. (PSOF, Ex. S, at 18.) The standard of care required Dr. McCarthy to refer Mr. Limbacher for an MRI of his left shoulder and/or to refer him to an orthopedic surgeon. (*Id.*) [3]

Defendants' argument that Dr. McCarthy met the standard of care because she "ordered x-rays, MRIs, and a cortisone shot" is deceptive. Dr. McCarthy ordered an MRI of Mr. Limbacher's back. She expressly refused to order an MRI of Mr. Limbacher's shoulder. (PSOF ¶ 51.)

The jury may reasonably find that Dr. McCarthy's limited treatment of Mr. Limbacher's disabled shoulder, coupled with her failure to follow the well-accepted standard of care for diagnosing and treating a traumatic shoulder injury by referring Mr. Limacher for a shoulder MRI or to an orthopedic specialist after a year of pain and suffering with no improvement, were objectively unreasonable. If a doctor chooses an "easier and less efficacious treatment" for a

---

[3] Dr. McCarthy never consulted an orthopedist. (PSOF Ex. Z, at 42:19–22.)

14

serious medical condition, it can amount to a due process violation. *Berry*, 604 F.3d at 441 (doctor that refused to refer prisoner to dentist was not entitled to summary judgment) (citations omitted); *Hayes v. Snyder*, 546 F.3d 516, 526 (7th Cir. 2008) ("The fact that a general practitioner is unable to identify or document the cause of a patient's pain does not strike us as a reason to *reject* a request to see a specialist; indeed,…it suggests the opposite.…[T]he very reason why a specialist would be called in is that a generalist is unable to identify the cause of a particular ailment.").

Furthermore, Seventh Circuit and District Court precedent directly refutes Dr. McCarthy's argument that her suggestion of a temporary remedy for the chronic, recurring pain in Mr. Limbacher's shoulder joint was sufficient to meet the standard of care. *Petties*, 836 F.3d at 731 ("But repeatedly, we [the Seventh Circuit] have rejected the notion that the provision of some care means the doctor provided medical treatment which meets the basic requirements of [due process]."); *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005) (denying summary judgment where, as here, evidence showed an "obdurate refusal to alter [plaintiff's] course of treatment despite his repeated reports that the medication was not working and his condition was getting worse."); *Cumbee*, 2016 WL 5404597, at *5 (Tharp, J.); *Hernandez v. Hain*, No. 19 C 5147, 2021 WL 3618276, at *6 (N.D. Ill. Aug. 16, 2021) (Kennelly, J.) (a jury could consider doctor's "wait and see" approach despite plaintiff's continued pain for two weeks objectively unreasonable); *Leger v. Jaimet*, No. 3:15-cv-00080-SMY-RJD, 2017 WL 5069334, at *6 (S.D. Ill. Nov. 2, 2017) (jury could reasonably conclude physician was deliberately indifferent where plaintiff "consistently complained that he was not getting any relief" from extended conservative treatment of ruptured rotator cuff); *Hill v. Lakin*, No. 19-cv-00405-JPG, 2022 WL 672464, at *6 (S.D. Ill. Mar. 7, 2022) (doctor could be found objectively unreasonable under the Fourteenth Amendment

where doctor chose the "easy, but ineffective" treatment of pain medication and stretching for five months for ankle injury despite plaintiff's "frequent and persistent complaints of pain").

### iii. Defendant Physician Assistant Barbra Davis' Treatment Was Objectively Unreasonable.

Barbara Davis, a Physician Assistant who treated Mr. Limbacher on multiple occasions, fell short of the standard of care required by the nature and severity of Mr. Limbacher's shoulder condition. Per the medical notes, P.A. Davis saw Mr. Limbacher on November 13, 2018, December 12, 2018, January 29, 2019, and July 24, 2019. By the time of these appointments, Mr. Limbacher's medical record reflected numerous complaints about severe pain, discomfort and lack of function in his shoulder that had been continuing for over a year. During the January 2019 visit, Mr. Limbacher reported to P.A. Davis that "the pain or the condition of his left shoulder had never been addressed." (PSOF ¶ 49.) By July of 2019, twenty months had passed since Mr. Limbacher fell and injured his shoulder. Yet Mr. Limbacher had to return again for medical treatment because the ongoing pain and limited shoulder mobility remained untreated and unresolved.

During his visits with P.A. Davis, Mr. Limbacher requested that P.A. Davis order an MRI. P.A. Davis once asked Dr. McCarthy to approve a shoulder MRI, but Dr. McCarthy declined. (PSOF ¶ 51.) Mr. Limbacher made subsequent requests for MRIs to P.A. Davis. (PSOF ¶ 52.) There is no record indication that P.A. Davis took any action in response to these later requests. Mr. Limbacher also requested to see an orthopedist. At one of her earliest appointments with Mr. Limbacher, P.A. Davis told Mr. Limbacher that he would see an orthopedic doctor, but this promise went nowhere. In subsequent visits, P.A. Davis "changed her whole tune" and treated Mr. Limbacher dismissively. (PSOF ¶ 53.)

As was also true for Dr. McCarthy, P.A. Davis could not identify the source of the severe pain that Mr. Limbacher reported.[4] "Some people have pain that I can never tell." (PSOF ¶ 54.) She did, however, subjectively minimize the significance of the pain Mr. Limbacher reported, supposedly because he had suffered periodic dislocations since his initial injury. (*Id.*) She testified that "the pain he described is totally…out of portion to [a shoulder dislocation]." (PSOF ¶ 54.) *See Greeno*, 414 F.3d at 655 ("[T]here is no requirement that a prisoner provide 'objective' evidence of pain and suffering—self-reporting is often the only indication a doctor has of a patient's condition.") (citing *Cooper v. Casey*, 97 F.3d 914, 916-17 (7th Cir. 1996)); *see also Harper v. Bolton*, 57 F. Supp. 3d 889, 897 (N.D. Ill. 2014) (Cole, M.J.) ("[A] plaintiff's testimony cannot be ignored or found not credible even if a doctor cannot find a verifiable source for the claimed pain.").

Defendants assert that Mr. Limbacher supposedly refused to participate in physical therapy for his shoulder and that P.A. Davis supposedly counseled him on physical therapy. (Def. Mot. 6, 14.) Mr. Limbacher's testimony contradicts these points. He testified that the physical therapy for his shoulder was mostly "a sheet of paper with exercises to take back to [his] cell to do at [his] own time." (PSOF ¶ 25.) He further testified that he attempted the prescribed exercises. Instead of seeing the improvement that he was told to expect, the exercises "made it worse. It wasn't good for [him]." (*Id.*)

One fact is beyond contradiction—P.A. Davis had multiple opportunities to refer Mr. Limbacher to an orthopedist. She never made the referral. The standard of care for diagnosing and

---

[4] Despite not ordering an MRI and not referring Mr. Limbacher to a specialist, P.A. Davis claimed in her deposition that "[w]e knew exactly what he had." (PSOF, Ex. FF, at 92.) She claimed Mr. Limbacher had no need for shoulder replacement surgery – "But that is not this case at all." (*Id.* at 87.) Of course, when Mr. Limbacher was finally referred to an orthopedic doctor in 2020, the orthopedic doctors all agreed that Mr. Limbacher requires shoulder replacement surgery.

17

treating a patient in Mr. Limbacher's condition presenting serious symptoms more than three months after the initial injury is to refer the patient to an orthopedic specialist for further advanced imaging. (PSOF, Ex. S, at 18; Ex. R, at 2–3.)

A jury could reasonably find that P.A. Davis' refusal to order an MRI and or refer Mr. Limbacher to an orthopedist and her failure to appreciate the consequences of Mr. Limbacher's shoulder presentation, were objectively unreasonable.[5] Mr. Limbacher's condition was never resolved despite many months and his many requests for care. *See  Smith v. Kapotas*, No. 18 C 4260, 2020 WL 553619, at *4 (N.D. Ill. Feb. 4, 2020) (a medical professional may show "reckless disregard for a serious health risk without 'literally ignor[ing]' the detainee.") (quoting *Sherrod v. Linge*, 223 F.3d 605, 611–12 (7th Cir. 2000)); *Conley*, 796 F.3d at 747 ("An official may not escape liability by refusing to verify underlying facts that she strongly suspects to be true.") (internal quotations and citations omitted); *Cumbee*, 2016 WL 5404597, at *5 (Tharp, J.).

### iv. Defendant Physician Assistant Kevin Sims' Treatment Was Objectively Unreasonable.

Physician Assistant Sims saw Mr. Limbacher on January 30, 2018. The evidence concerning that visit, including P.A. Sims' admissions, permits a jury to find that he should have referred Mr. Limbacher to an orthopedic specialist for treatment, and that P.A. Sim's failure to do so was objectively unreasonable. P.A. Sims admitted that orthopedics was not his "forte," saying that is "why I refer to my orthopedic specialist" for orthopedic problems. (PSOF ¶ 59.) According

---

[5] In addition to finding that P.A. Davis, P.A Trammel and P.A. Sims should have referred Mr. Limbacher to a specialist, a jury could reasonably find that these defendants violated the standard of care by failing to assure that Dr. McCarthy or another provider ordered an MRI and/or referred Mr. Limbacher to a specialist. *See Perez* 792 F.3d at 779–80 (nurse has an independent duty to provide "constitutionally adequate care," which could include "contacting supervisory personnel to voice any concerns about treatment being provided").

to P.A. Sims, a referral to an orthopedic specialist did not require anyone else's approval and was as easy as writing an order on the computer. (PSOF ¶ 60.)

Notwithstanding P.A. Sims' recognition of his limited aptitude in orthopedics, he did not refer Mr. Limbacher to the orthopedic clinic. (PSOF ¶ 61.) He left Mr. Limbacher to suffer from an untreated shoulder problem without any clinical relief. If a medical provider is in over his or her head, the provider's obligation is to refer the patient to a specialist, not to do nothing. *Hayes*, 546 F.3d at 525–26 (unreasonable for provider to not refer plaintiff to specialist); *McWilliams*, 2018 WL 3970145, at *10 ("refusal to engage specialist permits an inference that a medical provider was deliberately indifferent") (applying stricter Eighth Amendment standard).

P.A. Sims contends that Mr. Limbacher "made no mention of his left shoulder injury, nor did [Mr. Limbacher] mention wanting to see an orthopedic surgeon regarding his left shoulder." (PSOF ¶ 51.) But Mr. Sims admits to no memory of treating Mr. Limbacher. (PSOF, Ex. Y, at 56:7–11; 62:22–24; 79:12–18.) In sharp contrast, Mr. Limbacher recalls that he specifically alerted P.A. Sims to Mr. Limbacher's shoulder condition. (PSOF ¶ 62.) After checking the date of Mr. Limbacher's injury, P.A. Sims was "surprised that [Mr. Limbacher] had not seen an orthopedic specialist." (PSOF ¶ 61.) This dispute about who said what to whom once again highlights the disputed questions of material fact that must be resolved by the jury. *See Peters*, 2020 WL 5593754, at *6.

P.A. Sims' assertion that he was ignorant of Mr. Limbacher's shoulder pain and disfunction is further contradicted by the documentary evidence of Mr. Limbacher's prior requests for medical care for his shoulder. Request Forms readily accessible to P.A. Sims showed that Mr. Limbacher previously complained about shoulder pain. (PSOF ¶ 64.) While P.A. Sims contends that it was "not practical" to read Mr. Limbacher's medical history that was readily available to him on his

computer (PSOF, Ex. Y, at 38:3–14; 43:15–22), a jury could find P.A. Sims' lack of preparation and diligence to be far outside of everyday standards for any skilled medical professional.

P.A. Sims offers a final straw man argument about a referral he made to a physical therapist for Mr. Limbacher's back pain. (Def. Mot. 8–9.) That P.A. Sims made a referral for a different medical condition does not excuse P.A. Sims' failure to refer Mr. Limbacher to a specialist who could diagnose and treat Mr. Limbacher's shoulder condition.

## V.      CONCLUSION

Each of the medical provider Defendants were charged with providing adequate medical services for Mr. Limbacher's serious shoulder problem or referring Mr. Limbacher to a specialist who could provide those services. Admissible evidence would fully support a jury's verdict that Defendants failed in these duties and violated Mr. Limbacher's Fourteenth Amendment rights. The evidence shows Mr. Limbacher suffered years of pain, having difficulty in daily living even after his release from custody as a direct result of the objectively unreasonable medical treatment that he received. The evidence shows that Defendants' actions and inactions led to deterioration in Mr. Limbacher's left shoulder to such a significant extent that he now requires shoulder replacement surgery. Mr. Limbacher is entitled to have his §1983 claims tried to a jury.

WHEREFORE, for the reasons detailed above, Plaintiff Shane Edward Limbacher respectfully requests that this Court (i) DENY Defendants' Motion for Summary Judgment in its entirety; (ii) ORDER this matter for trial; and (iii) GRANT any further relief that the Court deems appropriate to Plaintiff Shane Edward Limbacher.

Dated: November 27, 2023                          Respectfully submitted,

                                                  /s/ Randall A. Hack
                                                  Counsel for Plaintiff

Randall A. Hack (6187595)
Brian I. Hays (6256068)
Locke Lord LLP
111 South Wacker Drive
Chicago, IL 60606
(312) 443-0676
rhack@lockelord.com
bhays@lockelord.com

## CERTIFICATE OF SERVICE

I, Randall Hack, hereby certify that on November 27, 2023, I electronically filed the foregoing with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, using the Court's CM/ECF system, which will automatically send notification of this filing to all counsel of record.

*/s/ Randall A. Hack*

21