**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| Shane Edward Limbacher, | ) |
| | ) |
| Plaintiff, | ) Case No. 19-cv-07509 |
| | ) |
| vs. | ) Honorable District Court Judge |
| | ) John J. Tharp Jr. |
| Sheriff Thomas J. Dart, et. al., | ) |
| | ) Honorable Magistrate Judge |
| Defendants. | ) Jeffery Cole |
| | ) |

**PLAINTIFF'S LOCAL RULE 56.1(b)(3)
STATEMENT OF ADDITIONAL MATERIAL FACTS**

Plaintiff Shane Edward Limbacher, pursuant to Local Rule 56.1(b)(3) of the Rules of the Northern District of Illinois, files this Statement of Additional Material Facts ("PSOF") in support of his response in opposition to Defendants' motion for summary judgment.

**I.      List of Exhibits**

    A.     Health Services Request Form (Nov. 17, 2017)

    B.     Health Services Request Form (Dec. 14, 2017)

    C.     Health Services Request Form (Jan. 8, 2018)

    D.     Health Services Request Form (Jan. 18, 2018)

    E.     Health Services Request Form (Jan. 26, 2018)

    F.     Outpatient PT-OT-CHS Report (Feb. 20, 2018)

    G.     Health Services Request Form (Feb. 21, 2018)

    H.     Outpt Medical CHS (Mar. 2, 2018)

    I.     Outpt Medical CHS (May 7, 2018)

    J.     Health Services Request Form (June 19, 2018)

    K.     Health Services Request Form (July 7, 2018)

1

L. Health Services Request Form (July 13, 2018)

M. Health Services Request Form (Aug. 3, 2018)

N. Health Services Request Form (Sept. 28, 2018)

O. Evaluation of Shoulder Complaints (UpToDate) (accessed on Nov. 20, 2022)

P. Neurosurgery Outpatient Report (Limbacher11996-12019)

Q. Outpatient Progress Note (June 30, 2020)

R. Expert Report of Dr. Sebastian Ko

S. Expert Report of Dr. Ryan Herrington

T. ER CHS Record (Nov. 13, 2017)

U. Dr. Yu Deposition

V. Health Services Request Form (Nov. 14, 2017)

W. Outpatient Medical CHS Record (Nov. 29, 2017)

X. Outpatient Medical CHS Report (Jan. 30, 2018)

Y. Defendant Sims Deposition

Z. Dr. McCarthy Deposition

AA. Correspondence between Davis and McCarthy (Dec. 4, 2018)

BB. Shane Limbacher Deposition

CC. Health Services Request Form (Nov. 22, 2017)

DD. Medical visit with Defendant Sims (Jan. 10, 2017)

EE. Medical visit with Defendant Trammel (May 29, 2018)

FF. Defendant Davis Deposition

GG. Medical visit with Defendant Davis (Nov. 13, 2018)

HH. Medical visit with Defendant Davis (Dec. 12, 2018)

    II.     Medical visit with Defendant Davis (Jan. 29, 2019)

    JJ.    Health Services Request Form (Nov. 22, 2017)

    KK.  McCarthy Medical Report (Dec. 4, 2018)

**II.    Additional Material Facts**

1. Plaintiff was incarcerated as a pretrial detainee at the Cook County Department of Corrections. (Defendants' Statement of Undisputed Material Facts ("DSOF"),¶ 1.)

2. During a medical appointment on November 13, 2017, Mr. Limbacher took a hard fall in which he dislocated his shoulder and tore his labrum. (DSOF ¶ 4; Ex. S at 1.)

3. The fall resulted in immediate, severe pain and distress. While lying on the floor, Mr. Limbacher kept complaining, "My shoulder. My shoulder." (Ex. BB, at 27:8–13, 29:17–30:6.)

4. The nurse called for emergency help. Mr. Limbacher was strapped to a gurney and taken to Urgent Care. (DSOF ¶ 4.)

5. Mr. Limbacher reported to the paramedics that his shoulder was hurting. (Ex. BB, at 34:15–20.)

    **A. Urgent Care Visit**

6. When Mr. Limbacher arrived at Urgent Care, his vitals were taken by Wendell Smith. Ex. T, at 1–2 (Physical Examination VS/Measurements, 11/13/2017 12:38)).

7. Mr. Limbacher briefly met with Dr. Yu before being sent for x-rays of his spine. (Ex. T, at 4 (Radiology order 12:52).) Mr. Limbacher told Dr. Yu that he hurt his head, neck, and shoulder. (Ex. BB, at 35:5–22.) Dr. Yu examined Mr. Limbacher's neck but did not examine his shoulder. (Ex. BB, at 35:23–36:18.)

8. When Mr. Limbacher returned from the x-rays, he informed Dr. Yu that he still needed his shoulder looked at. Dr. Yu said, "I'm done with him," and made a dismissive gesture with his hand before sending Mr. Limbacher away. (Ex. BB, at 36:19–37:5.)

9. Although Dr. Yu failed to perform an examination of Mr. Limbacher's shoulder, Dr. Yu admitted that when a patient complains of a shoulder injury, Dr. Yu should perform a physical examination of the shoulder. (Ex. U, at 21:2–4.) Dr. Yu also admitted that if his physical examination led him to suspect a dislocation, he would order an x-ray. (*Id.* at 22:6–23:1.) If a patient disclosed their shoulder pain, he would reduce it and "then the patient needs to be followed up with an orthopedic surgeon to make sure it is healing properly." (*Id.* at 30:16–31:4.)

10. Dr. Yu did not examine Mr. Limbacher's shoulder, did not order an x-ray of Mr. Limbacher's shoulder; did not order an MRI of the shoulder, and did not refer Mr. Limbacher to an orthopedic doctor for a follow up appointment. (*See* Ex. T (showing an absence of treatment).)

11. Dr. Yu's failure to even examine Mr. Limbacher's left shoulder set the course for three years of poor treatment and subsequent pathology in the joint. As Dr. Herrington explained:

> [A]ppropriate attention to the left shoulder by Dr. Yu on 11/13/17, as required by standard of care, on a more likely than not basis would have resulted in a left shoulder dislocation being either confirmed or at least clinically suspected. This in turn on a more likely than not basis would have influenced clinical decision making by subsequent providers and would have put Mr. Limbacher in a better position of having his shoulder dislocation timely treated with the development of glenohumeral arthritis potentially delayed or even prevented.

(Ex. S, at 15.)

### B. Subsequent Medical Visits

12. From the time of his initial injury on November 13, 2017, through his release from custody, Mr. Limbacher experienced debilitating, recurring shoulder pain and limited use and function in the shoulder joint. (Ex. BB, at 99:8–101:5.)

135474918v.2

13. Mr. Limbacher submitted over 12 Health Services Request Forms complaining of acute left shoulder pain and limitations on the function of that joint. (Ex. A-E, G, J-N, CC). All of these Request Forms and other medical records were available to treating providers on their electronic medical record system. (Ex. Z, at 38:3–14, 43:15–22.) The text of each Request Form is copied and made part of the medical record. (*Id.* at 42:8–43:22.)

14. Despite Mr. Limbacher's repeated reports of severe shoulder pain, disability, and impaired function, not one of the Defendants took it upon themselves to make an accurate diagnosis of Mr. Limbacher's shoulder injury or to provide effective treatment for the injury.

15. Not one of the Defendants who treated Mr. Limbacher after the date of injury timely referred Mr. Limbacher for further imaging tests or to an orthopedic specialist for treatment.

16. On November 14, 2017, the day after the injury, Mr. Limbacher submitted a Health Services Request Form ("HSRF") complaining that Dr. Yu had not treated all of Mr. Limbacher's injuries: "My…left shoulder…[is] in severe pain from the fall I took in Ms. Jardine's chair yesterday. I do not feel that all my injuries were treated and looked at properly (sic)." (Ex. V.)

17. On November 17, 2017, Mr. Limbacher submitted another HSRF begging for someone to treat his neck, shoulder, and back pain: "I'm still having severe neck, shoulder and back pain. My left arm and left leg are numb. It's difficult to walk. Something is wrong. PLEASE HELP!" (Ex. A).

18. On November 22, 2017, Mr. Limbacher submitted yet another HSRF asking someone to see him about his neck, left shoulder, back, leg, and knee: "I still have pain in my neck, left should and back, left leg and knee. My left arm goes numb. …. Something is wrong." (Ex. CC.)

19. On November 29, 2017, Mr. Limbacher was seen by P.A. Trammell. Ex. 9. P.A.

5

Trammell told Mr. Limbacher that he would schedule Mr. Limbacher for an orthopedic appointment. (Ex. BB, at 44:4–15.) P.A. Trammell did not schedule an appointment with an orthopedic specialist. (*See* Ex. W (absence of referral).)

20. On December 14, 2017, Mr. Limbacher submitted another HSRF asking to see a doctor about his "severe pain in my neck, back, left shoulder and knee." (Ex. B.)

21. On January 8, 2018, Mr. Limbacher submitted another HSRF asking to see a doctor for his neck, back, shoulder, and knee pain caused by the November 13, 2017 accident. (Ex. C.)

22. Mr. Limbacher submitted another HSRF on January 18, 2018 complaining of neck and back pain that was causing severe headaches. (Ex. D.)

23. Having still not seen a doctor, Mr. Limbacher submitted another HSRF on January 26, 2018. Mr. Limbacher complained that he needed additional medical attention for his back, neck, left shoulder, and knee pain. He noted that "[t]he pain from my accident has existed for more than 2 months. … My many requests have gone unanswered." (Ex. E.)

24. On January 30, 2018, Mr. Limbacher saw P.A. Sims. Mr. Limbacher discussed his left shoulder with P.A. Sims. P.A. Sims expressed surprise that Mr. Limbacher had not been referred to orthopedics given the amount of time that had passed since the accident. (Ex. BB, at 49:6–18.) P.A. Sims referred Mr. Limbacher for physical therapy for his lower back but not for his shoulder. (Ex. DD (referral to physical therapy for "chronic LBP").)

25. Mr. Limbacher saw a physical therapist on February 20, 2018. The appointment focused on Mr. Limbacher's back, although some of the exercises did involve the shoulders. (Ex. F at 3.) He was given "a sheet of paper with exercises to take back to [his] cell to do at [his] own time." (Ex. BB, at 50:24–51:19.) Mr. Limbacher attempted the prescribed exercises. Instead of seeing the improvement that he was told to expect, the exercises "made it worse. It wasn't good

6

for [him]." (*Id.* at 51:20–52:5.)

26. Mr. Limbacher submitted another HSRF on February 21, 2018, complaining that his neck and back were "still in severe pain." (Ex. G.)

27. Mr. Limbacher saw P.A. Trammell on March 2 and again on May 7, 2018. (Ex. H and Ex. I.) Mr. Limbacher reported severe shoulder pain, reminded P.A. Trammel of his prior commitment to refer Mr. Limbacher to an orthopedic specialist, and each time requested to see a specialist. (Ex. BB, at 53:12–57:2; 62:18–64:18.) In the report from the May 7, 2018 visit, P.A. Trammell noted that Mr. Limbacher was suffering from chronic neck, bilateral upper extremities ("BUE"), and lower back pain and that Mr. Limbacher experienced little relief with physical therapy. (Ex. I at 1.)

28. Mr. Limbacher saw P.A. Trammell again on May 29, 2018 for continuing chronic neck, BUE, and lower back pain. (Ex. EE.)

29. Despite the many indications that Mr. Limbacher needed to see an orthopedist, and P.A. Trammell's verbal acknowledgements that Mr. Limbacher needed a specialist referral, P.A. Trammel never made a referral or followed-up to assure that Mr. Limbacher saw a specialist. (*See* Ex. H, I and AH (absence of referrals).)

30. When Mr. Limbacher met with Dr. McCarthy in October and December 2018, now roughly a year after the triggering injury, he complained of shoulder pain and limited movement in his arm. (Ex. AA, at 30:12–16; Ex. BB, at. 70:10–73:10; 74:22–78:8.)

31. Dr. McCarthy admitted that by the time she saw him, Mr. Limbacher presented with a "chronic injury." (Ex. AA, at 115:14–22.) She admitted that, if a patient reported that his or her shoulder was "making noise and creaking" (Ex. AA, at 32:2–13; 121:20–122:2), it would be a

7

serious complaint that she would "try to get to the bottom of what might be causing that perception." (Ex. AA, at 33:6–14.)

32. Dr. McCarthy's examination revealed limited left shoulder range of motion and "'catching and cracking' between 80 to 100 degrees." (Ex. AI, at 3).

33. She observed indications of a possible shoulder impingement, tendinopathy or rotator cuff injury (Ex. AA, at 76:22–78:6.)

34. Despite the signs that something was seriously wrong with Mr. Limbacher's left shoulder, Dr. McCarthy did not "get to the bottom" and come to a conclusive diagnosis of the reasons for Mr. Limbacher's severe symptoms. (Ex. AA, at 72:24–73:8; 82:18–21; 83:24–84:2.)

35. Dr. McCarthy knew that "getting an accurate diagnosis of somebody who is at risk of further injury" can be "important part of delivering high quality medical care." (Ex. AA, at 114:15–20.) That is because "any traumatic injury can cause issues down the line," including that "a patient might need surgery to repair the pathology they might not have needed had it been treated promptly when [it] was first injured." (Ex. AA, at 117:5–14.) Dr. McCarthy's "knowledge and experience as a physician" was that "the sooner anything can be evaluated, …you could say that it would be better for the patient." (Ex. AA, at. 117:16–118:5.) Yet, Dr. McCarthy did not order a shoulder MRI. (*Id.* at 92: 9–19.)

36. When P.A. Davis asked if Dr. McCarthy wanted an MRI of Mr. Limbacher's shoulder, Dr. McCarthy rejected the suggestion. (Ex. AA 64:11–65:5; Ex. AA.)

37. Mr. Limbacher requested that Dr. McCarthy refer him to an orthopedist. (Ex. BB. 72:12–73:10.)

38. "Orthopedists are available at Cermak." (Ex. AA, at 88:5–12; 89:4–7; Ex. FF, at 27:18–29:16 (detainees may be referred from Cermak Health Services to Stroger Hospital, which provides full range of orthopedic services including shoulder replacement).)

39. Dr. McCarthy did not consult an orthopedist. (Ex. AA, at 42:19–22.)

40. Despite signs of chronic shoulder pathology, no definitive diagnosis, no MRI, and an express request for a referral by Mr. Limbacher, Dr. McCarthy did not refer Mr. Limbacher to an orthopedist, supposedly because he could have made the request himself. (Ex. AA, at 88:5–12.)

41. Dr. McCarthy testified that, as was true here, if she was "not sure about the diagnosis of a patient," her uncertainty "can be" a factor that she considers "in deciding whether to refer a patient for consultation to another doctor." (Ex. AA, at 113:15–19.)

42. Instead of identifying and addressing the root cause of Mr. Limbacher's recurring shoulder problems herself or referring Mr. Limbacher to a specialist who could do so, Dr. McCarthy offered only a cortisone injection that she knew would at best offer temporary relief to Mr. Limbacher, leaving the root cause of his symptoms unaddressed. (Ex. AA, at 81:6–10.)

43. Mr. Limbacher had reasons to decline the cortisone injection, including that it would not solve the main problem and he wanted to discuss the injection with an orthopedic surgeon. (Ex. BB, at 71:20–72:8, 76:11–78:8.)

44. Dr. McCarthy insisted that she would not make an orthopedic referral unless and until Mr. Limbacher had the injection. (Ex. BB, at 76:15–78:8.)

45. Dr. McCarthy admitted that the injection was at best a temporary solution and was not a permanent solution to the problems she observed in Mr. Limbacher's shoulder. (Ex. AA, at 81:6–10.)

9

46. As Dr. Herrington explained, offering a shoulder injection after the passage of almost a year where a patient is not recovering and continues to experience feelings of "catching and cracking" was objectively unreasonable and violated the standard of care for treating shoulder injuries. (Ex. S, at 18.) The standard of care required Dr. McCarthy to refer Mr. Limbacher for an MRI of his left shoulder and referral to an orthopedic surgeon. (*Id.*)

47. P.A. Davis saw Mr. Limbacher on November 13, 2018, December 12, 2018, January 29, 2019, and July 24, 2019. (Ex. GG; Ex. HH; Ex. II.)

48. By the time of these appointments, Mr. Limbacher's medical record reflected numerous complaints about severe pain, discomfort and lack of function in his shoulder that had been continuing for more than a year. (*See supra* ¶¶ 13, 16–18, 20–24, 26–32.)

49. During the January 29, 2019 visit, Mr. Limbacher reported to P.A. Davis that "the pain or the condition of his left shoulder had never been addressed." (Ex. FF, at 89:12–90:9.)

50. By July of 2019, twenty months had passed since Mr. Limbacher fell and injured his shoulder. Yet Mr. Limbacher returned again for medical treatment because the ongoing pain and limited shoulder mobility remained untreated and unresolved.

51. During his visits with P.A. Davis, Mr. Limbacher requested that P.A. Davis order an MRI. P.A. (Ex. BB, at 85:23–86:16.) Davis asked Dr. McCarthy to approve the shoulder MRI, but Dr. McCarthy declined. (Ex. FF, at 80:11–18; 84:6–19.)

52. Mr. Limbacher made subsequent requests for MRIs to P.A. Davis. (Ex. BB, at 87:15–89:12.) There is no record indication that P.A. Davis ever took any action in response to these later requests.

53. Mr. Limbacher also requested to see an orthopedist. At one of her earliest appointments with Mr. Limbacher, P.A. Davis told Mr. Limbacher that he would see an orthopedic

10

doctor. Subsequently, P.A. Davis "changed her whole tune" and treated Mr. Limbacher dismissively. (Ex. BB, at 87:15–89:12.)

54. P.A. Davis could not identify the source of the severe pain that Mr. Limbacher reported. "Some people have pain that I can never tell." (Ex. FF, at 74:1–7.) She did, however, subjectively minimize the significance of the pain Mr. Limbacher reported, supposedly because he had suffered periodic dislocations since his initial injury. (*Id.* at 73:2–74:10.) She testified that "the pain he described is totally…out of portion to [shoulder dislocation]." (*Id.* at 73:2–11.)

55. Despite not ordering an MRI and not referring Mr. Limbacher to a specialist. P.A. Davis claimed in deposition that "[w]e knew exactly what he had." (Ex. FF, at 92:13–20.) She claimed Mr. Limbacher had no need for shoulder replacement surgery – "But that is not this case at all." (*Id.* at 86:20–87:12.)

56. When Mr. Limbacher was finally referred to an orthopedic doctor in 2020, the orthopedic doctors all agree that Mr. Limbacher requires shoulder replacement surgery. (*See* Ex. R at 5 ("ultimate treatment for osteoarthritis would be an arthroplasty"); Ex. S, at 2.)

57. Mr. Limbacher's condition was never resolved by Defendants despite many months and many requests by him for care.

58. Physician Assistant Sims saw Mr. Limbacher on January 30, 2018.

59. P.A. Sims admitted that orthopedics was not his "forte," saying that is "why I refer to my orthopedic specialist" for orthopedic problems. (Ex. Z, at 35:17–36:7.)

60. A referral to an orthopedic specialist did not require anyone else's approval and was as easy as writing an order on the computer. (*Id.* at 17:13–18:6, 50:3–6.)

61. Notwithstanding P.A. Sims' recognition of his limited aptitude in orthopedics, he did not refer Mr. Limbacher to the orthopedic clinic. (Ex. Z, at 17:12, 35:17–36:15.)

62. Mr. Limbacher specifically alerted P.A. Sims to Mr. Limbacher's shoulder condition. (Ex. BB, at 48:24–49:18.)

63. After checking the date of Mr. Limbacher's injury, P.A. Sims was "surprised that [Mr. Limbacher] had not seen an orthopedic specialist." (Ex. BB, at 49:9–49:18.)

64. Health Services Request Forms readily accessible to P.A. (Ex. Z, at 43:15–17.) Sims showed that Mr. Limbacher previously complained about shoulder pain.

### C. Standard of Care for Diagnosis and Treatment of a Traumatic Shoulder Injury and Chronic Shoulder Pain and Dysfunction

65. Defendants failed to meet the baseline standard of care in treating Mr. Limbacher's left shoulder injury by refusing to order an MRI, refusing to refer him to an orthopedic specialist, and refusing to alter his course of treatment despite years of debilitating pain and limited shoulder function with no material improvement. (Ex. S, at 2–3.)

66. Dr. Ryan Herrington is a physician and expert in custodial medicine. As he explains in his Report, the "standard of care has to do with outcomes and how the best outcome for a particular patient, confronted with a particular set of clinical circumstances, can be realized as much as possible by the patient's providers and the system in which those providers are practicing." (Ex. S, at 4.)

67. Dr. Herrington reviewed all Mr. Limbacher's medical records to determine whether Defendants satisfied the required standard of care. Dr. Herrington concluded that each of the Defendants "deviated from accepted and prevailing standards of care." (Ex. S, at 12–13.)

68. Dr. Sebastian Ko is an orthopedic surgeon and Mr. Limbacher's treating surgeon. For suspected shoulder injuries after a fall, Dr. Ko's Report explains "[t]he appropriate standard of care for a patient complaining of head, neck, back, and shoulder pain from a fall is to address all four areas of complaint." (Ex. R, at 2.) The standard of care demands that "the provider must

12

address the shoulder injury…after confirming there are no injuries to the spine." (*Id.*) Then, "[i]f a patient reports pain and loss of motion after a traumatic injury, X-rays should be taken to determine whether the patient has any fractures or dislocations." (*Id.*) Next, "[i]f the X-rays do not confirm any fractures or dislocations, and the patient continues to have pain and loss of motion, an MRI should be performed to determine whether the patient has any occult factures, rotator cuff tear, labral tear, or other intra-articular pathology." (*Id.* (emphasis added).) Importantly, and of direct application here, if a patient continues to experience chronic shoulder pain (pain for over three to six months) after physical therapy, a patient should be referred to an orthopedic specialist. (*Id.* at 3)

69. The standard of care for a traumatic shoulder injury is also outlined in the UpToDate system, an electronic clinical resource tool that was available to the Defendants on their computers. (Ex. U, at 26:21–28:1.) An UpToDate flow chart shows the diagnostic steps for a shoulder injury. (Ex. U, at 26:21–28:1; Ex. P at 50.)



70. None of the Defendants ever diagnosed Mr. Limbacher's medical problem.

135474918v.2

71. None provided treatment that eliminated or significantly relieved Mr. Limbacher's chronic shoulder pain and impairment and restored Mr. Limbacher's shoulder to reasonable function.

72. None of the Defendants ordered a shoulder MRI or other advanced imaging.

73. None of the Defendants referred Mr. Limbacher to an orthopedic physician who could provide the specialist care that Mr. Limbacher had not received from Defendants.

74. From the injury date through his release from custody some years later, Mr. Limbacher had to live with debilitating shoulder pain and lack of function, which significantly impaired his ability to sleep, to exercise, to dress and to otherwise engage in daily activities free from pain and discomfort. (Ex. BB, at 98:8–101:5.)

Dated: November 27, 2023

Respectfully submitted,

*/s/ Randall A. Hack*
Counsel for Plaintiff

Randall A. Hack (6187595)
Brian I. Hays (6256068)
Locke Lord LLP
111 South Wacker Drive
Chicago, IL 60606
(312) 443-0676
rhack@lockelord.com
bhays@lockelord.com

**CERTIFICATE OF SERVICE**

  I, Randall Hack, hereby certify that on November 27, 2023, I electronically filed the foregoing with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, using the Court's CM/ECF system, which will automatically send notification of this filing to all counsel of record.

                         */s/ Randall A. Hack*