# Exhibit S

David Medical Services, PLLC
4250 Martin Way E
Suite 105, PMB 125
Olympia, WA  98516

# CASE INVESTIGATION, ASSESSMENT, AND OPINION

*SHANE E. LIMBACHER VS SHERIFF THOMAS J. DART ET AL.*



Ryan D. Herrington, MD, MPH
Senior Physician Consultant
David Medical Services, PLLC

_____

Date

___13 December 2022___

Retaining Party:

Mr. Shane Limbacher

# TABLE OF CONTENTS

Case Demographic Data and Assignment and Purpose Statement..................................................................3

Executive Summary............................................................................................................................4

Documents Reviewed.........................................................................................................................5

Relevant Clinical Summary and Factual Background................................................................................5

Methodology of Review......................................................................................................................12

Clinical Synopsis and Opinions...........................................................................................................13

References......................................................................................................................................19

Appendices....................................................................................................................................20

Limbacher vs. Dart et al.

## CASE DEMOGRAPHIC DATA
## ASSIGNMENT AND PURPOSE STATEMENT

**Case Demographic Data**

Patient Name: Shane E. Limbacher

Correctional Facility Name: Cook County Jail

Dates of Incarceration: 05/19/2017 through 02/24/2021

Responsible Health Services Authority: Cermak Health Services of Cook County

Responsible Custody/Detention Authority: Cook County Department of Corrections

**Assignment and Purpose Statement**

This is an investigative review of medical care provided to and received by Mr. Shane Limbacher during the above referenced period of incarceration at the Cook County Jail. Specifically, this is a review of the medical management he received after a fall sustained on 11/13/17. The purpose of this review is to assess whether clinical decision making and treatment choices afforded to Mr. Limbacher reasonably comported with accepted and prevailing standards of care for a correctional facility. Particular attention is given to difficulties Mr. Limbacher had with his left shoulder after his fall and how his left shoulder was assessed and treated by his correctional healthcare providers. Mr. Limbacher ultimately was found to have osteoarthritis of the glenohumeral joint of his left shoulder. Glenohumeral arthritis is understood and known to be attributable to traumatic injuries. This investigation in addition assesses the likelihood of a causal relationship between Mr. Limbacher's fall of 11/13/17 and his eventual diagnosis of left shoulder glenohumeral arthritis.

1 **Standard of Care**

2

3    From a clinician's perspective, the idea and intent behind the concept of standard of care has to

4  do with outcomes and how the _**best**_ outcome for a particular patient, confronted with a particular set of

5  clinical circumstances, can be realized _as much as possible_ by the patient's providers and the system in

6  which those providers are practicing.   There are times, depending on circumstances, where the best

7  outcome is cure.  There are other times where cure is neither realistic nor possible.  There are times where

8  the best outcome is that the patient is simply not allowed to become worse.  Clinical medicine is an art as

9  well as a science and standard of care does not and cannot guarantee a specific outcome for a patient.

10  Standard of care is intended to put the patient in a position where the best outcome is rendered more

11  likely.   Healthcare providers are professionally obligated to meet the standard of care.    All patients,

12  including those who are incarcerated, are entitled to clinical decision making that comports with standard

13  of care.

14
15

16 ## EXECUTIVE SUMMARY

17

18    Mr. Shane Limbacher is a now formerly incarcerated 49 year old male.  He was 44 years old when

19  he was booked into the Cook County Jail on 05/19/17.  He was 48 years old when he released on 02/24/21.

20  Reviewed medical records from Cook County Jail indicate that Mr. Limbacher was treated on multiple

21  occasions for a range of clinical conditions, including an injury to his left shoulder and chronic

22  complications of this injury that he subsequently developed.

23

24    The Cook County Jail is a large jail complex facility located in Chicago, Illinois operated by the Cook

25  County Department of Corrections.   Cermak Health Services of Cook County is the entity primarily

4

1  responsible for delivering healthcare to incarcerated individuals at the Cook County Jail with the John H.

2  Stroger Hospital of Cook County serving as a resource for specialty referral.   At all times relevant, Cermak

3  Health Services was responsible for tending to Mr. Limbacher's medical needs during his incarceration.

4

5  　　　　　Opinions are found in the summary opinion section of this report. The opinions formulated and

6  documented herein are made to a reasonable degree of medical certainty and probability and on a more

7  likely than not basis. Modifications or supplementation may be necessary should additional information

8  come to bear.

9

## DOCUMENTS REVIEWED

11
12  All documents forwarded for analysis were reviewed.
13
14  Clinical documentation review for this Investigation includes:
15  　　　　　Cook County Health and Hospitals System (Cermak) medical records for Mr. Limbacher
16
17  Legal filings reviewed include:
18  　　　　　Complaint
19  　　　　　Defendants' Answer and Affirmative Defenses to Plaintiff's Complaint
20
21

## RELEVANT CLINICAL SUMMARY AND FACTUAL BACKGROUND

24  *The intent of the Relevant Clinical Summary & Factual Background section is to provide the factual*
25  *foundation upon which the opinions in this analysis are formulated.  Direct references, verbatim*
26  *quotations, and actual excerpts from reviewed records as well as date-by-date timelines are used where*
27  *possible and practical; otherwise, more generalized summaries are utilized.  Clinical documentation is*
28  *often written in medical shorthand, sometimes with poor legibility, replete with abbreviations and*
29  *technical and nuanced terminology which can be challenging to read with good understanding.*
30  *Accordingly, some paraphrasing, use of layperson language, and the addition of clarifying language is*
31  *sometimes used as necessary for the reader's benefit.*

32  HSRF = Health Services Request Form.  Italicized language belongs to Mr. Limbacher.

1     **Cook County Jail Incarceration**
2
3     11/13/17, Nursing Visit, Wilson
4     Medical emergency, patient found on floor. Specific documentation reads "fell on floor and bumped his
5     head." Cervical spine precautions noted with cervical collar placement and use of spinal backboard
6     documented.  Transported to urgent care.
7
8     11/13/17, Adult Triage Note, Smith
9     Documentation reads "status post slip and fall with no loss of consciousness."
10
11    11/13/17, Urgent Care Provider Visit, Yu
12    Complaint is "trauma to the left neck, head and hip due to fall from chair one hour prior." No loss of
13    consciousness, no headache, no blurred vision, no dizziness and no nausea or vomiting.  Physical
14    examination limited to head and neck.  Cervical spine x-rays are remarkable for findings of multilevel
15    degenerative changes with specific reference made to C4 translation over C5.  C7 vertebral body is
16    partially obscured. Lumbar x-rays are remarkable for mild degenerative changes.  Clinical impression is
17    "trauma to head, neck and left hip."  Prescriptions for methocarbamol and naproxen are provided.
18
19    *11/14/17, HSRF*
20    *"My lower back…neck…left shoulder…left knee… are in severe pain from the fall I took in Ms. Jardine's*
21    *chair yesterday…I do not feel that all my injuries were treated and looked at properly…I feel that my*
22    *injuries have been carelessly dismissed.*
23
24    11/15/17, Provider Visit, Papiez
25    History documented is recent trauma, "falling off exam chair when pants got caught." Specific reference
26    is made to left hip pain, left shoulder pain and headaches.  Urine leakage is also noted.  Physical
27    examination of the shoulder references intact distal motor strength as well as limited extension and
28    abduction past 90 degrees.  Diagnosis is history of fall, wry neck, acute neck pain, acute back pain.  No
29    shoulder diagnosis is listed.
30
31    *11/17/17, HSRF*
32    *"I'm still having severe neck, shoulder and back pain."*
33
34    11/24/17, Nursing Visit, Steels
35    Complaints are pain to shoulder, neck, knee and back.  Continuation of medications as prescribed is
36    advised.
37
38    11/29/17, Provider Visit, Trammel
39    Documented complaints include reference to 16 day history of left hip, shoulder and lower back pain.  A
40    left shoulder physical examination is not documented.  Clinical impression is resolving left hip, left
41    shoulder and lower back pain.
42
43    *12/02/17, HSRF*
44    *"My pain meds aren't working" with reference made to left arm and shoulder.*
      *"My shoulder feels like it is going to pop out the socket again."*

1 *12/14/17, HSRF*
2 *"My pain meds have expired and I'm still having severe pain in my neck, back, left shoulder and knee."*
3
4 01/08/18, Nursing Visit, Steels
5 "I need to see a doctor for my neck, back, shoulder and knee pain that is the result of the accident that
6 occurred on 11/13/17." Referral to urgent care is documented.
7
8 01/08/18, Urgent Care Provider visit, Ahmad
9 Complaints are lower back pain, urinary incontinence and perineal numbness. Referred to Stroger
10 Hospital to rule out cauda equina syndrome. Lumbar CT is documented and noted findings include L5-
11 S1 disc bulge.
12
13 *01/16/18, HSRF*
14 *"Back pain, left shoulder and knee pain."*
15
16 02/15/18, Stroger Hospital Electrodiagnostic Studies Right Upper Extremity
17 Borderline study, suggestion of chronic C8 radiculopathy noted.
18
19 03/21/18, Physical Therapy, Crothers
20 Reference made to patient refusing movement to clinic for physical therapy.
21
22 04/05/18, Physical Therapy, Lassa
23 Reference made to patient refusing movement to clinic for physical therapy.
24
25 05/01/18, Physical Therapy, Crothers
26 Reference made to patient refusing movement to clinic for physical therapy. Further scheduling
27 deferred.
28
29 07/25/18, Neurosurgery Consultation, Raksin
30 Documented indication for referral is "bulging lumbar disc." Reference made to physical therapy
31 exacerbating neck and back pain. Treatment plan is MR imaging of the cervical and lumbar spine.
32
33 *08/03/18, HSRF*
34 *"My left shoulder pain is unbearable, I need to see an orthopedic…."*
35
36 08/05/18, Patient Visit, Morgan
37 Documented complaint is "I can't lift my arm all the way up." Encouraged to participate in physical
38 therapy.
39
40 *09/10/18, HSRF*
41 *"I'm still waiting to see an orthopedic regarding my left shoulder."*
42
43 09/10/18, Nursing Visit, Shearer
44 Documentation reads: "patient has been assessed for this issue, has scheduled referral…"

1     *09/28/18, HSRF*
2     *"Neck and shoulder has severe pain."*
3
4     09/29/18, Patient Visit, Morgan
5     Documented complaints include reference to left shoulder coming out of socket. Assessment
6     documented is impaired comfort.
7
8     10/02/18, Rehabilitation Medicine Consultation, McCarthy
9     Multiple joint complaints noted…. "especially" the left shoulder. Reference made to fall in November
10    2017 where "left shoulder felt like it popped out and then quickly went back into socket." Physical
11    examination documents "catching and cracking" of the left shoulder as well as limited active range of
12    motion. Drop arm and empty can testing is positive. Documented diagnosis includes "left shoulder
13    pain," possible rotator cuff pathology noted. Treatment plan is follow-up 11/6/18 for shoulder injection
14    and advanced imaging if no improvement.
15
16    10/09/18, Provider Visit, Trammell
17    Impression and plan documentation is pasted verbatim from above 10/02/18 visit with Rehabilitation
18    Medicine. Documented diagnosis is worsening neck, bilateral upper extremity, lower back and left
19    shoulder chronic pain. Methocarbamol is ordered.
20
21    10/11/18, Left Shoulder X-rays
22    Findings: humeral head degenerative changes and glenoid subchondral cysts.
23
24    11/13/18, Provider Visit, Davis
25    Multiple musculoskeletal problems and history of shoulder dislocation noted. Patient request for left
26    shoulder MRI noted. Documentation references an 11/06/18 visit with Dr. McCarthy not being
27    scheduled.
28
29    11/20/18, E-mail addendum documentation by McCarthy and e-mail response by Davis
30
31    McCarthy: Left shoulder MRI is not recommended with rationale that patient left shoulder symptoms
32    likely due to "significant arthritis" which could be managed via injection.
33
34    Davis: Conveys to McCarthy patient request for left shoulder MRI noting that patient is already going for
35    two MRI studies and the left shoulder may indeed be needed anyway.
36
37    11/23/18, Cervical Spine MRI
38    Documented impression is multilevel degenerative changes. Specific reference is made to C4-5 disc
39    extrusion with partial abutment of the ventral spinal cord. C4 on 5 retrolisthesis (3.2mm) is also
40    documented.
41
42    11/23/18, Lumbar Spine MRI
43    Interpretation reads multilevel degenerative disc changes greatest at L5-S1. Partial abutment of the
44    right S1 nerve root is documented.

8

1    <u>12/04/18, Rehabilitation Medicine Follow-Up McCarthy</u>
2    Multiple complaints are noted including left shoulder pain, neck pain radiating down the left arm and
3    lower back pain with radiation down the left lower extremity.  Drop arm testing is positive.  Impression
4    is left shoulder pain with movement.  Left shoulder injection is offered but declined.  Notation made
5    that follow-up for injection can be re-arranged at later time should there be a change of mind.
6
7    <u>12/12/18, Provider Visit, Davis</u>
8    Documented clinical impression is C6 radiulopathy and rule out disc bulging.
9
10   <u>01/09/19, Neurosurgery Consultation, Raksin</u>
11   Documented impression is left C6 and left S1 radiculopathy.
12   Physical therapy and pain clinic referrals are recommended.  No indication for neurosurgical
13   intervention.
14
15   <u>01/29/19, Provider Follow-Up, Davis</u>
16   "Numerous" musculoskeletal complaints are documented.  Clinical impression is "musculoskeletal pain."
17
18   <u>05/29/19, Provider Visit, Taiwo</u>
19   "Several musculoskeletal complaints" is documented.
20
21   *<u>08/14/19, HRSF</u>*
22   *"I'm requesting an evaluation with an orthopedic regarding continued pain in my neck, back and left*
23   *shoulder."*
24
25   <u>08/17/19, Nursing Note, Gresham-Trotter</u>
26   No visit is documented.  Reference made to conferring with provider regarding request for orthopedic
27   evaluation.
28
29   *<u>08/19/19, HSRF</u>*
30   *Left shoulder injection previously offered by rehabilitation and declined is requested.*
31
32   *<u>08/23/19, HSRF</u>*
33   *"Shoulder has so much pain I can't lift my arm, the pain is in the socket mostly."*
34
35   <u>08/25/19, Nursing Visit, Tabb</u>
36   Chronic shoulder pain is noted.  Recommendation is to increase fluids and monitor for pain triggers.
37
38   *<u>08/30/19, HSRF</u>*
39   *"I feel like I have broken glass inside my left shoulder…."*
40
41   <u>09/01/19, Nursing Note, Morgan</u>
42   No visit is documented.  Reference made to pending primary care visit on 10/28/19 to discuss
43   orthopedic follow-up.
44

1  *09/27/19, HSRF*
2  *"I am requesting cortisone shot in my left shoulder and would like to see an orthopedic doctor."*
3
4  10/28/19, Provider Visit, Harris
5  History of left shoulder pain since 11/13/17 is noted.  Reference made to accompanying dislocation of
6  left shoulder.  Physical examination notes positive apprehension testing and reduced range of motion.
7  Reference made to degenerative changes of the glenoid and proximal humerus on x-ray.  Clinical
8  impression is left shoulder pain.  Left shoulder MRI and left upper extremity electrodiagnostic testing is
9  recommended.  Orthopedic surgery referral is ordered.
10
11  *09/30/19, HSRF*
12  *"I have herniated discs in my neck and back, pain in my left shoulder with limited/restricted mobility from*
13  *an injury….it is impossible to function without pain medications….why have they been suddenly*
14  *restricted?"*
15
16  *10/26/19, HSRF*
17  *"I can no longer handle the pain in my left shoulder…I'm requesting to see an orthopedic specialist to*
18  *evaluate my injury….Please schedule me an appointment to see Dr. McCarthy for cortisone shot she*
19  *previously offered me."*
20
21  10/27/19, Nursing Note, Gresham-Trotter
22  Reference made to upcoming appointment on 10/28/19.  No visit documented.
23
24  10/28/19, Provider Visit, Harris
25  Clinical note not seen.
26
27  *11/03/19, HSRF*
28  *"I desperately need a cortisone shot in my left shoulder…Dr. McCarthy said I may have a shot upon*
29  *request….."*
30
31  11/04/19, Nursing Note, Gresham-Trotter
32  Reference made to referral to orthopedic surgery.  No visit documented.
33
34  11/13/19, Orthopedic Surgery Consultation, Chollampel
35  Complaint documented is left shoulder pain since 11/13/17.  History is fall from medical chair and
36  hitting the left shoulder with accompanying dislocation and self-reduction.  No further reductions.
37  Reference is made to x-ray imaging with findings of glenoid and humerus degenerative changes.
38  Apprehension testing noted to be painful.  Deltoid atrophy is documented.  Impression is left shoulder
39  pain for two years.  MR imaging of the left shoulder to rule out rotator cuff injury and also
40  electrodiagnostic testing are  recommended.
41
42  11/13/19, Left Shoulder X-rays
43  Impression is degenerative changes of the glenoid and proximal humerus similar to study on 10/11/18.
44

1    *11/20/19, HSRF*
2    *Please have Ms. Davis schedule me for a cortisone injection….I can't take the pain any longer."*
3
4    12/05/19, Physical Therapy, Crothers
5    Complaints of left shoulder pain noted.  Specific reference to fall on 11/13/17 with dislocation and self
6    reduction at that point in time.  No subsequent dislocations.  Independent with activities of daily living in
7    housing unit.  Feeling of shoulder "almost popping out" noted. Left shoulder flexion 80 degrees,
8    abduction 75 degrees.  Left shoulder strength testing 2 out of 5.  Left shoulder guarding noted.  Plan of
9    care is 4 physical therapy sessions.
10
11   12/20/19, Physical Therapy, Lassa
12   No text seen
13
14   *12/20/19, HSRF*
15   *I would like to have my left shoulder looked at…it feels like a torn muscle.*
16
17   *01/03/20, HSRF*
18   *"It feels like I have a torn muscle in my left arm/shoulder area-I need to see a doctor."*
19
20   *01/13/20, HSRF*
21   *"Please schedule me to have cortisone shots in my left shoulder and neck…..I'm in severe pain."*
22
23   01/14/20, Provider Visit, Davis
24   Multiple musculoskeletal complaints.  Relevant diagnosis is musculoskeletal pain.  Reference made to
25   follow-up with orthopedics, neurology and occupational therapy.
26
27   01/17/20, Outpatient Occupational Therapy, Lassa
28   Refused movement to PT clinic. Reference made to patient wanting to reschedule after orthopedics
29   appointment.
30
31   *02/16/20, HSRF*
32   *HSRF asks why pain medication discontinued stating is needed for back and shoulder pain.*
33
34   03/02/20 Left Shoulder MRI (*Chollampel ordering provider)
35   Documented reason for exam: shoulder dislocation
36   Interpretation:  chronic findings secondary to sequela of remote and/or recurrent posterior shoulder
37   dislocation events with main findings noted at the abnormal posteroinferior osseous glenoid and
38   labroscapular structures and associated moderate glenohumeral osteoarthritis possibly also post-
39   traumatic.  Moderate acromioclavicular osteoarthritis is also documented.
40
41   Additional interpretive documentation reads: "…emphasizing the likelihood of prior posterior dislocation
42   event and evolution of a notable bony Bankart lesion of the posteroinferior glenoid with distraction of
43   the labrocapsular structures as described above…a joint effusion with glenohumeral osteoarthritis are
44   also chronic findings which are likely related."

11

1    03/05/20, Electrodiagnostic Studies Left Upper Extremity
2    Study is normal.
3
4    *03/09/20, HSRF*
5    *"Please schedule me appointments for cortisone shot in my neck and left shoulder….these are serious*
6    *medical issues that are being disregarded."*
7
8    03/11/20, Orthopedic Follow-Up, Thomas
9    Documentation references fall from a medical chair onto the left shoulder on 11/13/17 with the
10   shoulder dislocating and the patient reducing the dislocation himself.  Documentation reads patient
11   "feels like the shoulder is going to come out."  Interim relevant orthopedic history includes referral to
12   physical therapy at 11/13/19 visit and officers "pulling" on the shoulder with patient stopping physical
13   therapy and home exercises.  MRI findings reviewed. Referral to Stroger Hospital (Dr. Bruce) for possible
14   surgical intervention is noted.  Re-referred to physical therapy.
15
16   03/20/20, Physical Therapy, Crothers
17   Impression documented is "no indication for 'urgent' PT re-evaluation."  Reference made to public
18   health emergency.  Appointment to be re-scheduled.
19
20   05/19/20, Physical Therapy, Crothers
21   Documentation reads "patient's poor attendance to PT follow-up appointments does concern 'this
22   provider' with any surgical interventions which may require consistent outpatient attendance."
23   Scheduling of PT interventions is "deferred."
24
25   06/30/20, Orthopedic Surgery Stroger Hospital, Karuthalackal
26   First time visit at orthopedics at Stroger Hospital.  Chronic left shoulder pain from a fall from a chair in
27   November 2017.  Also noted is a complaint of the left shoulder "popping out of place."  No history of
28   prior injury or dislocation the left upper extremity.  No dislocation on physical examination.  Clinical
29   impression is left shoulder pain due to glenohumeral arthritis. Importance of physical therapy is stressed
30   and a left glenohumeral steroid injection is performed with significant relief of pain noted.  Physical
31   therapy is ordered "once again."  Ultimate treatment is documented to be left shoulder arthroplasty (eg
32   replacement).
33
34   07/02/20, Provider Visit, Stadnicki
35   Reference made to left shoulder pain improvement after steroid injection.  Physical examination of the
36   left shoulder documents positive apprehension testing.
37
38

## METHODOLOGY OF REVIEW

39
40

41        In order to evaluate whether clinical decision-making reviewed in this analysis deviated from

42   accepted and prevailing standards of care, three tests were applied after considering all evidence

1    submitted or otherwise available for review. These tests which are listed and defined below are the

2    foresight test, the substitution test and the mitigating circumstances test.

3    Foresight Test:  This test asks whether healthcare providers took any unacceptable risks with
4    Mr. Limbacher's care.

5    Substitution Test:  This test asks whether another individual or individuals with similar
6    qualifications and experience would have made substantively different decisions for Mr.
7    Limbacher based upon accepted and prevailing standards of care.

8    Mitigating Circumstances Test:  This test asks whether there were any mitigating circumstances
9    playing a role with respect to the care Mr. Limbacher received during incarceration.

10

11   These tests comport with what an expert witness operating in the healthcare field would proceed

12   through in the process of opinion formulation. These tests are specifically brought forth and used in this

13   investigation in a purposeful effort to generate opinions in a manner consistent with Federal Rule of

14   Evidence 702 which, among other things, requires the use of reliable principles and methods.

15

## 16 CLINICAL SYNOPSIS AND OPINIONS

17
18   Reviewed records on a more likely than not basis support Mr. Limbacher injuring his left
19
20   shoulder as the result of the fall he sustained on 11/13/17.  This investigative review offers clarification
21
22   of these injuries as well the responsible mechanism of injury.   This investigative review in addition
23
24   identifies multiple deviations from accepted and prevailing standards of care for medical practice in a
25
26   correctional environment both from a diagnostic perspective and a treatment perspective as discussed
27
28   below.
29
30                              *How Limbacher was injured on 11/13/17*
31
32   Oftentimes in medicine, the terms "proximal causality" and "ultimate causality" are used to
33

1    explain a patient's medical condition.  Mr. Limbacher's assertion that he fell on 11/13/17 as the result of

3    getting caught in his ill-fitting county-issued pants is objectively not inconsistent with the "slip and fall

5    injury out of a chair" documentation that his medical records collectively describe and also not

7    inconsistent with Dr. Papiez's more specific documentation of 11/15/17 that is seen to read "falling off

9    exam chair when pants got caught." Given this and given the absence of an alternative explanation in his

11   medical record, Mr. Limbacher becoming caught up in his clothing is seen as the most likely explanation

13   for his fall of 11/13/17.  Using the proximal and ultimate causality terminology above, the proximal

15   cause of the left shoulder injuries that Mr. Limbacher sustained on 11/13/17 was the fall he sustained

17   on 11/13/17.  The ultimate cause of the injuries he sustained on 11/13/17 was his ill-fitting facility

19   issued clothing.

20

21          *Injuries involving the left shoulder Limbacher sustained as the result of his fall on 11/13/17*

22          Mr. Limbacher's 03/02/20 left shoulder MRI, the report of which can be found in the appendix

23   section of this report, contains objective evidence of a posterior shoulder dislocation. This same imaging

24   study also establishes a diagnosis of glenohumeral arthritis a discussion of which also can be found in

25   the appendix section of this report.

26          One of the known and accepted causes of glenohumeral arthritis is trauma.  Posterior shoulder

27   dislocations in particular are described by clinical authorities to impart increased risk of the subsequent

28   development of glenohumeral arthritis.

29          In summary, the provided medical records describe a fall for Mr. Limbacher on 11/13/17, a

30   posterior shoulder dislocation and glenohumeral arthritis. The most likely causal pathway that links

31   these three elements together is as follows:

32          Fall on 11/13/17 → posterior shoulder dislocation(s) → glenohumeral arthritis

33

14

1                 **Insufficient Post-injury Assessment**
2           **Failure to rule out fractures of the Cervical Spine**
3             **Failure to Survey for Shoulder Injury**
4                **Poor Documentation Practices**

5         The provided records describe a medical emergency at the Cook County Jail involving Mr.

6   Limbacher occurring on 11/13/17. This emergency which is consistently described in reviewed records

7   as a "fall" was judged by medical professionals at the jail to be of sufficient severity to warrant placing

8   Mr. Limbacher in a cervical collar and on a backboard to have fractures of his vertebral column formally

9   ruled out. The post-injury assessment Mr. Limbacher received from Dr. Yu however failed to comport

10   with standard of care because a cervical spine fracture was not properly ruled out, because no survey

11   was performed to assess for the presence of additional injuries including injury to the left shoulder and

12   because no meaningful inquiry as to the cause of Mr. Limbacher's fall was undertaken.

13

14         As discussed above, the provided medical records describe a fall for Mr. Limbacher on 11/13/17,

15   a posterior shoulder dislocation objectively confirmed by MRI on 03/02/20 and glenohumeral arthritis

16   with the likely causal pathway being: fall on 11/13/17 → posterior shoulder dislocation(s) →

17   glenohumeral arthritis. Additional appropriate attention to the left shoulder by Dr. Yu on 11/13/17, as

18   required by standard of care, on a more likely than not basis would have resulted in a left shoulder

19   dislocation being either confirmed or at least clinically suspected. This in turn on a more likely than not

20   basis would have influenced clinical decision making by subsequent providers and would have put Mr.

21   Limbacher in a better position of having his shoulder dislocation timely treated with the development of

22   glenohumeral arthritis potentially delayed or even prevented.

23

24         Standard of care for a patient who falls requires assessment for injuries sustained as the result

25   of the fall such as contusions, fractures, concussion etc. Standard of care however also requires

26   assessing for conditions that may have led to the patient sustaining the fall to begin with…for example a

15

1  stroke, heart arrhythmia or low blood sugar.

2       Specifically drilling down on the documentation that appears in Mr. Limbacher's medical record

3  on 11/13/17, the day of his injury, specific documentation notes that Mr. Limbacher "fell on the

4  floor and bumped his head." Other documentation also from 11/13/17 references a "slip and fall with

5  no loss of consciousness" and "trauma to left neck, head and hip due to fall from chair."

6       Collectively putting the above together, reviewed records appear to indicate that Mr. Limbacher

7  on 11/13/17 suffered a slip and fall injury out of a chair which begs the question "how does one slip and

8  fall out of a chair?" And what is not seen in Mr. Limbacher's chart and what is required by standard of

9  care is clearly documented timely investigative clinical thinking on the part of his medical providers into

10  what specifically caused him to "slip and fall" out of his chair.

11       Below is an excerpt from Defendants' Answer and Affirmative Defenses to Plaintiff's Complaint

12  which was reviewed as part of this investigation. This excerpt contains Mr. Limbacher's assertion that

13  he slipped and fell because of ill fitting jail clothing he had been issued.

> 11.    On November 13, 2017, Limbacher was housed in Division 8, Tier 4F. That day
> while on a check-up with Cermak nurse Jardine in room 4024A, as he attempted to get down off
> the medical table, his right foot was caught up in his oversized, frayed left pant leg, initiating him
> to fall to the floor, landing on his head and left shoulder. As a result from the impact from the
> fall, Limbacher's neck, back and left shoulder was injured. He also cracked and chipped his front
> teeth from the fall. These injuries has caused great pain and limited mobility in his left shoulder.
>
>     **Answer:**    **Defendants lack sufficient knowledge or information to form a belief**
> **as to the truth of the allegations contained in paragraph 11.**

14

15  *DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT page 4.*

16       Defendants' *lack of sufficient knowledge or information to form a belief as to the truth of Mr.*

17  *Limbacher's allegation* that his fall was sustained as the result of being "caught up" in poorly fitting

18  county issued pants speaks to and is reasonably explained by the absence in Mr. Limbacher's medical

19  record of what is referred to above, and required by standard of care, as clearly documented timely

16

1    investigative clinical thinking addressing how or what caused Mr. Limbacher to "slip and fall" out of his

2    chair in the first place.  Had this documentation been present in Mr. Limbacher's medical record as is

3    required by standard of care, Defendant's would have sufficient knowledge to form a belief as to the

4    truth of Mr. Limbacher's assertion that he fell as the result of poorly fitting clothing.

5            In addition, Mr. Limbacher's post-injury assessment failed to comport with standard of care

6    because the cervical spine x-rays that were obtained did not clearly visualize all cervical vertebrae and

7    there is no specific documentation referencing the absence of tenderness upon palpation of the cervical

8    spine.  Accordingly, Mr. Limbacher's cervical spine was not "cleared" because a cervical spine fracture

9    would not have been definitively ruled out based on the imaging and physical examination that was

10   documented on that day.

11

12

13                                        **Delayed Diagnosis**
14                                        **Delayed Treatment**
15                                        **Delayed Referral**
16

17           Standard of care is more than just providing the right care.  Standard of care further requires

18   that the right care be delivered timely. Unreasonable and avoidable delays in care are therefore

19   contrary to standard of care.  This would include efforts directed towards diagnostic clarification and

20   relief of symptoms including pain.  In Mr. Limbacher's case, his left shoulder injury occurred on 11/13/17

21    however the extent of his shoulder pathology was not clearly defined until 03/02/20 when he received

22   his MRI.

23           After Mr. Limbacher submitted a health services request form on 11/14/17 documenting,

24   among other things, his complaints of left shoulder pain, he was seen on 11/29/17, by Physician

25   Assistant Tramell who documented in a general sense resolving pain for Mr. Limbacher.  No specific

26   documentation however references the left shoulder and there is no documented physical examination

1    of the left shoulder.  Mr. Limbacher's HSRF three days later on 12/02/17 referencing his pain

2    medications not working and his shoulder feeling like it's going to "pop out" of the socket again

3    contradicts PA Tramell's documentation of "resolving pain." More likely than not, PA Trammell's

4    assessment of resolving pain was not clinically accurate in disservice to Mr. Limbacher.

5          Mr. Limbacher was seen in physical medicine and rehabilitation consultation by Dr. McCarthy on

6    10/02/18.  At this juncture, with the passage of nearly a year of time, Mr. Limbacher was clearly not

7    satisfactorily recovering from his left shoulder injury.  Dr. McCarthy referenced his 11/13/17 fall where

8    the left shoulder "felt like it popped out and then quickly went back into socket."  Physical examination

9    noted "catching and cracking" of the left shoulder and drop arm as well as empty can testing was

10   positive.  Mr. Limbacher's treatment plan was a follow-up on 11/6/18 for a shoulder injection with

11   advanced imaging if no improvement.  While a shoulder injection, if performed timely rather than

12   deferred and accordingly delayed, would have been clinically reasonable, given the passage of nearly a

13   year of time, given that Mr. Limbacher was not recovering from his left shoulder injury and given the

14   objective findings of catching and cracking on physical examination, standard of care required timely

15   advanced imaging of the left shoulder (eg an MRI) along with plans to refer to orthopedic surgery.  Given

16   that none of these occurred timely, Dr. McCarthy's visit with Mr. Limbacher on 10/02/18 fell short of

17   standard of care.

18         Similarly, for subsequent visits with other providers who saw and evaluated Mr. Limbacher

19   including PA Trammell (10/09/18) and PA Davis (11/13/18, 12/12/18 and 01/29/19), the passage of time

20   and failure to recover should have prompted additional diagnostic and treatment efforts (eg MRI and

21   orthopedic referral) which did not occur until significant later in Mr. Limbacher's incarceration.  These

22   provider encounters represent unfortunately for Mr. Limbacher lost opportunities for him to obtain

23   relief of his shoulder pain.

24

**Formulation and Synthesis**

Foresight Test: Mr. Limbacher's correctional healthcare providers do not pass the Foresight Test because of the duration of time (over two years) that passed between his 11/13/17 injury and his 03/03/20 MRI which as stated above clarified the extent of the pathology involving his left shoulder.

Substitution Test: Mr. Limbacher's correctional healthcare providers do not pass the Substitution Test because more likely than not, other similarly qualified and experienced providers would have made substantively different decisions for him by ensuring earlier, more timely, access to advanced imaging (eg MRI) and orthopedic surgery consultation.

Mitigating Circumstances Test: Based on review of the available records and based upon a reasonable degree of medical certainty, no mitigating circumstances are identified that would warrant a reframing of any of the opinions documented herein.


**Summary Opinion**

Based on review of the reviewed medical records, the most likely clinical synopsis is that Mr. Limbacher sustained a fall on 11/13/17 and sustained a posterior dislocation of his left shoulder which self-reduced but led to the development of chronic instability which in turn led to the development of post-traumatic glenohumeral arthritis. Based on review of the provided medical records, Mr. Limbacher's left shoulder was not managed in accordance with prevailing and accepted standards of care. Specifically, an MRI of the left shoulder did not occur timely and was irresponsibly delayed. Referral to othopedic surgery also did not occur timely and was irresponsibly delayed. As a result and on a more likely than not basis, Mr. Limbacher suffered unnecessary levels of pain and disability.


## REFERENCES

Magraviti, James, "How to Start, Build and Run a Successful Expert Witness Practice," SEAK Inc., 2018.

"Standards for Health Services in Jails", National Commission for Correctional Healthcare, 2018.

Lawler S. and Jawa A., "Glenohumeral Arthritis,"OrthoBullets (www.orthobullets.com) 08/28/22.

# APPENDICES

## Appendix 1.

13 December 2022



Ryan D. Herrington, MD, MPH
David Medical Services, PLLC
4250 Martin Way E
Suite 105, PMB 125
Olympia, WA 98516

Mr. Randall A. Hack, Esq.
Mr. Brian I. Hays, Esq
Locke Lord, LLP
111 South Wacker Dr.
Suite 4100
Chicago, IL 60606

RE: Statement of Qualifications

Dear Mr. Hack and Mr. Hays,

By way of training and experience, I am qualified to perform this investigation and formulate the opinions herein. I obtained my medical degree from the University of Virginia in 1995. I am licensed to practice medicine in the state of Washington. I am dual board certified by the American Board of Preventive Medicine in both Public Health/Preventive Medicine and Addiction Medicine. I have worked as a primary care physician and as a medical director and administrator in correctional settings. I also have a master level degree in Public Health which I obtained from the Ohio State University College of Public Health in 2001 and so I have a professional appreciation for population-based health care. My complete professional resume is attached. Also attached is documentation regarding legal cases in which I have served as an expert witness. This report is my work product. My fee for this review and report which is not contingent on the content or on the outcome of this action is $250/hour.

Sincerely,

Ryan D. Herrington, MD, MPH

# Appendix 2.

## *A Few Words on Glenohumeral Arthritis*

The shoulder, like the hip, is a ball and socket joint with the rounded top of the humerus bone serving as the "ball" and the shoulder blade, specifically the glenoid fossa of the shoulder blade, serving as the "socket." A picture is below for reference. It is acceptable in medical parlance to shorten "glenoid fossa" to simply "glenoid." The shoulder blade also is more formally known as the scapula.



*https://www.fda.gov/science-research/fda-science-forum/shoulder-joint-modeling-range-motion-evaluation*

Bony articulations or joints are frequently affected by natural degenerative processes commonly referred to as arthritis. The glenohumeral joint is no exception. A full treatise on the various types of arthritis is beyond the scope of this investigation. Suffice it to say that degenerative arthritis is frequently seen in clinical practice including a correctional practice.

A few noteworthy clinical "pearls" regarding glenohumeral arthritis

- Glenohumeral arthritis can be "post-traumatic" in nature in other words attributable to trauma.
- Usually becomes more common with increasing age in particular after age 60.
- It is more common with patients who have had posterior shoulder dislocation.
- It is also more common in patients who have had chronic dislocations.

*Glenohumeral Arthritis, Orthobullets.com*