# Exhibit Y

Page 1

1             IN THE UNITED STATES DISTRICT COURT

          FOR THE NORTHERN DISTRICT OF ILLINOIS

2

3

4    SHANE EDWARD LIMBACHER,            )

     (#2017-0519100)                    )

5                                       )

          Plaintiff,                    )

6                                       )

       vs.                             ) No. 1:19-cv-07509

7                                       )

     SHERIFF THOMAS J. DART, et al.,  )

8                                       )

          Defendants.                   )

9

10

11

12

13           Deposition of KEVIN E. SIMS, taken remotely

14    before NADINE J. WATTS, CSR, RPR, and Notary Public,

15    pursuant to the Federal Rules of Civil Procedure for the

16    United States District Courts pertaining to the taking

17    of depositions, commencing at 10:00 a.m. Central

18    Standard Time on the 16th day of November, A.D., 2022.

19

20

21

22

23

24

Page 2

```
 1          There were present at the taking of this
 2   deposition the following counsel:
 3          (Appeared via videoconference)
            LOCKE LORD, LLP by
 4          MR. RANDALL A. HACK
            111 South Wacker Drive
 5          Suite 4100
            Chicago, Illinois  60606
 6          (312) 443-0676
            rhack@lockelord.com
 7
              on behalf of the Plaintiff;
 8
            (Appeared via videoconference)
 9          COOK COUNTY STATE'S ATTORNEY'S OFFICE by
            MR. ALEXANDER PREBER
10          69 West Washington Street
            Suite 3200
11          Chicago, Illinois  60602
            (312) 603-1880
12          alexander.preber@cookcountyil.gov
13            on behalf of Defendant Kevin Sims;
14          (Appeared via videoconference)
            COOK COUNTY STATE'S ATTORNEY'S OFFICE by
15          MS. MIA BUNTIC
            2650 South California Avenue
16          Suite 12C36
            Chicago, Illinois  60602
17          (708) 386-7301
            mia.buntic@cookcountyil.gov
18
              on behalf of Defendant Dr. Kahn.
19
20   ALSO PRESENT VIA VIDEOCONFERENCE:
21          Mr. Shane E. Limbacher
22          Ms. Jorie Johnson
23
24
```

Page 3

1          DEPOSITION OF KEVIN E. SIMS
2             TAKEN NOVEMBER 16, 2022
3
4   EXAMINATION BY                          PAGE
5   Mr. Randall A. Hack                        4
6                  EXHIBITS
7                                          PAGE
8   DEPOSITION EXHIBIT 1                      52
       Cook County Health and Hospitals
9      System orders for Shane Limbacher
10  DEPOSITION EXHIBIT 2                      63
       Cook County Health and Hospitals
11     System orders for Shane Limbacher
12  DEPOSITION EXHIBIT 3                      67
       Cook County Health and Hospitals
13     System Outpt Medical CHS for Shane
       Limbacher
14
    DEPOSITION EXHIBIT 4                      71
15     Cook County Health and Hospitals
       System Outpt Medical CHS for Shane
16     Limbacher
17  DEPOSITION EXHIBIT 5                      86
       Cook County Sheriff's Office Inmate
18     Grievance Form
19  DEPOSITION EXHIBIT 6                      90
       Cook County Sheriff's Office Inmate
20     Grievance Form
21
22
23
24

```
 1                    KEVIN E. SIMS,
 2   called as a witness herein, having been first duly
 3   sworn, was examined upon oral interrogatories and
 4   testified as follows:
 5                    EXAMINATION
 6                    by Mr. Hack
 7      MR. HACK:  Q  Sir, good morning.  My name is Randy
 8   Hack.  I represent the plaintiff in this action,
 9   Mr. Shane Limbacher.  I'll be asking you some questions,
10   and at the conclusion of this your counsel and counsel
11   for other defendants may also have a chance to ask you
12   questions.
13           Please state your full name for the record.
14      A   My name is Kevin Eugene Sims.
15      Q   And where do you live, Mr. Sims?
16      A   I live in Chicago, Illinois.
17      Q   And what's your street address?
18      A   5527 South Natoma.
19      Q   And what's your zip code?
20      A   60638.
21      Q   And how long have you lived there?
22      A   25 years.
23      Q   Okay.  Are you presently employed?
24      A   Yes.
```

```
                                               Page 5
 1     Q    And with whom do you work?

 2     A    I work for Cermak Health Services.

 3     Q    And how long have you worked with Cermak Health

 4   Services?

 5     A    28 years and 11 months.

 6     Q    And what is your title at Cermak Health

 7   Services?

 8     A    I am a physician assistant.

 9     Q    What is a physician assistant?

10     A    A physician assistant is licensed to practice

11   medicine under the license of a physician.

12     Q    Where did you receive your training as a

13   physician's assistant?

14     A    I received my training at Cook County Hospital.

15     Q    Let's go back a little bit.  Before you started

16   training as a PA, did you go to college?

17     A    I had a few credit hours, but I was actually

18   coming from the service.

19     Q    Okay.  What branch of the military were you in?

20     A    The Navy.

21     Q    And how long did you serve?

22     A    Four years.

23     Q    And what did you do in the Navy?

24     A    I was a hospital corpsman.
```

```
 1      Q    And what are the duties of a corpsman?

 2      A    We supplied medical services to the Department

 3  of the Navy and the Marines.

 4      Q    And how -- Tell me about the training that you

 5  received as a corpsman.

 6      A    I'm not so sure what -- I'm not sure on that

 7  question.

 8      Q    Sure.  In order to become a corpsman, did you go

 9  through a training course?

10      A    Yes, I went to school at Great Lakes and then

11  got assigned to Bethesda, Maryland.

12      Q    Okay.  And when you left Great Lakes, was your

13  first position as a corpsman?

14      A    Yes.

15      Q    And did you serve as a corpsman all the

16  remainder of your time in the service?

17      A    Yes.

18      Q    And did you serve at sea?

19      A    No.

20      Q    The training for corpsman, did you receive any

21  training in orthopedics?

22      A    It was a very general education.  It was not

23  specific for orthopedics, no.

24      Q    When you -- Your tenure with the service was up
```

1    in what year?

2        A    1988.

3        Q    And in 1988 after you've completed your service

4    what did you do next professionally?

5        A    Okay.  I applied for the PA program at Malcolm X

6    College, and I -- Actually, before I did that I

7    undertook some prerequisites to get in their program.

8        Q    And what were those prerequisites that you took

9    in order to qualify for admission to the PA program?

10        A    So my -- some of my sciences had expired that I

11    had taken previously.  So chemistry.  I had to take a

12    speech class.  I think there was something else.  I'm

13    not sure.  English, I think I had to take a course in

14    English.

15        Q    Okay.  How long was your training at Malcolm X?

16        A    Two years.

17        Q    And did you graduate at the conclusion of two

18    years?

19        A    Yes.

20        Q    And what degree did you receive when you

21    graduated?

22        A    An Associate in Applied Science.

23        Q    As part of your PA training at Malcolm X, did

24    you take any courses involving the musculoskeletal

1   system?

2        A    We had courses in anatomy and physiology.  I'm

3   sure we had courses that entailed the musculoskeletal

4   system.  I can't give you specifics, but I'm sure we

5   covered that.

6        Q    Did you -- While you were at Malcolm X, did you

7   do any internships where you worked in a hospital or a

8   clinic or a doctor's office?

9        A    No.

10        Q    After you completed your degree in Applied

11   Science at Malcolm X, what professional position did you

12   take next?

13        A    I went to Cermak and then got a job at Cermak.

14        Q    And what year did you start at Cermak?

15        A    December of '93.

16        Q    And have you changed jobs during the 28 years

17   that you've been at Cermak?

18        A    No, I've been here for the whole tenure.

19        Q    And you've been a PA that whole time at Cermak?

20        A    Yes.

21        Q    Okay.  And have you worked in different

22   departments at Cermak?

23        A    I'm in the med-surge department, and I've been

24   in the med-surge department for 29 years.

Page 9

1      Q    When you say Cermak, do you mean Cermak Health

2   Services?

3      A    Yes.

4      Q    And tell me, what is Cermak Health Services

5   please?

6      A    Cermak Health Services is the medical service --

7   It's basically a clinic of Cook County Hospital, but

8   it's a clinic located at Cook County Jail.

9      Q    And who are your --

10     A    And it's to provide medical services for the

11  inmates at Cook County.

12     Q    I was going to say, your inmates at -- or your

13  patients at Cermak are people in the custodial setting

14  at Cook County Jail?

15     A    Correct.  It's not a County clinic that you

16  would opt to normally go to.

17     Q    I'd like to try to spend some time asking a

18  little bit about your on-the-job training as a

19  physician's assistant.

20          So let's begin with when you began work at

21  Cermak, did you take any on-the-job -- formal on-the-job

22  training courses?

23     A    Well, we are required to do CME every two years.

24  So that's my ongoing education.

1           In order to maintain my certification as a

2      physician assistant, I need to complete a prerequisite

3      amount of hours every two years and then test every six

4      years, which actually they changed now to every 10

5      years.  But I was on an every year -- or every six-year

6      cycle until they changed it recently, which I've already

7      completed my last exam.

8      Q    What formal training did you receive in

9      orthopedics at Cermak?

10     A    There is no formal training for orthopedics at

11     Cermak.

12     Q    Okay.  Let's start with a very basic question.

13     What is orthopedics?

14     A    Orthopedics is the service that deals with bones

15     and musculoskeletal complaints or injuries or -- They're

16     bone doctors basically.

17     Q    And over the course of your career -- Well, let

18     me ask it a different way.  Does Cermak have an

19     orthopedic department?  Cermak Health Services, does it

20     have a formal orthopedic department?

21     A    Yes.

22     Q    And have you ever worked --

23     A    They have an orthopedic clinic on-site that also

24     works with the orthopedic clinic at Stroger Hospital.

1      Q    And not everybody may know the workings of our

2    County system.  What is Stroger Hospital?

3      A    Say that again.  I'm sorry.

4      Q    I said what is Stroger Hospital?

5      A    It's a hospital.

6      Q    Right.  And it's owned by the County of Cook,

7    correct?

8      A    Correct.

9      Q    And inmates and other people in a custodial

10   setting can be transferred from Cermak to receive

11   services at Cook County, correct?

12     A    Correct.

13     Q    Okay.  Before we go further, I'd like to spend a

14   few moments just covering some background.

15          Is there any reason that you are not able to

16   testify truthfully and accurately today?

17     A    No.

18     Q    Prior to appearing for your deposition today did

19   you have an opportunity to meet with counsel who

20   represents you in this action?

21     A    Yes.

22     Q    And how long did you meet with counsel?

23     A    Half hour.

24     Q    Did you review any documents when you met with

1   counsel?

2       A    Yes.

3       Q    And did any of those documents refresh your

4   recollection about events and circumstances involving

5   our client, Mr. Limbacher?

6       A    I'm not sure I understand that question.

7       Q    Sure.  When you looked at those documents, did

8   any of them bring back a memory or a recollection that

9   you did not previously have about any interaction

10  between you and Mr. Limbacher?

11      A    I looked up my note from my encounter with

12  Mr. Limbacher.

13      Q    Okay.  And did those refresh your recollection

14  about what happened, who said what to whom, and other

15  things about those interactions?

16      A    It's in my note.  Our encounter is in my note.

17      Q    And when you say your notes, are these typed

18  notes or handwritten notes?

19      A    This is an electronic medical record.  So it's

20  typed.

21      Q    And at the top of it, it says Cook County Health

22  and Hospitals System I bet?

23      A    Not on the one that I printed out.

24      Q    Oh, okay.  I'll come back to your interactions

1   with Mr. Limbacher in a little bit, Mr. Sims.  First, I
2   still have some more preliminaries.
3            During the course of your tenure at Cermak you
4   mentioned that you had to take CME courses every two
5   years.  Did you take continuing medical education
6   courses in orthopedics?
7       A   I'm sure at some point some of my courses
8   involved orthopedics.  Off the top of my head, I don't
9   have my CME log for the past 29 years, so I can't answer
10  that specifically.
11      Q   Okay.  And do you maintain such a log about any
12  training -- any continuing medical education courses
13  that you would have taken?
14      A   It is on the record through the National
15  Commission of Accreditation of PAs.
16      Q   Thank you.
17      A   And I also have my own records, yes.
18      Q   Okay.  Do you have that with you?
19      A   No.
20      Q   Okay.  You said that you had to take a test
21  every six years as a PA; is that correct?
22      A   Yes.
23      Q   And have you passed all those exams that you've
24  taken over the course of your career?

1       A    Yes.

2       Q    And did any of those exams include questions or

3    sections focused on orthopedics?

4       A    Yes.

5       Q    And as best you can recollect -- Well, I'm going

6    to ask the question differently.  Do you take a single

7    test that's focused on orthopedics or a test that's

8    focused on a range of subjects, some of which are

9    orthopedics, or something else?

10      A    It's a range of body systems that we're

11   covering, and musculoskeletal would certainly be

12   included on the exam, yes.  There's a section

13   specifically for musculoskeletal.

14      Q    And did you take any tests that were singularly

15   focused only on orthopedics or the musculoskeletal

16   system?

17      A    No, it is a general exam.

18      Q    And that was true throughout your time at

19   Cermak, correct?

20      A    Correct.

21      Q    You had mentioned earlier that you had a bio or

22   a resume, a professional biography or resume.  Do you

23   maintain one?

24      A    I'll have to dust it off.  I have it somewhere.

1    I have not put it out there.  I'm getting close to

2    retirement, so.

3        Q   Is your resume -- I take it that's not posted

4    online?

5        A   No.

6        Q   Okay.  As a -- Have you done any research

7    projects at Cermak that were focused on orthopedics?

8        A   No.

9        Q   Have you participated in any studies that were

10   focused on orthopedics?

11       A   No.

12       Q   Other than on-the-job training -- I just want to

13   be sure that I understand the extent of any coursework

14   or training programs you had.  Other than on-the-job

15   training and your continuing medical education courses,

16   did you receive any other formal training in orthopedics

17   during your time at Cermak?

18       A   No.

19       Q   It's difficult to ask this question across the

20   time of your career, so let's focus on the last five

21   years.  In the last five years what percentage of your

22   time would you estimate is spent analyzing or treating

23   orthopedic injuries of one type or another?

24       MR. PREBER:  Objection, speculation.  But you may

1    answer.

2         THE WITNESS:  I couldn't answer that question.  I

3    don't keep track of that.

4         MR. HACK:  Q   Okay.  And of the time that you spent

5    in orthopedics, where you are treating orthopedic

6    patients, how much of that time is -- in the last five

7    years would you say you've devoted to analyzing and

8    treating injuries of the shoulder?

9         MR. PREBER:  Objection as to form.  But you may

10   answer.

11        THE WITNESS:  I can't -- I don't know that -- the

12   answer to that question.

13        MR. HACK:  Q   Do you consider yourself to be expert

14   in the diagnosis and treatment of shoulder injuries?

15        A   I do not consider myself an expert.

16        MR. PREBER:  Just to hold my objection, objection as

17   to form as well.

18        MR. HACK:  Q   Do you have a formal job description,

19   Mr. Sims?

20        A   Yes, the County has a job description on the

21   application, yes.

22        Q   Okay.  And where would I find -- Is that

23   available publicly?

24        A   I believe if there's a position that's open, it

1  would be available on the computer program Taleo.

2  That's the HR computer process for hiring.

3     Q   What -- In your own words, please tell me what

4  your job description is.

5     A   In my own words?  My own words would be to take

6  care of and provide medical services to the inmates at

7  Cook County Jail.

8     Q   In providing medical services to the inmates at

9  Cook County Jail, do you have the opportunity to refer

10  or escalate a patient from the med-surge department to

11  other departments both at Cermak and at Cook County?

12     A   Yes, I do refer patients.

13     Q   Tell me, first off, what is the process for

14  referring a patient either to a different -- Well,

15  first, let's start it this way.  What is the process for

16  referring a patient of yours at Cermak to another

17  medical profession?

18     A   If I want to consult somebody, is that what

19  you're asking?

20     Q   Sure, let's -- I think that's the right word.

21  I'm not a personal injury lawyer.  That's what I'm

22  getting at.

23     A   Okay.  If I have a patient that I need to refer

24  for medical services, I write an order in the computer.

1    Q   And where does that order go?

2    A   Into a scheduling queue for that respective

3 department.

4    Q   Okay.  Do you have to obtain anyone's approval

5 before you send or refer a patient out for consult?

6    A   No.

7    Q   Are there any written guidelines, policies, or

8 procedures that set out the process for referring a

9 patient for a consult to another Cermak provider?

10    A   Say that again.  I'm not sure --

11    Q   Sure.  Are there written rules or policies that

12 tell you when and in what circumstances you are supposed

13 to refer a patient out to another medical provider at

14 Cermak for additional care?

15    A   Well, it comes down to my clinical judgment.  As

16 far as is it written down, I don't have the answer to

17 that question.

18    Q   Okay.  Let's suppose that -- Again, I'd like to

19 focus on the process here, not any particular patient.

20    A   Okay.

21    Q   If you have a patient and you believe that

22 patient should be seen by a provider at the Cook County

23 Hospital, what is the process for directing a patient to

24 Cook County Hospital?

1      A    Well, the quickest way, if I'm -- if it's an

2   acute injury, I can refer them to our urgent care who

3   can have them sent out to the emergency room at Stroger,

4   whereas once they get to Stroger, they can consult

5   whatever service might be needed.

6      Q    Okay.  And do you again have discretion to

7   decide when a patient needs to be referred to Stroger

8   for additional treatment?

9      A    So the best way I can explain it, if it's a

10  routine appointment, I'll order it.  If it's an

11  emergency, I have other means to get that problem

12  solved.  So, again, it depends on the problem, it

13  depends if we're talking a chronic problem versus an

14  acute problem.  So the circumstances will dictate what

15  steps we'll take.

16     Q    The opportunity to refer a patient to Stroger,

17  is that also left to your clinical judgment?

18     A    Well, so there are two things.  We have some

19  clinics that are on-site.  So, you know, my job, I will

20  refer -- And if we can provide the service on-site,

21  that's the ideal.  Okay?  If we cannot provide the

22  service, then they go to where their service can be

23  provided, and that could be Stroger, it could be

24  Provident Hospital.  So it all depends on what the

1    circumstances are.

2        Q    Let's talk about resources available to treat

3    orthopedic injuries.

4        A    Okay.

5        Q    Could we please?  So let's start.  You are and

6    have been a member of the med-surge department at Cermak

7    Health Services, correct?

8        A    Correct.

9        Q    And tell me, what are the responsibilities of

10   that department?  What does it do?

11       A    Basically we get assigned to a division and

12   we're responsible for that particular division.  There's

13   some of us that are not assigned and they're floaters

14   and they'll go to different divisions.  But that's kind

15   of the layout.  And then we have urgent care that we

16   cover.  And also receiving, which is when they come in

17   when they're first arrested.

18            So they get a history and physical when they

19   come in the door.  That's called receiving.  And then we

20   also have urgent care.  And we also have primary care

21   clinics, which is where they -- the clinics that are

22   located in their respective divisions.

23       Q    Okay.  And so there are really four -- Well, you

24   mentioned urgent care, receiving, assignment to

Page 21

1    division, and primary care clinics.  Okay?

2          What are the urgent care resources that are

3    available to inmates at Cook County Jail?

4      A    It's not an emergency room.  So we're not -- We

5    don't have any lab -- Well, we do have a lab, but it's a

6    delayed lab.  We'd have to send the labs to Stroger.  We

7    don't have a lab on-site.

8          We have x-ray on-site for a set amount of

9    hours.  It's not 24 hours.  What else are you --

10     Q    Do you have MRIs on-site?

11     A    No.

12     Q    Do you have -- Well, you know what a CT scan is,

13   right?

14     A    Yes.  We have CT available here.

15     Q    Okay.  And is that available -- service

16   available 24 hours?

17     A    No.

18     Q    Are there other -- any other medical imaging

19   systems that you would use for orthopedic injuries

20   available at Cermak?

21     A    We just covered them, what we have available.

22     Q    Okay.  Were you ever -- Let's focus from 2017 to

23   the present.  During 2017 to the present you mentioned

24   at least four different areas, urgent care, receiving,

Page 22

```
 1   divisions, and primary care clinics.  Where did you

 2   work?

 3        A    No.  The primary care clinics and the divisions,

 4   that's synonymous.  So it's really three.  It sounds

 5   like four, but it's three.  So when we say primary care

 6   clinics, those are the clinics that take place in the

 7   divisions.

 8        Q    Very well.  So there are really three, urgent

 9   care, receiving, and primary care?

10        A    Correct.

11        Q    Of those three, where were you assigned in the

12   last five years?

13        A    I currently am in Division 9, and before that I

14   was assigned to Division 8.

15        Q    And when you were -- And for what period of time

16   were you in 8?

17        A    I don't recall off the top of my head.

18        Q    Do you remember when you moved to 9?

19        A    Not specifically.  It was a few years back.

20        Q    Okay.  And would you see only patients from

21   those divisions or would you sometimes see patients from

22   other divisions depending on the needs of the day?

23        A    No, they don't transport between divisions.  So

24   I would be seeing the patients that are housed in that
```

1 building, which is a division. And if it was Division

2 9, I would just see Division 9 patients.

3     Q   What's the business address for your -- where

4 you have worked in the last five years?

5     A   2800 South California.

6     Q   And is that the address for all the primary care

7 services that are delivered to Cook County inmates?

8     A   I believe so.

9     Q   Okay. And are all the service lines contained

10 in the same building or are there multiple buildings

11 down there?

12     A   I'm not sure what --

13     Q   For the medical services, is there one big

14 medical service building or are there multiple buildings

15 that medical services are provided to inmates?

16     A   Okay. So Division 8 is all medical and mental

17 health. That building houses medical and mental health.

18 Whereas, the other divisions are general population, and

19 we have a clinic within the boundaries of that division.

20     Q   Okay. Thank you for explaining that.

21     Cermak Health Services, right, one of its jobs

22 is to provide primary care to the inmates in custody?

23     A   Correct.

24     Q   And another of its jobs is to provide specialty

```
 1    care to those inmates where needed, correct?

 2         A    If needed, yes.

 3         Q    And does Cermak offer a full range of

 4    non-emergency services?

 5         A    I'm not sure what you're asking with that.

 6         Q    Sure.  Well, I went to the website and it

 7    described itself as offering a full range of

 8    non-emergency services.  I'm asking, would you describe

 9    the services available at Cermak in those words?  Is

10    that accurate?

11         A    I would say we have services other than primary

12    care available.  That's how I would say it.

13         Q    Okay.  Does Cermak offer same-day surgery

14    services where needed?

15         A    That is not at Cermak.  That won't be -- We have

16    no surgical procedures done at Cermak.

17         Q    Surgical procedures, would that be handled at

18    Cook County or at Provident?

19         A    Correct.

20         Q    Okay.  Are there specialty clinics at Cermak

21    Health Services?

22         A    Yes.

23         Q    First off, can you list them for me as best you

24    can?
```

```
 1        A    We have optometry.  We have dental services.  We
 2   have orthopedics on-site.  We have HIV clinic or
 3   infectious disease clinic.  And we've lost a few clinics
 4   with the pandemic.  We used to have dermatology.  We
 5   used to have podiatry.  We used to have urology too.
 6   But we've lost a few services.
 7        Q    Sure.  You're probably not alone in that.
 8        A    Yes.
 9        Q    What services did the -- does the orthopedic
10   specialty clinic provide?
11        A    Well, we used to -- we used to have an
12   orthopedic doctor come in and evaluate patients.  That
13   doctor has since left.  We have a PA running the
14   orthopedic department, and basically they're -- she
15   coordinates services, orthopedic services.
16        Q    And what is her name?
17        A    Menisha Patel.
18        Q    P-A-T-E-L?
19        A    Correct.
20        Q    Thinking about the orthopedic clinic, what was
21   the name of the orthopedic doctor who had previously
22   served on staff there?
23        A    Dr. Kapotas.
24        Q    Okay.  And when did Dr. Kapotas leave?
```

1    A    It's probably been a year-and-a-half to two

2  years now.

3    Q    And in addition -- So let's focus on the period

4  as best we can before Dr. Kapotas left.  Okay?

5    A    Okay.

6    Q    So when he was still there.  When Dr. Kapotas

7  was on staff in the orthopedic clinic, who else

8  worked -- what other medical professionals worked with

9  him in that clinic?

10    A    The person that I mentioned before, Patel,

11  Menisha Patel.

12    Q    Menisha Patel, and she's a PA, correct?

13    A    Yes, correct.

14    Q    And are there any other medical professionals

15  who you recall working with Dr. Kapotas in the last say

16  four years, five years?

17    A    I think that she was the only one that was.

18    Q    If you -- Well, let me ask it -- a first

19  question.  In 2017, 2018 was Dr. Kapotas on staff at the

20  orthopedic clinic during those years?

21    A    I believe he was.

22    Q    And as best you can recollect, for how many

23  years did Dr. Kapotas work at Cermak before he left?

24    A    I can say over 10.  I can't give specifics.

1    Q   Sure.  That's plenty good.  So he'd been there

2    at least a fair while?

3    A   Yes.

4    Q   And did you know Dr. Kapotas personally?

5    A   No, I knew him professionally, but not

6    personally.

7    Q   And would you routinely have professional

8    interaction with Dr. Kapotas?

9    A   I would confer more with Menisha Patel, who's

10   the cubicle next to me.  So if I had any ortho issues, I

11   would normally confer with her.

12   Q   And if in your clinical judgment a patient's

13   care needed to be escalated, you could refer that

14   patient to Ms. Patel, correct?

15   A   I normally would do that, yes.  I would leave it

16   to her -- Well, yes, I could try to expedite things if

17   need be.

18   Q   And if for whatever reason you were concerned

19   enough that you wanted a patient to see a doctor right

20   away, did you have the discretion to refer a patient

21   directly to Dr. Kapotas?

22   A   No, you -- Well, one more time please, the

23   question.

24   Q   Sure.  I was just going to ask, if you felt a

1    situation was sufficiently serious that it warranted a

2    quick meeting with a physician, did you have the

3    discretion to refer a patient directly to Dr. Kapotas if

4    that was what your medical judgment said should be done?

5        A   I have referred patients to orthopedics, not

6    specifically Dr. Kapotas.  I refer them to the clinic.

7        Q   Okay.  And as best you recollect, are there

8    rules or procedures or guidelines governing who sees a

9    patient first in the orthopedic clinic?

10       A   Well, I mean, there is routine, priority,

11    urgent, and when you place your order, it will ask you.

12    So that's --

13       Q   And -- I interrupted you.  I didn't mean to.

14       A   Okay.  That's how you would prioritize your

15    patients.  I would say that if I had something that was

16    urgent, I often discussed that with the orthopedic to

17    see how quick we could get them in.

18       Q   Okay.  And that was something -- And when you

19    say you talked to orthopedics, you typically would talk

20    to Ms. Patel about that, correct?

21       A   Correct.

22       Q   And you could always say -- At least you had the

23    ability to say to her, look, this is a serious problem,

24    he needs to see a doctor right away?

1    A   No, I would not do that.  I would say this is

2   what I have, what do you think.

3    Q   Okay.  So that was pretty much your standard

4   operating procedure, how you two would interact?

5    A   Not every case I would not do that.  We're

6   talking about acute cases.

7    Q   Okay.

8    A   But every referral I did not confer with

9   Ms. Patel that I submitted.

10    Q   Did you ever have occasion to sit with Ms. Patel

11   when she was examining a patient or when you were

12   examining a patient and work together?

13    A   No.  They have their own clinic.

14    Q   Did you ever have occasion to sit with Dr.

15   Kapotas when he was examining a patient or when Dr.

16   Kapotas sat with you when you were examining a patient?

17    A   No.

18    Q   Let's talk a little bit about what resources are

19   available to you in doing your work.  May we, Mr. Sims?

20    A   Sure.

21    Q   So, first off, do you keep in your -- Tell me,

22   where do you office?  It sounded like you had a work

23   space.  I think you called it a cubicle.  Is that right?

24    A   Yes, we have a medical office in Cermak, and

```
 1    then again we have clinics in the respective division.
 2         Q    And essentially where do you hang your hat when
 3    you go in to work in the morning?
 4         A    When I head in to the office, I go to the
 5    doctor's office and then I proceed to my assignment in
 6    Division 9.  And then I come back when I'm done with
 7    seeing patients in Division 9.
 8         Q    But do you have a place where you keep
 9    knickknacks, books, pens, notepads, you know, office
10    stuff?
11         A    The office.
12         Q    Yes, okay.  Fine.  And you have a space at the
13    office, right?
14         A    Yes.
15         Q    Okay.  Do you have a bookshelf there?
16         A    I do.
17         Q    And do you keep any medical texts or treatises
18    in your office?
19         A    I have some very old texts and -- that are dusty
20    because everything now is electronic.  And we have --
21    Where I get most of my medical or clinical information
22    is a program that's offered through the computer.  It's
23    a program called UpToDate.
24         Q    Tell me about the UpToDate program.  First off,
```

Page 31

1  how do you access it?

2      A    Through the computer that I use.  I access it

3  through Power Chart, which is the -- which is an

4  electronic medical record that we use.

5           So when I'm in the medical record, I can --

6  there's a banner that includes this resource.

7      Q    And does -- I'm sorry, I've got to ask you

8  again.  Tell me the name of the recourse again.

9  UpToDate?

10     A    UpToDate.

11     Q    And does UpToDate have a section on orthopedics

12 available for you to access?

13     A    It has a plethora of problems, and orthopedics

14 is one of many.

15     Q    And is it your understanding and recollection

16 that if you wanted to look for information about a

17 shoulder injury, you could look on UpToDate for that

18 information?

19     A    You would have to have a diagnosis first and

20 then it would elaborate on the diagnosis.  But it's not

21 a general resource.  It's more specific for once you

22 have the diagnosis.

23     Q    Okay.  But if you had a hypothetical or a

24 tentative diagnosis for a patient who had a shoulder

1    injury, you could put that in UpToDate and go see what

2    UpToDate would say about the treatment of that injury,

3    correct?

4        A    It would make recommendations.

5        Q    Right.  How often do you go and access UpToDate?

6        A    I don't know.  I don't keep track of how often.

7        Q    Let's go back in time a couple years.  Let's say

8    2018.  How often -- Was UpToDate available on your

9    computer then?

10       A    I'm not sure.

11       Q    As best you can recollect, when was UpToDate

12   first available to you, Mr. Sims?

13       A    I can't answer that.  I don't know.

14       Q    When do you access UpToDate to obtain additional

15   information about the care of a patient?

16       A    When I have a question that I'm concerned about.

17   Treatments, what's the latest.

18            The reason I like UpToDate is because it is

19   evidence-based medicine, which means they do the

20   research on the clinical trials and give you the latest

21   information.  And that's why it's called UpToDate,

22   right, because they do -- they do the research and they

23   go over all the recent publishings, all the recent

24   studies and whatnot and give you kind of a snapshot.

1     Q   You know, sometimes -- I just want to be clear.

2   Sometimes I pause because I don't wish to speak over

3   you.

4     A   Okay.

5     Q   So please understand if there's a delay.  I'm

6   trying to be polite.  It's easier when we're together

7   and I can look at you and I know exactly what you're

8   doing or thinking.  So I just wanted to mention that

9   sometimes that's why I'm delaying.

10         In addition to the UpToDate service, are there

11   other electronic resources with medical information

12   available to you as the PA on your -- through your

13   computer at work?

14     A   Well, there's -- we all have websites.

15     Q   Okay.  And are there any websites that you

16   regularly check for information, latest information,

17   about orthopedic injuries?

18     A   Well, I just gave you my go to, which is the

19   UpToDate.  That's the one that I lean on the most.

20     Q   When's the last time you accessed the UpToDate

21   program for -- in connection with a patient's orthopedic

22   injury?

23     A   I can't recall to tell you the truth.  I use it

24   more for non-orthopedic problems.  If I have an

1  orthopedic question, I go to -- right next to my

2  cubicle, to my orthopedic colleague.  She's my best

3  human resource that I use for orthopedics, but usually

4  the questions that come up are not -- Orthopedics is not

5  a heavy UpToDate use for me.

6      Q   And just so I'm clear about the timing,

7  Ms. Patel, Menisha Patel, she was -- sat next to you in

8  2017 and 2018 as well, right?

9      A   She's been in the office next to me for quite

10  some time.

11     Q   Okay.  But at least five years?

12     A   Yes.

13     Q   Okay.  When you -- Have you received any formal

14  training or instruction about the standard of care that

15  you are to apply when treating your patients at Cermak

16  Health Services?

17     A   Repeat the question please.

18     MR. HACK:  Sure.  Could you read it back, Nadine.

19         (Whereupon, the reporter read the following:

20         "Q  Have you received any formal training or

21          instruction about the standard of care that

22          you are to apply when treating your patients

23          at Cermak Health Services?")

24     THE WITNESS:  Formal?  No, there is no formal

1   training.

2      MR. HACK:  Q  What do you understand to be the

3   standard of care that you are obliged to deliver to

4   patients whom you treat at Cermak Health Services?

5      A  I don't understand that question.

6      Q  Do you know what the term standard of care

7   means?

8      A  I do.

9      Q  Okay.  What is it as you use it?  In other

10   words, give me your definition of the standard of care.

11      A  Standard of care is what the community -- what

12   is the community standard as far as a particular

13   diagnosis or illness.  And that's the -- I guess

14   that's -- I'm not quite sure what your question is.

15      Q  Let's approach it another way.

16      A  Okay.

17      Q  Do you understand that medical services that you

18   deliver at Cermak Health Services should be consistent

19   with the -- with the type and quality of medical

20   services that would be available from other providers in

21   our community?

22      A  Yes.  Yes.  And I'm well-versed in internal

23   medicine.  That's really kind of my forte.  It's not

24   orthopedics.  I could go in to that specialty if I would

1    like.  I am not a specialist.  I am a primary care

2    provider that knows a little about a lot versus knowing

3    a lot about a little.  And that's what orthopedics --

4    That's why I count on my specialist.

5            So as far as the standard of care for

6    orthopedic problems, that's why I refer to my orthopedic

7    specialist.  Okay?

8            Now, when it comes to diabetes, my bread and

9    butter, do you want to know the standard of care of

10   diabetes?  I'll be happy to provide that to you.  But,

11   again, you're asking me a lot about orthopedics, which,

12   if I have an orthopedic problem, I rely on my orthopedic

13   doctors to guide me in to doing the best or provide the

14   best care for those patients.  That's why I consult

15   them.

16       Q   Okay.  And surely then the orthopedic physicians

17   in your mind, their obligation to your patients is to

18   provide a diagnosis and treatment that's consistent with

19   orthopedic practices in our community, correct?

20       A   Correct.

21       Q   Okay.  You know, I had a colleague stop by

22   because I had asked for some assistance with something.

23   Would you like to take a short break, Mr. Sims, now?  I

24   like to take 45, 50 minutes.  It will just be a short

```
 1   break, a couple minutes.  Would that be agreeable or
 2   would you like to keep going?
 3        A    I'd like to be done with this.  I have another
 4   clinic to get to.
 5        Q    Tell me when your other clinic is please.
 6        A    12:30.
 7        Q    I'm glad you told me that.  Let's take five --
 8   let's take less than five minutes, and let's all try to
 9   reconvene in less than five minutes, if we could,
10   please.
11        A    Sounds good.
12        MR. HACK:  Thank you.
13            (Recess was taken.)
14        MR. HACK:  Q   Back on the record.
15            You -- Pardon me.  Mr. Sims, are you ready?
16        A    Yes, I am.
17        Q    Thank you.  Back on the record.
18            Mr. Sims, what medical record system does
19   Cermak Health Services use?
20        A    Cerner.
21        Q    And what is the Cerner system?
22        A    It's an electronic medical record system.
23        Q    Okay.  And does it provide access at the point
24   of treatment to all of a patient's prior medical
```

1    records?

2        A   You're in the patient's medical record.

3        Q   Right.  If I'm -- We're going to try to explain

4    this by way of example.  If a patient presents at your

5    health service, how do you prepare for a patient's

6    visit?  What do you do?  Mr. Smith is coming to see you.

7    What do you do?

8        A   The only thing I do is I look at their

9    appointment and see how they showed up at my door.

10       Q   Okay.  Do you -- If you wanted to, could you

11   open up the Cerner medical record system and see all the

12   patient's prior care at Cermak Health Services?

13       A   I could, but that's not a practical -- that's

14   not practical.

15       Q   Okay.  But I'm just trying to understand what's

16   available to you.

17       A   Well, it's a medical record.  And every time you

18   go to your doctor's office you have -- they have your

19   medical record available.

20       Q   Right.  And so --

21       A   Do they research your complete medical record

22   prior to you showing for your appointment?  No, I don't

23   think they do that.

24       Q   Okay.  Do you -- Before you receive a patient,

1   do you typically read some part of the prior medical

2   record or do you just start with we'll take them --

3       A   Sure.  Again, the reason why I look to see how

4   he showed up at my door is because I'm going to pick

5   them up wherever he left off, whether it be urgent care,

6   whether it be the last primary care clinic, whether it

7   be receiving follow-up or intake follow-up, right, the

8   three places that -- where services are rendered.

9       Q   Am I right that you will read them -- it's your

10  normal practice to read the immediately prior medical

11  record, the record of the service rendered immediately

12  prior to your seeing a patient?  That's what you

13  typically do?

14      A   I'll look at the note as far as the provider who

15  referred them for a follow-up visit.

16      Q   Okay.  But, as a general practice, you don't go

17  back and read prior to that, correct?

18      A   I could spend an hour to two hours every day

19  reviewing a chart.  I don't have that luxury.  So could

20  I?  Yes.  Do I?  No.

21      Q   And are the medical records available to all

22  treating providers at Cermak Health Services?

23      A   Some -- Different entities have different access

24  to the medical record, and it's usually based on what

1   they need to know.  So different people have different

2   access -- different information access I should say.

3       Q    And do you rely on those medical records in the

4   daily course of your providing services to patients?

5       A    Absolutely.

6       Q    And is it your understanding of the practice at

7   Cermak is that providers are supposed to make a record

8   of their interaction with the patient?

9       A    I can't speak for other providers.  I'll speak

10  for myself.  Whenever I have an interaction, I document

11  my interaction.

12      Q    And do you take your notes contemporaneously or

13  shortly after you interact with a patient?

14      A    I usually try to get them done during the

15  clinic.  If not, I come back to the office to finish

16  them, yes.

17      Q    And it's your regular practice to create such a

18  record of your interactions with individual patients?

19      A    If they have a scheduled appointment, it's on

20  the record.

21      Q    Okay.  And when you are creating a medical

22  record, is it -- do you try to make that record as

23  accurate as possible?

24      A    That's a silly question.

1     Q   Do you intend --

2     A   Yes, I make it as accurate as I can.

3     Q   And --

4     A   I think that's a gimmie.

5     Q   And you understand that other people may be

6 relying on that medical record, people who see the

7 patient next, right?

8     A   Yes, it's on the record.

9     Q   Right.  And so you expect that people rely on

10 that record in the delivery of medical services,

11 correct?

12     A   Yes.

13     Q   And is it mandatory, Dr. -- or, Mr. Sims, for

14 you to make a record of every patient interaction?

15     A   If I'm walking down the hall and somebody stops

16 me, that interaction is not recorded because I don't

17 have access to a chart.  So I can't say that a hundred

18 percent.  But if they have an appointment in my clinic,

19 they will leave with a note of our encounter, yes.

20     Q   How do patients -- Because you're first, I have

21 to ask you some questions that I might not have asked

22 you if you were say the fifth witness.  How does an

23 inmate request an appointment with Cermak Health

24 Services?

1     A    They don't request appointments.  I have a

2  yellow slip of paper.  It could be white now.  It's

3  called an inmate health service request form, which is

4  designed to take whatever complaint they may have

5  medically or -- There's a lot of different non-medical

6  complaints on those too.  But that's how they access if

7  they have a problem.

8     Q    All right.  The patient -- or the inmate fills

9  out a health service request form.  Where does the form

10  go?

11     A    It goes -- The nurses collect them.  The nurses

12  will collect them.

13     Q    Then who is -- After the nurses collect them,

14  what happens next to the forms?

15     A    They're evaluated by the nurses.

16     Q    Okay.  And is there, if you will, a head nurse

17  or a head scheduling nurse or somebody --

18     A    Whoever is assigned to do those health request

19  forms.

20     Q    And then --

21     A    How that gets divvied up, I have no clue.  I'm

22  not in the nursing department or privy to that.

23     Q    Sure.  And then your first notice then that a

24  patient is coming to see you will be they'll show up on

1    your appointment calendar for a day?

2        A    So they -- a request for an appointment is

3    ordered.  It goes into a scheduling queue.  Our

4    scheduler takes it off the queue and puts it into the

5    slots, the scheduled slot.

6        Q    Okay.  And is there a name of the person that

7    does that, a title or a department name or something

8    like that?

9        A    That does what?

10       Q    Makes -- puts the patient's name in slots and

11   schedules them.

12       A    That is done by -- It's an administration

13   assistant.  There's a pool of administrative assistants.

14   So it's not necessarily one assigned to a division.

15       Q    Got it.  And before you see a patient do you

16   have access to the health service request form?

17       A    That gets scanned into the chart.

18       Q    Okay.  And when you see a patient, do you always

19   have access to that or is it sometimes missing?  How

20   often is it complete?

21       A    If it has been scanned to the chart, it will be

22   in the chart.

23       Q    Would you agree that the medical record that you

24   keep is the best record of what happened when a patient

1   and you had an appointment and a visit at Cermak Health

2   Services?

3       A   Best compared to what?

4       Q   Well --

5       A   It's all I have.  So there's no -- I have no

6   point of reference to compare it to anything else.

7       Q   I was going to say, there is no regularly kept

8   record of an interaction other than what's on the

9   medical chart, right?

10      A   Correct.

11      Q   Okay.  When a patient presents with an

12  orthopedic problem of one type or another, are you able

13  to recognize the signs and symptoms of different

14  orthopedic injuries?

15      A   That's such a general question.  I'm not quite

16  sure how to answer that question.

17      Q   Okay.  Well, let's start a different way.  You'd

18  agree with me it's important to take an accurate history

19  of a patient who comes to you for treatment, correct?

20      A   Yes.

21      Q   And it's important for you to make a thorough

22  and a complete physical examination, correct?

23      A   Yes.

24      Q   Okay.  And how do you take a complete and

Page 45

1    accurate history from a patient?

2        MR. PREBER:  Objection as to form.  But you may

3    answer, Mr. Sims.

4        THE WITNESS:  What is the question?

5        MR. HACK:  Q   My question is, how do you go about

6    making sure that you've done a complete and accurate

7    history of a patient when they present to you for

8    treatment?

9        A   I talk to the patient, I get the history, I do

10   the physical, I do my assessment, and I come up with a

11   plan.  That's how it works.

12       Q   How long is the patient scheduled to see you?

13   In other words -- That's a bad question.  Right, there

14   are 24 hours in a day.  There's some number of hours

15   that you work each day.  And a patient has an

16   appointment for a certain period of time, right?

17       A   We have a clinic time, but they're not assigned

18   specific times.

19       Q   I see.  So it's not like you get 15 minutes from

20   10:00 to 10:15?

21       A   Right, it's not that sophisticated.  We are not

22   that sophisticated.

23       Q   Okay.  When a -- You had mentioned that you do a

24   physical exam.  In laymen's terms, what's a physical

1   exam?

2        A    I look at the patients, I lay my hands on the

3   patients, and I try to come up with an explanation for

4   the patient's complaint.

5        Q    Sure.  When a patient presents to you with a

6   shoulder problem, what are the types of physical exams

7   or tests that you undertake?

8        A    I'll look at the musculature of the shoulder.

9   Obviously if a patient is unable to move that shoulder,

10  there's going to be some muscle wasting.  I'll do some

11  range of motions to see if they can move it in all

12  directions.  I'll check the strength.  So basically

13  looking at just the structure itself, the range of

14  motion, and obviously areas of tenderness, right?  When

15  you're doing a physical exam, you want to see the source

16  of the discomfort, if there is.

17       Q    Right.  If a person presents after a shoulder

18  trauma, what -- are there certain tests that have a name

19  that you do to test range of motion?

20       A    I want to ask something.

21       Q    Sure.

22       A    I'm going over my note, and I'm getting a lot of

23  shoulder questions, but the note is basically about a

24  back follow-up.  So -- And I'm getting orthopedics and

```
 1   I'm getting shoulder, and I'm kind of wondering why

 2   we're going this route when I don't have a shoulder

 3   issue during my encounter with your client.

 4       Q   Well, the reason is that the entirety of your

 5   care and patient interaction is important to my

 6   understanding of what you said to him and what he said

 7   to you.  And so I'm working my way to your examination

 8   notes, which I assure you we will cover.

 9       A   Well, but specifically we didn't even discuss a

10   shoulder issue in this note.  So my question is, is I am

11   being questioned regarding a shoulder when that was not

12   even addressed in the encounter that I had with your

13   client.  So I'm --

14       Q   I'll get to your note in due time.  For now,

15   you're obliged to answer the questions I ask.

16       A   Okay.

17       Q   And I'll assure you, Mr. Sims, that I will give

18   you an opportunity to tell me about your recollection of

19   those details.  So let's proceed on that basis.

20           What are the names of the tests that you could

21   give to a patient who presents with range of motion

22   problems in their shoulder?

23       MR. PREBER:  Objection, speculation.

24       THE WITNESS:  I do flexion, extension, internal
```

Page 48

1   rotation, external rotation, abduction, and adduction.

2   Those are all the ranges of the motion of the shoulder.

3       MR. HACK:   Q   Okay.  What are the tests that you do

4   to test the strength of a shoulder?

5       A   I basically -- Resistance, against resistance.

6   I'll tell them to push or don't let me push your arms

7   down.  We'll assess the strength that way.

8       Q   And what are you looking for when you said you

9   looked at the structure of the shoulder?  What do you

10  look at and what are you looking for when you do that?

11      A   I'm looking for muscle wasting, atrophy, because

12  if you don't use it, you lose it.

13      Q   And you mentioned also you were looking for

14  tenderness.  What does tenderness signal to you as a PA?

15      A   Well, it's usually the body telling you

16  something is not right.  Right?  That's what pain

17  usually pronounces itself as.  Something's not right.

18      Q   And severe pain is another red flag, right?

19      A   Well, that's subjective.  I can't -- you know, I

20  can't speculate on somebody's assessment of their pain.

21      Q   But if a patient tells you -- Suppose a patient

22  comes to you and says, you know, my pain is 7 or 8 on a

23  scale of 10.  You'd agree with me that that requires a

24  close look by you, right?

1     MR. PREBER: Objection to speculation and to form.

2     THE WITNESS: I'm more interested actually in the

3 quality of the pain than the severity of the pain,

4 because the severity of the pain can be subjective. I

5 can't -- The patient is going to tell me. But, you

6 know, what's severe for one patient might be nothing for

7 another patient.

8        So, again, when you use the term severity, I

9 don't get into the severity of. I'm more concerned

10 about the quality of the pain because that will guide me

11 to the source of the pain.

12     MR. HACK: Q As a -- Mr. Sims, as a non-expert,

13 please explain in laymen's terms what do you mean as a

14 professional by the quality of the pain? Just what does

15 that mean in simple terms?

16     A Okay. So the simplest way I can describe it is

17 to ask the patient what sensation are they feeling. In

18 other words, pain means different things to different

19 people. Just describe the sensation that you're

20 feeling.

21     Q If you can't make a -- You had said that you

22 come up with a plan -- you make a diagnosis, you come up

23 with a plan. If you're not certain of a diagnosis, one

24 option that you have is to refer an orthopedic patient

Page 50

```
 1   to Ms. Patel, right?

 2       A    Say that again.

 3       Q    I said if you're not certain about the diagnosis

 4   of an orthopedic injury, one option that you have is to

 5   refer that patient to Menisha Patel, correct?

 6       A    Correct.

 7       Q    And are there any other places that you refer

 8   orthopedic patients other than to Ms. Patel?

 9       A    No.

10       Q    Okay.  Now, when you're examining a patient, an

11   orthopedic patient, one of the options that you have is

12   to have additional tests and imaging done, correct?

13       A    I order diagnostics based on my clinical

14   judgment.

15       Q    Okay.  And what diagnostic tests are available

16   to you for a person who presents with an orthopedic

17   shoulder injury of one type or another?

18       A    The only thing I have available -- On-site or

19   off-site or what --

20       Q    Let's start first on-site.

21       A    On-site, I have x-ray and I have -- standard

22   x-ray and I have CAT scan.

23       Q    And what are available to you off-site, sir?

24       A    They have MRIs available off-site.
```

Page 51

1    Q    And that's at Cook County, right?

2    A    Correct.

3    Q    Any other diagnostic imaging tools available to

4    you to look at a shoulder injury?

5    A    Not really.  Ultrasound is available, but that's

6    only if I suspect some type of mass that's in the

7    shoulder area, but that's very rare.

8    Q    Do you have the authority or -- Do you have the

9    opportunity to refer a patient directly to a surgeon if

10   you think a patient presents with symptoms requiring

11   surgery?

12   A    If it's an acute surgical problem, I'm referring

13   that to the emergency room.  If it's an elective

14   procedure, that's up on the -- that's up to the surgeon.

15   I don't schedule elective procedures.  I don't schedule

16   any surgical procedures.

17   Q    Have you ever received direction or instruction

18   or encouragement -- So have you ever received direction,

19   instruction, or encouragement to limit the number of

20   MRIs that you ask for your patients?

21   A    No.

22   Q    Have you ever been asked to limit the type and

23   number of diagnostic tests that you deliver to your

24   patients, or that you schedule for your patients?

Page 52

1      A    No.

2      Q    And have you ever been asked to reduce the

3  number of referrals to other specialists for patients

4  that you treat?

5      A    No.

6      Q    Have you ever been criticized by any of your

7  superiors for too frequently ordering MRIs or other

8  diagnostic tests?

9      A    No.

10     Q    Mr. Sims, we're going to see how this works.

11  Okay?  I have an exhibit.  I'm going to open it.  It

12  should show up in front of you too once I click a

13  button.  Would you let me know if it does?

14     A    Yes.

15          (Document marked as Deposition

16          Exhibit 1 for identification.)

17     Q    It should be in front of you.

18     MR. PREBER:  Counsel, I don't see anything either.

19     THE WITNESS:  I don't have anything.

20     MR. HACK:  Do you have your Veritext Exhibit Share

21  screen up?

22     THE WITNESS:  I have no idea what that is.  I have

23  the Zoom meeting --

24     MR. HACK:  Okay.  Let's go off -- That's fine,

Page 53

1    Mr. Sims.  Let's go off the record for a moment, if we

2    could, please.

3              (Recess was taken.)

4      MR. HACK:  Q   Do you see Exhibit 1 in front of you?

5      A   Exhibit 1, Cook County Health and Hospitals

6    System.

7      Q   Thank you.  Okay.  Before we get to the

8    exhibit -- I'm going to have a few in a minute, but

9    let's -- I understand -- Let's go on the record.

10             I have a general question first and then I'm

11   going to get to some specific questions about your

12   interactions with Mr. Limbacher.

13             As a PA, are you assigned to a different doctor

14   each day?  Do you work for lots of doctors --

15     A   No, I'm --

16     Q   -- or some doctors?  Tell me how you work -- how

17   that's assigned.

18     A   I'm assigned a supervising physician and that's

19   required by the State of Illinois.  And so that -- I

20   don't work with that doctor in my clinics, but that's

21   who I'm listed as my supervising physician.

22     Q   Okay.  And do you have one supervising physician

23   at a time?

24     A   Yes.

Page 54

1     Q    And --

2     A    Yes.  And when that person retires, you have to

3     file paperwork to have that supervising physician

4     removed and whoever your -- the next one is.

5     Q    And what is the obligation of your supervising

6     physician?  Is it to supervise your work day in and day

7     out as you understand the practice -- the procedures at

8     Cermak Health Services?

9     A    They do a chart review.  I'm not quite sure what

10    the Bureau has them do as far as the oversight and chart

11    reviews and whatnot.  I'm not privy to that information.

12    Q    Okay.  Do you have a regularly scheduled meeting

13    every day or every week or at some other period of time

14    with your supervising doctor to discuss patient care?

15    A    No.  When I have an issue with a patient, we

16    discuss as needed.

17    Q    Okay.  In the years 2017, 2018, and 2019 who was

18    your supervising physician?

19    A    I believe it was Dr. Baker.

20    Q    And what was Dr. Baker's first name?

21    A    Terrance.

22    Q    And what type of physician was Dr. Baker?

23    A    He was a primary care.

24    Q    And is Dr. Baker still employed at either -- at

```
 1   Cermak?

 2        A    No, he's retired.

 3        Q    Okay.  And when he was your supervisor, he was

 4   an employee of Cermak Health Services?

 5        A    Yes.

 6        Q    Okay.  And who is your present supervising

 7   physician?

 8        A    Dr. DeFuniak.

 9        Q    And as best you can recollect, when was Dr.

10   DeFuniak appointed as your supervising physician?

11        A    Probably about three years ago.  Three or four

12   years ago is I think when Dr. Baker retired and we made

13   the transition.

14        Q    Okay.  As I said, I'm going to ask just

15   everybody hang just for one second.  I'll be right back.

16   I needed -- I have an interruption.  I'll attend to

17   that.  I'll be right back.  Don't go off the record.

18           And, Mr. Sims, I understand you have a 12:30

19   clinic obligation today; is that correct?

20        A    Yes.

21        Q    Okay.  So I will -- I surely don't wish to

22   disrespect your other patients.  We'll stop at 12:30.  I

23   don't know whether I'm done or not.  We'll find out.

24           Because of the timeframe, I'd like to get right
```

1    to something that you wanted to speak about before.  How

2    often did you meet Mr. Limbacher while he was

3    incarcerated at the Cook County Jail?

4        A   I believe the note that's in question from

5    January 30th of 2018.  I did not look to see if there

6    was other encounters with Dr. -- with Mr. Limbacher.

7        Q   Okay.  Asking what you remember as opposed to

8    looking at your note, do you have any recollection of

9    meeting Mr. Limbacher on any other day than January

10   the 30th?

11       A   I don't recall.

12       Q   Okay.  You had mentioned that you had a note in

13   front of you.

14       A   Yes.

15       Q   And because I believe -- I need to try to figure

16   out if I have the same notes that you have, because the

17   documents were produced in the COVID emergency and

18   things were perhaps done differently than they would

19   have in a different setting.

20         And so I'm not going to bellyache.  I'm just

21   going to observe -- I'm doing the best I can with what

22   I've got.

23       A   Okay.

24       Q   So can you tell me what page numbers are on that

1    document or documents that you're referring to?

2        A    I have 1 of 6.  Is that what you're asking?

3        Q    No.

4        A    No?

5        MR. PREBER:  Counsel, are you asking about the Bates

6    Nos.?

7        MR. HACK:  I just -- Hang on, Alex.

8        THE WITNESS:  What I did is I printed the clinical

9    note from the healthcare -- or the health record.  So I

10   may not have the same copy as you.

11       MR. HACK:  No.  No, you might not.

12       THE WITNESS:  Okay.  Does it start out with PCC

13   Division 8, 4th floor?  It says final report and then

14   right underneath to the left --

15       MR. HACK:  Q  I got it.  We'll cover that in a

16   moment.

17       A    Okay.

18       Q    Thank you.  You are helpful and patient in

19   dealing with the document issues.

20            Please look at Exhibit 1, which I have in front

21   of you.  Do you see Exhibit 1, sir?

22       A    Yes, from the admission date 5-19 of 2017.

23       Q    Right.  And at the bottom of the range, if you

24   go very far down, you'll see it says page 5041 of 5547.

Page 58

1  Do you see that?

2      A   Yes.

3      Q   And am I correct that this is a printout of

4  different orders by physicians or physician's assistants

5  for Mr. Limbacher?

6      A   It looks like an order.  I've never seen it like

7  this because obviously it's different when it's in the

8  chart and I normally don't print out my orders.  But,

9  yes, it appears to be Cerner orders.

10     Q   Right.  So this would appear electronically when

11 you looked at it at work, right?

12     A   Right.  What I can do is I can go in and look at

13 all active orders, non-active orders, all active

14 non-medications, all active medications, et cetera, et

15 cetera.

16     Q   Look down at the fourth large box.  Do you see

17 it begins order referral to primary care and there's a

18 date, 12-13-2017, 8:00 o'clock Central.  Do you see

19 that?

20     A   Yes.

21     Q   And if you look further down, you'll see your

22 name, Kevin Sims -- or Sims PA-C Kevin, correct?

23     A   Yes, but it was entered by somebody else.

24     Q   Well, I was just --

Page 59

```
 1      A   I don't know how that works.

 2      Q   Okay.  Give me one second, if I could, sir.

 3      A   Okay.

 4      Q   I'll give you the floor in just a second.  Okay?

 5      A   Okay.

 6      Q   It says Sims PA-C.  What's the C stand for?

 7      A   Certifying.

 8      Q   Oh, okay.  And who certifies you as a

 9   physician's assistant?

10      A   The National Commission of Certifying PAs,

11   NCCPA.

12      Q   And where are they located?

13      A   Georgia.

14      Q   Okay.  And you've been certified for 20-plus

15   years, correct?

16      A   It's going to be 29 next month.

17      Q   And have you lost your certification for any

18   reason?

19      A   No.

20      Q   Have you ever had a disciplinary or other

21   professional inquiry into your status as a certified PA?

22      A   No.

23      Q   We were looking at this last box.  We identified

24   your name as the ordering physician.  And you were
```

1    saying to me entered by, and according to this, this

2    order was entered by Dr. Greg Papiez, correct?

3         A   It says -- yes, it says entered by.  That's why

4    I'm confused.  But let me clarify that because I have

5    the patient's chart and I can go to that order.  So let

6    me pull it up in the chart if you don't mind.

7         Q   I do not mind.  And I would like to find out,

8    sir, so that when you're looking at your chart, you can

9    be of assistance, did you see Mr. Limbacher in December

10   of 2017?

11        A   That's what I'm going to check out right now.

12   What was the date again?

13        Q   The date here, sir, is December 13th, 2017.

14        A   December I'm sorry?

15        Q   December 13th, sir, 2017.

16        A   Okay.  Let me go back because it's -- we've got

17   a lot of documents here.

18             Yes.  Okay.  So on December 13th, 2017 I put

19   in the -- there's a note related on that date.  It says

20   seen in PCC 11-29-17 with a 1-10-2018 PCC follow-up

21   scheduled.

22        Q   Hang on.

23        A   Pardon me?

24        Q   Hang on a sec.

Page 61

1      A    Okay.

2      Q    I think I know what you're referring to, but I

3  need to get there.

4      A    Okay.

5      Q    Can you please -- I know I interrupted your

6  reading.  If you could go back and begin reading where

7  you began before please.

8      A    Hold on for just a second.  I want to check

9  something.

10          So what you sent me --

11     MR. PREBER:  You're referring to Bates No. 2804,

12  correct, Counsel, is where you're at?

13     MR. HACK:  No.

14     THE WITNESS:  Okay.  So where we at?  What's the

15  question?

16     MR. HACK:  Q   My question to you, sir, is -- well,

17  what we're trying to do, my question was, did you see

18  Mr. Limbacher in December of 2017?

19     A    No, because what happened was we have patients

20  sometimes that get double booked, in other words,

21  there's redundant appointments, and I put in my note on

22  12-13-2017 that he was seen in primary care clinic

23  11-29.  He was evaluated.  And that was by another

24  provider, not me.  And that provider basically saw them

Page 62

1  and scheduled them for a follow-up in January of 2018.

2      Q   You're --

3      A   Hold on for just a second.  I want to see -- I

4  want to check something.  12-13-17.  Okay.  Hold on.

5          Okay.  So I put it together.  So that 12-13

6  appointment -- that 12-13-2017 appointment that your

7  client had was ordered on 11-15-2017 by Dr. Papiez.

8      Q   Okay.

9      A   Okay?  So that was ordered 11-15-2017.

10          Now, when he showed up, he was seen on 11-29.

11  So basically he had an appointment earlier than our

12  appointment.  So the provider saw your client on 11-29,

13  two weeks after Dr. Papiez ordered a follow-up, and

14  scheduled a follow-up appointment in January of 2018.

15      Q   And --

16      A   So -- Pardon?

17      Q   Sorry, I thought you were done.  Please

18  continue.

19      A   Okay.  So when he arrived, that's basically a

20  double book, and I put PCC, primary care clinic,

21  follow-up as previously scheduled.

22      Q   Okay.  So did you speak with Mr. Limbacher that

23  day?

24      A   I have no idea if I spoke to him or not.

```
 1      Q    You mentioned that -- You were going through the
 2  chronology and you said that he had an appointment on
 3  November the 29th, 2017, correct?  That's what your
 4  records show you?
 5      A    He was seen on -- There is an encounter for a
 6  PCC visit on 11-29-2017.
 7      Q    And he met with PA Glenn Trammell that day,
 8  correct?
 9      A    Correct.
10      Q    I have that note.
11      A    Okay.
12      Q    Were you present at the interaction between
13  Mr. Trammell and Mr. Limbacher on that day?
14      A    No.
15      Q    Okay.  I'm going to give you another exhibit.
16  We have to keep moving.
17           And, by the way, you've been most helpful in
18  trying to ensure the accuracy of your testimony by
19  reference to your notes.  And I thank you for doing
20  that.
21      A    You're welcome.
22      Q    I would now -- I'm going to publish another
23  exhibit, which will show up here in just a moment.
24           (Document marked as Deposition
```

 1             Exhibit 2 for identification.)

 2      Q    There should be a new exhibit appearing in front

 3   of you.  Do you see it?

 4      A    No.  I'm still on Exhibit 0001.

 5      Q    Actually, you need to minimize that.  The new

 6   one should be up.

 7      A    All right.  So this one is Exhibit 2.  Okay.

 8      Q    I would ask you to take a moment and look at the

 9   first, second, and fourth boxes in particular.

10      A    Okay.

11      Q    First off, this is a print -- a summary print of

12   different orders concerning Mr. Limbacher's care,

13   correct?

14      A    Yes.

15      Q    Okay.  And you recognize the form of these.

16   These look like orders from the Cook County -- the

17   Cermak Health System medical records form -- chart,

18   right?

19      A    It appears so, yes.  Like I said, I have not --

20   I'm not familiar with this particular form of orders.

21   But, anyway, it appears so.

22      Q    Okay.  If you look at the first, second, and

23   fourth box on Exhibit 2, that indicates a patient

24   interaction with Mr. Limbacher on November the 20th,

1    2017, correct?

2        A    Say that again.  I'm sorry.

3        Q    Sure.  Does this order form indicate to you that

4    you had a patient interaction with Mr. Limbacher on

5    November the 20th, 2017?

6        A    No, I did not have an encounter.  Hold on.  That

7    was my colleague.  November -- What's the date?

8        Q    November the 20th, Mr. Sims.

9        A    November 20th.  No, I did -- I renewed his

10   medication on that date.  I did not actually see him,

11   because there is a note from November 20th, 2017.  It

12   says no show for PCC secondary to court.  Meds renewed.

13   Has PCC follow-up already scheduled for 12-13-2017.

14       Q    Okay.  And from that note -- Well, let me take

15   it another way.  Mr. Limbacher did not show for his

16   appointment that day; is that what's indicated by the

17   note?

18       A    N/S stands for no show for PCC, primary care

19   clinic, secondary to court.

20       Q    I see.  And the 2/2 is secondary to court?

21       A    Yes, secondary to court.

22       Q    Okay.  I'm going to ask you in a minute -- I'm

23   going to have you set that aside.  Did you talk to

24   Mr. Limbacher that day by telephone?

1    A   No.

2    Q  Did you have any interaction with him whatsoever

3 prior to renewing his medication?

4    A   No.  He missed our appointment.  I reviewed his

5 chart and reordered the medication that he was probably

6 already on.

7    Q  Okay.  I'm going to -- Do you have any other

8 recollection of that -- of the events involving

9 Mr. Limbacher on that day?

10    A   The only -- the only thing I can surmise based

11 on this note is he had an appointment and he didn't make

12 the appointment because he was in court.  And the nurse

13 will tell me this guy's in court, he's a no-show.  So at

14 the end of clinic I run through the list of anybody that

15 we missed, refused, et cetera.

16    MR. HACK:  My screen share just dropped.  Hang on a

17 minute.  Goodness sakes.

18        Okay.  Let's go off the record for a minute.

19 I'll be back to you in just a second.  I've got another

20 exhibit I would like to show you, Mr. Sims.  It will be

21 the record that you're referring to.  I want to

22 authenticate it and then we'll look at another record of

23 your visit with Mr. Limbacher.  Give me just a moment.

24    THE WITNESS:  Okay.

Page 67

```
 1              (Recess was taken.)

 2      MR. HACK:  Q   Okay.  Mr. Sims, the other exhibit

 3   should be in front of you, Exhibit 3.

 4              (Document marked as Deposition

 5              Exhibit 3 for identification.)

 6      Q   It begins Cook County Health and Hospitals

 7   System.  It refers to Mr. Limbacher.  And if you were to

 8   look at the Bates No. at the very small bottom of the

 9   page, it's 008624.  Is that the document you have in

10   front of you?

11      A   Let's see, 5-19-2017.

12      Q   Yes.  That's the admission date, correct?

13      A   Yes.

14      Q   And if you look all the way at the bottom of the

15   page, you will see in very small print there's a Bates

16   No.  We don't need to look at that.  Both of us are --

17   We are not young men.  Let's leave it with that.

18      A   Okay.

19      Q   Please take a look at the one, two, three -- I'm

20   going to move to the fourth page of this document.

21   There we go.

22              Do you see Exhibit 4 in -- the exhibit in front

23   of you and a note dated 11-20-2017 with your name on it?

24      A   That's the one I was just discussing.
```

1    Q    Okay.

2    A    Yes.

3    Q    And having looked at this note, do you have any

4   other recollection of any interaction with Mr. Limbacher

5   that day?

6    A    No.

7    Q    Okay.  Now look below it if you would.  Below

8   the -- on the left side it says has PCC follow-up

9   already scheduled for 12-13-2017, correct?

10    A    Say that again.  I'm sorry.

11    Q    Sure.  On the left side it says no show for

12   primary care clinic secondary to court --

13    A    Right.

14    Q    -- meds renewed.

15         Okay.  Below that it says electronically

16   authored on, right?

17    A    Yes.

18    Q    Tell me what is reflected in those four boxes on

19   that -- Those four lines on that electronic signature,

20   what is that telling us?

21    A    What -- I'm not quite sure what your question

22   is.

23    Q    Sure.  First off, that tells you the date that

24   this medical record was authored, correct, and what

Page 69

1   time, right?

2       A    Yes.

3       Q    And it tells you who authored it, by you,

4   correct?

5       A    Correct.

6       Q    And it tells you what group you're with,

7   med-surge, Cermak Health Services?

8       A    Right.

9       Q    You're a PA.

10      A    Right.

11      Q    And that's your pager number, correct?

12      A    Used to be, yes.  We don't do pagers anymore.

13      Q    Okay.  But that was -- The system would stamp

14  that or -- each time you would input a medical record?

15      A    That's my signature.  Whenever I enter a note,

16  it dates and times the signature.

17      Q    Okay.  And the signature follows the note for

18  the day?

19      A    I'm not sure what that means.

20      Q    Okay.  The signature is below the note to which

21  you are referring.  In this case, the electronically

22  authored on refers to the two groups of information

23  directly above it, below the line and above the line,

24  right, the 11-20-2017 visit?

1    A   Okay.  I started the note at 14:54 at the top,

2  and I closed it -- or I signed off on it one minute

3  later.

4    Q   Very good.  And that signature refers to that

5  whole record, right?

6    A   To my note that I just put in there.

7    Q   Yes.

8    A   Yes.

9    Q   And that signature is put on when you close it,

10  right?

11    A   When I sign off on the note.

12    Q   Great.  Let's look at the next note.  We have a

13  date of November the 22nd, 2017 at 1:06 p.m., correct?

14    A   Repeat that one more time.

15    Q   Sure.  We have a note from November 22nd, 2017

16  at 1:06 p.m., correct?

17    A   At 1:06 p.m.  Let's see.  Yes.

18    Q   And that's your signature, right?  You put this

19  information in, correct?

20    A   There's nothing in there.

21    Q   Turn the page.

22    A   Okay.  What I am saying to you is after I signed

23  off on that November 17th, okay, the next, it says

24  11-22-17.

1      Q    Yes.

2      A    But I don't have any information.  So I don't

3   know what I was signing is basically what I'm saying.

4      Q    Could you just turn to the next page.

5      A    I am turning to the next page, and the next page

6   says 5-19-2017.

7      Q    Does the next page not say outpatient medical

8   CHS, seen in PCC 11-15-17?

9      A    Hold on for just a second.  I'm trying to figure

10  this out.

11           Okay.  I got it.  Yes, 11-22.  Okay, I got

12  that.

13     Q    Did you see Mr. Limbacher on the 22nd of

14  November --

15     A    No --

16     Q    -- 2017?

17     A    -- I did not.  I did not see him because I

18  didn't need to see him.  He was double booked.

19     Q    Okay.  And do you have any recollection of any

20  interaction with Mr. Limbacher on that day?

21     A    No.

22     Q    Okay.  I have another exhibit to publish please.

23  Exhibit 4 is in front of you, Mr. Sims.

24           (Document marked as Deposition

1      Exhibit 4 for identification.)

2      Q   I would like you to turn if you would to -- And

3   I'll move it.  There is a note dated January 30th, 2018,

4   11:05 in the morning.

5          If you -- It is about -- It is one -- It is on

6   the fourth page of this document.  Would you please turn

7   there.

8      A   The fourth page?  One, two, three, four.  Is

9   that the note dated 1-30-2018?

10     Q   Yes.  You know what?  I hate to do this to you.

11  Could you look at the note immediately prior to it?

12     A   From 12-27-2017?

13     Q   No, the immediate prior one that I show is

14  1-9-2018 signed by you.

15     A   1-9-2018?

16     Q   Third page, bottom.

17     A   Okay.  Let me just see here.  So 1-9-18,

18  correct?

19     Q   Correct.

20     A   Yes.  Yes, I see it.

21     Q   Did you see Mr. Limbacher that day?

22     A   No, it said declined PCC appointment, meds

23  reconciled, reschedule PCC follow-up two to three weeks.

24     Q   And did you speak with Mr. Limbacher that day by

```
                                           Page 73

 1    telephone or any other way?

 2        A    Not that I can recall.

 3        Q    Did you communicate -- Could you communicate

 4    with prisoners by telephone?

 5        A    No.

 6        Q    Okay.  And could you communicate with them by

 7    e-mail?

 8        A    No.

 9        Q    Let's look at the next note please, 1-30-2018.

10        A    Yes.

11        Q    You saw Mr. Limbacher on this day, correct?

12        A    Correct.

13        Q    Where did you see him?

14        A    Let's see.  I saw him -- At the top it will say

15    patient location.  So I saw him in Division 8 on the

16    fourth floor.  That's where I saw him.

17        Q    Prior to seeing Mr. Limbacher this day, what did

18    you do to prepare for your -- the meeting?

19        A    This was a January 30th of 2018.  I have no

20    idea.

21        Q    You read this medical note before your

22    deposition today, correct?

23        A    Correct.

24        Q    And did reviewing the note refresh any
```

1  recollection that you had about what happened and who

2  said what to whom?

3      A   All the information that I have is a note.  I

4  don't remember things off the top of my head.  That's

5  why we write notes.  And this is a note that is from an

6  encounter I had with your client on that particular

7  date.  And that's all I remember.  What I remember is

8  what I read from my note.

9      Q   Okay.  What symptoms did Mr. Limbacher present

10  that day?

11      A   Okay.  So this was a regular PCC appointment

12  with an interval urgent care follow-up.  In other words,

13  in the -- he had gone for an emergency room visit in

14  between his primary care clinic appointments, which are

15  scheduled at regular intervals, right, because the

16  primary care clinic would address his asthma, his

17  allergies.  And then basically at the bottom is what he

18  was seen for in the emergency room.

19      Q   Okay.  What was he seen for in the emergency

20  room?

21      A   Okay.  It says history of cervical lumbar

22  osteoarthritis, recently sent to Stroger for lower back

23  pain with lower extremity radiculopathy.

24      Q   I hate to ask you -- Hang on just a minute.

1      I've got to find it.  This document is multiple pages,

2      correct?

3           A    Yes.

4           Q    Under what category -- Under what heading are

5      you reading?

6           A    Under History of Present Illness.

7           Q    I got it.  Thank you.

8                I interrupted you.  I believe my question was,

9      what did Mr. Limbacher -- what symptoms did

10     Mr. Limbacher present that day?

11          A    Everything is in the note.  I'm not quite sure

12     what -- We basically -- I asked him about his asthma.  I

13     asked him about his thumb numbness, allergies, and his

14     recent visit to Stroger Hospital.

15          Q    What did he tell you about his visit to Stroger

16     Hospital?

17          A    Well, I'm focusing in on the pain.  I didn't ask

18     him about the trip to Stroger Hospital because I can

19     pull up that note.  So I know exactly why he -- what was

20     evaluated.  And so I looked at the January 8th, 2018

21     Stroger emergency room encounter.

22          Q    Okay.

23          A    And that -- and this was his follow-up for that.

24     So I basically looked at that, and I asked him about the

1   pain.  He said the radiculopathy has resolved, but still

2   with sharp pain in the lower back.  He denies bowel or

3   bladder incontinence, lower extremity weakness, or

4   saddle anesthesia.  Positive pain relief with

5   Diclofenac.

6       Q   And tell me, what is Diclofenac?

7       A   That's a non-steroidal anti-inflammatory

8   medication.

9       Q   Okay.  Is it taken orally?

10      A   It can be oral.  It can be topical, topical

11  meaning like a cream.

12      Q   Did you perform any physical examination on

13  Mr. Limbacher that day?

14      A   If you go down under Objective.

15      Q   I have that.

16      A   Okay.  That's my exam.

17      Q   So under Objective we have a series of

18  categories, right?

19      A   Uh-huh.

20      Q   VS measurements, and then it goes all the way

21  down to musculoskeletal, correct?

22      A   Correct.

23      Q   What musculoskeletal examination of

24  Mr. Limbacher did you make that day?

1    A   Okay.  He had a normal gait.  So he walked in

2  normally.  The lower extremity was within normal limits.

3  So I'm looking at the musculature.  I'm looking at any

4  abnormalities to the lower extremities.

5       I looked at his spine, specifically his lumbar

6  5, which is the lower part of the back.  There's

7  different levels of spine.  This happened to be at the

8  lumbar 5 level.  He had some tenderness along the spine.

9  He had a normal range of motion to his back.  There was

10  no redness, no bruising, no mass, and no swelling.  That

11  was my exam.

12    Q   Did he report any problems with the movement of

13  his shoulder?

14    A   I don't see anything in the note that alluded to

15  that.

16    Q   Did he report pain in his shoulder?

17    A   Not that I see in this note.

18    Q   Did he report having had severe trauma prior to

19  your seeing Mr. Limbacher?

20    A   The trauma that he had was from a fall, and that

21  was the emergency room follow-up.

22    Q   Did you make a complete examination to rule out

23  any after effects from his earlier trauma?

24    A   No, it looks like I was focused on his back,

1   which is what his complaint was when he went to the

2   emergency room.

3       Q   Did you say anything to him at all about care

4   and treatment of his shoulder?

5       A   No, there is nothing in the plan.  There was --

6   there was nothing of content with the shoulder.  It was

7   the lower back.            .

8           And basically we continued the Diclofenac.  He

9   was on Lidocaine patches.  I added a muscle relaxer, and

10  I referred him -- Oh, and I also ordered some Tylenol

11  for any break-through discomfort, meaning if he's taking

12  medication and the medication lasts for 10 hours -- I

13  mean if it's prescribed every 12 hours, but it lasts

14  only for 10 hours, then I prescribed some Tylenol for

15  any break-through pain to cover him until his next dose

16  of the medication.  And then I also referred him to

17  physical therapy.

18      Q   What was he referred to physical therapy for?

19      A   For the back.  Discussed importance of

20  stretching and exercise, most useful tools in managing

21  chronic lower back pain.

22      Q   Did you consider sending Mr. Limbacher for a CT

23  imaging procedure?

24      A   No, because the CT was done in the emergency

1  room.

2           If you look at that note, under Results you'll

3  see the first entry under results review is the CT

4  lumbar spine without contrast.  That was done in the

5  emergency room.  So I have access to that.  So he's

6  already had a CT done.

7      Q   Did you ask -- Did you consider sending

8  Mr. Limbacher for an MRI procedure?

9      A   No, because there's no mention of me sending him

10 for an MRI.  So if I would have sent him or was

11 considering it, I would have put that in the note.

12     Q   Did Mr. Limbacher say anything to you about

13 wanting to see an orthopedic surgeon for the pain in his

14 shoulder?

15     A   Not that I can recall.

16     Q   Did Mr. Limbacher request that you refer him for

17 a consultation with orthopedics?

18     A   I don't recall that.

19     Q   Mr. Sims, I need to be respectful of your

20 patients and the commitments you've previously made.

21 You need to leave at exactly 12:30?

22     A   I got about 15 minutes' worth of wiggle room.

23     Q   Okay.  I'm going to try to use it well.

24     A   Okay.

Page 80

1        Q    Did you prepare this note of your visit with

2   Mr. Limbacher on January 30th, 2018?

3        A    Yes.

4        Q    And your visit with Mr. Limbacher was about 20

5   minutes, correct?

6        A    Let's see.  He checked in at 11:0 -- or I

7   started the note at 11:05.  You know, the note doesn't

8   necessarily reflect the amount of time that we spent.  I

9   don't necessarily queue it as soon as they walk in.  So

10  I don't recall that specifically.

11       Q    You completed your note at 11:25 in the morning,

12  correct?

13       A    Correct.

14       Q    And that's your electronic signature at the

15  back, right?

16       A    Correct.

17       Q    Did your -- Did you make any diagnosis -- Well,

18  let me rephrase it.  Did you form any impression --

19  Well, first off, what's a medical impression?

20       A    That's your diagnosis basically.

21       Q    Okay.  Did you make any diagnosis of any

22  orthopedic problem other than lower back pain?

23       A    No.  Under the Diagnosis it says lower back pain

24  and leg paresthesias.

Page 81

1      Q   Did you come up with any plan to address any

2  orthopedic concern other than lower back pain?

3      A   No.  I referred him.  In other words, the plan

4  was pain management, and basically I told you what I did

5  as far as adding the medication, and physical therapy is

6  a modality to help with pain management.  That's why I

7  referred him to physical therapy.

8      Q   And that physical therapy though was -- Were

9  your instructions there for physical therapy for his

10  back or for any other body part?

11      A   For the back.

12      Q   Okay.  Do you recall from looking at

13  Mr. Limbacher's prior medical history that he had

14  reported significant shoulder pain on more than one

15  occasion?

16      A   We did not address that at this encounter that I

17  see.  I see no mention of that in the note.

18      Q   Right.  My question is a bit different than

19  that.  Did you go back and look at Mr. Limbacher's prior

20  medical record?

21      A   I can't recall what I did on that specific date.

22      Q   If you had known that Mr. Limbacher's medical

23  file reflected multiple complaints about significant

24  shoulder pain, wouldn't you agree that the standard of

Page 82

1    care required you to ask him about that and its current

2    state?

3        MR. PREBER:  Objection as speculation.

4        THE WITNESS:  There's no way that I can ask about

5    every remote ache and pain that you've ever had that I'm

6    going to follow up on.  Is that what you're asking?

7        MR. HACK:  Q   My question was the way -- was

8    exactly what I asked.  My question was, if the medical

9    records showed Mr. Limbacher repeatedly presenting with

10   severe shoulder pain, wouldn't the standard of care in

11   your primary care clinic require you to have known that

12   and to have asked him about it?

13       A   Not necessarily.  What happens if the pain has

14   resolved?  I'm relying on the patient to direct kind of

15   the show.  So if that was his main concern, then that

16   certainly could have been addressed if that was what he

17   wanted to address.  But what we addressed is what's in

18   the note, so.

19           I don't believe I'm going to, again, do a deep

20   dive into the note on every encounter.  I don't have the

21   time to do that.

22       Q   And if it wasn't in the note from the

23   January 30th visit, it was not addressed during that

24   visit as far as you remember by you, correct?

1     A    Correct.

2     Q    I'd like to -- I have a couple other ones.  Am I

3  correct that there was no referral of Mr. Limbacher to

4  orthopedics that day; is that correct?

5     A    That is correct.  The only referral I made was

6  to physical therapy.

7     Q    Did you ask Menisha Patel, who sat next to you,

8  about Mr. Limbacher's presentation and symptoms?

9     A    I don't believe I would be compelled to based on

10  the CAT scan results.  There was no compelling

11  orthopedic issue regarding orthopedic intervention

12  needed for arthritis of the back.  There were no

13  fractures or dislocations.  That's really when I would

14  deploy or call in or confer with orthopedics.

15        But based on his CAT scan result of his lower

16  back, there was no compelling orthopedic issue that

17  needed to be addressed as far as his back.

18     Q    Did you -- At the conclusion of your interaction

19  with Mr. Limbacher, did you schedule up a -- did you

20  schedule a follow-up visit with you?

21     A    Let's see.  Yes, he had a follow-up visit that I

22  ordered 10 to 16 weeks.

23     Q    And tell me, first off, did you have the ability

24  to schedule Mr. Limbacher to come back and see you or --

1   to see you personally?

2       A    No, I don't -- We don't request -- You know, if

3   you're assigned to a division, sometimes there's good

4   continuity of care because you're there quite

5   frequently.  Other times somebody is filling in for you.

6   So there's no -- there's no mechanism where I can

7   specify he needs to see me.

8       Q    Okay.

9       A    I put in a timeframe.

10      Q    You did not believe that for continuity of care

11  purposes it was important that he see you personally

12  again so that you could follow up on his condition?

13      A    Ideally, in a perfect world, you would stick

14  with one provider all the way through.  But I don't

15  control where I get assigned.  So, again, there's no

16  mechanism to ensure that the patient that you saw

17  previously, that you're going to follow up with them.

18      Q    Is there any policy -- written policy or

19  procedure about how follow-up visits should be -- who

20  should conduct follow-up visits at Cermak Health

21  Services?

22      A    I'm not sure what you're asking me.

23      Q    Sure.  Is there a written document or an

24  electronic document which says how you should go about

1  scheduling follow-up appointments for patients and which

2  provider they should go see?

3      A   No, not that I'm familiar with.  I base my

4  follow-up based on what their clinical condition is and

5  there's some other factors.

6          If I'm referring them to somewhere, I want

7  them to make it to their appointment before our

8  follow-up visit, right?  So there's certain things that

9  I consider, and basically the patient's condition also.

10  If I'm really concerned about a patient, I'm going to

11  put a quicker turnaround time if it's an acute issue.

12      Q   Okay.  And severe pain would be an indication of

13  an acute issue, correct?

14      A   Pain can be chronic or acute.  So there's

15  variances of pain.

16      Q   Okay.  Acute pain though would be something you

17  would look at closely, correct?

18      A   I look at pain the same.  It's all the same.

19  Pain is pain, right?

20          I think the relief of pain is what I do,

21  whether it be chronic or acute.  So I'm not going to say

22  one is more important than the other because it's

23  important to the patient to get relief from their pain.

24  The patient doesn't care whether it's acute or chronic.

Page 86

```
 1        Q   When a patient presents repeatedly for pain in
 2   the same area, isn't that something that you would agree
 3   requires a close and careful look from a PA?
 4        MR. PREBER:  Objection as speculation.
 5        THE WITNESS:  Yeah, I don't know how to answer that.
 6   That's --
 7        MR. HACK:  Q   So I'm asking if the patient comes in
 8   and the patient says I have this pain in my shoulder and
 9   I've been seen three or four times about it and it isn't
10   getting better, doesn't that suggest -- wouldn't that
11   suggest to you, as the PA, that that's something that
12   would require a careful look?
13        A   Everything requires a careful look when they
14   come to see me.  I'm not sure how -- why you want me to
15   quantify that.
16        Q   Okay.  Let's take a look -- Given the time, I'm
17   going to do another Exhibit Share, Mr. Sims.  I sure
18   don't want to delete this from the thing.  There we go.
19        A   And that's Exhibit No. 5?
20        Q   That one was I believe -- Or was that 4,
21   Mr. Sims?
22        A   No, I think that was 4.
23        Q   That would be 4.  This will be 5, sir.
24            (Document marked as Deposition
```

```
 1        Exhibit 5 for identification.)
 2    Q   And let me know if you have an exhibit in front
 3  of you marked No. 5 please, sir.
 4    A   I do.
 5    Q   You need to refresh, Mr. Sims, just in case
 6  that's helpful.
 7    A   I got it.  Thank you.
 8    Q   Do you have Exhibit 5 in front of you?
 9    A   I do.
10    Q   And it is an inmate grievance form, correct?
11    A   It looks -- It appears so, yes.
12    Q   And that's because its title is that, right?
13    A   Pardon?
14    Q   I said that's the title of the document, right?
15    A   Yes, Cook County Sheriff's Office Inmate
16  Grievance Form.
17    Q   Right.  And if you look down here, name of staff
18  or inmates having information regarding this complaint,
19  Dr. Sims.  That's your name, correct?  Although, you're
20  a PA, not --
21    A   Yes.
22    Q   So it's you.  Do you -- In the course of your
23  work as a PA, when an inmate files a grievance form, do
24  you receive a copy of that form?
```

```
 1      A   I do not.

 2      Q   When an inmate files a grievance, is it standard

 3   practice at Cermak for some person, some individual, to

 4   come and ask you for information about the facts and

 5   circumstances surrounding the inmate's grievance?

 6      MR. PREBER:  Objection as speculation.

 7      MR. HACK:  Q   Just so we're clear, my question is

 8   does somebody come and ask the witness about a grievance

 9   in which the witness is named.

10      A   Say that again now.

11      Q   Sure.  I want to be very clear.  If an inmate

12   files a grievance -- You don't need to look at this

13   document, by the way.  I'm going to ask you about this

14   document in a minute.

15           In the normal course of business, when an

16   inmate files a grievance and it is -- the grievance

17   concerns treatment by you, does someone come and ask you

18   for information about the inmate's care?

19      A   No.

20      Q   When a grievance is filed about you in

21   performing your professional duties as a PA, are you

22   informed that a grievance has been filed with your name

23   on it?

24      A   No.
```

```
 1       Q    Did you tell Mr. Limbacher that he would benefit
 2   from physical therapy for his back, neck, and shoulder?
 3       A    As far as from what I can tell, I referred him
 4   to physical therapy for his back --
 5       Q    Okay.  I want to --
 6       A    -- based on my note.
 7       Q    Okay.  Let me ask you -- Let me approach this a
 8   little bit differently.  Had you seen this document
 9   before, Mr. Sims, before I showed it to you just now?
10       A    This grievance?
11       Q    Yes.
12       A    No.
13       Q    Okay.  Did you know that Mr. Limbacher had filed
14   this grievance?
15       A    No.
16       Q    And no one had contacted you about -- to ask for
17   information about responding to it; is that right?
18       A    That is correct.
19       Q    And my question to you is -- I just want to be
20   very clear on this.  On January the 30th, when you met
21   with Mr. Limbacher, did you say to him that he would
22   benefit from physical therapy for his back, neck, and
23   shoulder?
24       A    I referred him, based on my note, to physical
```

1    therapy for his back pain.  That's what I am looking at

2    as far as the note, and that's as much as I can remember

3    about that.  And I referred him to physical therapy, and

4    I told him that I was going to refer him to physical

5    therapy.  Whenever I send you to a specialist, you'll

6    know.

7        Q   Okay.  Let's look -- I only have two minutes, so

8    I'm going to just pick one.  I've got one more.

9        A   Another exhibit?

10       Q   Yes.

11       A   Okay.

12       Q   It should be now in front of you, Mr. Sims.

13               (Document marked as Deposition

14                Exhibit 6 for identification.)

15       A   I'm still on 5, but I'll refresh again.

16       Q   Yes, it should be 6.

17       A   Okay.  I am disappointed; is that the -- another

18   grievance?

19       Q   Yes.  First off, this is another inmate

20   grievance form, Exhibit 6, correct?

21       A    It looks -- it looks that way.  It looks the

22   same, yes.

23       Q   Right.  And your name shows up on it.  If you

24   look sort of in the middle of the page, next to doctor

```
 1   it says Mr. Sims, right?

 2       A    Sims, Mr. Trammel, Dr. McCarthy, PA Davis.

 3       Q    Right.  Have you seen this -- Did you see this

 4   document before?

 5       A    No.

 6       Q    Were you ever informed that Mr. Limbacher had

 7   filed another grievance concerning his condition and the

 8   pain in his shoulder?

 9       A    No, I was not aware of this.

10       Q    Did you understand that Mr. Limbacher's shoulder

11   felt like it had needles or glass inside of it and that

12   he reported that to Stroger?

13       A    No, I was unaware of that.

14       Q    Did Mr. Limbacher ever report to you that his

15   shoulder felt like it had needles or glass inside of it?

16       A    Not that I can recall.

17       Q    Did he ever tell you that he had severe shoulder

18   pain?

19       A    Not that I can recall.

20       Q    If you had received and been made aware of this

21   grievance, wouldn't you agree with me that the standard

22   of care would have required that Mr. Limbacher receive

23   prompt treatment for these injuries about which he's

24   complaining?
```

Page 92

```
1      A   I don't think he needs a grievance.  I think you

2   could just submit a health service request form.  That's

3   my personal feeling.

4      Q   But you would agree that if somebody feels like

5   they had needles or glass in their shoulder and severe

6   pain, that's a condition that requires prompt treatment,

7   correct?

8      MR. PREBER:  Objection as speculation.

9      THE WITNESS:  Pain needs to be assessed.  I'm not

10  going to go into to what degree they have to be to be

11  assessed.  I think all pain should be assessed.

12     MR. HACK:  Q   If a patient presents repeatedly with

13  pain that feels like sharp needles and glass in their

14  shoulder, wouldn't you agree that the standard of care

15  requires that the problem be diagnosed and the patient

16  receive care --

17     A   I believe the patient should be assessed.

18     Q   And then should get the care necessary to remedy

19  the underlying medical condition, correct?

20     A   He has pain.  Pain needs to be addressed.

21     Q   And the way you address an injury or pain is to

22  make an accurate diagnosis and to provide the medical

23  care required to treat the underlying condition,

24  correct?
```

Page 93

1      A   Correct.

2      MR. HACK:  Okay.  I did try to be respectful of your

3  schedule today, sir, and I have 12:47 on my computer.

4  Good day.

5      THE WITNESS:  Thank you.

6          (Whereupon, the deposition concluded

7          at 12:47 p.m. Central Standard Time.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1   STATE OF ILLINOIS   )

                      )  SS:

2   COUNTY OF C O O K   )

3         The within and foregoing deposition of the

4   aforementioned witness was taken before NADINE J.

5   WATTS, CSR, RPR, and Notary Public, at the place, date

6   and time aforementioned.

7         There were present during the taking of the

8   deposition the previously named counsel.

9         The said witness was first duly sworn and was

10   then examined upon oral interrogatories; the questions

11   and answers were taken down in shorthand by the

12   undersigned, acting as stenographer and Notary Public;

13   and the within and foregoing is a true, accurate and

14   complete record of all of the questions asked of and

15   answers made by the forementioned witness, at the time

16   and place hereinabove referred to.

17         Before completion of the deposition, review of

18   the transcript { } was {X} was not requested.  If

19   requested, any changes made by the deponent (and

20   provided to the reporter) during the period allowed are

21   appended hereto.

22         The undersigned is not interested in the

23   within case, nor of kin or counsel to any of the

24   parties.

Page 95

1          Witness my official signature and seal as

2    Notary Public in and for Cook County, Illinois on the

3    6th day of December, A.D. 2022.

4

5          _____

           NADINE J. WATTS CSR, RPR

6          Notary Public

           License No. 084-002736

7          One North Franklin Street

           Suite 3000

8          Chicago, Illinois  60606

           Phone:  (312) 442-9087

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**[0001 - 8th]** Page 1

**0**

**0001** 64:4
**008624** 67:9
**07509** 1:6
**084-002736** 95:6

**1**

**1** 3:8 52:16 53:4
  53:5 57:2,20,21
**1-10-2018** 60:20
**1-30-2018** 72:9
  73:9
**1-9-18** 72:17
**1-9-2018** 72:14
  72:15
**10** 10:4 26:24
  48:23 78:12,14
  83:22
**10:00** 1:17 45:20
**10:15** 45:20
**11** 5:5
**11-15-17** 71:8
**11-15-2017** 62:7
  62:9
**11-20-2017**
  67:23 69:24
**11-22** 71:11
**11-22-17** 70:24
**11-29** 61:23
  62:10,12
**11-29-17** 60:20
**11-29-2017** 63:6
**111** 2:4
**11:0** 80:6
**11:05** 72:4 80:7
**11:25** 80:11
**12** 78:13

**12-13** 62:5
**12-13-17** 62:4
**12-13-2017**
  58:18 61:22
  62:6 65:13 68:9
**12-27-2017**
  72:12
**12:47** 93:3,7
**12c36** 2:16
**13th** 60:13,15,18
**14:54** 70:1
**15** 45:19 79:22
**16** 3:2 83:22
**16th** 1:18
**17th** 70:23
**1988** 7:2,3
**1:06** 70:13,16,17
**1:19** 1:6

**2**

**2** 3:10 64:1,7,23
**2/2** 65:20
**20** 59:14 80:4
**2017** 21:22,23
  26:19 34:8
  54:17 57:22
  60:10,13,15,18
  61:18 63:3 65:1
  65:5,11 70:13,15
  71:16
**2017-0519100**
  1:4
**2018** 26:19 32:8
  34:8 54:17 56:5
  62:1,14 72:3
  73:19 75:20
  80:2

**2019** 54:17
**2022** 1:18 3:2
  95:3
**20805** 95:4
**20th** 64:24 65:5
  65:8,9,11
**22nd** 70:13,15
  71:13
**24** 21:9,16 45:14
**25** 4:22
**2650** 2:15
**28** 5:5 8:16
**2800** 23:5
**2804** 61:11
**29** 8:24 13:9
  59:16
**29th** 63:3

**3**

**3** 3:12 67:3,5
**3000** 95:7
**30th** 56:5,10
  72:3 73:19 80:2
  82:23 89:20
**312** 2:6,11 95:8
**3200** 2:10
**386-7301** 2:17

**4**

**4** 3:5,14 67:22
  71:23 72:1
  86:20,22,23
**4100** 2:5
**442-9087** 95:8
**443-0676** 2:6
**45** 36:24
**4th** 57:13

**5**

**5** 3:17 77:6,8
  86:19,23 87:1,3
  87:8 90:15
**5-19** 57:22
**5-19-2017** 67:11
  71:6
**50** 36:24
**5041** 57:24
**52** 3:8
**5527** 4:18
**5547** 57:24

**6**

**6** 3:19 57:2
  90:14,16,20
**603-1880** 2:11
**60602** 2:11,16
**60606** 2:5 95:8
**60638** 4:20
**63** 3:10
**67** 3:12
**69** 2:10
**6th** 95:3

**7**

**7** 48:22
**708** 2:17
**71** 3:14

**8**

**8** 22:14,16 23:16
  48:22 57:13
  73:15
**86** 3:17
**8:00** 58:18
**8th** 75:20

| 9 | | | |
|---|---|---|---|
| **9**  22:13,18 23:2,2 30:6,7 | 85:21,24 | **allowed**  94:20 | 45:16 62:6,6,11 |
| **90**  3:19 | **added**  78:9 | **alluded**  77:14 | 62:12,14 63:2 |
| **93**  8:15 | **adding**  81:5 | **amount**  10:3 | 65:16 66:4,11,12 |
| | **addition**  26:3 | 21:8 80:8 | 72:22 74:11 |
| **a** | 33:10 | **analyzing**  15:22 | 85:7 |
| **a.d.**  1:18 95:3 | **additional**  18:14 | 16:7 | **appointments** |
| **a.m.**  1:17 | 19:8 32:14 | **anatomy**  8:2 | 42:1 61:21 |
| **abduction**  48:1 | 50:12 | **anesthesia**  76:4 | 74:14 85:1 |
| **ability**  28:23 | **address**  4:17 | **answer**  13:9 | **approach**  35:15 |
| 83:23 | 23:3,6 74:16 | 16:1,2,10,12 | 89:7 |
| **able**  11:15 44:12 | 81:1,16 82:17 | 18:16 32:13 | **approval**  18:4 |
| **abnormalities** | 92:21 | 44:16 45:3 | **area**  51:7 86:2 |
| 77:4 | **addressed**  47:12 | 47:15 86:5 | **areas**  21:24 |
| **absolutely**  40:5 | 82:16,17,23 | **answers**  94:11 | 46:14 |
| **access**  31:1,2,12 | 83:17 92:20 | 94:15 | **arms**  48:6 |
| 32:5,14 37:23 | **adduction**  48:1 | **anti**  76:7 | **arrested**  20:17 |
| 39:23 40:2,2 | **administration** | **anybody**  66:14 | **arrived**  62:19 |
| 41:17 42:6 | 43:12 | **anymore**  69:12 | **arthritis**  83:12 |
| 43:16,19 79:5 | **administrative** | **anyone's**  18:4 | **aside**  65:23 |
| **accessed**  33:20 | 43:13 | **anyway**  64:21 | **asked**  36:22 |
| **accreditation** | **admission**  7:9 | **appear**  58:10 | 41:21 51:22 |
| 13:15 | 57:22 67:12 | **appeared**  2:3,8 | 52:2 75:12,13,24 |
| **accuracy**  63:18 | **aforementioned** | 2:14 | 82:8,12 94:14 |
| **accurate**  24:10 | 94:4,6 | **appearing**  11:18 | **asking**  4:9 9:17 |
| 40:23 41:2 | **ago**  55:11,12 | 64:2 | 17:19 24:5,8 |
| 44:18 45:1,6 | **agree**  43:23 | **appears**  58:9 | 36:11 56:7 57:2 |
| 92:22 94:13 | 44:18 48:23 | 64:19,21 87:11 | 57:5 82:6 84:22 |
| **accurately**  11:16 | 81:24 86:2 | **appended**  94:21 | 86:7 |
| **ache**  82:5 | 91:21 92:4,14 | **application** | **assess**  48:7 |
| **acting**  94:12 | **agreeable**  37:1 | 16:21 | **assessed**  92:9,11 |
| **action**  4:8 11:20 | **al**  1:7 | **applied**  7:5,22 | 92:11,17 |
| **active**  58:13,13 | **alex**  57:7 | 8:10 | **assessment** |
| 58:13,14 | **alexander**  2:9 | **apply**  34:15,22 | 45:10 48:20 |
| **acute**  19:2,14 | **alexander.preber** | **appointed**  55:10 | **assigned**  6:11 |
| 29:6 51:12 | 2:12 | **appointment** | 20:11,13 22:11 |
| 85:11,13,14,16 | **allergies**  74:17 | 19:10 38:9,22 | 22:14 42:18 |
| | 75:13 | 40:19 41:18,23 | 43:14 45:17 |
| | | 43:1,2 44:1 | 53:13,17,18 84:3 |

84:15
**assignment**
  20:24 30:5
**assistance**  36:22
  60:9
**assistant**  5:8,9
  5:10,13 9:19
  10:2 43:13 59:9
**assistants**  43:13
  58:4
**associate**  7:22
**assure**  47:8,17
**asthma**  74:16
  75:12
**atrophy**  48:11
**attend**  55:16
**attorney's**  2:9,14
**authenticate**
  66:22
**authored**  68:16
  68:24 69:3,22
**authority**  51:8
**available**  16:23
  17:1 20:2 21:3
  21:14,15,16,20
  21:21 24:9,12
  29:19 31:12
  32:8,12 33:12
  35:20 38:16,19
  39:21 50:15,18
  50:23,24 51:3,5
**avenue**  2:15
**aware**  91:9,20

**b**

**back**  5:15 12:8
  12:24 22:19
  30:6 32:7 34:18

37:14,17 39:17
40:15 46:24
55:15,17 60:16
61:6 66:19
74:22 76:2 77:6
77:9,24 78:7,19
78:21 80:15,22
80:23 81:2,10,11
81:19 83:12,16
83:17,24 89:2,4
89:22 90:1
**background**
  11:14
**bad**  45:13
**baker**  54:19,22
  54:24 55:12
**baker's**  54:20
**banner**  31:6
**base**  85:3
**based**  32:19
  39:24 50:13
  66:10 83:9,15
  85:4 89:6,24
**basic**  10:12
**basically**  9:7
  10:16 20:11
  25:14 46:12,23
  48:5 61:24
  62:11,19 71:3
  74:17 75:12,24
  78:8 80:20 81:4
  85:9
**basis**  47:19
**bates**  57:5 61:11
  67:8,15
**began**  9:20 61:7
**begins**  58:17
  67:6

**behalf**  2:7,13,18
**believe**  16:24
  18:21 23:8
  26:21 54:19
  56:4,15 75:8
  82:19 83:9
  84:10 86:20
  92:17
**bellyache**  56:20
**benefit**  89:1,22
**best**  14:5 19:9
  24:23 26:4,22
  28:7 32:11 34:2
  36:13,14 43:24
  44:3 55:9 56:21
**bet**  12:22
**bethesda**  6:11
**better**  86:10
**big**  23:13
**bio**  14:21
**biography**  14:22
**bit**  5:15 9:18
  13:1 29:18
  81:18 89:8
**bladder**  76:3
**body**  14:10
  48:15 81:10
**bone**  10:16
**bones**  10:14
**book**  62:20
**booked**  61:20
  71:18
**books**  30:9
**bookshelf**  30:15
**bottom**  57:23
  67:8,14 72:16
  74:17

**boundaries**
  23:19
**bowel**  76:2
**box**  58:16 59:23
  64:23
**boxes**  64:9 68:18
**branch**  5:19
**bread**  36:8
**break**  36:23 37:1
  78:11,15
**bring**  12:8
**bruising**  77:10
**building**  23:1,10
  23:14,17
**buildings**  23:10
  23:14
**buntic**  2:15
**bureau**  54:10
**business**  23:3
  88:15
**butter**  36:9
**button**  52:13

**c**

**c**  58:22 59:6,6
  94:2
**calendar**  43:1
**california**  2:15
  23:5
**call**  83:14
**called**  4:2 20:19
  29:23 30:23
  32:21 42:3
**care**  17:6 18:14
  19:2 20:15,20,20
  20:24 21:1,2,24
  22:1,3,5,9,9 23:6
  23:22 24:1,12

27:13 32:15
34:14,21 35:3,6
35:10,11 36:1,5
36:9,14 38:12
39:5,6 47:5
54:14,23 58:17
61:22 62:20
64:12 65:18
68:12 74:12,14
74:16 78:3 82:1
82:10,11 84:4,10
85:24 88:18
91:22 92:14,16
92:18,23
**career** 10:17
13:24 15:20
**careful** 86:3,12
86:13
**case** 29:5 69:21
87:5 94:23
**cases** 29:6
**cat** 50:22 83:10
83:15
**categories** 76:18
**category** 75:4
**central** 1:17
58:18 93:7
**cermak** 5:2,3,6
8:13,13,14,17,19
8:22 9:1,1,4,6,13
9:21 10:9,11,18
10:19 11:10
13:3 14:19 15:7
15:17 17:11,16
18:9,14 20:6
21:20 23:21
24:3,9,13,15,16
24:20 26:23

29:24 34:15,23
35:4,18 37:19
38:12 39:22
40:7 41:23 44:1
54:8 55:1,4
64:17 69:7
84:20 88:3
**cerner** 37:20,21
38:11 58:9
**certain** 45:16
46:18 49:23
50:3 85:8
**certainly** 14:11
82:16
**certification**
10:1 59:17
**certified** 59:14
59:21
**certifies** 59:8
**certifying** 59:7
59:10
**cervical** 74:21
**cetera** 58:14,15
66:15
**chance** 4:11
**changed** 8:16
10:4,6
**changes** 94:19
**chart** 31:3 39:19
41:17 43:17,21
43:22 44:9 54:9
54:10 58:8 60:5
60:6,8 64:17
66:5
**check** 33:16
46:12 60:11
61:8 62:4

**checked** 80:6
**chemistry** 7:11
**chicago** 2:5,11
2:16 4:16 95:8
**chronic** 19:13
78:21 85:14,21
85:24
**chronology** 63:2
**chs** 3:13,15 71:8
**circumstances**
12:4 18:12
19:14 20:1 88:5
**civil** 1:15
**clarify** 60:4
**class** 7:12
**clear** 33:1 34:6
88:7,11 89:20
**click** 52:12
**client** 12:5 47:3
47:13 62:7,12
74:6
**clinic** 8:8 9:7,8
9:15 10:23,24
23:19 25:2,3,10
25:20 26:7,9,20
28:6,9 29:13
37:4,5 39:6
40:15 41:18
45:17 55:19
61:22 62:20
65:19 66:14
68:12 74:14,16
82:11
**clinical** 18:15
19:17 27:12
30:21 32:20
50:13 57:8 85:4

**clinics** 19:19
20:21,21 21:1
22:1,3,6,6 24:20
25:3 30:1 53:20
**close** 15:1 48:24
70:9 86:3
**closed** 70:2
**closely** 85:17
**clue** 42:21
**cme** 9:23 13:4,9
**code** 4:19
**colleague** 34:2
36:21 65:7
**collect** 42:11,12
42:13
**college** 5:16 7:6
**come** 12:24
20:16,19 25:12
30:6 34:4 40:15
45:10 46:3
49:22,22 81:1
83:24 86:14
88:4,8,17
**comes** 18:15
36:8 44:19
48:22 86:7
**coming** 5:18
38:6 42:24
**commencing**
1:17
**commission**
13:15 59:10
**commitments**
79:20
**communicate**
73:3,3,6
**community**
35:11,12,21

36:19
**compare** 44:6
**compared** 44:3
**compelled** 83:9
**compelling**
  83:10,16
**complaining**
  91:24
**complaint** 42:4
  46:4 78:1 87:18
**complaints**
  10:15 42:6
  81:23
**complete** 10:2
  38:21 43:20
  44:22,24 45:6
  77:22 94:14
**completed** 7:3
  8:10 10:7 80:11
**completion**
  94:17
**computer** 17:1,2
  17:24 30:22
  31:2 32:9 33:13
  93:3
**concern** 81:2
  82:15
**concerned** 27:18
  32:16 49:9
  85:10
**concerning**
  64:12 91:7
**concerns** 88:17
**concluded** 93:6
**conclusion** 4:10
  7:17 83:18
**condition** 84:12
  85:4,9 91:7 92:6

92:19,23
**conduct** 84:20
**confer** 27:9,11
  29:8 83:14
**confused** 60:4
**connection**
  33:21
**consider** 16:13
  16:15 78:22
  79:7 85:9
**considering**
  79:11
**consistent** 35:18
  36:18
**consult** 17:18
  18:5,9 19:4
  36:14
**consultation**
  79:17
**contacted** 89:16
**contained** 23:9
**contemporane...**
  40:12
**content** 78:6
**continue** 62:18
**continued** 78:8
**continuing** 13:5
  13:12 15:15
**continuity** 84:4
  84:10
**contrast** 79:4
**control** 84:15
**cook** 2:9,14 3:8
  3:10,12,15,17,19
  5:14 9:7,8,11,14
  11:6,11 12:21
  17:7,9,11 18:22
  18:24 21:3 23:7

24:18 51:1 53:5
  56:3 64:16 67:6
  87:15 95:2
**cookcountyil.g...**
  2:12,17
**coordinates**
  25:15
**copy** 57:10 87:24
**corpsman** 5:24
  6:1,5,8,13,15,20
**correct** 9:15
  11:7,8,11,12
  13:21 14:19,20
  20:7,8 22:10
  23:23 24:1,19
  25:19 26:12,13
  27:14 28:20,21
  32:3 36:19,20
  39:17 41:11
  44:10,19,22 50:5
  50:6,12 51:2
  55:19 58:3,22
  59:15 60:2
  61:12 63:3,8,9
  64:13 65:1
  67:12 68:9,24
  69:4,5,11 70:13
  70:16,19 72:18
  72:19 73:11,12
  73:22,23 75:2
  76:21,22 80:5,12
  80:13,16 82:24
  83:1,3,4,5 85:13
  85:17 87:10,19
  89:18 90:20
  92:7,19,24 93:1
**counsel** 2:2 4:10
  4:10 11:19,22

12:1 52:18 57:5
  61:12 94:8,23
**count** 36:4
**county** 2:9,14
  3:8,10,12,15,17
  3:19 5:14 9:7,8
  9:11,14,15 11:2
  11:6,11 12:21
  16:20 17:7,9,11
  18:22,24 21:3
  23:7 24:18 51:1
  53:5 56:3 64:16
  67:6 87:15 94:2
  95:2
**couple** 32:7 37:1
  83:2
**course** 6:9 7:13
  10:17 13:3,24
  40:4 87:22
  88:15
**courses** 7:24 8:2
  8:3 9:22 13:4,6
  13:7,12 15:15
**coursework**
  15:13
**court** 1:1 65:12
  65:19,20,21
  66:12,13 68:12
**courts** 1:16
**cover** 20:16 47:8
  57:15 78:15
**covered** 8:5
  21:21
**covering** 11:14
  14:11
**covid** 56:17
**cream** 76:11

create  40:17
creating  40:21
credit  5:17
criticized  52:6
csr  1:14 94:5
  95:5
ct  21:12,14
  78:22,24 79:3,6
cubicle  27:10
  29:23 34:2
current  82:1
currently  22:13
custodial  9:13
  11:9
custody  23:22
cv  1:6
cycle  10:6

d

daily  40:4
dart  1:7
date  57:22 58:18
  60:12,13,19 65:7
  65:10 67:12
  68:23 70:13
  74:7 81:21 94:5
dated  67:23 72:3
  72:9
dates  69:16
davis  91:2
day  1:18 22:22
  24:13 39:18
  43:1 45:14,15
  53:14 54:6,6,13
  56:9 62:23 63:7
  63:13 65:16,24
  66:9 68:5 69:18
  71:20 72:21,24

73:11,17 74:10
  75:10 76:13,24
  83:4 93:4 95:3
dealing  57:19
deals  10:14
december  8:15
  60:9,13,14,15,18
  61:18 95:3
decide  19:7
declined  72:22
deep  82:19
defendant  2:13
  2:18
defendants  1:8
  4:11
definition  35:10
defuniak  55:8,10
degree  7:20 8:10
  92:10
delay  33:5
delayed  21:6
delaying  33:9
delete  86:18
deliver  35:3,18
  51:23
delivered  23:7
delivery  41:10
denies  76:2
dental  25:1
department  6:2
  8:23,24 10:19,20
  17:10 18:3 20:6
  20:10 25:14
  42:22 43:7
departments
  8:22 17:11
depending  22:22

depends  19:12
  19:13,24
deploy  83:14
deponent  94:19
deposition  1:13
  2:2 3:1,8,10,12
  3:14,17,19 11:18
  52:15 63:24
  67:4 71:24
  73:22 86:24
  90:13 93:6 94:3
  94:8,17
depositions  1:17
dermatology
  25:4
describe  24:8
  49:16,19
described  24:7
description
  16:18,20 17:4
designed  42:4
details  47:19
devoted  16:7
diabetes  36:8,10
diagnosed  92:15
diagnosis  16:14
  31:19,20,22,24
  35:13 36:18
  49:22,23 50:3
  80:17,20,21,23
  92:22
diagnostic  50:15
  51:3,23 52:8
diagnostics
  50:13
diclofenac  76:5
  76:6 78:8

dictate  19:14
different  8:21
  10:18 17:14
  20:14 21:24
  39:23,23 40:1,1
  40:2 42:5 44:13
  44:17 49:18,18
  53:13 56:19
  58:4,7 64:12
  77:7 81:18
differently  14:6
  56:18 89:8
difficult  15:19
direct  82:14
directing  18:23
direction  51:17
  51:18
directions  46:12
directly  27:21
  28:3 51:9 69:23
disappointed
  90:17
disciplinary
  59:20
discomfort
  46:16 78:11
discretion  19:6
  27:20 28:3
discuss  47:9
  54:14,16
discussed  28:16
  78:19
discussing  67:24
disease  25:3
dislocations
  83:13
disrespect  55:22

**[district - exhibit]**

| | | | |
|---|---|---|---|
| **district** 1:1,1,16 | **dose** 78:15 | 84:24 | **eugene** 4:14 |
| **dive** 82:20 | **double** 61:20 | **electronically** | **evaluate** 25:12 |
| **division** 20:11 | 62:20 71:18 | 58:10 68:15 | **evaluated** 42:15 |
| 20:12 21:1 | **dr** 2:18 25:23,24 | 69:21 | 61:23 75:20 |
| 22:13,14 23:1,1 | 26:4,6,15,19,23 | **emergency** 19:3 | **events** 12:4 66:8 |
| 23:2,16,19 30:1 | 27:4,8,21 28:3,6 | 19:11 21:4 24:4 | **everybody** 11:1 |
| 30:6,7 43:14 | 29:14,15 41:13 | 24:8 51:13 | 55:15 |
| 57:13 73:15 | 54:19,20,22,24 | 56:17 74:13,18 | **evidence** 32:19 |
| 84:3 | 55:8,9,12 56:6 | 74:19 75:21 | **exactly** 33:7 |
| **divisions** 20:14 | 60:2 62:7,13 | 77:21 78:2,24 | 75:19 79:21 |
| 20:22 22:1,3,7 | 87:19 91:2 | 79:5 | 82:8 |
| 22:21,22,23 | **drive** 2:4 | **employed** 4:23 | **exam** 10:7 14:12 |
| 23:18 | **dropped** 66:16 | 54:24 | 14:17 45:24 |
| **divvied** 42:21 | **due** 47:14 | **employee** 55:4 | 46:1,15 76:16 |
| **doctor** 25:12,13 | **duly** 4:2 94:9 | **encounter** 12:11 | 77:11 |
| 25:21 27:19 | **dust** 14:24 | 12:16 41:19 | **examination** 3:4 |
| 28:24 53:13,20 | **dusty** 30:19 | 47:3,12 63:5 | 4:5 44:22 47:7 |
| 54:14 90:24 | **duties** 6:1 88:21 | 65:6 74:6 75:21 | 76:12,23 77:22 |
| **doctor's** 8:8 30:5 | | 81:16 82:20 | **examined** 4:3 |
| 38:18 | **e** | **encounters** 56:6 | 94:10 |
| **doctors** 10:16 | **e** 1:13 2:21 3:1 | **encouragement** | **examining** 29:11 |
| 36:13 53:14,16 | 4:1 25:18 73:7 | 51:18,19 | 29:12,15,16 |
| **document** 40:10 | **earlier** 14:21 | **english** 7:13,14 | 50:10 |
| 52:15 57:1,19 | 62:11 77:23 | **ensure** 63:18 | **example** 38:4 |
| 63:24 67:4,9,20 | **easier** 33:6 | 84:16 | **exams** 13:23 |
| 71:24 72:6 75:1 | **education** 6:22 | **entailed** 8:3 | 14:2 46:6 |
| 84:23,24 86:24 | 9:24 13:5,12 | **enter** 69:15 | **exercise** 78:20 |
| 87:14 88:13,14 | 15:15 | **entered** 58:23 | **exhibit** 3:8,10,12 |
| 89:8 90:13 91:4 | **edward** 1:4 | 60:1,2,3 | 3:14,17,19 52:11 |
| **documents** | **effects** 77:23 | **entirety** 47:4 | 52:16,20 53:4,5 |
| 11:24 12:3,7 | **either** 17:14 | **entities** 39:23 | 53:8 57:20,21 |
| 56:17 57:1 | 52:18 54:24 | **entry** 79:3 | 63:15,23 64:1,2 |
| 60:17 | **elaborate** 31:20 | **escalate** 17:10 | 64:4,7,23 66:20 |
| **doing** 29:19 33:8 | **elective** 51:13,15 | **escalated** 27:13 | 67:2,3,5,22,22 |
| 36:13 46:15 | **electronic** 12:19 | **essentially** 30:2 | 71:22,23 72:1 |
| 56:21 63:19 | 30:20 31:4 | **estimate** 15:22 | 86:17,19 87:1,2 |
| **door** 20:19 38:9 | 33:11 37:22 | **et** 1:7 58:14,14 | 87:8 90:9,14,20 |
| 39:4 | 68:19 80:14 | 66:15 | |

| | | | |
|---|---|---|---|
| **exhibits** 3:6 | **file** 54:3 81:23 | 77:24 | 72:6,8 73:16 |
| **expect** 41:9 | **filed** 88:20,22 | **focusing** 75:17 | **fractures** 83:13 |
| **expedite** 27:16 | 89:13 91:7 | **follow** 39:7,7,15 | **franklin** 95:7 |
| **expert** 16:13,15 | **files** 87:23 88:2 | 46:24 60:20 | **frequently** 52:7 |
| 49:12 | 88:12,16 | 62:1,13,14,21 | 84:5 |
| **expired** 7:10 | **filling** 84:5 | 65:13 68:8 | **front** 52:12,17 |
| **explain** 19:9 | **fills** 42:8 | 72:23 74:12 | 53:4 56:13 |
| 38:3 49:13 | **final** 57:13 | 75:23 77:21 | 57:20 64:2 67:3 |
| **explaining** 23:20 | **find** 16:22 55:23 | 82:6 83:20,21 | 67:10,22 71:23 |
| **explanation** 46:3 | 60:7 75:1 | 84:12,17,19,20 | 87:2,8 90:12 |
| **extension** 47:24 | **fine** 30:12 52:24 | 85:1,4,8 | **full** 4:13 24:3,7 |
| **extent** 15:13 | **finish** 40:15 | **following** 2:2 | **further** 11:13 |
| **external** 48:1 | **first** 4:2 6:13 | 34:19 | 58:21 |
| **extremities** 77:4 | 13:1 17:13,15 | **follows** 4:4 69:17 | |
| **extremity** 74:23 | 20:17 24:23 | **foregoing** 94:3 | **g** |
| 76:3 77:2 | 26:18 28:9 | 94:13 | |
| | 29:21 30:24 | **forementioned** | **gait** 77:1 |
| **f** | 31:19 32:12 | 94:15 | **general** 6:22 |
| | 41:20 42:23 | **form** 3:18,20 | 14:17 23:18 |
| **factors** 85:5 | 50:20 53:10 | 16:9,17 42:3,9,9 | 31:21 39:16 |
| **facts** 88:4 | 54:20 64:9,11,22 | 43:16 45:2 49:1 | 44:15 53:10 |
| **fair** 27:2 | 68:23 79:3 | 64:15,17,20 65:3 | **georgia** 59:13 |
| **fall** 77:20 | 80:19 83:23 | 80:18 87:10,16 | **getting** 15:1 |
| **familiar** 64:20 | 90:19 94:9 | 87:23,24 90:20 | 17:22 46:22,24 |
| 85:3 | **five** 15:20,21 | 92:2 | 47:1 86:10 |
| **far** 18:16 35:12 | 16:6 22:12 23:4 | **formal** 9:21 10:8 | **gimmmie** 41:4 |
| 36:5 39:14 | 26:16 34:11 | 10:10,20 15:16 | **give** 8:4 26:24 |
| 54:10 57:24 | 37:7,8,9 | 16:18 34:13,20 | 32:20,24 35:10 |
| 81:5 82:24 | **flag** 48:18 | 34:24,24 | 47:17,21 59:2,4 |
| 83:17 89:3 90:2 | **flexion** 47:24 | **forms** 42:14,19 | 63:15 66:23 |
| **federal** 1:15 | **floaters** 20:13 | **forte** 35:23 | **given** 86:16 |
| **feeling** 49:17,20 | **floor** 57:13 59:4 | **four** 5:22 20:23 | **glad** 37:7 |
| 92:3 | 73:16 | 21:24 22:5 | **glass** 91:11,15 |
| **feels** 92:4,13 | **focus** 15:20 | 26:16 55:11 | 92:5,13 |
| **felt** 27:24 91:11 | 18:19 21:22 | 68:18,19 72:8 | **glenn** 63:7 |
| 91:15 | 26:3 | 86:9 | **go** 5:15,16 6:8 |
| **fifth** 41:22 | **focused** 14:3,7,8 | **fourth** 58:16 | 9:16 11:13 18:1 |
| **figure** 56:15 | 14:15 15:7,10 | 64:9,23 67:20 | 19:22 20:14 |
| 71:9 | | | 30:3,4 32:1,5,7 |

32:23 33:18
34:1 35:24
38:18 39:16
42:10 45:5
52:24 53:1,9
55:17 57:24
58:12 60:5,16
61:6 66:18
67:21 76:14
81:19 84:24
85:2 86:18
92:10
**goes** 42:11 43:3
76:20
**going** 9:12 14:5
27:24 37:2 38:3
39:4 44:7 46:10
46:22 47:2 49:5
52:10,11 53:8,11
55:14 56:20,21
59:16 60:11
63:1,15,22 65:22
65:23 66:7
67:20 79:23
82:6,19 84:17
85:10,21 86:17
88:13 90:4,8
92:10
**good** 4:7 27:1
37:11 70:4 84:3
93:4
**goodness** 66:17
**governing** 28:8
**graduate** 7:17
**graduated** 7:21
**great** 6:10,12
70:12

**greg** 60:2
**grievance** 3:18
3:20 87:10,16,23
88:2,5,8,12,16
88:16,20,22
89:10,14 90:18
90:20 91:7,21
92:1
**group** 69:6
**groups** 69:22
**guess** 35:13
**guide** 36:13
49:10
**guidelines** 18:7
28:8
**guy's** 66:13

## h

**hack** 2:4 3:5 4:6
4:7,8 16:4,13,18
34:18 35:2
37:12,14 45:5
48:3 49:12
52:20,24 53:4
57:7,11,15 61:13
61:16 66:16
67:2 82:7 86:7
88:7 92:12 93:2
**half** 11:23 26:1
**hall** 41:15
**handled** 24:17
**hands** 46:2
**handwritten**
12:18
**hang** 30:2 55:15
57:7 60:22,24
66:16 74:24

**happened** 12:14
43:24 61:19
74:1 77:7
**happens** 42:14
82:13
**happy** 36:10
**hat** 30:2
**hate** 72:10 74:24
**head** 13:8 22:17
30:4 42:16,17
74:4
**heading** 75:4
**health** 3:8,10,12
3:15 5:2,3,6 9:1
9:4,6 10:19
12:21 20:7
23:17,17,21
24:21 34:16,23
35:4,18 37:19
38:5,12 39:22
41:23 42:3,9,18
43:16 44:1 53:5
54:8 55:4 57:9
64:17 67:6 69:7
84:20 92:2
**healthcare** 57:9
**heavy** 34:5
**help** 81:6
**helpful** 57:18
63:17 87:6
**hereinabove**
94:16
**hereto** 94:21
**hiring** 17:2
**history** 20:18
44:18 45:1,7,9
74:21 75:6
81:13

**hiv** 25:2
**hold** 16:16 61:8
62:3,4 65:6 71:9
**hospital** 5:14,24
8:7 9:7 10:24
11:2,4,5 18:23
18:24 19:24
75:14,16,18
**hospitals** 3:8,10
3:12,15 12:22
53:5 67:6
**hour** 11:23
39:18
**hours** 5:17 10:3
21:9,9,16 39:18
45:14,14 78:12
78:13,14
**housed** 22:24
**houses** 23:17
**hr** 17:2
**huh** 76:19
**human** 34:3
**hundred** 41:17
**hypothetical**
31:23

## i

**idea** 52:22 62:24
73:20
**ideal** 19:21
**ideally** 84:13
**identification**
52:16 64:1 67:5
72:1 87:1 90:14
**identified** 59:23
**illinois** 1:1 2:5
2:11,16 4:16
53:19 94:1 95:2

95:8
**illness** 35:13
　75:6
**imaging** 21:18
　50:12 51:3
　78:23
**immediate** 72:13
**immediately**
　39:10,11 72:11
**importance**
　78:19
**important** 44:18
　44:21 47:5
　84:11 85:22,23
**impression**
　80:18,19
**incarcerated**
　56:3
**include** 14:2
**included** 14:12
**includes** 31:6
**incontinence**
　76:3
**indicate** 65:3
**indicated** 65:16
**indicates** 64:23
**indication** 85:12
**individual** 40:18
　88:3
**infectious** 25:3
**inflammatory**
　76:7
**information**
　30:21 31:16,18
　32:15,21 33:11
　33:16,16 40:2
　54:11 69:22
　70:19 71:2 74:3

87:18 88:4,18
　89:17
**informed** 88:22
　91:6
**injuries** 10:15
　15:23 16:8,14
　20:3 21:19
　33:17 44:14
　91:23
**injury** 17:21
　19:2 31:17 32:1
　32:2 33:22 50:4
　50:17 51:4
　92:21
**inmate** 3:17,19
　41:23 42:3,8
　87:10,15,23 88:2
　88:11,16 90:19
**inmate's** 88:5,18
**inmates** 9:11,12
　11:9 17:6,8 21:3
　23:7,15,22 24:1
　87:18
**input** 69:14
**inquiry** 59:21
**inside** 91:11,15
**instruction**
　34:14,21 51:17
　51:19
**instructions** 81:9
**intake** 39:7
**intend** 41:1
**interact** 29:4
　40:13
**interaction** 12:9
　27:8 40:8,10,11
　41:14,16 44:8
　47:5 63:12

64:24 65:4 66:2
　68:4 71:20
　83:18
**interactions**
　12:15,24 40:18
　53:12
**interested** 49:2
　94:22
**internal** 35:22
　47:24
**internships** 8:7
**interrogatories**
　4:3 94:10
**interrupted**
　28:13 61:5 75:8
**interruption**
　55:16
**interval** 74:12
**intervals** 74:15
**intervention**
　83:11
**involved** 13:8
**involving** 7:24
　12:4 66:8
**issue** 47:3,10
　54:15 83:11,16
　85:11,13
**issues** 27:10
　57:19

**j**

**j** 1:7,14 94:4
　95:5
**jail** 9:8,14 17:7,9
　21:3 56:3
**january** 56:5,9
　62:1,14 72:3
　73:19 75:20

80:2 82:23
　89:20
**job** 8:13 9:18,21
　9:21 15:12,14
　16:18,20 17:4
　19:19
**jobs** 8:16 23:21
　23:24
**johnson** 2:22
**jorie** 2:22
**judgment** 18:15
　19:17 27:12
　28:4 50:14

**k**

**k** 94:2
**kahn** 2:18
**kapotas** 25:23
　25:24 26:4,6,15
　26:19,23 27:4,8
　27:21 28:3,6
　29:15,16
**keep** 16:3 29:21
　30:8,17 32:6
　37:2 43:24
　63:16
**kept** 44:7
**kevin** 1:13 2:13
　3:1 4:1,14 58:22
　58:22
**kin** 94:23
**kind** 20:14 32:24
　35:23 47:1
　82:14
**knew** 27:5
**knickknacks**
　30:9

**know**  11:1 16:11
  19:19 21:12
  27:4 30:9 32:6
  32:13 33:1,7
  35:6 36:9,21
  40:1 48:19,22
  49:6 52:13
  55:23 59:1 61:2
  61:5 71:3 72:10
  75:19 80:7 84:2
  86:5 87:2 89:13
  90:6
**knowing**  36:2
**known**  81:22
  82:11
**knows**  36:2

**l**

**l**  25:18
**lab**  21:5,5,6,7
**labs**  21:6
**lakes**  6:10,12
**large**  58:16
**lasts**  78:12,13
**latest**  32:17,20
  33:16
**lawyer**  17:21
**lay**  46:2
**laymen's**  45:24
  49:13
**layout**  20:15
**lean**  33:19
**leave**  25:24
  27:15 41:19
  67:17 79:21
**left**  6:12 19:17
  25:13 26:4,23
  39:5 57:14 68:8

68:11
**leg**  80:24
**level**  77:8
**levels**  77:7
**license**  5:11 95:6
**licensed**  5:10
**lidocaine**  78:9
**limbacher**  1:4
  2:21 3:9,11,13
  3:16 4:9 12:5,10
  12:12 13:1
  53:12 56:2,6,9
  58:5 60:9 61:18
  62:22 63:13
  64:24 65:4,15,24
  66:9,23 67:7
  68:4 71:13,20
  72:21,24 73:11
  73:17 74:9 75:9
  75:10 76:13,24
  77:19 78:22
  79:8,12,16 80:2
  80:4 82:9 83:3
  83:19,24 89:1,13
  89:21 91:6,14,22
**limbacher's**
  64:12 81:13,19
  81:22 83:8
  91:10
**limit**  51:19,22
**limits**  77:2
**line**  69:23,23
**lines**  23:9 68:19
**list**  24:23 66:14
**listed**  53:21
**little**  5:15 9:18
  13:1 29:18 36:2
  36:3 89:8

**live**  4:15,16
**lived**  4:21
**llp**  2:3
**located**  9:8
  20:22 59:12
**location**  73:15
**locke**  2:3
**lockelord.com**
  2:6
**log**  13:9,11
**long**  4:21 5:3,21
  7:15 11:22
  45:12
**look**  28:23 31:16
  31:17 33:7 38:8
  39:3,14 46:2,8
  48:10,24 51:4
  56:5 57:20
  58:12,16,21 64:8
  64:16,22 66:22
  67:8,14,16,19
  68:7 70:12
  72:11 73:9 79:2
  81:19 85:17,18
  86:3,12,13,16
  87:17 88:12
  90:7,24
**looked**  12:7,11
  48:9 58:11 68:3
  75:20,24 77:5
**looking**  46:13
  48:8,10,11,13
  56:8 59:23 60:8
  77:3,3 81:12
  90:1
**looks**  58:6 77:24
  87:11 90:21,21
  90:21

**lord**  2:3
**lose**  48:12
**lost**  25:3,6 59:17
**lot**  36:2,3,11
  42:5 46:22
  60:17
**lots**  53:14
**lower**  74:22,23
  76:2,3 77:2,4,6
  78:7,21 80:22,23
  81:2 83:15
**lumbar**  74:21
  77:5,8 79:4
**luxury**  39:19

**m**

**mail**  73:7
**main**  82:15
**maintain**  10:1
  13:11 14:23
**making**  45:6
**malcolm**  7:5,15
  7:23 8:6,11
**management**
  81:4,6
**managing**  78:20
**mandatory**
  41:13
**marines**  6:3
**marked**  52:15
  63:24 67:4
  71:24 86:24
  87:3 90:13
**maryland**  6:11
**mass**  51:6 77:10
**mccarthy**  91:2
**mean**  9:1 28:10
  28:13 49:13,15

78:13

**meaning** 76:11
78:11

**means** 19:11
32:19 35:7
49:18 69:19

**measurements**
76:20

**mechanism** 84:6
84:16

**med** 8:23,24
17:10 20:6 69:7

**medical** 3:13,15
6:2 9:6,10 12:19
13:5,12 15:15
17:6,8,17,24
18:13 21:18
23:13,14,15,16
23:17 26:8,14
28:4 29:24
30:17,21 31:4,5
33:11 35:17,19
37:18,22,24 38:2
38:11,17,19,21
39:1,10,21,24
40:3,21 41:6,10
42:5 43:23 44:9
64:17 68:24
69:14 71:7
73:21 80:19
81:13,20,22 82:8
92:19,22

**medically** 42:5

**medication**
65:10 66:3,5
76:8 78:12,12,16
81:5

**medications**
58:14,14

**medicine** 5:11
32:19 35:23

**meds** 65:12
68:14 72:22

**meet** 11:19,22
56:2

**meeting** 28:2
52:23 54:12
56:9 73:18

**member** 20:6

**memory** 12:8

**men** 67:17

**menisha** 25:17
26:11,12 27:9
34:7 50:5 83:7

**mental** 23:16,17

**mention** 33:8
79:9 81:17

**mentioned** 13:4
14:21 20:24
21:23 26:10
45:23 48:13
56:12 63:1

**met** 11:24 63:7
89:20

**mia** 2:15

**mia.buntic** 2:17

**middle** 90:24

**military** 5:19

**mind** 36:17 60:6
60:7

**minimize** 64:5

**minute** 53:8
65:22 66:17,18
70:2 74:24
88:14

**minutes** 36:24
37:1,8,9 45:19
79:22 80:5 90:7

**missed** 66:4,15

**missing** 43:19

**modality** 81:6

**moment** 53:1
57:16 63:23
64:8 66:23

**moments** 11:14

**month** 59:16

**months** 5:5

**morning** 4:7
30:3 72:4 80:11

**motion** 46:14,19
47:21 48:2 77:9

**motions** 46:11

**move** 46:9,11
67:20 72:3

**moved** 22:18

**movement** 77:12

**moving** 63:16

**mri** 79:8,10

**mris** 21:10 50:24
51:20 52:7

**multiple** 23:10
23:14 75:1
81:23

**muscle** 46:10
48:11 78:9

**musculature**
46:8 77:3

**musculoskeletal**
7:24 8:3 10:15
14:11,13,15
76:21,23

**n**

**n** 65:18

**nadine** 1:14
34:18 94:4 95:5

**name** 4:7,13,14
25:16,21 31:8
43:6,7,10 46:18
54:20 58:22
59:24 67:23
87:17,19 88:22
90:23

**named** 88:9 94:8

**names** 47:20

**national** 13:14
59:10

**natoma** 4:18

**navy** 5:20,23 6:3

**nccpa** 59:11

**necessarily**
43:14 80:8,9
82:13

**necessary** 92:18

**neck** 89:2,22

**need** 10:2 17:23
27:17 40:1
56:15 61:3 64:5
67:16 71:18
79:19,21 87:5
88:12

**needed** 19:5 24:1
24:2,14 27:13
54:16 55:16
83:12,17

**needles** 91:11,15
92:5,13

**needs** 19:7 22:22
28:24 84:7 92:1
92:9,20

| | | | |
|---|---|---|---|
| **never** 58:6 | **notice** 42:23 | **offer** 24:3,13 | 55:14,21 56:7,12 |
| **new** 64:2,5 | **november** 1:18 | **offered** 30:22 | 56:23 57:12,17 |
| **non** 24:4,8 33:24 | 3:2 63:3 64:24 | **offering** 24:7 | 59:2,3,4,5,8,14 |
| 42:5 49:12 | 65:5,7,8,9,11 | **office** 2:9,14 | 60:16,18 61:1,4 |
| 58:13,14 76:7 | 70:13,15,23 | 3:17,19 8:8 | 61:14 62:4,5,8,9 |
| **normal** 39:10 | 71:14 | 29:22,24 30:4,5 | 62:19,22 63:11 |
| 77:1,2,9 88:15 | **number** 45:14 | 30:9,11,13,18 | 63:15 64:7,10,15 |
| **normally** 9:16 | 51:19,23 52:3 | 34:9 38:18 | 64:22 65:14,22 |
| 27:11,15 58:8 | 69:11 | 40:15 87:15 | 66:7,18,24 67:2 |
| 77:2 | **numbers** 56:24 | **official** 95:1 | 67:18 68:1,7,15 |
| **north** 95:7 | **numbness** 75:13 | **oh** 12:24 59:8 | 69:13,17,20 70:1 |
| **northern** 1:1 | **nurse** 42:16,17 | 78:10 | 70:22,23 71:11 |
| **nos** 57:6 | 66:12 | **okay** 4:23 5:19 | 71:11,19,22 |
| **notary** 1:14 94:5 | **nurses** 42:11,11 | 6:12 7:5,15 8:21 | 72:17 73:6 74:9 |
| 94:12 95:2,6 | 42:13,15 | 10:12 11:13 | 74:11,19,21 |
| **note** 12:11,16,16 | **nursing** 42:22 | 12:13,24 13:11 | 75:22 76:9,16 |
| 39:14 41:19 | | 13:18,20 15:6 | 77:1 79:23,24 |
| 46:22,23 47:10 | **o** | 16:4,22 17:23 | 80:21 81:12 |
| 47:14 56:4,8,12 | **o** 94:2,2 | 18:4,18,20 19:6 | 84:8 85:12,16 |
| 57:9 60:19 | **o'clock** 58:18 | 19:21 20:4,23 | 86:16 89:5,7,13 |
| 61:21 63:10 | **objection** 15:24 | 21:1,15,22 22:20 | 90:7,11,17 93:2 |
| 65:11,14,17 | 16:9,16,16 45:2 | 23:9,16,20 24:13 | **old** 30:19 |
| 66:11 67:23 | 47:23 49:1 82:3 | 24:20 25:24 | **once** 19:4 31:21 |
| 68:3 69:15,17,20 | 86:4 88:6 92:8 | 26:4,5 28:7,14 | 52:12 |
| 70:1,6,11,12,15 | **objective** 76:14 | 28:18 29:3,7 | **ones** 83:2 |
| 72:3,9,11 73:9 | 76:17 | 30:12,15 31:23 | **ongoing** 9:24 |
| 73:21,24 74:3,5 | **obligation** 36:17 | 33:4,15 34:11,13 | **online** 15:4 |
| 74:8 75:11,19 | 54:5 55:19 | 35:9,16 36:7,16 | **open** 16:24 |
| 77:14,17 79:2,11 | **obliged** 35:3 | 36:21 37:23 | 38:11 52:11 |
| 80:1,7,7,11 | 47:15 | 38:10,15,24 | **operating** 29:4 |
| 81:17 82:18,20 | **observe** 56:21 | 39:16 40:21 | **opportunity** |
| 82:22 89:6,24 | **obtain** 18:4 | 42:16 43:6,18 | 11:19 17:9 |
| 90:2 | 32:14 | 44:11,17,24 | 19:16 47:18 |
| **notepads** 30:9 | **obviously** 46:9 | 45:23 47:16 | 51:9 |
| **notes** 12:17,18 | 46:14 58:7 | 48:3 49:16 | **opposed** 56:7 |
| 12:18 40:12 | **occasion** 29:10 | 50:10,15 52:11 | **opt** 9:16 |
| 47:8 56:16 | 29:14 81:15 | 52:24 53:7,22 | **option** 49:24 |
| 63:19 74:5 | | 54:12,17 55:3,6 | 50:4 |

| | | | |
|---|---|---|---|
| **options** 50:11 | 31:11,13 34:3,4 | 81:6,14,24 82:5 | 28:9 29:11,12,15 |
| **optometry** 25:1 | 35:24 36:3,11 | 82:10,13 85:12 | 29:16 31:24 |
| **oral** 4:3 76:10 | 46:24 79:17 | 85:14,15,16,18 | 32:15 38:4,24 |
| 94:10 | 83:4,14 | 85:19,19,20,23 | 39:12 40:8,13 |
| **orally** 76:9 | **osteoarthritis** | 86:1,8 90:1 91:8 | 41:7,14 42:8,24 |
| **order** 6:8 7:9 | 74:22 | 91:18 92:6,9,11 | 43:15,18,24 |
| 10:1 17:24 18:1 | **outpatient** 71:7 | 92:13,20,20,21 | 44:11,19 45:1,7 |
| 19:10 28:11 | **outpt** 3:13,15 | **pandemic** 25:4 | 45:9,12,15 46:5 |
| 50:13 58:6,17 | **oversight** 54:10 | **paper** 42:2 | 46:9 47:5,21 |
| 60:2,5 65:3 | **owned** 11:6 | **paperwork** 54:3 | 48:21,21 49:5,6 |
| **ordered** 43:3 | | **papiez** 60:2 62:7 | 49:7,17,24 50:5 |
| 62:7,9,13 78:10 | **p** | 62:13 | 50:10,11 51:9,10 |
| 83:22 | | **pardon** 37:15 | 54:14,15 57:18 |
| **ordering** 52:7 | **p** 25:18 | 60:23 62:16 | 64:23 65:4 |
| 59:24 | **p.m.** 70:13,16,17 | 87:13 | 73:15 82:14 |
| **orders** 3:9,11 | 93:7 | **paresthesias** | 84:16 85:10,23 |
| 58:4,8,9,13,13 | **pa** 5:16 7:5,9,23 | 80:24 | 85:24 86:1,7,8 |
| 64:12,16,20 | 8:19 13:21 | **part** 7:23 39:1 | 92:12,15,17 |
| **ortho** 27:10 | 25:13 26:12 | 77:6 81:10 | **patient's** 27:12 |
| **orthopedic** | 33:12 48:14 | **participated** | 33:21 37:24 |
| 10:19,20,23,24 | 53:13 58:22 | 15:9 | 38:2,5,12 43:10 |
| 15:23 16:5 20:3 | 59:6,21 63:7 | **particular** 18:19 | 46:4 60:5 85:9 |
| 21:19 25:9,12,14 | 69:9 86:3,11 | 20:12 35:12 | **patients** 9:13 |
| 25:15,20,21 26:7 | 87:20,23 88:21 | 64:9,20 74:6 | 16:6 17:12 |
| 26:20 28:9,16 | 91:2 | **parties** 94:24 | 22:20,21,24 23:2 |
| 33:17,21,24 34:1 | **page** 3:4,7 56:24 | **pas** 13:15 59:10 | 25:12 28:5,15 |
| 34:2 36:6,6,12 | 57:24 67:9,15,20 | **passed** 13:23 | 30:7 34:15,22 |
| 36:12,16,19 | 70:21 71:4,5,5,7 | **patches** 78:9 | 35:4 36:14,17 |
| 44:12,14 49:24 | 72:6,8,16 90:24 | **patel** 25:17 | 40:4,18 41:20 |
| 50:4,8,11,16 | **pager** 69:11 | 26:10,11,12 27:9 | 46:2,3 50:8 |
| 79:13 80:22 | **pagers** 69:12 | 27:14 28:20 | 51:20,24,24 52:3 |
| 81:2 83:11,11,16 | **pages** 75:1 | 29:9,10 34:7,7 | 55:22 61:19 |
| **orthopedics** 6:21 | **pain** 48:16,18,20 | 50:1,5,8 83:7 | 79:20 85:1 |
| 6:23 10:9,10,13 | 48:22 49:3,3,4 | **patient** 17:10,14 | **pause** 33:2 |
| 10:14 13:6,8 | 49:10,11,14,18 | 17:16,23 18:5,9 | **pcc** 57:12 60:20 |
| 14:3,7,9,15 15:7 | 74:23 75:17 | 18:13,19,21,22 | 60:20 62:20 |
| 15:10,16 16:5 | 76:1,2,4 77:16 | 18:23 19:7,16 | 63:6 65:12,13,18 |
| 25:2 28:5,19 | 78:15,21 79:13 | 27:14,19,20 28:3 | 68:8 71:8 72:22 |
| | 80:22,23 81:2,4 | | |

72:23 74:11
**pens** 30:9
**people** 9:13 11:9
40:1 41:5,6,9
49:19
**percent** 41:18
**percentage**
15:21
**perfect** 84:13
**perform** 76:12
**performing**
88:21
**period** 22:15
26:3 45:16
54:13 94:20
**person** 26:10
43:6 46:17
50:16 54:2 88:3
**personal** 17:21
92:3
**personally** 27:4
27:6 84:1,11
**pertaining** 1:16
**phone** 95:8
**physical** 20:18
44:22 45:10,24
45:24 46:6,15
76:12 78:17,18
81:5,7,8,9 83:6
89:2,4,22,24
90:3,4
**physician** 5:8,9
5:10,11 10:2
28:2 53:18,21,22
54:3,6,18,22
55:7,10 59:24
**physician's** 5:13
9:19 58:4 59:9

**physicians** 36:16
58:4
**physiology** 8:2
**pick** 39:4 90:8
**place** 22:6 28:11
30:8 94:5,16
**places** 39:8 50:7
**plaintiff** 1:5 2:7
4:8
**plan** 45:11 49:22
49:23 78:5 81:1
81:3
**please** 4:13 9:5
17:3 20:5 27:22
33:5 34:17 37:5
37:10 49:13
53:2 57:20 61:5
61:7 62:17
67:19 71:22
72:6 73:9 87:3
**plenty** 27:1
**plethora** 31:13
**plus** 59:14
**podiatry** 25:5
**point** 13:7 37:23
44:6
**policies** 18:7,11
**policy** 84:18,18
**polite** 33:6
**pool** 43:13
**population**
23:18
**position** 6:13
8:11 16:24
**positive** 76:4
**possible** 40:23
**posted** 15:3

**power** 31:3
**practical** 38:13
38:14
**practice** 5:10
39:10,16 40:6,17
54:7 88:3
**practices** 36:19
**preber** 2:9 15:24
16:9,16 45:2
47:23 49:1
52:18 57:5
61:11 82:3 86:4
88:6 92:8
**preliminaries**
13:2
**prepare** 38:5
73:18 80:1
**prerequisite**
10:2
**prerequisites** 7:7
7:8
**prescribed** 78:13
78:14
**present** 2:1,20
21:23,23 45:7
55:6 63:12 74:9
75:6,10 94:7
**presentation**
83:8
**presenting** 82:9
**presently** 4:23
**presents** 38:4
44:11 46:5,17
47:21 50:16
51:10 86:1
92:12
**pretty** 29:3

**previously** 7:11
12:9 25:21
62:21 79:20
84:17 94:8
**primary** 20:20
21:1 22:1,3,5,9
23:6,22 24:11
36:1 39:6 54:23
58:17 61:22
62:20 65:18
68:12 74:14,16
82:11
**print** 58:8 64:11
64:11 67:15
**printed** 12:23
57:8
**printout** 58:3
**prior** 11:18
37:24 38:12,22
39:1,10,12,17
66:3 72:11,13
73:17 77:18
81:13,19
**prioritize** 28:14
**priority** 28:10
**prisoners** 73:4
**privy** 42:22
54:11
**probably** 25:7
26:1 55:11 66:5
**problem** 19:11
19:12,13,14
28:23 36:12
42:7 44:12 46:6
51:12 80:22
92:15
**problems** 31:13
33:24 36:6

47:22 77:12
**procedure** 1:15
29:4 51:14
78:23 79:8
84:19
**procedures** 18:8
24:16,17 28:8
51:15,16 54:7
**proceed** 30:5
47:19
**process** 17:2,13
17:15 18:8,19,23
**produced** 56:17
**profession** 17:17
**professional**
8:11 14:22 27:7
49:14 59:21
88:21
**professionally**
7:4 27:5
**professionals**
26:8,14
**program** 7:5,7,9
17:1 30:22,23,24
33:21
**programs** 15:14
**projects** 15:7
**prompt** 91:23
92:6
**pronounces**
48:17
**provide** 9:10
17:6 19:20,21
23:22,24 25:10
36:10,13,18
37:23 92:22
**provided** 19:23
23:15 94:20

**provident** 19:24
24:18
**provider** 18:9,13
18:22 36:2
39:14 61:24,24
62:12 84:14
85:2
**providers** 35:20
39:22 40:7,9
**providing** 17:8
40:4
**public** 1:14 94:5
94:12 95:2,6
**publicly** 16:23
**publish** 63:22
71:22
**publishings**
32:23
**pull** 60:6 75:19
**purposes** 84:11
**pursuant** 1:15
**push** 48:6,6
**put** 15:1 32:1
60:18 61:21
62:5,20 70:6,9
70:18 79:11
84:9 85:11
**puts** 43:4,10

**q**

**qualify** 7:9
**quality** 35:19
49:3,10,14
**quantify** 86:15
**question** 6:7
10:12 12:6 14:6
15:19 16:2,12
18:17 26:19

27:23 32:16
34:1,17 35:5,14
40:24 44:15,16
45:4,5,13 47:10
53:10 56:4
61:15,16,17
68:21 75:8
81:18 82:7,8
88:7 89:19
**questioned**
47:11
**questions** 4:9,12
14:2 34:4 41:21
46:23 47:15
53:11 94:10,14
**queue** 18:2 43:3
43:4 80:9
**quick** 28:2,17
**quicker** 85:11
**quickest** 19:1
**quite** 34:9 35:14
44:15 54:9
68:21 75:11
84:4

**r**

**radiculopathy**
74:23 76:1
**randall** 2:4 3:5
**randy** 4:7
**range** 14:8,10
24:3,7 46:11,13
46:19 47:21
57:23 77:9
**ranges** 48:2
**rare** 51:7
**ray** 21:8 50:21
50:22

**read** 34:18,19
39:1,9,10,17
73:21 74:8
**reading** 61:6,6
75:5
**ready** 37:15
**really** 20:23 22:4
22:8 35:23 51:5
83:13 85:10
**reason** 11:15
27:18 32:18
39:3 47:4 59:18
**recall** 22:17
26:15 33:23
56:11 73:2
79:15,18 80:10
81:12,21 91:16
91:19
**receive** 5:12 6:20
7:20 10:8 11:10
15:16 38:24
87:24 91:22
92:16
**received** 5:14
6:5 34:13,20
51:17,18 91:20
**receiving** 20:16
20:19,24 21:24
22:9 39:7
**recess** 37:13
53:3 67:1
**recognize** 44:13
64:15
**recollect** 14:5
26:22 28:7
32:11 55:9
**recollection** 12:4
12:8,13 31:15

47:18 56:8 66:8
68:4 71:19 74:1
**recommendati...**
32:4
**reconciled** 72:23
**reconvene** 37:9
**record** 4:13
12:19 13:14
31:4,5 37:14,17
37:18,22 38:2,11
38:17,19,21 39:2
39:11,11,24 40:7
40:18,20,22,22
41:6,8,10,14
43:23,24 44:8
53:1,9 55:17
57:9 66:18,21,22
68:24 69:14
70:5 81:20
94:14
**recorded** 41:16
**records** 13:17
38:1 39:21 40:3
63:4 64:17 82:9
**recourse** 31:8
**red** 48:18
**redness** 77:10
**reduce** 52:2
**redundant** 61:21
**refer** 17:9,12,23
18:5,13 19:2,16
19:20 27:13,20
28:3,6 36:6
49:24 50:5,7
51:9 79:16 90:4
**reference** 44:6
63:19

**referral** 29:8
58:17 83:3,5
**referrals** 52:3
**referred** 19:7
28:5 39:15
78:10,16,18 81:3
81:7 89:3,24
90:3 94:16
**referring** 17:14
17:16 18:8
51:12 57:1 61:2
61:11 66:21
69:21 85:6
**refers** 67:7 69:22
70:4
**reflect** 80:8
**reflected** 68:18
81:23
**refresh** 12:3,13
73:24 87:5
90:15
**refused** 66:15
**regarding** 47:11
83:11 87:18
**regular** 40:17
74:11,15
**regularly** 33:16
44:7 54:12
**related** 60:19
**relaxer** 78:9
**relief** 76:4 85:20
85:23
**rely** 36:12 40:3
41:9
**relying** 41:6
82:14
**remainder** 6:16

**remedy** 92:18
**remember** 22:18
56:7 74:4,7,7
82:24 90:2
**remote** 82:5
**remotely** 1:13
**removed** 54:4
**rendered** 39:8
39:11
**renewed** 65:9,12
68:14
**renewing** 66:3
**reordered** 66:5
**repeat** 34:17
70:14
**repeatedly** 82:9
86:1 92:12
**rephrase** 80:18
**report** 57:13
77:12,16,18
91:14
**reported** 81:14
91:12
**reporter** 34:19
94:20
**represent** 4:8
**represents** 11:20
**request** 41:23
42:1,3,9,18 43:2
43:16 79:16
84:2 92:2
**requested** 94:18
94:19
**require** 82:11
86:12
**required** 9:23
53:19 82:1
91:22 92:23

**remedy** ... **requires** 48:23
86:3,13 92:6,15
**requiring** 51:10
**reschedule** 72:23
**research** 15:6
32:20,22 38:21
**resistance** 48:5,5
**resolved** 76:1
82:14
**resource** 31:6,21
34:3
**resources** 20:2
21:2 29:18
33:11
**respectful** 79:19
93:2
**respective** 18:2
20:22 30:1
**responding**
89:17
**responsibilities**
20:9
**responsible**
20:12
**result** 83:15
**results** 79:2,3
83:10
**resume** 14:22,22
15:3
**retired** 55:2,12
**retirement** 15:2
**retires** 54:2
**review** 11:24
54:9 79:3 94:17
**reviewed** 66:4
**reviewing** 39:19
73:24

**reviews** 54:11
**rhack** 2:6
**right** 11:6 17:20
21:13 23:21
27:19 28:24
29:23 30:13
32:5,22 34:1,8
38:3,20 39:7,9
41:7,9 42:8 44:9
45:13,16,21
46:14,17 48:16
48:16,17,18,24
50:1 51:1 55:15
55:17,24 57:14
57:23 58:10,11
58:12 60:11
64:7,18 68:13,16
69:1,8,10,24
70:5,10,18 74:15
76:18 80:15
81:18 85:8,19
87:12,14,17
89:17 90:23
91:1,3
**room** 19:3 21:4
51:13 74:13,18
74:20 75:21
77:21 78:2 79:1
79:5,22
**rotation** 48:1,1
**route** 47:2
**routine** 19:10
28:10
**routinely** 27:7
**rpr** 1:14 94:5
95:5
**rule** 77:22

**rules** 1:15 18:11
28:8
**run** 66:14
**running** 25:13

**s**

**s** 65:18
**saddle** 76:4
**sakes** 66:17
**sat** 29:16 34:7
83:7
**saw** 61:24 62:12
73:11,14,15,16
84:16
**saying** 60:1
70:22 71:3
**says** 12:21 48:22
57:13,24 59:6
60:3,3,19 65:12
68:8,11,15 70:23
71:6 74:21
80:23 84:24
86:8 91:1
**scale** 48:23
**scan** 21:12 50:22
83:10,15
**scanned** 43:17
43:21
**schedule** 51:15
51:15,24 83:19
83:20,24 93:3
**scheduled** 40:19
43:5 45:12
54:12 60:21
62:1,14,21 65:13
68:9 74:15
**scheduler** 43:4

**schedules** 43:11
**scheduling** 18:2
42:17 43:3 85:1
**school** 6:10
**science** 7:22 8:11
**sciences** 7:10
**screen** 52:21
66:16
**sea** 6:18
**seal** 95:1
**sec** 60:24
**second** 55:15
59:2,4 61:8 62:3
64:9,22 66:19
71:9
**secondary** 65:12
65:19,20,21
68:12
**section** 14:12
31:11
**sections** 14:3
**see** 22:20,21
23:2 27:19
28:17,24 32:1
38:6,9,11 39:3
41:6 42:24
43:15,18 45:12
45:19 46:11,15
52:10,18 53:4
56:5 57:21,24
58:1,16,18,21
60:9 61:17 62:3
64:3 65:10,20
67:11,15,22
70:17 71:13,17
71:18 72:17,20
72:21 73:13,14
77:14,17 79:3,13

**80:6 81:17,17**
83:21,24 84:1,7
84:11 85:2
86:14 91:3
**seeing** 22:24
30:7 39:12
73:17 77:19
**seen** 18:22 58:6
60:20 61:22
62:10 63:5 71:8
74:18,19 86:9
89:8 91:3
**sees** 28:8
**send** 18:5 21:6
90:5
**sending** 78:22
79:7,9
**sensation** 49:17
49:19
**sent** 19:3 61:10
74:22 79:10
**series** 76:17
**serious** 28:1,23
**serve** 5:21 6:15
6:18
**served** 25:22
**service** 5:18 6:16
6:24 7:3 9:6
10:14 19:5,20,22
19:22 21:15
23:9,14 33:10
38:5 39:11 42:3
42:9 43:16 92:2
**services** 5:2,4,7
6:2 9:2,4,6,10
10:19 11:11
17:6,8,24 20:7
23:7,13,15,21

24:4,8,9,11,14
24:21 25:1,6,9
25:15,15 34:16
34:23 35:4,17,18
35:20 37:19
38:12 39:8,22
40:4 41:10,24
44:2 54:8 55:4
69:7 84:21
**set** 18:8 21:8
65:23
**setting** 9:13
11:10 56:19
**severe** 48:18
49:6 77:18
82:10 85:12
91:17 92:5
**severity** 49:3,4,8
49:9
**shane** 1:4 2:21
3:9,11,13,15 4:9
**share** 52:20
66:16 86:17
**sharp** 76:2 92:13
**sheriff** 1:7
**sheriff's** 3:17,19
87:15
**short** 36:23,24
**shorthand** 94:11
**shortly** 40:13
**shoulder** 16:8,14
31:17,24 46:6,8
46:9,17,23 47:1
47:2,10,11,22
48:2,4,9 50:17
51:4,7 77:13,16
78:4,6 79:14
81:14,24 82:10

86:8 89:2,23
91:8,10,15,17
92:5,14
**show** 42:24
52:12 63:4,23
65:12,15,18
66:13,20 68:11
72:13 82:15
**showed** 38:9
39:4 62:10 82:9
89:9
**showing** 38:22
**shows** 90:23
**side** 68:8,11
**sign** 70:11
**signal** 48:14
**signature** 68:19
69:15,16,17,20
70:4,9,18 80:14
95:1,4
**signed** 70:2,22
72:14
**significant** 81:14
81:23
**signing** 71:3
**signs** 44:13
**silly** 40:24
**simple** 49:15
**simplest** 49:16
**sims** 1:13 2:13
3:1 4:1,14,15
13:1 16:19
29:19 32:12
36:23 37:15,18
41:13 45:3
47:17 49:12
52:10 53:1
55:18 58:22,22

59:6 65:8 66:20
67:2 71:23
79:19 86:17,21
87:5,19 89:9
90:12 91:1,2
**single** 14:6
**singularly** 14:14
**sir** 4:7 50:23
57:21 59:2 60:8
60:13,15 61:16
86:23 87:3 93:3
**sit** 29:10,14
**site** 10:23 19:19
19:20 21:7,8,10
25:2 50:18,19,20
50:21,23,24
**situation** 28:1
**six** 10:3,5 13:21
**slip** 42:2
**slot** 43:5
**slots** 43:5,10
**small** 67:8,15
**smith** 38:6
**snapshot** 32:24
**solved** 19:12
**somebody** 17:18
41:15 42:17
58:23 84:5 88:8
92:4
**somebody's**
48:20
**something's**
48:17
**soon** 80:9
**sophisticated**
45:21,22
**sorry** 11:3 31:7
60:14 62:17

65:2 68:10
**sort** 90:24
**sounded** 29:22
**sounds** 22:4
37:11
**source** 46:15
49:11
**south** 2:4,15
4:18 23:5
**space** 29:23
30:12
**speak** 33:2 40:9
40:9 56:1 62:22
72:24
**specialist** 36:1,4
36:7 90:5
**specialists** 52:3
**specialty** 23:24
24:20 25:10
35:24
**specific** 6:23
31:21 45:18
53:11 81:21
**specifically**
13:10 14:13
22:19 28:6 47:9
77:5 80:10
**specifics** 8:4
26:24
**specify** 84:7
**speculate** 48:20
**speculation**
15:24 47:23
49:1 82:3 86:4
88:6 92:8
**speech** 7:12
**spend** 9:17 11:13
39:18

spent  15:22 16:4
  80:8
spine  77:5,7,8
  79:4
spoke  62:24
ss  94:1
staff  25:22 26:7
  26:19 87:17
stamp  69:13
stand  59:6
standard  1:18
  29:3 34:14,21
  35:3,6,10,11,12
  36:5,9 50:21
  81:24 82:10
  88:2 91:21
  92:14 93:7
stands  65:18
start  8:14 10:12
  17:15 20:5 39:2
  44:17 50:20
  57:12
started  5:15 70:1
  80:7
state  4:13 53:19
  82:2 94:1
state's  2:9,14
states  1:1,16
status  59:21
stenographer
  94:12
steps  19:15
steroidal  76:7
stick  84:13
stop  36:21 55:22
stops  41:15
street  2:10 4:17
  95:7

strength  46:12
  48:4,7
stretching  78:20
stroger  10:24
  11:2,4 19:3,4,7
  19:16,23 21:6
  74:22 75:14,15
  75:18,21 91:12
structure  46:13
  48:9
studies  15:9
  32:24
stuff  30:10
subjective  48:19
  49:4
subjects  14:8
submit  92:2
submitted  29:9
sufficiently  28:1
suggest  86:10,11
suite  2:5,10,16
  95:7
summary  64:11
superiors  52:7
supervise  54:6
supervising
  53:18,21,22 54:3
  54:5,14,18 55:6
  55:10
supervisor  55:3
supplied  6:2
suppose  18:18
  48:21
supposed  18:12
  40:7
sure  6:6,6,8 7:13
  8:3,4 12:6,7
  13:7 15:13

17:20 18:10,11
  23:12 24:5,6
  25:7 27:1,24
  29:20 32:10
  34:18 35:14
  39:3 42:23
  44:16 45:6 46:5
  46:21 54:9 65:3
  68:11,21,23
  69:19 70:15
  75:11 84:22,23
  86:14,17 88:11
surely  36:16
  55:21
surge  8:23,24
  17:10 20:6 69:7
surgeon  51:9,14
  79:13
surgery  24:13
  51:11
surgical  24:16
  24:17 51:12,16
surmise  66:10
surrounding
  88:5
suspect  51:6
swelling  77:10
sworn  4:3 94:9
symptoms  44:13
  51:10 74:9 75:9
  83:8
synonymous
  22:4
system  3:9,11,13
  3:15 8:1,4 11:2
  12:22 14:16
  37:18,21,22
  38:11 53:6

64:17 67:7
  69:13
systems  14:10
  21:19

**t**

t  25:18
take  7:11,13,24
  8:12 9:21 13:4,5
  13:20 14:6,14
  15:3 17:5 19:15
  22:6 36:23,24
  37:7,8 39:2
  40:12 42:4
  44:18,24 64:8
  65:14 67:19
  86:16
taken  1:13 3:2
  7:11 13:13,24
  37:13 53:3 67:1
  76:9 94:4,11
takes  43:4
taleo  17:1
talk  20:2 28:19
  29:18 45:9
  65:23
talked  28:19
talking  19:13
  29:6
telephone  65:24
  73:1,4
tell  6:4 9:4 17:3
  17:13 18:12
  20:9 29:21
  30:24 31:8
  33:23 37:5
  47:18 48:6 49:5
  53:16 56:24

thing 38:8 50:18
66:10 86:18
things 12:15
19:18 27:16
49:18 56:18
74:4 85:8
think 7:12,13
17:20 26:17
29:2,23 38:23
41:4 51:10
55:12 61:2
85:20 86:22
92:1,1,11
thinking 25:20
33:8
third 72:16
thomas 1:7
thorough 44:21
thought 62:17
three 22:4,5,8,11
39:8 55:11,11
67:19 72:8,23
86:9
thumb 75:13
time 1:18 6:16
8:19 9:17 14:18
15:17,20,22 16:4
16:6 22:15
27:22 32:7
33:20 34:10
38:17 45:16,17
47:14 53:23
54:13 69:1,14
70:14 80:8
82:21 85:11
86:16 93:7 94:6
94:15

timeframe 55:24
84:9
times 45:18
69:16 84:5 86:9
timing 34:6
title 5:6 43:7
87:12,14
today 11:16,18
55:19 73:22
93:3
told 37:7 81:4
90:4
tools 51:3 78:20
top 12:21 13:8
22:17 70:1
73:14 74:4
topical 76:10,10
track 16:3 32:6
training 5:12,14
5:16 6:4,9,20,21
7:15,23 9:18,22
10:8,10 13:12
15:12,14,15,16
34:14,20 35:1
trammel 91:2
trammell 63:7
63:13
transcript 94:18
transferred
11:10
transition 55:13
transport 22:23
trauma 46:18
77:18,20,23
treat 20:2 35:4
52:4 92:23
treating 15:22
16:5,8 34:15,22

66:13 68:18
75:15 76:6
83:23 89:1,3
91:17
telling 48:15
68:20
tells 48:21 68:23
69:3,6
tenderness 46:14
48:14,14 77:8
tentative 31:24
tenure 6:24 8:18
13:3
term 35:6 49:8
terms 45:24
49:13,15
terrance 54:21
test 10:3 13:20
14:7,7 46:19
48:4
testified 4:4
testify 11:16
testimony 63:18
tests 14:14 46:7
46:18 47:20
48:3 50:12,15
51:23 52:8
texts 30:17,19
thank 13:16
23:20 37:12,17
53:7 57:18
63:19 75:7 87:7
93:5
therapy 78:17
78:18 81:5,7,8,9
83:6 89:2,4,22
90:1,3,5

39:22
treatises 30:17
treatment 16:14
19:8 32:2 36:18
37:24 44:19
45:8 78:4 88:17
91:23 92:6
treatments
32:17
trials 32:20
trip 75:18
true 14:18 94:13
truth 33:23
truthfully 11:16
try 9:17 27:16
37:8 38:3 40:14
40:22 46:3
56:15 79:23
93:2
trying 33:6
38:15 61:17
63:18 71:9
turn 70:21 71:4
72:2,6
turnaround
85:11
turning 71:5
two 7:16,17 9:23
10:3 13:4 19:18
26:1 29:4 39:18
62:13 67:19
69:22 72:8,23
90:7
tylenol 78:10,14
type 15:23 35:19
44:12 50:17
51:6,22 54:22

| | | | |
|---|---|---|---|
| **typed** 12:17,20 | **use** 21:19 31:2,4 | **wanted** 27:19 | **white** 42:2 |
| **types** 46:6 | 33:23 34:3,5 | 31:16 33:8 | **wiggle** 79:22 |
| **typically** 28:19 | 35:9 37:19 | 38:10 56:1 | **wish** 33:2 55:21 |
| 39:1,13 | 48:12 49:8 | 82:17 | **witness** 4:2 16:2 |
| | 79:23 | **wanting** 79:13 | 16:11 34:24 |
| **u** | **useful** 78:20 | **warranted** 28:1 | 41:22 45:4 |
| **uh** 76:19 | **usually** 34:3 | **washington** 2:10 | 47:24 49:2 |
| **ultrasound** 51:5 | 39:24 40:14 | **wasting** 46:10 | 52:19,22 57:8,12 |
| **unable** 46:9 | 48:15,17 | 48:11 | 61:14 66:24 |
| **unaware** 91:13 | | **watts** 1:14 94:5 | 82:4 86:5 88:8,9 |
| **underlying** | **v** | 95:5 | 92:9 93:5 94:4,9 |
| 92:19,23 | **variances** 85:15 | **way** 10:18 17:15 | 94:15 95:1 |
| **underneath** | **veritext** 52:20 | 19:1,9 35:15 | **wondering** 47:1 |
| 57:14 | **versed** 35:22 | 38:4 44:17 47:7 | **word** 17:20 |
| **undersigned** | **versus** 19:13 | 48:7 49:16 | **words** 17:3,5,5 |
| 94:12,22 | 36:2 | 63:17 65:15 | 24:9 35:10 |
| **understand** 12:6 | **videoconference** | 67:14 73:1 | 45:13 49:18 |
| 15:13 33:5 35:2 | 2:3,8,14,20 | 76:20 82:4,7 | 61:20 74:12 |
| 35:5,17 38:15 | **visit** 38:6 39:15 | 84:14 88:13 | 81:3 |
| 41:5 53:9 54:7 | 44:1 63:6 66:23 | 90:21 92:21 | **work** 5:1,2 9:20 |
| 55:18 91:10 | 69:24 74:13 | **we've** 25:3,6 | 22:2 26:23 |
| **understanding** | 75:14,15 80:1,4 | 60:16 | 29:12,19,22 30:3 |
| 31:15 40:6 47:6 | 82:23,24 83:20 | **weakness** 76:3 | 33:13 45:15 |
| **undertake** 46:7 | 83:21 85:8 | **website** 24:6 | 53:14,16,20 54:6 |
| **undertook** 7:7 | **visits** 84:19,20 | **websites** 33:14 | 58:11 87:23 |
| **united** 1:1,16 | **vs** 1:6 76:20 | 33:15 | **worked** 5:3 8:7 |
| **uptodate** 30:23 | | **week** 54:13 | 8:21 10:22 23:4 |
| 30:24 31:9,10,11 | **w** | **weeks** 62:13 | 26:8,8 |
| 31:17 32:1,2,5,8 | **wacker** 2:4 | 72:23 83:22 | **working** 26:15 |
| 32:11,14,18,21 | **walk** 80:9 | **welcome** 63:21 | 47:7 |
| 33:10,19,20 34:5 | **walked** 77:1 | **went** 6:10 8:13 | **workings** 11:1 |
| **urgent** 19:2 | **walking** 41:15 | 24:6 78:1 | **works** 10:24 |
| 20:15,20,24 21:2 | **want** 15:12 | **west** 2:10 | 45:11 52:10 |
| 21:24 22:8 | 17:18 33:1 36:9 | **whatnot** 32:24 | 59:1 |
| 28:11,16 39:5 | 46:15,20 61:8 | 54:11 | **world** 84:13 |
| 74:12 | 62:3,4 66:21 | **whatsoever** 66:2 | **worth** 79:22 |
| **urology** 25:5 | 85:6 86:14,18 | **when's** 33:20 | **write** 17:24 74:5 |
| | 88:11 89:5,19 | | |

**[written - zoom]**

| |
|---|
| **written**  18:7,11<br>18:16 84:18,23 |
| **x** |
| **x**  7:5,15,23 8:6<br>8:11 21:8 50:21<br>50:22 94:18 |
| **y** |
| **yeah**  86:5<br>**year**  7:1 8:14<br>10:5,5 26:1<br>**years**  4:22 5:5<br>5:22 7:16,18<br>8:16,24 9:23<br>10:3,4,5 13:5,9<br>13:21 15:21,21<br>16:7 22:12,19<br>23:4 26:2,16,16<br>26:20,23 32:7<br>34:11 54:17<br>55:11,12 59:15<br>**yellow**  42:2<br>**young**  67:17 |
| **z** |
| **zip**  4:19<br>**zoom**  52:23 |

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.



DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

# VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.