# Exhibit FF

Page 1

1          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3

4   SHANE EDWARD LIMBACHER,      )
                                 )
5                  Plaintiff,    )
                                 )
6       vs.                      )    No. 19-cv-07509
                                 )
7   SHERIFF THOMAS J. DART,      )
    et al.,                      )
8                                )
                   Defendants.   )

9

10

11          The Remote Zoom Deposition of

12   BARBARA DAVIS, taken before CAMILLE TROK, a C.S.R.

13   and Notary Public within and for the State of

14   Illinois, pursuant to the provisions of the Federal

15   Rules of Civil Procedure of the United States

16   District Court, pertaining to the taking of

17   depositions, taken at the hour of approximately

18   10:30 o'clock p.m. on November 21, 2022.

19

20

21

    Reported by:  Camille Trok, RPR
22   License No. 84.000960

23

24

Page 2

1
2    A P P E A R A N C E S:
3            LOCKE LORD, LLP, by
             MR. RANDALL HACK
4            111 South Wacker Drive, Suite 4100
             Chicago, Illinois 60606
5            (312) 443-0676
             rhack@lockelord.com
6
                  Appeared on behalf of the Plaintiff;
7
8            COOK COUNTY STATE'S ATTORNEY, by
             MR. ALEXANDER PREBER and
9            MS. MIA BUNTIC
             219 South Dearborn Street, Suite 500
10           Chicago, Illinois 60604
             (872) 256-2529
11           alexander.preber@cookcountyil.gov
             mia.buntic@cookcountyil.gov
12
                  Appeared on behalf of the Defendant.
13
14   Also present on Zoom:
          Mr. Shane Edward Limbacher.
15
16
17
18
19
20
21
22
23
24

Page 3

1

2                          I   N   D   E   X

3

  WITNESS:  BARBARA DAVIS

4

5

6    EXAMINATION BY:                              PAGE:

7    Mr. Hack                                       4

8

9

10

     EXHIBITS:                                    PAGE:

11

     Exhibit No. 1                                 52

12   Exhibit No. 2                                 60

     Exhibit No. 3                                 75

13   Exhibit No. 4                                 78

     Exhibit No. 5                                 79

14   Exhibit No. 6                                 89

15

16

17

18

19

20

21

22

23

24

```
                                            Page 4

 1             MR. HACK:  Camille, go ahead, please, swear

 2    the witness.

 3             THE COURT REPORTER:  Before I swear her, do

 4    you both agree that I can swear her remotely?

 5             MR. HACK:  Yes.

 6             MR. PREBER:  Yes.

 7                    (Witness sworn.)

 8                    BARBARA DAVIS,

 9    called as a witness herein, having been first duly

10    sworn, was examined upon oral interrogatories and

11    testified as follows:

12                      EXAMINATION

13    BY MR. HACK:

14       Q.   Good morning, ma'am, my name is Randy Hack.

15    I'm appointed counsel for Mr. Shane Limbacher, who

16    is the Plaintiff in this case.

17             What is your name, please?

18       A.   Barbara Ann Davis.

19       Q.   Ms. Davis, where do you live?

20       A.   11401 South Bell, Chicago.

21       Q.   That's in the City of Chicago?

22             And what's your zip code?

23       A.   60643.

24       Q.   Ms. Davis, I'm not a personal injury
```

```
                                              Page 5
 1   lawyer, nor am I expert in the area of medicine or
 2   patient care.
 3           If I ask a question that you don't
 4   understand, please tell me that.  I will do my very
 5   best to rephrase it.  I'll make no promises, other
 6   than I promise to try.  So if you would do that, I
 7   would be appreciative.
 8           Is there any reason you cannot testify
 9   accurately and truthfully today?
10       A.   No.
11       Q.   Ms. Davis, what is your professional title?
12       A.   I'm an advanced practice provider, a/k/a
13   physician assistant.
14       Q.   And where do you work?
15       A.   The County of Cook, Cermak Health Services.
16       Q.   And Cermak Health Services on California,
17   on the south side?
18       A.   Yes.
19       Q.   I believe you said you were a, could you
20   say the phrase again?  Advanced practice --
21       A.   Provider.
22       Q.   Advance practice provider, okay.
23           I'd like to start with some background on
24   you.
```

```
                                        Page 6

1              Did you go to college?

2        A.    Yes.

3        Q.    And where did you receive your college

4    degree?

5        A.    Loyola University.

6        Q.    And what did you study at Loyola?

7        A.    Sciences and English literature.

8        Q.    And when did you graduate, Ms. Davis?

9        A.    When, or where?

10       Q.    When?

11       A.    In 1976.

12       Q.    And did you graduate with a Bachelor of

13   Science, as well as a Bachelor of Arts?

14       A.    A Bachelor of Science.

15       Q.    Bachelor of Science, okay.

16             And after graduating, what was your first

17   professional position?

18       A.    I was a registered nurse.

19       Q.    Prior to becoming a registered nurse, did

20   you go to nursing school?

21       A.    Yes.

22       Q.    And where did you go to nursing school?

23       A.    Augustana.

24       Q.    And how long was your nursing curriculum?
```

Page 7

1    A.   A little over two years.

2    Q.   What year did you graduate from Augustana?

3    A.   1981.

4    Q.   As part of your nursing curriculum at

5    Augustana, were you trained in the diagnosis and

6    treatment of orthopedic injuries?

7    A.   Nurses don't diagnose medical diagnoses.

8    Q.   Were you trained at all in the treatment of

9    orthopedic injuries?

10   A.   General; general information.

11   Q.   Okay.  I'm afraid I'm not a nurse, and I

12   don't know nursing school.

13        When you graduated, did you have a

14   specialty of some kind, or is it you get a nursing

15   degree and then you can specialize later?  Or

16   something else?

17   A.   Both.

18   Q.   Okay.  Did you have any type of specialty

19   degree or designation when you graduated from

20   Augustana?

21   A.   No.

22   Q.   After graduating from Augustana with your

23   nursing degree, what did you do next professionally?

24   A.   I worked at the University of Chicago.

Page 8

1      Q.   And what position did you take at the

2    U of C?

3      A.   Multiple.  I worked in pediatric

4    cardiology; high-risk OB; primary care; nephrology.

5      Q.   And did you work in the main hospital

6    campus down on the south side?

7      A.   Yes.

8      Q.   And how long were you employed as a nurse

9    by the U of C?

10      A.   15 years.

11      Q.   So that gets us to about 1996, I think; is

12    that right?

13      A.   That's correct.

14      Q.   And in 1996 did you change positions?

15      A.   No.  I went back to school.

16      Q.   Okay.  Tell us about that.

17           Where did you go back to school?

18      A.   Cook County PA Program.

19      Q.   The program is offered by Cook County, the

20    County itself?

21      A.   Cook County Hospital.  That was the only

22    program offered in the State of Illinois; the only

23    program, yes.  Our clinic, clinical rotation for

24    most of us was through Cook County.

```
                                          Page 9
 1      Q.   Got it.  That's what I didn't realize, it
 2   was at the hospital, right?
 3           That's where you trained, correct?
 4      A.   Yes.
 5      Q.   And you went back to Cook County Hospital
 6   and took additional courses to become a physician's
 7   assistant, correct?
 8      A.   A physician assistant.
 9      Q.   Yes.  And how long was your course of study
10   to become a physician assistant?
11      A.   27 months.
12      Q.   And was that a course of study that was
13   full time, or were you also working at that time?
14      A.   No, I was not working.  And yes, it was
15   full time.
16      Q.   Okay.  And when did you graduate or
17   matriculate from the Cook County Hospital PA
18   Program?
19      A.   In July of -- it might have been August of
20   '98.
21      Q.   Okay.  Thank you.
22           When you were studying for your physician's
23   assistant degree, were you trained in the diagnosis
24   of orthopedic injuries?
```

1      A.   Yes.

2      Q.   And what type of training did you receive

3    in orthopedics, as best you can describe it?

4      A.   Common injuries you would see in primary

5    care.

6      Q.   And were injuries of the shoulder among

7    the injuries that you were taught to diagnose at

8    PA school?

9      A.   Yes.

10      Q.   And were you also trained in how to treat

11    injuries of the shoulder when you were at PA school?

12      A.   Yes.

13      Q.   And in particular, did you receive any

14    training in how to diagnose and treat dislocations?

15      A.   Yes.

16      Q.   And did you receive training in how to

17    treat osteoarthritis or necrosis in the shoulder?

18      A.   Yes.

19      Q.   Okay.  And what do you remember being

20    taught about diagnosing and treating dislocations?

21      A.   It depends on which type of dislocation it

22    was.

23      Q.   Okay.  Are there --

24      A.   You have to give me something specific.

Page 11

1      Q.    I'm about to.

2      A.    Okay.

3      Q.    Are there different types of shoulder

4   dislocations?

5      A.    Yes.

6      Q.    And what are they?  List them.

7      A.    Well, you can either have an anterior, or a

8   posterior dislocation.

9      Q.    And one pops out the front, and one pops

10  out the back?

11     A.    Yes.

12     Q.    Okay.  And were you trained in how to

13  diagnose and treat both anterior and posterior

14  dislocations?

15     A.    Yes.

16     Q.    Okay.  And since you graduated from

17  PA school, have you taken any other training in

18  orthopedic patient care?

19     A.    Yes.

20     Q.    And please explain what additional training

21  you've taken in patient care since you graduated

22  from PA school, please.

23     A.    I worked 15 years with the Department Chair

24  of Orthopedics at Cook County.

1    Q.   And who was the Department Chair of
2  Orthopedics at Cook County for those 15 years?
3    A.   Dr. Kapotas.  K-a-p-o-t-a-s.
4    Q.   And Dr. Kapotas is retired presently,
5  correct?
6    A.   I have no idea.  I haven't seen him in
7  years.
8    Q.   Oh, okay.  What was the period of time,
9  ma'am, that you worked with Dr. Kapotas at Cook
10  County?
11    A.   I probably haven't worked with him, oh, for
12  maybe six, seven years.
13    Q.   Okay.  Maybe I've got the timing wrong.
14         Tell me again, please, when did you
15  graduate from the Cook County PA Program?
16    A.   In '98.
17    Q.   Okay.  And then you went right to work with
18  Dr. Kapotas as a physician's assistant?
19    A.   There's no apostrophe S.  I don't belong to
20  anybody, it's physician assistant.
21    Q.   Oh, okay.  I will call it a physician
22  assistant.
23         When you were a physician assistant, did
24  you work immediately for Dr. Kapotas upon

Page 13

1    graduation?

2         A.   It may have been a couple of months or a

3    year later, but not far after.

4         Q.   Okay.  And you worked with Dr. Kapotas at

5    the main hospital, the main --

6         A.   No.

7         Q.   And where did you work with Dr. Kapotas,

8    please?

9         A.   Cermak.

10        Q.   And that's Cermak Medical Center, correct?

11        A.   No.  There's no Medical Center.  It's

12   Cermak Health Service.

13        Q.   I'm sorry, that's what I meant to say,

14   thank you.

15             And tell me, Ms. Davis, what is Cermak

16   Health Services?

17        A.   It's the medical arm of the jail.

18        Q.   And you provide medical treatment to

19   patients who are incarcerated at Cook County Jail,

20   correct?

21        A.   Yes.

22        Q.   And Dr. Kapotas worked with you there at

23   Cermak Health Services for 15 years, correct?

24        A.   Yes.

Page 14

1      Q.   And as a physician assistant, are you

2   assigned to a particular doctor who is responsible

3   for overseeing your work in any way?

4      A.   I have a collaborating physician, but I

5   don't work with him.  I only need to consult if I

6   have a question.

7      Q.   Okay.  That was sort of where I was getting

8   to, I didn't know the vernacular.

9           Tell me what is the responsibility of a

10  consulting physician for a physician assistant?

11          MR. PREBER:  Objection to speculation.

12          THE WITNESS:  Well, pretty much like I

13  said.  I mean, the collaborating physician will, at

14  times, review my chart; answer questions if I have

15  one.  That's pretty much it.

16  BY MR. HACK:

17     Q.   And did you meet with your supervising

18  physician in any formal, regular way?

19          For example, did you meet with Dr. Kapotas

20  weekly?

21     A.   Oh, no.  I think there's a misunderstanding

22  here.

23          Dr. Kapotas worked for Cook County

24  Hospital, a/k/a John Stroger Hospital.  He came to

Page 15

```
 1    Cermak once a week for orthopedic only.

 2             He is not my collaborating physician.

 3        Q.   Thank you very much.  You know, I think I

 4    skipped by that.  Let's go back a little bit.

 5             You would see Dr. Kapotas on occasion when

 6    he came to the Cermak Health Services to treat

 7    patients, correct?

 8        A.   Yes.

 9        Q.   And Dr. Kapotas was not your consulting

10    physician, correct?

11        A.   It's not consulting, it's collaborating.

12        Q.   Thank you.  Dr. Kapotas was not your

13    collaborating physician, correct?

14        A.   No.

15        Q.   When you worked at Cermak Health Services,

16    who was your collaborating physician?

17        A.   Dr. Margul (phonetic) Khan.

18        Q.   Could you spell his last name?

19        A.   K-h-a-n.

20        Q.   And for what period of time was Dr. Khan

21    your collaborating physician?

22        A.   From the time I was hired until the

23    present.

24        Q.   And how many -- how many years have you
```

Page 16

1    been at Cermak Health Services, Ms. Davis?

2        A.    22.

3        Q.    Okay.  And he's been your collaborating

4    physician all 22 years, correct?

5        A.    Yes.

6        Q.    And what is Dr. Khan's medical specialty?

7            MR. PREBER:  Objection to speculation.

8            THE WITNESS:  Family medicine.

9    BY MR. HACK:

10       Q.    And does he practice in a particular

11   division, group, office, or some other department

12   over at Cermak Health Services?

13           MR. PREBER:  Objection to speculation.

14           THE WITNESS:  Currently he's in urgent

15   care.

16   BY MR. HACK:

17       Q.    Okay.  And he presently is in urgent care.

18           Has he had other postings during that

19   period?

20       A.    I would not -- postings?  That means

21   postings --

22       Q.    I'll just ask.  Did he ever work in

23   orthopedics?

24           MR. PREBER:  Objection.  Speculation, as

Page 17

1   well.

2          THE WITNESS:  I don't know.

3   BY MR. HACK:

4      Q.   Did he ever work in primary care?

5      A.   Family medicine by definition includes the

6   specialty, so you take care of adults, children,

7   pregnancy, so it's quite a breadth of care.

8      Q.   Is there a name for the department or group

9   of doctors at Cermak Health Services who provide

10  primary care services to patients?

11     A.   We're all in the primary care clinic.

12     Q.   Okay.  That's what I'm trying to find out,

13  the name of the clinic.  Thank you.

14          What is the primary care clinic?

15          (Zoom interference.)

16          MR. HACK:  Hang on.  Mia, you might want to

17  hit the mute button.

18          MS. BUNTIC:  Sorry, guys.

19          MR. HACK:  All good.

20  BY MR. HACK:

21     Q.   What is the primary care clinic at Cermak

22  Health Services, Ms. Davis?

23     A.   All of the people who are on the medical

24  staff; who cover all the medical care required or

Page 18

1    needed at Cermak for the detainees.

2        Q.   I may have asked you this before, if I did

3    I don't mean to go over some old ground, but after

4    you became a licensed physician assistant, did you

5    take any subsequent formal training in the diagnosis

6    and treatment of orthopedic injuries?

7        A.   So, I worked in the clinic with

8    Dr. Kapotas, that's where I got it.

9        Q.   Okay.  So that was on-the-job training for

10   all the years that you worked with Dr. Kapotas,

11   correct?

12       A.   Yes.

13       Q.   Okay.  Did you come to form an impression

14   of the quality of medicine and patient care that

15   Dr. Kapotas provided to his patients?

16           MR. PREBER:  Objection.  Calls for

17   speculation.

18           THE WITNESS:  I mean, I'm not a regulating

19   board, but he was the chair of the department.

20           I would think that he would be quite good

21   at what he does.

22   BY MR. HACK:

23       Q.   And was that your observation, that

24   Dr. Kapotas was quite good at what he did?

Page 19

1      A.    That's what I said, yes.

2      Q.    Okay.  In your role as a physician

3   assistant, when you are treating patients, do you

4   have the ability to refer a patient for treatment to

5   Cook County Hospital?

6      A.    Yes.

7      Q.    Do you have the ability, as a physician

8   assistant, to direct patients to receive care from

9   the Orthopedics Department at Cook County Hospital?

10     A.    Yes.

11     Q.    As a physician assistant, did you have the

12  authority to order x-rays for patients that you

13  treated?

14     A.    Yes.

15     Q.    And as a PA at Cermak, do you also have the

16  ability to order MRIs for patients that you treat?

17     A.    Yes.

18     Q.    As a PA at Cermak, do you also have the

19  ability to order CT scans of patients that you

20  treat?

21     A.    Yes.

22     Q.    And as a PA at Stroger, did you also have

23  the ability to order -- help me, withdraw the

24  question.  Just give me a minute.  We'll approach it

Page 20

1     another way.

2            What other kind of imaging services do you

3     have the ability to refer patients to?

4          A.   Ultrasound.

5          Q.   That's the word I was looking for.  Thank

6     you.

7          A.   I would like to correct, you asked me as a

8     PA at Stroger?  I did not work at Stroger.

9          Q.   I meant to say -- if I said Stroger, I

10    meant Cermak.  Thank you.

11           And you never worked at Stroger, correct?

12         A.   During clinical rotations, but never as an

13    employee.

14         Q.   Right.  And your employment for the last 20

15    some years has been at Cermak Health Services?

16         A.   I've worked at Juvenile Detention Center.

17         Q.   Oh.  Okay.  Well, let's focus on the period

18    2017 to 2021.

19           During that period of time, where were you

20    employed?

21         A.   Cermak.

22         Q.   And during that time you were a physician

23    assistant, correct?

24         A.   Yes.

Page 21

1      Q.   Did you have any other positions during

2   that time period at Cermak?

3      A.   No.

4      Q.   Okay.  Thank you.

5           Do you have a formal job description as a

6   physician assistant at Cermak?

7      A.   I'm sure I do.

8      Q.   In your own words, what is your job

9   description?

10      A.   I make assessments; I evaluate patient

11   complaints; I diagnose; I treat; I write

12   prescriptions; I refer.

13      Q.   And when you say you refer, you mean you

14   might refer a patient for treatment by a different

15   medical provider, correct?

16      A.   Yes.

17      Q.   And are there formal written procedures or

18   guidelines for when a PA should refer a patient to a

19   different medical provider or specialist?

20      A.   No.

21      Q.   Did you receive any formal training in

22   when -- I'm sorry, let me withdraw that.

23           Did you receive any formal training at

24   Cermak about when and in what circumstances you

Page 22

1   should refer patients or escalate their care to a
2   higher-level provider, such as a specialist?
3       A.   Well, pretty much.  Everyone understands
4   their level of scope of care.  If it is outside
5   their scope, we will usually refer.
6       Q.   And what is the scope of care that you
7   provide to patients at Cermak?
8       A.   I think I just told you what my job
9   description is.
10      Q.   Okay.  And is the answer the same?
11      A.   Yes.
12      Q.   And were you ever instructed in the
13  standard of care that you should provide to patients
14  at Cermak?
15      A.   Yes.
16      Q.   And what were you taught was the standard
17  of care that should govern your treatment of
18  patients at Cermak?
19      A.   Well, I mean this is a standard for anyone,
20  not just me, but anyone in medicine.
21           Whatever is the best care dictated by the
22  patients' diagnosis.  And there are a million
23  diagnoses, so, I mean, I would be here until next
24  year trying to tell you what standard of care is for

Page 23

1    everything.

2        Q.   Well, I'm asking about what the standard of

3    care is in your mind for the services that you

4    provide.

5            What is that standard of care?

6        A.   Well, the best standard, the best care that

7    I can provide; the care that I give to patients at

8    Cermak is no different than a patient who would be

9    outside.  It is the same care.

10       Q.   Ms. Davis, I'm going to change topics for a

11   bit.  Just I want to cover a couple things, so I

12   make sure I don't forget.

13           Before you presented, you know, showed up

14   in the video for your deposition today, did you have

15   a chance to meet with Counsel for -- your Counsel in

16   this matter, Mr. Preber?

17       A.   Yes.

18       Q.   Okay.  And did you have occasion to look

19   through any of the medical records, charts, x-rays,

20   MRIs or other documents about Mr. Limbacher's care?

21       A.   I looked at my notes.

22       Q.   Okay.  And where did you locate those

23   notes?  Or, let me rephrase the question.

24           How did you locate those notes?

Page 24

1      A.   They are electronic records.

2      Q.   And did you look on the Cermak's electronic

3  record system for every interaction between you and

4  Mr. Limbacher?

5      A.   Yes.

6      Q.   And did you find indications that you and

7  Mr. Limbacher had some number of interactions?

8      A.   Yes.

9      Q.   And how often did you meet with

10  Mr. Limbacher, from best you could tell, by

11  reviewing the medical records?

12      A.   Four or five times.

13      Q.   Okay.  And do you remember what years those

14  interactions took place?

15      A.   Probably four, maybe five years.

16      Q.   I think I should have all the records about

17  that, we're going to look through those in a bit,

18  together; give you a chance to describe your

19  recollection of those interactions.  But before we

20  get there I have some other general questions about

21  the medical records system at Cermak.

22           Cermak uses the Cerner Medical Records

23  System, correct?

24      A.   Yes.

1      Q.   And do you have access to that on your
2    computer that you're sitting at right now?
3      A.   Yes.
4      Q.   And I actually don't want to talk about
5    Mr. Limbacher, I just want to talk about how the
6    system worked, because I've never used it.
7           Let's suppose for a minute you have a
8    patient, Mr. Smith, and you're going to treat
9    Mr. Smith.  You have -- Mr. Smith has an appointment
10   with you.
11          Could you pull up, could you go to your
12   computer, put in Mr. Smith's name and perhaps a
13   number, or some other identifying information, and
14   pull up all the prior records of treatment that
15   Mr. Smith received at Cermak?
16     A.   Yes.
17     Q.   And when you did that, let's assume
18   Mr. Smith is a prisoner, if we could, together, that
19   he's incarcerated in the jail.
20          When you went to the server system, would
21   you also be able to see if Mr. Smith received
22   treatment at the John Stroger Hospital?
23     A.   Yes.  I'd like to clarify one thing.
24          There are no prisoners here.

Page 26

1     Q.   Well, they're only patients?

2     A.   No.  No.  There's a difference.

3     Q.   Yes?

4     A.   People in prison have been convicted and

5  are in prison.

6          People in jail have only been charged, and

7  are in jail.

8     Q.   That's my mistake.  I'm not a criminal

9  lawyer.

10         Patients at Cook County are pretrial

11 detainees, correct?

12    A.   Correct.

13    Q.   Right.  They've not been convicted of any

14 crime.

15    A.   Only charged.

16    Q.   Only charged.  And thank you for clarifying

17 that.

18         So, let's go back to our hypothetical.  I'm

19 talking about Mr. Smith, and I don't remember if you

20 answered this.

21         My question was, if you're going to have an

22 appointment with Mr. Smith, who is a pretrial

23 detainee, and Mr. Smith had previously been treated

24 at Cook County, when you go into the Cerner medical

                                              Page 27

1    records before Mr. Smith's visit, are you able to

2    see what treatment that he would have received at

3    Stroger Hospital?

4         A.   Yes.

5         Q.   And because maybe not everybody knows what

6    Stroger Hospital is, what is the John Stroger

7    Hospital?

8         A.   It's a medical center.  It's the County

9    facility that treats people who have no insurance;

10   underinsured or insurance, and also, it's attached

11   to a trauma center that treats -- well, go ahead.

12        Q.   No, I did not mean to interrupt you.

13   That's one of the problems with Zoom.  I wouldn't

14   have interrupted you if we were together.

15             Please go ahead, Ms. Davis.

16        A.   And so the trauma center will treat

17   traumas.

18        Q.   And Cook County, John Stroger Hospital is a

19   provider to which you may refer some of your

20   patients from Cermak Health Services, correct?

21        A.   Yes.

22        Q.   And Cook County, John Stroger Hospital has

23   a complete orthopedic department, correct?

24        A.   Yes.

Page 28

1      Q.   They provide a broad range of orthopedic

2   services, correct?

3      A.   Yes.

4      Q.   And among the services available for a

5   pretrial detainee would be shoulder surgeries,

6   correct?

7      A.   Yes.

8      Q.   And physicians at Cook County Stroger

9   Hospital also provide shoulder replacement

10  surgeries, correct?

11     A.   I'm sorry, repeat that question.

12     Q.   Sure.  Do the orthopedic surgeons at

13  Cook County Hospital provide shoulder replacements?

14     A.   Yes.

15     Q.   And they repair rotator cuffs, correct?

16     A.   Not everyone does everything.  Just because

17  you're an orthopedic surgeon, that doesn't mean you

18  can do all things.

19          Some people specialize in shoulder, some

20  people specialize in long bones.  It depends on

21  their specialty.  But all orthopedic docs don't do

22  all surgery.

23     Q.   That I understand.  I was trying to

24  understand what the department does; what surgeries

Page 29

1    are available from the orthopedic department,

2    including all of the surgeons that practice in that

3    department.

4            So one of the things that the orthopedic

5    department provides is shoulder replacement

6    surgeries, correct?

7        A.   Yes.

8        Q.   And another thing that it provides would

9    be the repair of torn rotator cuffs or labrums,

10   correct?

11       A.   Yes.

12       Q.   And you had mentioned long bones.  And you

13   would have the opportunity to have bones and joints

14   repaired by the orthopedic surgeons at Stroger,

15   correct?

16       A.   Yes.

17       Q.   Do you have an office, Ms. Davis, at

18   Cermak?

19       A.   Yes.

20       Q.   And do you keep any medical records

21   materials in your office?

22       A.   Yes.

23       Q.   And do you keep any reference materials on

24   orthopedic injuries and treatment in your office?

```
                                              Page 30
 1        A.    Yes.
 2        Q.    And what resources do you have in your
 3   office that address orthopedic injuries and
 4   treatment?
 5        A.    I have several books on orthopedics.  I
 6   have worked here for years, so I have several books;
 7   quite a few.
 8        Q.    Name the ones you remember.
 9        A.    Off the top of my head I can't recall the
10   names.  They're all orthopedic books.
11        Q.    Are they medical textbooks?
12        A.    Yes.
13        Q.    Can you remember any of the authors' names?
14        A.    No.
15        Q.    When is last time you consulted one of your
16   orthopedic texts in your office?
17        A.    Maybe a week or so ago.
18        Q.    Is it something that you will typically do
19   in the course of your practice?
20        A.    Go ahead.
21        Q.    I meant to ask you, do you regularly
22   consult with the textbooks in your office as part of
23   your medical practice?
24        A.    There is a program called Up-to-Date.
```

```
                                        Page 31

 1          If there is some information, and as you

 2   well know, medicine has a wide breadth of

 3   information; information, treatments that change

 4   daily.  And we, Cook County, Cermak Health Services,

 5   have a program called Up-to-Date.

 6          So if I have a question, I usually will

 7   refer to Up-to-Date, because Up-to-Date is the most

 8   current.  Books are outdated by the time they're

 9   printed.

10      Q.   When is the last time you consulted the

11   Up-to-Date program as part of your patient care?

12      A.   Oh, a couple of days ago.

13      Q.   And in the average week, how often do you

14   consult the Up-to-Date Program, as best you can

15   recollect?

16      A.   Five or ten times.

17      Q.   When is the last time you consulted the

18   Up-to-Date Program section that concerns orthopedic

19   injuries?

20      A.   I can't recall off the top of my head.

21      Q.   There's a section in Up-to-Date that deals

22   with the diagnosis and treatment of shoulder

23   injuries, correct?

24      A.   It's a pretty big section.  That's a pretty
```

Page 32

1    wide category.

2         Q.   Okay.  But -- I bet it is.  I've had a few

3    shoulder surgeries myself, so I actually know

4    something about these.

5              But if you wanted to get medical

6    information about the treatment of shoulder

7    injuries, including possibly surgery for those, that

8    information can be found on Up-to-Date, correct?

9         A.   Yes.

10        Q.   Do you have access, as a physician

11   assistant, to the same information on Up-to-Date

12   that an MD or DO would?

13        A.   Yes.

14        Q.   Okay.  So there's only one system at the --

15   let me restate it another way.

16             So far as you know, all medical providers

17   at Cermak have access to the same Up-to-Date

18   information?

19        A.   Yes.

20        Q.   Does Cermak have written policies and

21   procedures governing the medical care and treatment

22   to which pretrial detainees are entitled?

23        A.   It has nothing to do with them being

24   pretrial detainees.

Page 33

1          Like I said before, they have the same

2     standard of care as anyone else.

3          Q.   I may not have asked that question very

4     well, let me try again, please.

5               And I'll tell you I'm just trying to

6     understand.  I'm trying to understand if there are

7     documents, or there's a document either in hard copy

8     or electronic form which describes the duties of

9     Cermak to provide, and its provider, to provide care

10    to your patient population.

11         A.   Well, I'm sure in their mission and vision

12    statement, you will find that.

13         Q.   Okay.  So there's a mission and vision

14    statement.

15              Is that available online, on a website?

16         A.   Probably.

17         Q.   Okay.  In addition to the vision and

18    mission statement, can you think of any other

19    writing which sets out the policies and procedures

20    that people at Cermak are supposed to follow when

21    they provide patient care?

22         A.   I think the mission and vision statement

23    says it all.

24         Q.   Okay.  Are there any written procedures or

Page 34

1    guidelines that govern how timely a patient should

2    be treated at Cermak?

3        A.    No.

4        Q.    Are there written guidelines that govern

5    the quality of care that patients are supposed to

6    receive from providers at Cermak?

7        A.    As medical providers, we are trained to

8    provide the best care.  And so I don't -- I mean,

9    this is, like, common sense.  It's part of the job.

10           The diagnosis will dictate how urgent

11   something is.  If you're having a heart attack, I'm

12   certainly not going to wait three weeks to send you

13   to see a cardiologist, right?

14           So the circumstances dictate how expedient

15   it is.

16       Q.    Are there any written guidelines which

17   explain how and when a prisoner -- I'm sorry, a

18   patient should be referred to see a specialist?

19       A.    No.

20       Q.    Are there specific written guidelines and

21   rules that identify when a patient should be sent to

22   see an orthopedic specialist?

23       A.    As I said before, if it's outside of the

24   scope of whatever my practice, their practice.  The

Page 35

1    diagnosis dictates the urgency.

2        Q.    In terms of diagnosing shoulder injuries,

3    what is the scope of your practice?

4            MR. PREBER:  Objection to ambiguous.  It's

5    a little bit vague.

6            But you may answer, if you understand,

7    Ms. Davis.

8            THE WITNESS:  Well, seeing that I don't --

9    I mean, here we go again.

10           It depends on the circumstances.  If

11   somebody walks in the room and I think that their

12   shoulder is somewhere it shouldn't be, I mean I can

13   pretty much tell maybe it's dislocated.  So, it

14   depends.

15   BY MR. HACK:

16       Q.    If you're unclear about a diagnosis or

17   course of treatment for a shoulder injury, do you

18   have other people that you can contact or consult

19   with at Cermak?

20       A.    Yes.

21       Q.    And who are the people available to you?

22   I'm sorry, I'm going to restate that.

23           Who were the people available to you in

24   2018 to 2021 if you had a question about an

Page 36

1    orthopedic injury with which a patient presented?

2        A.    Well, I could have called Urgent Care, I

3    could have called Stroger.

4        Q.    Is there an orthopedic department at

5    Cermak?

6        A.    No.

7        Q.    Do you know a woman by the name of

8    Misha Patel?

9        A.    No.  There's someone named Monisha Patel.

10       Q.    Thank you.  And who is Ms. Patel?

11       A.    She is the orthopedic PA who worked at

12   Cermak.

13       Q.    And is she someone to whom you have gone to

14   either -- gone for consultation on the diagnosis and

15   treatment of orthopedic injuries?

16       A.    Yes.

17       Q.    And when the doctor -- so once a week a

18   doctor comes over from Cook County and staffs the

19   orthopedic area at Cermak; is that correct?

20       A.    Yes.

21       Q.    And was that true back in 2018 to say 2020?

22       A.    Yes.

23       Q.    And did that ever change?  I mean, the

24   pandemic was going on during part of that.

Page 37

1      Was that care always available throughout
2  the pandemic?
3      A.   Well, if it wasn't available here, they
4  would be sent out to Stroger.
5      Q.   But as best you remember, the doctor came
6  in once a week during the pandemic?
7      A.   Best as I can remember.
8      Q.   And you worked, you went to work every day,
9  I would predict, during the pandemic?
10     A.   Yes.
11     Q.   Again, if you had a question about the care
12 of a patient who presented with an orthopedic
13 injury, you could direct that patient to the doctor
14 who was coming in once a week to Cermak, correct?
15     A.   I could, if necessary, yes.
16     Q.   And is that something that you would do and
17 that you did do in the course of your time treating
18 patients at Cermak?
19     A.   Yes.
20     Q.   And how often do you refer your patients to
21 the orthopedic group as best you can recollect?
22      Is it something you do every week?
23     A.   It depends on which division I'm working
24 in.

Page 38

1    Q.   Okay.  In the timeframe 2018 to 2021, what
2    division did you work in, Ms. Davis?
3    A.   I certainly could not recall that.  I would
4    have to go back and look at records, because we are
5    assigned different divisions.  Some people may be on
6    vacation, or someone calls off, but I think
7    primarily in 2018 I covered Division 10.
8    Q.   And who are -- Division 10 is a building,
9    correct?
10   A.   Yes.
11   Q.   Okay.  But during that time that you served
12   Division 10, you continued to work at the main
13   clinic, or the main health service office?
14   A.   There's no such thing as the main health
15   service office.
16   Q.   Does each division have a separate office;
17   medical office or area?
18   A.   Yes.
19   Q.   Okay.  So you've moved around between
20   locations periodically?
21   A.   Yes.
22   Q.   And Dr. Kapotas, when he was there, was he
23   assigned to Division 10 in the 2018 to 2020 period?
24        MR. PREBER:  Objection.  Calls for

Page 39

1   speculation.

2          THE WITNESS:  No.  Dr. Kapotas didn't go to

3   any division.  There's a clinic, specialty clinic at

4   Cermak, and he would come there, and the patients

5   would come to him.

6   BY MR. HACK:

7      Q.   Got it.  And what services are available at

8   the specialty clinic in addition to orthopedics?

9      A.   I'm sorry, rephrase that question.

10     Q.   Sure.  You mentioned that there was a

11  specialty clinic at Cermak, and my question to you

12  was in addition to orthopedics, what other services

13  are available at that specialty clinic?

14     A.   There's dialysis, there's cardiology,

15  dermatology, there is urology; nephrology;

16  optometry.  Oh, let's see.  Radiology, CT scans.

17          That's all I can remember.

18     Q.   Well, it's a big operation.  I was just

19  trying to get a sense of the scale of it.  So

20  clearly, it's a very significant operation?

21     A.   Yes.

22     Q.   And there are many doctors and PAs and

23  nurses that work in that specialty clinic, correct?

24     A.   Yes.

Page 40

1      Q.   Did you receive any training, as part of

2  your PA degree, in reading x-rays?

3      A.   Yes.

4      Q.   And do you believe that you are qualified,

5  medically qualified to review and make a judgment

6  about what is shown on an x-ray film of a shoulder?

7      A.   Most things, yes.

8           THE COURT REPORTER:  I'm sorry, what was

9  the first word you said?

10          MR. HACK:  She said, I believe:  Most

11 things.

12          THE COURT REPORTER:  Thank you.

13 BY MR. HACK:

14     Q.   Ms. Davis, did I get that right?

15     A.   That's correct.

16     Q.   As part of your PA degree, were you trained

17 in how to read MRI images?

18     A.   We were given an overview.  Because I

19 probably will not be reading MRIs; I would have

20 gotten the radiology report.

21     Q.   What would radiologists do?

22     A.   Oh, my goodness.

23          MR. PREBER:  Objection for speculation

24 again.

```
                                          Page 41

1              THE WITNESS:  I mean, there are all kind of

2     radiologists.  There are people who only do

3     mammograms; people who only read the bones.

4              It depends on what kind of radiologist

5     you're talking about.  Here we go.  Wide scope.

6     BY MR. HACK:

7        Q.   What type of radiologist reads MRIs taken

8     of orthopedic injuries?

9        A.   You might want to ask them.  I mean, I

10    don't know.

11       Q.   Okay.  There are radiologists at Stroger

12    Hospital available to read the MRIs of Cermak

13    patients, correct?

14       A.   Yes.

15       Q.   And do you refer -- is there a particular

16    provider or group of providers that you choose to

17    read an MRI for your patients?

18       A.   No.

19       Q.   A couple of background questions real

20    quick.

21              Do you have a license as a physician

22    assistant?

23       A.   Is that a question, or a statement?

24       Q.   Yes.  Do you?
```

Page 42

```
 1        A.   Yes.
 2        Q.   And how often do you have to renew your
 3   license?
 4        A.   Now -- it used to be every six years, now
 5   it's every ten.
 6        Q.   As a medical provider with the PA, are you
 7   required to take continuing medical education?
 8        A.   Always.
 9        Q.   And what are the requirements that you have
10   to fulfill as a PA?
11        A.   100 CMEs every two years.
12        Q.   And have you always completed your CME
13   requirements on time and fully?
14        A.   Yes.
15        Q.   And have you maintained and kept your
16   license intact since you graduated from Cook County
17   with your PA degree?
18        A.   Yes.  Otherwise, I could not work.
19        Q.   Right.  And have you ever had your license
20   suspended for any reason?
21        A.   No.
22        Q.   Have you ever been investigated by any PA
23   body for any reason?
24        A.   No.
```

Page 43

1    Q.   Okay.  Have you ever been a defendant in an
2    action involving claims of medical malpractice?
3    A.   No.
4    Q.   Have you ever been a defendant before in a
5    case in which a patient claims that he or she was
6    denied medical care in violation of their
7    constitutional rights?
8    A.   No, not that I can recall.
9    Q.   In what circumstances do you send a patient
10   to receive an x-ray?
11   A.   A suspected --
12   MR. PREBER:  Objection for ambiguous, and
13   calls for speculation.
14   THE WITNESS:  A suspected broken bone, or
15   to follow up on how they're healing; various
16   reasons.
17   BY MR. HACK:
18   Q.   What do x-rays let you see?
19   A.   Bones, primarily.
20   Q.   In what circumstances do you refer a
21   patient, an orthopedic patient to receive an MRI?
22   A.   If I cannot determine what I need to know
23   with plain films or a CAT scan.
24   Q.   A plain film is another name for an x-ray,

Page 44

1   right?

2        A.    Yes.

3        Q.    Okay.   You mentioned a CAT scan, right?

4        A.    Yes.

5        Q.    And I hate to ask this, but again, I'm not

6   a medical malpractice lawyer.

7             Is that the same thing as a CT scan, or is

8   it something different?

9        A.    It's the same.

10       Q.    Oh, okay.   In what circumstances do you

11  direct patients to receive a CT scan?

12       A.    If I don't find out the answer with the

13  plain film.

14       Q.    And in what circumstances do you send a

15  patient for an ultrasound, an orthopedic patient for

16  an ultrasound?

17       A.    If I'm looking for something in a hollow

18  organ, or say it's a complaint of testicular pain, I

19  would do an ultrasound, not an x-ray.

20       Q.    And in terms of diagnosing orthopedic

21  injuries, let me withdraw that.   I want to think

22  about the question for a moment.

23             When treating orthopedic injuries, what can

24  you see on an MRI that you can't see on an x-ray?

Page 45

1     A.   It's easier to see tissues instead of

2   bones.   Yes, it's easier to see tissue.

3     Q.   And conversely it's easier to see bones on

4   an x-ray than it is to see them with an MRI; is that

5   accurate, too?

6     A.   That depends.

7     Q.   Okay.   How do you make the judgment about

8   when I'm going to send a patient to an x-ray, or

9   when I'm going to send them to get an MRI, if they

10  present with an orthopedic injury?

11    A.   It depends on what you're looking for.

12         I mean, if someone has an injury of their

13  knee, and I'm not quite sure if it's the structures

14  that are supporting the knee versus the bone, I

15  might do an MRI.

16    Q.   And if you have questions about -- well,

17  first off, what are the tissues that surround the

18  shoulder?

19    A.   Oh, you're kidding?   Are we going to have

20  class here, or what?

21         MR. PREBER:   Objection to relevancy.

22         THE WITNESS:   There are tendons; there are

23  muscles; there are nerves that all surround the

24  shoulder.

Page 46

1   BY MR. HACK:

2       Q.   And if you were concerned whether a patient

3   had an injury to the tendons, the muscles or the

4   nerves that surround the shoulder, you would refer

5   them for an MRI, correct?

6            MR. PREBER:  Objection.  Misstates the

7   testimony.

8            THE WITNESS:  Not necessarily, no.  It

9   depends.  I mean, every patient is different.

10           If I just need to determine kind of

11  alignment or anatomical parts, sometimes you can do

12  it with an x-ray.

13  BY MR. HACK:

14      Q.   Is it your normal practice to first get an

15  x-ray, see what that shows, and then decide whether

16  the patient needs an MRI if they present --

17      A.   Always.

18      Q.   Okay.  And that would be true if they

19  presented with an orthopedic injury?

20      A.   Yes.

21      Q.   And would that also be true if they

22  presented with a potential injury to the shoulder?

23      A.   Yes.

24           MR. HACK:  Okay.  I always try to take a

Page 47

1   short break on the hour, it's a good thing for

2   everybody, so we're going to take a five-minute

3   break, and we'll reconvene in five minutes.

4           And I have 11:32.

5           THE WITNESS:  Okay.

6           MR. HACK:  Thank you.

7           (After a short recess, the deposition

8            resumed as follows:)

9   BY MR. HACK:

10      Q.   And I just want to remind myself.

11          You have patient care responsibilities at

12  1:00 p.m.?

13      A.   Yes.

14      Q.   Thank you.  Ms. Davis, are you ready to go?

15      A.   Yes.

16      Q.   Okay.  When a patient presents with a

17  shoulder injury, you would agree, wouldn't you, that

18  the standard of care requires you to decide and

19  determine whether that patient has an injury to the

20  bones in the shoulder, correct?

21      A.   Not necessarily.  I took a course in

22  trauma, so you always consider the mechanism of

23  injury.

24          So, I mean for sure, if somebody kind of

Page 48

1   bumped their shoulder walking through a door, do I

2   need an x-ray?  No.  There's just very little chance

3   that they've broken a bone.

4        Q.   Okay.  If a person has a severe trauma, is

5   one of the questions you would ask yourself in

6   treating a patient who presents with severe trauma

7   to the shoulder, whether they suffered a bone

8   injury?

9        A.   Yes.

10       Q.   And if a patient presented with severe

11  trauma, another thing you would think about is

12  whether they received any injuries to the soft

13  tissues in the shoulder, correct?  The muscles and

14  tendons?

15       A.   Maybe.

16       Q.   Okay.  And if a patient presents over and

17  over again with recurring pain in his shoulder, you

18  would -- the standard of care requires you to try to

19  get to the bottom of what causes that problem,

20  right?

21            MR. PREBER:  Objection to leading.

22            THE WITNESS:  Like I said, it all depends.

23  It depends on the history.

24

Page 49

1    BY MR. HACK:

2        Q.   So if a person presents and they've had a

3    lot of shoulder pain, and they present it over and

4    over again, the standard of care does not require

5    you to try to figure out why the patient has not --

6    the patient's condition has not cured?

7              MR. PREBER:  Objection.  Calls for

8    speculation.

9              THE WITNESS:  So, if a patient came in and

10   told me in his history that he had recurrent

11   dislocations, I already know what the problem is.

12   They will probably have some pain.

13             So, it depends on the history.

14   BY MR. HACK:

15       Q.   If a patient presents with recurring

16   shoulder dislocations, you would agree that that's a

17   condition that's likely to cause significant pain,

18   correct?

19             MR. PREBER:  Objection to leading.

20   Objection.  Calls for speculation.

21             THE WITNESS:  No.  I mean, there are plenty

22   of people who can reduce their own shoulder, and

23   never need to see a physician.

24

Page 50

1    BY MR. HACK:

2         Q.   If a person has recurring shoulder

3    dislocations, is one thing you'd be concerned about

4    is the possibility that those dislocations can cause

5    long-term injury to the shoulder?

6              MR. PREBER:   Objection to leading.

7              THE WITNESS:   There again, it depends on

8    the history.

9    BY MR. HACK:

10        Q.   So you might not -- a person might show up,

11   they've had a lot of shoulder pain, they've had a

12   lot of dislocations, and you might not consider

13   whether there's a risk of long-term injury from

14   that?

15        A.   Well, I'm sure I would consider that, but

16   there again, it depends on who the patient is, what

17   the injury was, and their status.   It would all

18   depend.

19        Q.   And you would agree, though, that in your

20   mind, what you're trying to get to is the clearest

21   picture of what the patient's condition is and the

22   best treatment that you can provide?

23        A.   That would be for any patient.

24             MR. HACK:   Okay.   I have one quick

Page 51

1    question, ma'am.

2            I had some problems with technology, this

3    will just take a minute, Ms. Davis.  I recognize

4    what time it is, I'll be back to you as soon as I

5    can.  It will just be a moment.

6            So if we can go off the record, please.

7            (There was a discussion held

8             off the record.)

9    BY MR. HACK:

10       Q.   Here we go.  Ms. Davis, we're going to talk

11   about your interactions with Mr. Limbacher for a bit

12   here, and I'm going to do my best to try to get

13   through most of this.

14           Do you recognize -- do you see an exhibit

15   in front of you?

16       A.   No.

17           MR. HACK:  Alex, can you screen share with

18   her?  Isn't that the plan?

19           MR. PREBER:  Yes.  Give me one second.  Let

20   me screen share it.  All right.

21           Okay.  Ms. Davis, can you see my screen

22   okay?

23           THE WITNESS:  Yes.

24           MR. PREBER:  Okay.  It might take me off if

Page 52

1   Mr. Hack is talking, but I don't know if there's a

2   way to lock it or not, but okay.

3          Do you need me to scroll down or anything

4   like that, Mr. Hack?

5          MR. HACK:  Right there.  This is going to

6   take longer than I hope, but you're going to be -- I

7   don't mean to give you orders, Alex, but I'm going

8   to have to ask you to move stuff around.

9          MR. PREBER:  You're all good.  Don't worry

10  about it.

11  BY MR. HACK:

12      Q.   Ms. Davis, would you take a look at

13  Exhibit 1, which is on your screen, and tell me what

14  it is?

15          (The document referred to was deemed

16           marked as Exhibit No. 1 for

17           identification.)

18          THE WITNESS:  It looks like an encounter

19  primary care notes from November 13th, 2018.

20  BY MR. HACK:

21      Q.   And it's a note that you would have

22  written, correct?

23      A.   Yes.

24      Q.   And do you record and create a note after

Page 53

1    your patient interactions as part of your normal job

2    responsibilities?

3         A.   During it, actually.

4         Q.   Okay.  So during a patient encounter you

5    will be preparing a note?

6         A.   Yes.

7         Q.   And then you will save that note into the

8    Cerner Medical Record System?

9         A.   Yes.

10        Q.   And is there any reason to think you would

11   not have followed your normal practice in preparing

12   this note?

13        A.   No.

14        Q.   And if we look at that page, Mr. Preber has

15   it in front of you, there's a service date, and

16   that's the date that service is provided, correct?

17        A.   Yes.

18        Q.   And is the time the time the appointment

19   was scheduled, or the time it actually began?

20        A.   The time it actually began.

21        Q.   Okay.  And so here we have:  Perform

22   information, and your name appears, correct?

23        A.   Yes.

24        Q.   And there's a time there.

Page 54

1           What does that time indicate, ma'am?

2      A.    The time that the patient was seen.

3      Q.    Oh, okay.  So it says:  Perform

4  information, right?

5      A.    Right.

6      Q.    Do you see that on the left side?

7      A.    Uh-huh.

8      Q.    And that's the minute the appointment

9  starts?

10     A.    No.  The 11:30 is when it started.

11     Q.    Okay.

12     A.    I spent, it appears, 16 minutes typing the

13  information, and then I actually saved it until it

14  was finally formally signed that evening.

15           THE COURT REPORTER:  I'm sorry, 16 minutes

16  or 60?

17           THE WITNESS:  So, it started at 11:30, and

18  I must have typed until 11:46, and then I officially

19  signed it at 6:26.

20           MR. HACK:  I'm trying to solve this tech

21  problem, give me just a half a second.

22           Alex, can you go to the next page?

23           Ms. Davis, I'm just going to have you walk

24  me through.

Page 55

1    BY MR. HACK:

2        Q.    What do you list in the subjective part of

3    a medical record when you record one?

4        A.    Pretty much what the patient has mentioned

5    during interviews and/or, as you can see -- once a

6    radiology note has been signed, you can see where

7    there's -- actually, that is a true diagnosis.

8            So this would solve the problems that we

9    had listed for Mr. Limbacher.

10       Q.    Okay.  Thank you.  And is that information

11   that you took from him, or that you took off the

12   computer, or something in the middle?

13       A.    It could be both.

14       Q.    Okay.  Tell me what's supposed to go in the

15   history of present illness section of the medical

16   record?

17       A.    Pretty much exactly what it says.  It tells

18   the story of what the present illness is.

19       Q.    Okay.  And when you record this section or

20   other sections of the medical record, you do your

21   best to be careful and accurate, correct?

22       A.    Yes.

23       Q.    This interaction occurred on November the

24   13th, 2018?

Page 56

1      A.   Yes.

2      Q.   And at the interaction what did

3  Mr. Limbacher say to you about his skeletal

4  problems?

5      A.   Well, probably some of the same, because I

6  documented that he had multiple skeletal problems,

7  and a history of his left shoulder dislocation in

8  the past.  No recurrence, so...

9           MR. HACK:  Alex -- sorry, ma'am, he's got

10  the screen.  Normally I have the screen.  I've got

11  to get used to the new format.

12          Go ahead, please.  I interrupted you.

13          THE WITNESS:  And I just mentioned that he

14  had been seen by the specialist of physical medicine

15  doctor, Dr. McCarthy; her recommendations, and what

16  her plan was; that he had missed a follow-up

17  appointment, and that Mr. Limbacher had requested

18  that he have an MRI of his shoulder to be added to

19  the request that he already had.

20  BY MR. HACK:

21      Q.   Tell me, I don't know, physical medicine is

22  not a term that I know.

23          What is physical medicine?

24      A.   That's the physiatrist.  It's a person who

Page 57

1    specializes in rehab medicine, so that if you have

2    some disorder, some problems with joints, they teach

3    you how to get your function back to whatever the

4    best is.

5        Q.   What did you say to Mr. Limbacher about

6    your diagnosis of his condition on November

7    the 13th, 2018?

8        A.   If it's not in this note, I couldn't tell

9    you what I said.  If it's not there, I don't

10   remember anything specifically about this date.

11       Q.   Okay.

12       A.   Let's see.  Oh.  Not unless there's

13   something down in the plan.

14           THE COURT REPORTER:  I'm sorry, what was

15   the first word you said?

16           MR. HACK:  Not unless there is something

17   further down in the plan.

18   BY MR. HACK:

19       Q.   Ms. Davis, did I get that right?

20       A.   That's correct.

21       Q.   There's no plan on this document --

22       A.   Okay.

23       Q.   -- for whatever reason.  We'll cover

24   another one in a minute, that does have a plan.

Page 58

1          So I'm right that aside from what's written
2     here on this document, you don't have a present
3     independent recollection of what Mr. Limbacher said
4     to you or what you said to him, correct?
5          A.   No.
6          Q.   Okay.  In the list of problems, right, all
7     problems, please read, tell me what the third
8     problem from the bottom is, which begins:  DJD,
9     degenerative joint disease.
10          Could you explain what that is?
11          A.   It's a fancy, nice word for wear and tear
12     arthritis.
13          Q.   And --
14          A.   Aging.
15          Q.   And what does lumbosacral --
16          A.   Lumbosacral?
17          Q.   Thank you.
18          A.   So, there's your cervical spine, your
19     thoracic spine, the lumbar spine and the sacral
20     spine.
21          So, it's kind of the middle of your back.
22          Q.   Do any of the problems listed here refer to
23     his shoulder specifically?
24          A.   No.

Page 59

1     Q.   At the patient interaction, by the way, I'd
2  like to call it the right thing.
3          Do you call it an interaction, an
4  appointment?
5          What should I use to describe when you meet
6  with a patient?
7     A.   An appointment.
8     Q.   At your appointment with Mr. Limbacher, did
9  you review any x-rays?
10    A.   If it's not in this note, I mean usually on
11 the bottom part of the note itself it asks about
12 x-rays and other kind of reports; diagnostics, but I
13 don't see one here.
14    Q.   Okay.  If you look at this report, does it
15 appear to you that some pages of it are missing?
16    A.   Yes.
17         MR. HACK:  Okay.  I can remedy that.
18 Let's -- I'm going to change exhibits, Alex.
19         The delay here, I have to do it a certain
20 way since we're on video.  Normally I'd hand you the
21 thing, but that's not how it's working.
22         Here we go.  This is Exhibit 2, Ms. Davis.
23
24

Page 60

```
 1              (The document referred to was deemed
 2               marked as Exhibit No. 2 for
 3               identification.)
 4          MR. HACK:  It is a longer version of the
 5     note we saw before.
 6              Alex, could you show Ms. Davis a few pages
 7     of this so we get to the -- which is the plan, and
 8     the plan occurs on the fourth page.  I'd like her to
 9     at least see this thing.  Actually, five pages.  If
10     you could just show her five pages, so she'll see
11     her electronic signature.
12              Can you do that?
13       A.   Yes.
14     BY MR. HACK:
15       Q.   Oh, I guess I've got control of this, now.
16              Ms. Davis, do you see me moving the
17     exhibit?
18       A.   Yes.
19       Q.   Oh, okay, marvelous.  Thank you.  This may
20     be a little easier than I anticipated.
21              So, this is another version.  There are a
22     bunch of documents that were produced in the case.
23     They were produced during the pandemic.  I assume
24     everybody tried their best, but things are not
```

Page 61

1    exactly the way I would have thought they were.

2         I've done the best I can to make them

3    available, so that we can make sense of them.  So,

4    I'd like to go back.

5         This is the same patient appointment we

6    talked about before, right?

7    A.   Yes.

8    Q.   And it's just a longer version of the

9    medical record we looked at before.

10        Is that how it appears to you?

11   A.   Yes.

12   Q.   Okay.  Let's go to -- back, now, to the

13   history of the present illness.

14        Did Mr. Limbacher explain to you why he

15   wanted an MRI of his left shoulder?

16   A.   Well, from what I understand or remember

17   from the other notes, it was because he -- oh,

18   actually, it says it right there.

19   Q.   Yeah.  It's the same note.

20   A.   He's requesting an MRI of his left shoulder

21   to be done, which is cervical and LS spine to

22   decrease multiple visits to John Stroger Hospital.

23        But I mean, I don't know if that's a good

24   reason to do an MRI.

Page 62

1      Q.   Do you remember anything about what

2    Mr. Limbacher said to you about wanting an MRI?

3      A.   No.  Just that he wanted one.

4      Q.   And do you remember anything that you said

5    to him about getting an MRI?

6      A.   No.

7      Q.   And as you sit here today, do you recall

8    why you did not schedule an MRI for Mr. Limbacher

9    after his appointment on the 13th of November?

10     A.   I turned it down in this very note.

11          I had a question mark about asking the

12   specialist if they wanted an MRI.

13     Q.   And where would I find that reference?

14     A.   If you scroll down, you'll see it.

15     Q.   It's under the plan section, correct?

16     A.   No.  So, scroll down.  Oh, there it is:

17   Impression of plan.

18     Q.   Okay.

19     A.   There it is.

20     Q.   And the impression of plan section, in

21   simple terms, what do you put in there?

22     A.   What my diagnosis is, and what is the plan

23   to do.

24     Q.   And what was your diagnosis as shown on

Page 63

1    Exhibit 2?

2         A.   Musculoskeletal pain.

3         Q.   Okay.  And what was the plan that you

4    determined should be followed for Mr. Limbacher's

5    continued care?

6         A.   I was going to send a note to Dr. McCarthy,

7    the physical rehab doc, to see if I should order an

8    MRI, and to do an x-ray of his left shoulder.

9         Q.   What did you say to Mr. Limbacher about the

10   plan for his treatment?

11        A.   Just what I wrote there.

12        Q.   Okay.  In other words, you don't separately

13   remember anything about what you said to him other

14   than what you see in this document; is that right?

15        A.   Yes.

16        Q.   Okay.  And what did Mr. Limbacher say to

17   you about the plan that was set out here in this

18   exhibit?

19        A.   I have no idea.

20        Q.   Okay.

21        A.   No idea.

22        Q.   You know, I meant to -- when you are

23   visiting with a patient at Cermak, in Division 10,

24   is there a video camera in the room where you meet

Page 64

```
1   with patients?
2        A.   No.
3        Q.   Is there any recording device of any kind
4   in the room where you meet with patients?
5        A.   No.
6        Q.   Okay.  Did you write a memorandum to
7   Dr. McCarthy after you had your appointment with
8   Mr. Limbacher on the 18th of -- I'm sorry, the 13th
9   of November, in 2018?
10       A.   Yes.
11       Q.   I'd like to move forward, Ms. Davis.  I'm
12  going to move down in the document a little bit,
13  okay?  And there we go.
14            You see I'm on Page 2847.  You'll see that
15  on the bottom of the page, right?
16       A.   Yes.  2847?  Okay.
17       Q.   Yeah.  Double zero, 2847.
18            You see that, right?
19       A.   Yes.
20       Q.   Okay.  And that's your electronic signature
21  on the left, right?
22       A.   Yes.
23       Q.   Okay.  And tell me how the electronic
24  signature is affixed when you complete a medical
```

Page 65

1   record?

2        A.   I sign it, electronically.

3        Q.   Okay.  And there's a button you have to

4   push?

5        A.   Yes.

6        Q.   And after you push the button it's saved in

7   the system?

8        A.   Forever.

9        Q.   Right.  And are you able, once you hit the

10  signature button, are you able to go back and edit

11  the notes, or are they done?

12       A.   No, they're done.

13       Q.   Okay.

14       A.   You can type in an addendum, but you cannot

15  change the record.

16       Q.   Okay.  Thank you.  And if we look just

17  above this, I should have done this in order, but I

18  didn't, these were the follow-up appointments that

19  had been arranged for Mr. Limbacher by -- at the

20  conclusion of his meeting, or your appointment,

21  correct?

22       A.   Yes.

23       Q.   Okay.  Let's look now, if we could, at the

24  next page of the document.  And we go:  Outpatient

Page 66

1    Medical CHS.

2              That is Outpatient Medical Cermak Health

3    Systems, right?

4         A.   Service.

5         Q.   I'm sorry, yes.

6         A.   Cermak Health Services.

7         Q.   Cermak Health Services.

8              And what are we looking at beginning at

9    Page 6, which is the page that you see in front of

10   you, ma'am, right now?

11        A.   That's another note dated December 12th,

12   2018.

13        Q.   And did you have a patient interaction with

14   Mr. Limbacher on that day?

15        A.   Yes.

16        Q.   And are these the notes, this page and

17   the pages that follow, of your interaction with

18   Mr. Limbacher on that day?

19        A.   Yes.

20        Q.   Okay.  Let's go down, if we could, to the

21   history of the present illness section, and I will

22   scroll down there.

23             Do you have that section of the document in

24   front of you?

Page 67

1      A.   Yes.

2      Q.   Okay.  What did Mr. Limbacher say to you

3  that day about his musculoskeletal complaints?

4      A.   Do you want me to read this note?

5      Q.   Well, I'm trying to find out -- the problem

6  I have, ma'am, is I recognize it was a bit of time

7  ago.  I've got to first ask you do you remember

8  anything, and then I can ask you what does the thing

9  say.

10        We can both read it, I'm trying to first

11  find out --

12      A.   Well --

13      Q.   -- if you have a separate memory.

14      A.   Oh.  I don't have any separate memory.

15      Q.   Okay.  You don't have a separate memory of

16  your interaction with Mr. Limbacher that day,

17  correct?

18      A.   Other than what I wrote here.

19      Q.   You don't remember what he said to you,

20  correct?

21      A.   No.

22      Q.   And do you remember what you said to him?

23      A.   The significant stuff I usually just type

24  in my notes.

Page 68

1    Q.   Okay.  Based on your notes, what did you

2    say to Mr. Limbacher that day?

3    A.   I'm sure I greeted him and asked how

4    things are going.  And we discussed that he had seen

5    Dr. McCarthy.

6         And at some point he must have -- she must

7    have written in a note, she typed that he disputed

8    what he said to her, and there's a neurosurgery

9    note.

10   Q.   I have that, by the way.  Just so you know,

11   I have it, and I can show you that in a moment, if

12   you would -- so...

13   A.   But, I mean, I have no idea what other

14   conversations contained.  I can only say what was in

15   their notes, because I wasn't there.

16        And as you can see, Mr. Limbacher asked for

17   different medication.  I'm sorry, what -- this is

18   the 18th -- December 12th of 2018?

19   Q.   2018, yes, ma'am.

20   A.   Right.  Okay.  And so this question about

21   he said that there's something wrong, I'm not quite

22   sure what that meant.  As you see, I put it in

23   quotes.  And he wanted to see neurosurgery, but

24   according to, from what I recall, neurosurgery,

Page 69

1    there was nothing -- neurosurgery will do surgery.

2            If you -- one is not interested in surgery

3    on their spine, they're not going to see

4    neurosurgery.

5            And from what I understood, Mr. Limbacher

6    didn't want surgery, anyway.

7        Q.   Okay.  And when we say he didn't want

8    surgery, we're talking there about surgery on his

9    spine, correct?

10       A.   Yes.

11       Q.   Okay.  Did Mr. Limbacher ever tell you he

12   didn't want surgery on his shoulder?

13       A.   I don't recall any conversations about

14   surgery on his shoulder.

15       Q.   Okay.  Do you remember any conversations

16   with Mr. Limbacher on this date about his shoulder

17   pain?

18       A.   If he did, I don't mention it.

19            Here we seem to have just talked about his

20   medication, and wanting to see the neurosurgeon, but

21   nothing about his shoulder.

22       Q.   Did Mr. Limbacher request a shoulder MRI in

23   your patient interaction on December the 12th, 2018?

24            That is an MRI of his left shoulder, a


Page 70

1    conversation about --

2        A.   Well, in the previous note he had asked me,

3    and I had sent the memo to Dr. McCarthy, but I don't

4    recall, or I did not write anything about another

5    MRI; just discussed it in the previous note, so...

6        Q.   Between the time of your previous note

7    and December the 12th, 2018, did you speak with

8    Dr. McCarthy about Mr. Limbacher's condition?

9        A.   I sent her a memo asking if she wanted me

10   to order an MRI.

11            I do not recall speaking with her.  I sent

12   a memo.

13       Q.   And did she call you back and ask you any

14   questions after you sent her your memo about the

15   shoulder MRI?

16       A.   Not that I recall.

17       Q.   Okay.  So is it correct that as best you

18   remember, you and Dr. McCarthy did not speak about

19   your memorandum inquiring about a left shoulder MRI?

20       A.   No.  I believe she would have responded in

21   the correspondence with me.

22       Q.   Okay.  By e-mail, or through the medical

23   record system?

24       A.   Through the medical record system.

Page 71

1      Q.    And the medical record system allows you to

2    send a message to another provider, correct?

3      A.    Yes.

4      Q.    And that provider can also respond to you

5    on the medical record system, correct?

6      A.    Yes.  Or choose not to.

7      Q.    Or choose not to.

8            And in either case, if you're using the

9    medical record system to engage in correspondence

10   with another provider, the system will retain that

11   correspondence, correct?

12     A.    Yes.

13     Q.    Okay.  Did you review any x-rays with

14   Mr. Limbacher at the December 12th, 2018 meeting?

15     A.    At some point, I don't know if it's this

16   one, but we spent quite a bit of time talking about

17   his results.

18           I don't know if it was this one in

19   particular.

20     Q.    Tell me what you remember.  It may not have

21   been this one, it might have been, we'll just --

22   we'll approach it slowly.

23           Tell me what you remember about your

24   discussion with Mr. Limbacher about his results.

Page 72

1          First off, where were you?

2     A.   When I discussed his results?

3     Q.   Yeah.  With him.

4     A.   Well, he would have been in an exam room.

5     And whether it was in the dispensary, that's the

6     only place I would have discussed his results.

7     Q.   What do you remember saying to

8     Mr. Limbacher about his x-ray results?

9     A.   They were not that remarkable, actually.

10         So, he had, as you can see, degenerative

11    joint disease; which with aging, we get that.

12    People who have some injuries may get it, but this

13    is kind of to be expected.

14         He had a lumbar disc that was kind of

15    bulging, but people, anybody.  If you took a

16    thousand x-rays, you could probably find 7, 800

17    people with that.  That doesn't equal pain.

18         So, from what I remember it, I was -- in my

19    head, it was just not really remarkable.

20    Q.   When you looked at -- well, let me stop.

21         What did Mr. Limbacher say to you about his

22    x-ray results at this meeting?

23    A.   I don't -- I mean, other than what I wrote?

24    Q.   Okay.

Page 73

1      A.    That's about it.  So...

2      Q.    Do you remember, and again, I'm trying to

3  focus on this one meeting, Mr. Limbacher telling you

4  that he had significant and recurring pain in his

5  left shoulder.

6      A.    From what I understand, I spent very little

7  time talking about his left shoulder, because he had

8  a history of having a dislocation.

9           And the pain he described is totally --

10  it's out of proportion to that.  It was not like he

11  dislocated his shoulder that day.

12     Q.    Not being a medical -- not being familiar

13  with medicine, I'm going to ask you a question I'm

14  probably not going to get right.

15          Do I understand you to say that his

16  complaint about pain, the pain he reported, let me

17  withdraw it.

18          Do I understand you to say that the pain he

19  reported seemed very different than what you would

20  have expected to see based on his x-ray?

21     A.    Yes.  And he saw a neurosurgeon.  I mean,

22  I'm certainly not a neurosurgeon, but he saw a

23  neurosurgeon.  And you can pull up their notes, and

24  read what they said.

Page 74

1      Q.   Did you reach any diagnosis or conclusion

2   why Mr. Limbacher had such intense shoulder pain?

3      A.   No.  Some people have pain that I can never

4   tell.  I certainly can't tell how much pain a

5   patient is in, but there should always be some

6   element of X happened, this is what to expect with

7   Y.

8      Q.   And did you see that expected pattern in

9   Mr. Limbacher's presentation?

10     A.   No.

11     Q.   After, or during your meeting with

12  Mr. Limbacher on the 12th of December, you went and

13  looked at the neurosurgery note from July 25th,

14  2018, right?

15     A.   I'm sure I read it at some point.  I don't

16  know exactly when, but I'm certain I read the note.

17     Q.   Right.  And you would have read it prior to

18  the time you put your electronic signature on this

19  record, correct?

20     A.   Yes.

21          MR. HACK:  Okay.  Give me a moment, I'm

22  going to get that document.

23          Let me know if that shows up before you.

24  Do you see the first page of Exhibit 3?

```
                                             Page 75

 1            (The document referred to was deemed

 2            marked as Exhibit No. 3 for

 3            identification.)

 4            THE WITNESS:  No.

 5            MR. HACK:  Alex?

 6            MR. PREBER:  Okay.  Do you see it now,

 7     Ms. Davis?

 8            THE WITNESS:  Yes.

 9            MR. HACK:  Thank you, Alex.

10     BY MR. HACK:

11        Q.   Ms. Davis, that's the first page of

12     Exhibit 3.

13            What do you recognize Exhibit 3 as?

14        A.   This is from Cook County, and it's

15     documenting the neurosurgeon, Dr. Raksin,

16     R-a-k-s-i-n.

17        Q.   Is this the neurology outpatient note,

18     medical record, that you consulted after your

19     meeting with Mr. Limbacher in December of 2018?

20        A.   She's actually a neurosurgeon, not a

21     neurologist.

22        Q.   Oh.  I meant to say neurosurgeon, thank

23     you.

24            Is this the neurosurgery outpatient
```

Page 76

1   record that you consulted after your interaction

2   with Mr. Limbacher in December of 2018?

3        A.    Probably not.  I usually look at the

4   PAC records, the actual radiology notes themselves.

5             MR. HACK:  Okay.  If you could -- let's

6   look at the third page.  Could we, Alex?

7             THE WITNESS:  Okay.

8   BY MR. HACK:

9        Q.    Let me ask you, Ms. Davis, is what we're

10  looking at now, which begins:  Neurosurgery

11  outpatient, is this the medical record that

12  you believe you consulted when you met with

13  Mr. Limbacher in December of 2018?

14       A.    Yes.

15       Q.    Okay.  And in particular, did you review

16  the history of present illness section that appears

17  on this page in front of you?

18       A.    Yes.

19       Q.    And what, if any, conclusions did you draw

20  from reviewing it?

21       A.    That there were quite -- I mean, it was

22  interesting, I thought, because the patient said he

23  landed on his head, but this talks about his back.

24       Q.    Do you remember any other -- any other

Page 77

1    information that was notable or important to you

2    when you looked at this note from the July 27th

3    neurosurgery visit?

4         A.    Yes.  And the same information, well,

5    actually, the information that the neurosurgeon

6    wrote.  Was that this second paragraph?

7         Q.    Okay.

8         A.    Just she, like everyone else who read this,

9    was trying to understand why he would fall.

10           Because there was nothing to support a fall

11   because of his back.

12        Q.    Okay.

13        A.    Or his head, for that matter.

14        Q.    Did you discuss this report with

15   Mr. Limbacher at all?

16        A.    I'm sure I did, because I remember

17   documented somewhere that I discussed his results

18   with him.

19        Q.    Okay.

20        A.    Not only myself, but he would have been

21   discussing the very same things with multiple

22   providers.

23        Q.    Okay.  Any recollection of what you said to

24   him about this July 25th report?

```
                                              Page 78
 1      A.   No.

 2      Q.   And do you remember anything that

 3  Mr. Limbacher said to you about this July 25th

 4  report?

 5      A.   No.

 6           MR. HACK:  Okay.  I've got another exhibit,

 7  Ms. Davis, this is Exhibit 4.

 8           (The document referred to was deemed

 9            marked as Exhibit No. 4 for

10            identification.)

11  BY MR. HACK:

12      Q.   Do you recognize the form of this document?

13      A.   Yes.

14      Q.   And what is it?

15      A.   The correspondence notes.

16      Q.   And if you look down the page, there's a

17  correspondence note dated 11/13/2018 between you and

18  Laura Hernandez, correct?

19      A.   Yes.

20      Q.   And who is Laura Hernandez?

21      A.   She works in scheduling off-site

22  appointments.

23      Q.   Okay.  And what was the purpose of

24  corresponding with Ms. Hernandez on this date?
```

```
                                              Page 79

 1      A.   Mr. Limbacher had missed an appointment in

 2   physical medicine.

 3      Q.   Right.  And you were following up to get

 4   him another appointment, correct?

 5      A.   Yes.

 6      Q.   Right.  And this is the note that you sent

 7   to arrange it; is that correct?

 8      A.   Yes.

 9           MR. HACK:  Okay.  We're done with that.

10   And I'm going to introduce another exhibit, ma'am.

11           Alex, could you make sure that Ms. Davis

12   has the ability to see this document?

13           MR. PREBER:  It should be good.  I just

14   pulled up Exhibit 5; is that correct, Mr. Hack?

15           MR. HACK:  Yes, please.

16           (The document referred to was deemed

17            marked as Exhibit No. 5 for

18            identification.)

19           MR. PREBER:  Okay.

20           Ms. Davis, can everyone see my screen?

21           THE WITNESS:  Yes.

22   BY MR. HACK:

23      Q.   Do you see this document?

24      A.   Yes.
```

Page 80

1    Q.    What is it?

2    A.    Another correspondence to Dr. McCarthy.

3    Q.    Right.  And I suppose if I want to read

4  this, right, I would start at the bottom, right, and

5  read up?

6          In other words, if I'm trying to see how

7  this occurred chronologically, right?

8    A.    Yes.

9    Q.    So I would start at the bottom note, right?

10   A.    Yes.

11   Q.    Okay.  What is the bottom note that begins:

12  From Davis PA-C Barbara A, which is of course you,

13  to Dr. McCarthy.

14          What are we looking at here?

15   A.    Well, this is the memo I talked about,

16  when Mr. Limbacher had asked if he could have an

17  MRI of his shoulder, and I said that I would ask

18  Dr. McCarthy.  This is indeed the memo.

19   Q.    Okay.  Looking at this memorandum, or your

20  note, does it refresh your recollection at all about

21  what Mr. Limbacher said to you about why he wants to

22  get an MRI of his left shoulder?

23   A.    No.  Honestly, I was never clear why he

24  needed an MRI of his shoulder.

Page 81

1      Q.   Did Mr. Limbacher tell you that his left

2   shoulder hurt?

3      A.   If he did, I'm sure I would have documented

4   it in my notes somewhere.

5      Q.   Did he tell you, ever, that he had

6   recurring pain in his left shoulder?

7      A.   Not that I recall offhand.

8           He complained of pain in various parts of

9   his body, so, but this had been going on for over a

10  year.

11     Q.   And you mentioned that he made complaints

12  about a variety of parts of his body.

13          Did he also include complaints about pain

14  in his left shoulder in conversation with you?

15     A.   Not that I recall.

16     Q.   Did he ever tell you that he had very

17  limited range of motion with his left shoulder?

18     A.   Well, he may have, but one thing I do

19  recall is that quite the field of specialties

20  attempted to get Mr. Limbacher to go to physical

21  therapy, which would have helped with that

22  situation, and he refused multiple times to go.

23          The neurosurgeon recommended it;

24  Dr. McCarthy recommended it; the therapists

Page 82

1   recommended it; everybody recommended physical

2   therapy as the first thing to do along with pain

3   medication and all that.

4           But Mr. Limbacher said that he basically

5   was not interested in doing it, because it caused

6   pain.

7       Q.   Did you ever speak with Mr. Limbacher, the

8   two of you, about why he elected not to attend

9   certain physical therapy appointments?

10      A.   Yeah, because he said it made his shoulder

11  worse.

12      Q.   Do you doubt that Mr. Limbacher's report of

13  pain in his shoulder at physical therapy was not

14  true?

15      A.   Oh, it's not true.  I mean, most people who

16  go to physical therapy have some pain trying to get

17  back full function.  Most people will have some

18  pain, yes.  I'd expect people to have some pain.

19      Q.   Did he tell you that the pain was so

20  excruciating that he felt it was doing him more harm

21  than good?

22      A.   No.  I don't recall that.

23      Q.   Did Mr. Limbacher ever explain to you that

24  his left shoulder hurt so much that he had

Page 83

1    difficulty sleeping?

2        A.    Not that I recall.  If it's not in my note,

3    I would not recall that.

4        Q.    Your medical notes, you're typing them

5    during the -- during your visit with the patient,

6    correct?

7        A.    Yes.

8        Q.    And you don't get every word that the

9    patient says in your medical notes, do you?

10       A.    No.

11       Q.    And you don't get every word that you say

12   in your medical notes, do you?

13       A.    Usually not.

14       Q.    So some things that may be discussed in any

15   particular meeting may, for one reason or another,

16   not be in your medical notes, correct?

17       A.    It's possible.

18       Q.    Now, do you have any other recollection of

19   any pain, inconvenience, stiffness, difficulty

20   moving, difficulty sleeping that Mr. Limbacher

21   mentioned to you?

22       A.    Oh, he may have, but even Dr. McCarthy, in

23   this note itself, she said that his complaints of

24   his other symptoms were worse than his shoulder

Page 84

1    complaints.

2         Q.    Okay.

3         A.    And that's why they chose to do his neck

4    and his spine, because he complained, and he said

5    those were worse.

6         Q.    Okay.  Let's look up the page, if we could.

7    I'll give you a chance to -- you see an addendum

8    from Dr. McCarthy dated November 20th, 2018,

9    correct?

10        A.    Yes.

11        Q.    Right.  And below that we see her note back

12   to you, right?

13        A.    Yes.

14        Q.    And Dr. McCarthy said that she would not do

15   an MRI at this time, correct?

16        A.    Yes.

17        Q.    And you did not schedule one, in reliance

18   on her direction here, correct?

19        A.    Yes.

20        Q.    And in your treatments of Mr. Limbacher,

21   had you previously observed significant

22   osteoarthritis in his left shoulder?

23        A.    Not that I recorded.  Osteoarthritis,

24   we all get that with aging.  And I don't know,

Page 85

1   Mr. Limbacher's -- how old is Mr. Limbacher?  In his

2   40s?  50s?

3        Q.   He's in his 40s, ma'am.

4        A.   Okay.  Well, I mean, he'll have some

5   arthritis.  That's just living; wear and tear with

6   joints.

7        Q.   Wear and tear of a joint can cause

8   significant pain and discomfort, can't it?

9        A.   If it's pretty severe.

10       Q.   Right.  And severe arthritis can be very

11  painful to a patient, correct?

12            MR. PREBER:  Objection.  Calls for

13  speculation.

14            THE WITNESS:  It can be.

15  BY MR. HACK:

16       Q.   Right.  And to be more clear, significant

17  arthritis in his shoulder can be very painful to a

18  patient, correct?

19            MR. PREBER:  Objection.  Calls for

20  speculation.  Also, leading.

21            THE WITNESS:  It can be, and that's why we

22  always recommend physical therapy.

23  BY MR. HACK:

24       Q.   Physical therapy is a -- would you say it's

Page 86

1    a frontline treatment for shoulder arthritis?

2        A.    Absolutely.

3        Q.    And what -- in the sequence of escalating

4    medical care, what comes after physical therapy for

5    arthritis in the shoulder?

6             What do you do next?

7        A.    They're all done together.

8             He was offered an injection, which would

9    have given him some pain relief; he was offered

10   physical therapy --

11       Q.    Let's stop right there.  Pardon me,

12   Ms. Davis, I tried not to interrupt.  I'd like you

13   to finish your answer.

14       A.    So as I was saying, they're usually, the

15   plan includes you can offer steroid injections will

16   cut down on the inflammation and pain; physical

17   therapy to help strengthen the muscles and to keep

18   it from being stiff, as well as medicine that you

19   can take by mouth.

20       Q.    All right.  Let's assume that we try that

21   frontline treatment for a person who presents with

22   shoulder arthritis.  Pain continues, and physical

23   therapy is not effective.

24            What comes next in terms of care for

Page 87

1   osteoarthritis in a shoulder?

2          MR. PREBER:  Objection.  It calls for

3   speculation again.

4          THE WITNESS:  Well, I'm not a shoulder

5   surgeon, but certainly at the very end of that road

6   would be a shoulder replacement.

7          But that is not this case, at all.

8   BY MR. HACK:

9      Q.   And when you say it's not this case at all,

10  have you looked at an MRI of Mr. Limbacher's left

11  shoulder?

12     A.   I actually did.

13     Q.   Okay.  When did you look at the MRI of

14  Mr. Limbacher's left shoulder?

15     A.   Well, at some point.

16          This has been going on for quite a while,

17  and when I first got some indication that my name

18  was in this lawsuit, it's been quite a while, and

19  I'm sure in the past somewhere I went over his

20  x-rays or MRIs.

21     Q.   And was that an MRI that was taken at

22  Stroger, or an MRI from some other location?

23     A.   Well, I'm sure it had to be Stroger.  The

24  only -- 99.9 percent of the time anyone who is a

Page 88

1    detainee at Cermak, they must go to Stroger for

2    care, if it's outside of Cermak.

3        Q.   What do you remember observing in the MRI

4    of Mr. Limbacher's left shoulder?

5        A.   Well, as I recall, that he did not have --

6    there was nothing wrong with his rotator cuff.

7            And from the history, which we read here

8    before, I knew he had mentioned he had had a

9    dislocation.

10           But I mean, from what I remember, like I

11   said before, it was unremarkable.  It was nothing

12   that would have made me think that he would have

13   needed to see a shoulder specialist.

14       Q.   Do you know what a bony bankart lesion is?

15       A.   Yes, I do.

16       Q.   When you looked at Mr. Limbacher's MRIs or

17   x-rays, did you see evidence of a bony bankart

18   lesion in his left shoulder?

19       A.   I don't remember that.  Most that you see,

20   folks who have recurrent dislocations.

21           As far as I remember, he had one.

22       Q.   When you reviewed the x-rays and MRIs, did

23   you see any evidence of a reverse Hill-Sachs defect?

24       A.   No.

Page 89

```
 1        Q.   Ms. Davis, I've got only a few minutes,
 2   because of your schedule.  Give me just a minute.  I
 3   want to make -- do you have -- okay, there it is.
 4             MR. HACK:  Ms. Davis, could you -- I'm
 5   going to put one more exhibit in front of you.
 6             Alex, could you do your magic?
 7             THE WITNESS:  I see it.
 8   BY MR. HACK:
 9        Q.   Thank you.  Ms. Davis, do you recognize the
10   form here?
11        A.   Yes.
12        Q.   And what are we looking at here with
13   Exhibit 6?
14             (The document referred to was deemed
15              marked as Exhibit No. 6 for
16              identification.)
17             THE WITNESS:  Another encounter with
18   Mr. Limbacher in the primary care clinic.
19   BY MR. HACK:
20        Q.   And there was an interaction that you and
21   he had in January of 2019, correct?
22        A.   Yes.
23        Q.   And what did Mr. Limbacher -- I'm sorry,
24   and these are the notes that you took of that
```

Page 90

1    interaction, correct?

2        A.   Yes.

3        Q.   And these look like notes that were stored

4    in the Cerner Record System at Cermak, correct?

5        A.   Yes.

6        Q.   Okay.  And he reported to you during this

7    interaction that his left shoulder had never been --

8    the pain or the condition of his left shoulder had

9    never been addressed; is that correct?

10       A.   That's what I wrote.  That is correct.

11       Q.   Okay.  And you said, you then, your note

12   goes on to say:  It was clear from the Cerner notes,

13   it had been.

14            Did I read that right?

15       A.   Yes.

16       Q.   And what Cerner notes are you referring to?

17       A.   Any notes.  I mean, he had spoken to

18   Dr. McCarthy about his shoulder; he had spoken to

19   multiple people in these notes about his shoulder.

20       Q.   And --

21       A.   He had had -- I'm sorry.

22       Q.   Please, go ahead.

23       A.   He had had the x-rays of his left shoulder,

24   and Dr. McCarthy discussed all of those results.

Page 91

1      Q.   Right.   Your notes reflect that he was

2   offered an injection in his shoulder, correct?

3      A.   Yes.

4      Q.   And the purpose of his shoulder injection

5   is to address pain in the joint, correct?

6      A.   Yes.

7      Q.   And so you knew, from reading this, that

8   Mr. Limbacher was experiencing shoulder pain,

9   correct?

10     A.   Yes.

11     Q.   Right?   And so he had also been offered

12  injections previously, correct?

13     A.   Yes.

14     Q.   And so you knew from the first time that

15  you knew he was getting a shoulder injection, that

16  he had a pain in his shoulder, correct?

17     A.   Yes.

18     Q.   So he didn't just complain about his back,

19  he also complained about pain in his shoulder to

20  you, correct?

21     A.   Well, in all of my notes I mentioned that

22  he has had numerous musculoskeletal complaints.   I

23  don't name them all.

24     Q.   Okay.   But as of this date, the 29th of

Page 92

1    January, 2019, did you know and understand that

2    Mr. Limbacher's shoulder pain continued, and that

3    his medical condition had not been fully addressed?

4              MR. PREBER:  Objection as to compound

5    question, and speculation.

6              THE WITNESS:  So, I will answer the first

7    question.

8              Yes, I understood Mr. Limbacher's

9    complaint.

10             And B, he had been offered a solution to

11   his pain, and declined it.

12   BY MR. HACK:

13      Q.   Did the fact Mr. Limbacher's pain was

14   continuing, cause you to wonder if his condition had

15   been properly diagnosed by you and other treating

16   providers?

17      A.   No, sir.  Not at all.  We had more than

18   enough information from his exams, from his x-ray.

19             We did not misdiagnose him at all.  We knew

20   exactly what he had.

21             MR. HACK:  Ms. Davis, I promised you that I

22   would try to be polite and courteous to your

23   patients, and to you.

24             I have 12:46 on my computer time, and I

Page 93

1    know that you have patients to see shortly.

2              I will discuss next steps with your

3    Counsel.  Thank you for attending today, and I will

4    conclude my questioning, because you have patients

5    to care for.

6              THE WITNESS:  Thank you.

7              MR. PREBER:  Thank you, very much.

8              THE COURT REPORTER:  Do you want this typed

9    up?

10             MR. HACK:  The transcript?

11             THE COURT REPORTER:  Yes.

12             MR. HACK:  I do.

13             THE COURT REPORTER:  Counsel?

14             MR. HACK:  Ms. Davis, at least from my

15   point of view, you're excused.

16             MR. PREBER:  Yes.  You're good to go.

17             Thank you.  Sorry about that.

18             THE COURT REPORTER:  Mr. Preber, do you

19   want a copy of this?

20             MR. PREBER:  Yes.  I would like a copy, as

21   well.

22             THE COURT REPORTER:  Are we off the record?

23             MR. HACK:  We are.

24             (The deposition ended at 12:55 p.m.)

Page 94

1    STATE OF ILLINOIS    )

                          ) ss:

2    COUNTY OF C O O K    )

3

4

5            I, Camille Trok, C.S.R., R.P.R., do hereby

6    certify that I reported in shorthand the testimony

7    held at the deposition of BARBARA DAVIS on the

8    21st day of November, 2022, and that this transcript

9    is a true and accurate transcription of my shorthand

10   notes so taken, to the best of my ability, and

11   contains all of the proceedings given at said

12   deposition.

13

14

15

16

17

                    Camille Trok

18                  License No. 084.000960

19

20

21

22

23

24

```
                                                              Page 95
 1                        Veritext Legal Solutions
                             1100 Superior Ave
 2                               Suite 1820
                          Cleveland, Ohio 44114
 3                         Phone: 216-523-1313
 4
      December 8, 2022
 5
      To: MR. ALEXANDER PREBER
 6
      Case Name: Limbacher, Shane Edward v. Dart, Sheriff Thomas J. Et Al.
 7
      Veritext Reference Number: 5591294
 8
      Witness:  Barbara  Davis      Deposition Date:  11/21/2022
 9
10    Dear Sir/Madam:
11
      Enclosed please find a deposition transcript.  Please have the witness
12
      review the transcript and note any changes or corrections on the
13
      included errata sheet, indicating the page, line number, change, and
14
      the reason for the change.  Have the witness' signature notarized and
15
      forward the completed page(s) back to us at the Production address
16    shown
17    above, or email to production-midwest@veritext.com.
18
      If the errata is not returned within thirty days of your receipt of
19
      this letter, the reading and signing will be deemed waived.
20
21    Sincerely,
22    Production Department
23
24    NO NOTARY REQUIRED IN CA
```

Page 96

1              DEPOSITION REVIEW
             CERTIFICATION OF WITNESS

2

        ASSIGNMENT REFERENCE NO: 5591294
3        CASE NAME: Limbacher, Shane Edward v. Dart, Sheriff Thomas J.
Et Al.
        DATE OF DEPOSITION: 11/21/2022
4        WITNESS' NAME: Barbara  Davis
5        In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7        I have made no changes to the testimony
as transcribed by the court reporter.

8

  _____     _____
9  Date              Barbara  Davis
10        Sworn to and subscribed before me, a
Notary Public in and for the State and County,
11  the referenced witness did personally appear
and acknowledge that:

12

        They have read the transcript;
13        They signed the foregoing Sworn
            Statement; and
14        Their execution of this Statement is of
            their free act and deed.

15

        I have affixed my name and official seal
16

this _____ day of_____, 20\_\_\_\_.
17

        _____
18        Notary Public
19        _____
        Commission Expiration Date
20
21
22
23
24
25

1               DEPOSITION REVIEW
             CERTIFICATION OF WITNESS

2

       ASSIGNMENT REFERENCE NO: 5591294
3       CASE NAME: Limbacher, Shane Edward v. Dart, Sheriff Thomas J.
Et Al.
       DATE OF DEPOSITION: 11/21/2022
4       WITNESS' NAME: Barbara  Davis
5       In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7       I have listed my changes on the attached
Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9       I request that these changes be entered
as part of the record of my testimony.

10

       I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
that both be appended to the transcript of my
12  testimony and be incorporated therein.
13 _____    _____
Date               Barbara  Davis

14

       Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
the referenced witness did personally appear
16  and acknowledge that:
17      They have read the transcript;
      They have listed all of their corrections
18         in the appended Errata Sheet;
      They signed the foregoing Sworn
19         Statement; and
      Their execution of this Statement is of
20         their free act and deed.
21      I have affixed my name and official seal
22  this _____ day of_____, 20____.
23         _____
         Notary Public

24

         _____
25         Commission Expiration Date

Page 98

```
1                    ERRATA SHEET
            VERITEXT LEGAL SOLUTIONS MIDWEST
2                 ASSIGNMENT NO: 5591294
3    PAGE/LINE(S) /        CHANGE        /REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19

     _____      _____
20   Date                  Barbara  Davis
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23                         _____
                           Notary Public
24
                           _____
25                         Commission Expiration Date
```

**[07509 - advanced]**                                                    Page 1

| **0** | **1996** 8:11,14 | **3** | **872** 2:10 |
|---|---|---|---|

**0**

**07509** 1:6
**084.000960**
 94:18

**1**

**1** 3:11 52:13,16
**10** 38:7,8,12,23
 63:23
**100** 42:11
**10:30** 1:18
**11/13/2018**
 78:17
**11/21/2022** 95:8
 96:3 97:3
**1100** 95:1
**111** 2:4
**11282** 94:17
**11401** 4:20
**11:30** 54:10,17
**11:32** 47:4
**11:46** 54:18
**12:46** 92:24
**12:55** 93:24
**12th** 66:11 68:18
 69:23 70:7
 71:14 74:12
**13th** 52:19 55:24
 57:7 62:9 64:8
**15** 8:10 11:23
 12:2 13:23
**16** 54:12,15
**1820** 95:2
**18th** 64:8 68:18
**19** 1:6
**1976** 6:11
**1981** 7:3

**1996** 8:11,14
**1:00** 47:12

**2**

**2** 3:12 59:22
 60:2 63:1
**20** 20:14 96:16
 97:22 98:22
**2017** 20:18
**2018** 35:24 36:21
 38:1,7,23 52:19
 55:24 57:7 64:9
 66:12 68:18,19
 69:23 70:7
 71:14 74:14
 75:19 76:2,13
 84:8
**2019** 89:21 92:1
**2020** 36:21 38:23
**2021** 20:18 35:24
 38:1
**2022** 1:18 94:8
 95:4
**20th** 84:8
**21** 1:18
**216-523-1313**
 95:3
**219** 2:9
**21st** 94:8
**22** 16:2,4
**256-2529** 2:10
**25th** 74:13 77:24
 78:3
**27** 9:11
**27th** 77:2
**2847** 64:14,16,17
**29th** 91:24

**3**

**3** 3:12 74:24
 75:2,12,13
**312** 2:5

**4**

**4** 3:7,13 78:7,9
**40s** 85:2,3
**4100** 2:4
**44114** 95:2
**443-0676** 2:5

**5**

**5** 3:13 79:14,17
**500** 2:9
**50s** 85:2
**52** 3:11
**5591294** 95:7
 96:2 97:2 98:2

**6**

**6** 3:14 66:9
 89:13,15
**60** 3:12 54:16
**60604** 2:10
**60606** 2:4
**60643** 4:23
**6:26** 54:19

**7**

**7** 72:16
**75** 3:12
**78** 3:13
**79** 3:13

**8**

**8** 95:4
**800** 72:16
**84.000960** 1:22

**872** 2:10
**89** 3:14

**9**

**98** 9:20 12:16
**99.9** 87:24

**a**

**ability** 19:4,7,16
 19:19,23 20:3
 79:12 94:10
**able** 25:21 27:1
 65:9,10
**absolutely** 86:2
**access** 25:1
 32:10,17
**accurate** 45:5
 55:21 94:9
**accurately** 5:9
**acknowledge**
 96:11 97:16
**act** 96:14 97:20
**action** 43:2
**actual** 76:4
**added** 56:18
**addendum** 65:14
 84:7
**addition** 33:17
 39:8,12
**additional** 9:6
 11:20
**address** 30:3
 91:5 95:15
**addressed** 90:9
 92:3
**adults** 17:6
**advance** 5:22
**advanced** 5:12
 5:20

**[affixed - believe]**

**affixed** 64:24
 96:15 97:21
**afraid** 7:11
**aging** 58:14
 72:11 84:24
**ago** 30:17 31:12
 67:7
**agree** 4:4 47:17
 49:16 50:19
**ahead** 4:1 27:11
 27:15 30:20
 56:12 90:22
**al** 1:7 95:6 96:3
 97:3
**alex** 51:17 52:7
 54:22 56:9
 59:18 60:6 75:5
 75:9 76:6 79:11
 89:6
**alexander** 2:8
 95:5
**alexander.preber**
 2:11
**alignment** 46:11
**allows** 71:1
**ambiguous** 35:4
 43:12
**anatomical**
 46:11
**ann** 4:18
**answer** 14:14
 22:10 35:6
 44:12 86:13
 92:6
**answered** 26:20
**anterior** 11:7,13
**anticipated**
 60:20

**anybody** 12:20
 72:15
**anyway** 69:6
**apostrophe**
 12:19
**appear** 59:15
 96:11 97:15
**appeared** 2:6,12
**appears** 53:22
 54:12 61:10
 76:16
**appended** 97:11
 97:18
**appointed** 4:15
**appointment**
 25:9 26:22
 53:18 54:8
 56:17 59:4,7,8
 61:5 62:9 64:7
 65:20 79:1,4
**appointments**
 65:18 78:22
 82:9
**appreciative** 5:7
**approach** 19:24
 71:22
**approximately**
 1:17
**area** 5:1 36:19
 38:17
**arm** 13:17
**arrange** 79:7
**arranged** 65:19
**arthritis** 58:12
 85:5,10,17 86:1
 86:5,22
**arts** 6:13

**aside** 58:1
**asked** 18:2 20:7
 33:3 68:3,16
 70:2 80:16
**asking** 23:2
 62:11 70:9
**asks** 59:11
**assessments**
 21:10
**assigned** 14:2
 38:5,23
**assignment** 96:2
 97:2 98:2
**assistant** 5:13
 9:7,8,10,23
 12:18,20,22,23
 14:1,10 18:4
 19:3,8,11 20:23
 21:6 32:11
 41:22
**assume** 25:17
 60:23 86:20
**attached** 27:10
 97:7
**attack** 34:11
**attempted** 81:20
**attend** 82:8
**attending** 93:3
**attorney** 2:8
**august** 9:19
**augustana** 6:23
 7:2,5,20,22
**authority** 19:12
**authorize** 97:11
**authors** 30:13
**available** 28:4
 29:1 33:15
 35:21,23 37:1,3

 39:7,13 41:12
 61:3
**ave** 95:1
**average** 31:13

**b**

**b** 92:10
**bachelor** 6:12,13
 6:14,15
**back** 8:15,17 9:5
 11:10 15:4
 26:18 36:21
 38:4 51:4 57:3
 58:21 61:4,12
 65:10 70:13
 76:23 77:11
 82:17 84:11
 91:18 95:15
**background**
 5:23 41:19
**bankart** 88:14
 88:17
**barbara** 1:12 3:3
 4:8,18 80:12
 94:7 95:8 96:4,9
 97:4,13 98:20
**based** 68:1 73:20
**basically** 82:4
**becoming** 6:19
**began** 53:19,20
**beginning** 66:8
**begins** 58:8
 76:10 80:11
**behalf** 2:6,12
**believe** 5:19 40:4
 40:10 70:20
 76:12

**bell** 4:20
**belong** 12:19
**best** 5:5 10:3
  22:21 23:6,6
  24:10 31:14
  34:8 37:5,7,21
  50:22 51:12
  55:21 57:4
  60:24 61:2
  70:17 94:10
**bet** 32:2
**big** 31:24 39:18
**bit** 15:4 23:11
  24:17 35:5
  51:11 64:12
  67:6 71:16
**board** 18:19
**body** 42:23 81:9
  81:12
**bone** 43:14
  45:14 48:3,7
**bones** 28:20
  29:12,13 41:3
  43:19 45:2,3
  47:20
**bony** 88:14,17
**books** 30:5,6,10
  31:8
**bottom** 48:19
  58:8 59:11
  64:15 80:4,9,11
**breadth** 17:7
  31:2
**break** 47:1,3
**broad** 28:1
**broken** 43:14
  48:3

**building** 38:8
**bulging** 72:15
**bumped** 48:1
**bunch** 60:22
**buntic** 2:9 17:18
**button** 17:17
  65:3,6,10

**c**

**c** 2:2 8:2,9 80:12
  94:2
**c.s.r.** 1:12 94:5
**ca** 95:24
**california** 5:16
**call** 12:21 59:2,3
  70:13
**called** 4:9 30:24
  31:5 36:2,3
**calls** 18:16 38:6
  38:24 43:13
  49:7,20 85:12,19
  87:2
**camera** 63:24
**camille** 1:12,21
  4:1 94:5,17
**campus** 8:6
**cardiologist**
  34:13
**cardiology** 8:4
  39:14
**care** 5:2 8:4 10:5
  11:18,21 16:15
  16:17 17:4,6,7
  17:10,11,14,21
  17:24 18:14
  19:8 22:1,4,6,13
  22:17,21,24 23:3
  23:5,6,7,9,20

31:11 32:21
33:2,9,21 34:5,8
36:2 37:1,11
43:6 47:11,18
48:18 49:4
52:19 63:5 86:4
86:24 88:2
89:18 93:5
**careful** 55:21
**case** 4:16 43:5
  60:22 71:8 87:7
  87:9 95:6 96:3
  97:3
**cat** 43:23 44:3
**category** 32:1
**cause** 49:17 50:4
  85:7 92:14
**caused** 82:5
**causes** 48:19
**center** 13:10,11
  20:16 27:8,11,16
**cermak** 5:15,16
  13:9,10,12,15,23
  15:1,6,15 16:1
  16:12 17:9,21
  18:1 19:15,18
  20:10,15,21 21:2
  21:6,24 22:7,14
  22:18 23:8
  24:21,22 25:15
  27:20 29:18
  31:4 32:17,20
  33:9,20 34:2,6
  35:19 36:5,12,19
  37:14,18 39:4,11
  41:12 63:23
  66:2,6,7 88:1,2
  90:4

**cermak's** 24:2
**cerner** 24:22
  26:24 53:8 90:4
  90:12,16
**certain** 59:19
  74:16 82:9
**certainly** 34:12
  38:3 73:22 74:4
  87:5
**certificate** 97:11
**certification**
  96:1 97:1
**certify** 94:6
**cervical** 58:18
  61:21
**chair** 11:23 12:1
  18:19
**chance** 23:15
  24:18 48:2 84:7
**change** 8:14
  23:10 31:3
  36:23 59:18
  65:15 95:13,14
  97:8 98:3
**changes** 95:12
  96:7 97:7,9
**charged** 26:6,15
  26:16
**chart** 14:14
**charts** 23:19
**chicago** 2:4,10
  4:20,21 7:24
**children** 17:6
**choose** 41:16
  71:6,7
**chose** 84:3
**chronologically**
  80:7

**chs** 66:1
**circumstances**
21:24 34:14
35:10 43:9,20
44:10,14
**city** 4:21
**civil** 1:15 96:5
97:5
**claims** 43:2,5
**clarify** 25:23
**clarifying** 26:16
**class** 45:20
**clear** 80:23
85:16 90:12
**clearest** 50:20
**clearly** 39:20
**cleveland** 95:2
**clinic** 8:23 17:11
17:13,14,21 18:7
38:13 39:3,3,8
39:11,13,23
89:18
**clinical** 8:23
20:12
**cme** 42:12
**cmes** 42:11
**code** 4:22
**collaborating**
14:4,13 15:2,11
15:13,16,21 16:3
**college** 6:1,3
**come** 18:13 39:4
39:5
**comes** 36:18
86:4,24
**coming** 37:14
**commission**
96:19 97:25

98:25
**common** 10:4
34:9
**complain** 91:18
**complained** 81:8
84:4 91:19
**complaint** 44:18
73:16 92:9
**complaints**
21:11 67:3
81:11,13 83:23
84:1 91:22
**complete** 27:23
64:24
**completed** 42:12
95:15
**compound** 92:4
**computer** 25:2
25:12 55:12
92:24
**concerned** 46:2
50:3
**concerns** 31:18
**conclude** 93:4
**conclusion** 65:20
74:1
**conclusions**
76:19
**condition** 49:6
49:17 50:21
57:6 70:8 90:8
92:3,14
**consider** 47:22
50:12,15
**constitutional**
43:7
**consult** 14:5
30:22 31:14

35:18
**consultation**
36:14
**consulted** 30:15
31:10,17 75:18
76:1,12
**consulting** 14:10
15:9,11
**contact** 35:18
**contained** 68:14
**contains** 94:11
**continued** 38:12
63:5 92:2
**continues** 86:22
**continuing** 42:7
92:14
**control** 60:15
**conversation**
70:1 81:14
**conversations**
68:14 69:13,15
**conversely** 45:3
**convicted** 26:4
26:13
**cook** 2:8 5:15
8:18,19,21,24
9:5,17 11:24
12:2,9,15 13:19
14:23 19:5,9
26:10,24 27:18
27:22 28:8,13
31:4 36:18
42:16 75:14
**cookcountyil.g...**
2:11,11
**copy** 33:7 93:19
93:20

**correct** 8:13 9:3
9:7 12:5 13:10
13:20,23 15:7,10
15:13 16:4
18:11 20:7,11,23
21:15 24:23
26:11,12 27:20
27:23 28:2,6,10
28:15 29:6,10,15
31:23 32:8
36:19 37:14
38:9 39:23
40:15 41:13
46:5 47:20
48:13 49:18
52:22 53:16,22
55:21 57:20
58:4 62:15
65:21 67:17,20
69:9 70:17 71:2
71:5,11 74:19
78:18 79:4,7,14
83:6,16 84:9,15
84:18 85:11,18
89:21 90:1,4,9
90:10 91:2,5,9
91:12,16,20
**corrections**
95:12 97:17
**correspondence**
70:21 71:9,11
78:15,17 80:2
**corresponding**
78:24
**counsel** 4:15
23:15,15 93:3,13
**county** 2:8 5:15
8:18,19,20,21,24

**[county - diagnoses]**

9:5,17 11:24
12:2,10,15 13:19
14:23 19:5,9
26:10,24 27:8,18
27:22 28:8,13
31:4 36:18
42:16 75:14
94:2 96:10
97:15
**couple** 13:2
23:11 31:12
41:19
**course** 9:9,12
30:19 35:17
37:17 47:21
80:12
**courses** 9:6
**court** 1:1,16 4:3
40:8,12 54:15
57:14 93:8,11,13
93:18,22 96:7
**courteous** 92:22
**cover** 17:24
23:11 57:23
**covered** 38:7
**create** 52:24
**crime** 26:14
**criminal** 26:8
**ct** 19:19 39:16
44:7,11
**cuff** 88:6
**cuffs** 28:15 29:9
**cured** 49:6
**current** 31:8
**currently** 16:14
**curriculum** 6:24
7:4

**cut** 86:16
**cv** 1:6

**d**

**d** 3:2
**daily** 31:4
**dart** 1:7 95:6
96:3 97:3
**date** 30:24 31:5
31:7,7,11,14,18
31:21 32:8,11,17
53:15,16 57:10
69:16 78:24
91:24 95:8 96:3
96:9,19 97:3,13
97:25 98:20,25
**dated** 66:11
78:17 84:8
**davis** 1:12 3:3
4:8,18,19,24
5:11 6:8 13:15
16:1 17:22
23:10 27:15
29:17 35:7 38:2
40:14 47:14
51:3,10,21 52:12
54:23 57:19
59:22 60:6,16
64:11 75:7,11
76:9 78:7 79:11
79:20 80:12
86:12 89:1,4,9
92:21 93:14
94:7 95:8 96:4,9
97:4,13 98:20
**day** 37:8 66:14
66:18 67:3,16
68:2 73:11 94:8

96:16 97:22
98:22
**days** 31:12 95:18
**deals** 31:21
**dear** 95:10
**dearborn** 2:9
**december** 66:11
68:18 69:23
70:7 71:14
74:12 75:19
76:2,13 95:4
**decide** 46:15
47:18
**declined** 92:11
**decrease** 61:22
**deed** 96:14 97:20
**deemed** 52:15
60:1 75:1 78:8
79:16 89:14
95:19
**defect** 88:23
**defendant** 2:12
43:1,4
**defendants** 1:8
**definition** 17:5
**degenerative**
58:9 72:10
**degree** 6:4 7:15
7:19,23 9:23
40:2,16 42:17
**delay** 59:19
**denied** 43:6
**department**
11:23 12:1
16:11 17:8
18:19 19:9
27:23 28:24
29:1,3,5 36:4

95:22
**depend** 50:18
**depends** 10:21
28:20 35:10,14
37:23 41:4 45:6
45:11 46:9
48:22,23 49:13
50:7,16
**deposition** 1:11
23:14 47:7
93:24 94:7,12
95:8,11 96:1,3
97:1,3
**depositions** 1:17
**dermatology**
39:15
**describe** 10:3
24:18 59:5
**described** 73:9
**describes** 33:8
**description** 21:5
21:9 22:9
**designation** 7:19
**detainee** 26:23
28:5 88:1
**detainees** 18:1
26:11 32:22,24
**detention** 20:16
**determine** 43:22
46:10 47:19
**determined** 63:4
**device** 64:3
**diagnose** 7:7
10:7,14 11:13
21:11
**diagnosed** 92:15
**diagnoses** 7:7
22:23

diagnosing
  10:20 35:2
  44:20
diagnosis 7:5
  9:23 18:5 22:22
  31:22 34:10
  35:1,16 36:14
  55:7 57:6 62:22
  62:24 74:1
diagnostics
  59:12
dialysis 39:14
dictate 34:10,14
dictated 22:21
dictates 35:1
difference 26:2
different 11:3
  21:14,19 23:8
  38:5 44:8 46:9
  68:17 73:19
difficulty 83:1
  83:19,20
direct 19:8 37:13
  44:11
direction 84:18
disc 72:14
discomfort 85:8
discuss 77:14
  93:2
discussed 68:4
  70:5 72:2,6
  77:17 83:14
  90:24
discussing 77:21
discussion 51:7
  71:24
disease 58:9
  72:11

dislocated 35:13
  73:11
dislocation
  10:21 11:8 56:7
  73:8 88:9
dislocations
  10:14,20 11:4,14
  49:11,16 50:3,4
  50:12 88:20
disorder 57:2
dispensary 72:5
disputed 68:7
district 1:1,1,16
division 1:2
  16:11 37:23
  38:2,7,8,12,16
  38:23 39:3
  63:23
divisions 38:5
djd 58:8
doc 63:7
docs 28:21
doctor 14:2
  36:17,18 37:5,13
  56:15
doctors 17:9
  39:22
document 33:7
  52:15 57:21
  58:2 60:1 63:14
  64:12 65:24
  66:23 74:22
  75:1 78:8,12
  79:12,16,23
  89:14
documented
  56:6 77:17 81:3

documenting
  75:15
documents
  23:20 33:7
  60:22
doing 82:5,20
door 48:1
double 64:17
doubt 82:12
dr 12:3,4,9,18,24
  13:4,7,22 14:19
  14:23 15:5,9,12
  15:17,20 16:6
  18:8,10,15,24
  38:22 39:2
  56:15 63:6 64:7
  68:5 70:3,8,18
  75:15 80:2,13,18
  81:24 83:22
  84:8,14 90:18,24
draw 76:19
drive 2:4
duly 4:9
duties 33:8

**e**

e 2:2,2 3:2 70:22
easier 45:1,2,3
  60:20
eastern 1:2
edit 65:10
education 42:7
edward 1:4 2:14
  95:6 96:3 97:3
effective 86:23
either 11:7 33:7
  36:14 71:8

elected 82:8
electronic 24:1,2
  33:8 60:11
  64:20,23 74:18
electronically
  65:2
element 74:6
email 95:17
employed 8:8
  20:20
employee 20:13
employment
  20:14
enclosed 95:11
encounter 52:18
  53:4 89:17
ended 93:24
engage 71:9
english 6:7
entered 97:9
entire 96:5 97:5
entitled 32:22
equal 72:17
errata 95:13,18
  97:7,10,18 98:1
escalate 22:1
escalating 86:3
et 1:7 95:6 96:3
  97:3
evaluate 21:10
evening 54:14
everybody 27:5
  47:2 60:24 82:1
evidence 88:17
  88:23
exactly 55:17
  61:1 74:16
  92:20

**[exam - good]**

**exam** 72:4
**examination** 3:6
4:12
**examined** 4:10
**example** 14:19
**exams** 92:18
**excruciating**
82:20
**excused** 93:15
**executed** 97:10
**execution** 96:14
97:19
**exhibit** 3:11,12
3:12,13,13,14
51:14 52:13,16
59:22 60:2,17
63:1,18 74:24
75:2,12,13 78:6
78:7,9 79:10,14
79:17 89:5,13,15
**exhibits** 3:10
59:18
**expect** 74:6
82:18
**expected** 72:13
73:20 74:8
**expedient** 34:14
**experiencing**
91:8
**expert** 5:1
**expiration** 96:19
97:25 98:25
**explain** 11:20
34:17 58:10
61:14 82:23

**f**

**facility** 27:9
**fact** 92:13
**fall** 77:9,10
**familiar** 73:12
**family** 16:8 17:5
**fancy** 58:11
**far** 13:3 32:16
88:21
**federal** 1:14
**felt** 82:20
**field** 81:19
**figure** 49:5
**film** 40:6 43:24
44:13
**films** 43:23
**finally** 54:14
**find** 17:12 24:6
33:12 44:12
62:13 67:5,11
72:16 95:11
**finish** 86:13
**first** 4:9 6:16
40:9 45:17
46:14 57:15
67:7,10 72:1
74:24 75:11
82:2 87:17
91:14 92:6
**five** 24:12,15
31:16 47:2,3
60:9,10
**focus** 20:17 73:3
**folks** 88:20
**follow** 33:20
43:15 56:16
65:18 66:17

**followed** 53:11
63:4
**following** 79:3
**follows** 4:11 47:8
**foregoing** 96:13
97:18
**forever** 65:8
**forget** 23:12
**form** 18:13 33:8
78:12 89:10
**formal** 14:18
18:5 21:5,17,21
21:23
**formally** 54:14
**format** 56:11
**forward** 64:11
95:15
**found** 32:8
**four** 24:12,15
**fourth** 60:8
**free** 96:14 97:20
**front** 11:9 51:15
53:15 66:9,24
76:17 89:5
**frontline** 86:1,21
**fulfill** 42:10
**full** 9:13,15
82:17
**fully** 42:13 92:3
**function** 57:3
82:17
**further** 57:17

**g**

**general** 7:10,10
24:20
**getting** 14:7 62:5
91:15

**give** 10:24 19:24
23:7 24:18
51:19 52:7
54:21 74:21
84:7 89:2
**given** 40:18 86:9
94:11
**go** 4:1 6:1,20,22
8:17 15:4 18:3
25:11 26:18,24
27:11,15 30:20
35:9 38:4 39:2
41:5 47:14 51:6
51:10 54:22
55:14 56:12
59:22 61:4,12
64:13 65:10,24
66:20 81:20,22
82:16 88:1
90:22 93:16
**goes** 90:12
**going** 23:10
24:17 25:8
26:21 34:12
35:22 36:24
45:8,9,19 47:2
51:10,12 52:5,6
52:7 54:23
59:18 63:6
64:12 68:4 69:3
73:13,14 74:22
79:10 81:9
87:16 89:5
**good** 4:14 17:19
18:20,24 47:1
52:9 61:23
79:13 82:21
93:16

**[goodness - injuries]** Page 8

**goodness** 40:22
**gotten** 40:20
**govern** 22:17
34:1,4
**governing** 32:21
**graduate** 6:8,12
7:2 9:16 12:15
**graduated** 7:13
7:19 11:16,21
42:16
**graduating** 6:16
7:22
**graduation** 13:1
**greeted** 68:3
**ground** 18:3
**group** 16:11
17:8 37:21
41:16
**guess** 60:15
**guidelines** 21:18
34:1,4,16,20
**guys** 17:18

**h**

**h** 15:19
**hack** 2:3 3:7 4:1
4:5,13,14 14:16
16:9,16 17:3,16
17:19,20 18:22
35:15 39:6
40:10,13 41:6
43:17 46:1,13,24
47:6,9 49:1,14
50:1,9,24 51:9
51:17 52:1,4,5
52:11,20 54:20
55:1 56:9,20
57:16,18 59:17

60:4,14 74:21
75:5,9,10 76:5,8
78:6,11 79:9,14
79:15,22 85:15
85:23 87:8 89:4
89:8,19 92:12,21
93:10,12,14,23
**half** 54:21
**hand** 59:20
**hang** 17:16
**happened** 74:6
**hard** 33:7
**harm** 82:20
**hate** 44:5
**he'll** 85:4
**head** 30:9 31:20
72:19 76:23
77:13
**healing** 43:15
**health** 5:15,16
13:12,16,23 15:6
15:15 16:1,12
17:9,22 20:15
27:20 31:4
38:13,14 66:2,6
66:7
**heart** 34:11
**held** 51:7 94:7
**help** 19:23 86:17
**helped** 81:21
**hernandez** 78:18
78:20,24
**high** 8:4
**higher** 22:2
**hill** 88:23
**hired** 15:22
**history** 48:23
49:10,13 50:8

55:15 56:7
61:13 66:21
73:8 76:16 88:7
**hit** 17:17 65:9
**hollow** 44:17
**honestly** 80:23
**hope** 52:6
**hospital** 8:5,21
9:2,5,17 13:5
14:24,24 19:5,9
25:22 27:3,6,7
27:18,22 28:9,13
41:12 61:22
**hour** 1:17 47:1
**huh** 54:7
**hurt** 81:2 82:24
**hypothetical**
26:18

**i**

**idea** 12:6 63:19
63:21 68:13
**identification**
52:17 60:3 75:3
78:10 79:18
89:16
**identify** 34:21
**identifying**
25:13
**illinois** 1:1,14
2:4,10 8:22 94:1
**illness** 55:15,18
61:13 66:21
76:16
**images** 40:17
**imaging** 20:2
**immediately**
12:24

**important** 77:1
**impression**
18:13 62:17,20
**incarcerated**
13:19 25:19
**include** 81:13
**included** 95:13
**includes** 17:5
86:15
**including** 29:2
32:7
**inconvenience**
83:19
**incorporated**
97:12
**independent**
58:3
**indicate** 54:1
**indicating** 95:13
**indication** 87:17
**indications** 24:6
**inflammation**
86:16
**information**
7:10 25:13 31:1
31:3,3 32:6,8,11
32:18 53:22
54:4,13 55:10
77:1,4,5 92:18
**injection** 86:8
91:2,4,15
**injections** 86:15
91:12
**injuries** 7:6,9
9:24 10:4,6,7,11
18:6 29:24 30:3
31:19,23 32:7
35:2 36:15 41:8

44:21,23 48:12
72:12
**injury** 4:24
35:17 36:1
37:13 45:10,12
46:3,19,22 47:17
47:19,23 48:8
50:5,13,17
**inquiring** 70:19
**instructed** 22:12
**insurance** 27:9
27:10
**intact** 42:16
**intense** 74:2
**interaction** 24:3
55:23 56:2 59:1
59:3 66:13,17
67:16 69:23
76:1 89:20 90:1
90:7
**interactions** 24:7
24:14,19 51:11
53:1
**interested** 69:2
82:5
**interesting** 76:22
**interference**
17:15
**interrogatories**
4:10
**interrupt** 27:12
86:12
**interrupted**
27:14 56:12
**interviews** 55:5
**introduce** 79:10
**investigated**
42:22

**involving** 43:2

## j

**j** 1:7 95:6 96:3
97:3
**jail** 13:17,19
25:19 26:6,7
**january** 89:21
92:1
**job** 18:9 21:5,8
22:8 34:9 53:1
**john** 14:24 25:22
27:6,18,22 61:22
**joint** 58:9 72:11
85:7 91:5
**joints** 29:13 57:2
85:6
**judgment** 40:5
45:7
**july** 9:19 74:13
77:2,24 78:3
**juvenile** 20:16

## k

**k** 5:12 12:3
14:24 15:19
75:16 94:2
**kapotas** 12:3,4,9
12:18,24 13:4,7
13:22 14:19,23
15:5,9,12 18:8
18:10,15,24
38:22 39:2
**keep** 29:20,23
86:17
**kept** 42:15
**khan** 15:17,20
**khan's** 16:6

**kidding** 45:19
**kind** 7:14 20:2
41:1,4 46:10
47:24 58:21
59:12 64:3
72:13,14
**knee** 45:13,14
**knew** 88:8 91:7
91:14,15 92:19
**know** 7:12 14:8
15:3 17:2 23:13
31:2 32:3,16
36:7 41:10
43:22 49:11
52:1 56:21,22
61:23 63:22
68:10 71:15,18
74:16,23 84:24
88:14 92:1 93:1
**knows** 27:5

## l

**labrums** 29:9
**landed** 76:23
**laura** 78:18,20
**lawsuit** 87:18
**lawyer** 5:1 26:9
44:6
**leading** 48:21
49:19 50:6
85:20
**left** 54:6 56:7
61:15,20 63:8
64:21 69:24
70:19 73:5,7
80:22 81:1,6,14
81:17 82:24
84:22 87:10,14

88:4,18 90:7,8
90:23
**legal** 95:1 98:1
**lesion** 88:14,18
**letter** 95:19
**level** 22:2,4
**license** 1:22
41:21 42:3,16,19
94:18
**licensed** 18:4
**limbacher** 1:4
2:14 4:15 24:4,7
24:10 25:5
51:11 55:9 56:3
56:17 57:5 58:3
59:8 61:14 62:2
62:8 63:9,16
64:8 65:19
66:14,18 67:2,16
68:2,16 69:5,11
69:16,22 71:14
71:24 72:8,21
73:3 74:2,12
75:19 76:2,13
77:15 78:3 79:1
80:16,21 81:1,20
82:4,7,23 83:20
84:20 85:1
89:18,23 91:8
95:6 96:3 97:3
**limbacher's**
23:20 63:4 70:8
74:9 82:12 85:1
87:10,14 88:4,16
92:2,8,13
**limited** 81:17
**line** 95:13 97:7
98:3

**[list - message]**                                                    Page 10

**list**  11:6 55:2
  58:6
**listed**  55:9 58:22
  97:7,17
**listing**  97:7
**literature**  6:7
**little**  7:1 15:4
  35:5 48:2 60:20
  64:12 73:6
**live**  4:19
**living**  85:5
**llp**  2:3
**locate**  23:22,24
**location**  87:22
**locations**  38:20
**lock**  52:2
**locke**  2:3
**lockelord.com**
  2:5
**long**  6:24 8:8 9:9
  28:20 29:12
  50:5,13
**longer**  52:6 60:4
  61:8
**look**  23:18 24:2
  24:17 38:4
  52:12 53:14
  59:14 65:16,23
  76:3,6 78:16
  84:6 87:13 90:3
**looked**  23:21
  61:9 72:20
  74:13 77:2
  87:10 88:16
**looking**  20:5
  44:17 45:11
  66:8 76:10
  80:14,19 89:12

**looks**  52:18
**lord**  2:3
**lot**  49:3 50:11,12
**loyola**  6:5,6
**ls**  61:21
**lumbar**  58:19
  72:14
**lumbosacral**
  58:15,16

**m**

**ma'am**  4:14 12:9
  51:1 54:1 56:9
  66:10 67:6
  68:19 79:10
  85:3
**madam**  95:10
**magic**  89:6
**mail**  70:22
**main**  8:5 13:5,5
  38:12,13,14
**maintained**
  42:15
**malpractice**  43:2
  44:6
**mammograms**
  41:3
**margul**  15:17
**mark**  62:11
**marked**  52:16
  60:2 75:2 78:9
  79:17 89:15
**marvelous**  60:19
**materials**  29:21
  29:23
**matriculate**  9:17
**matter**  23:16
  77:13

**mccarthy**  56:15
  63:6 64:7 68:5
  70:3,8,18 80:2
  80:13,18 81:24
  83:22 84:8,14
  90:18,24
**md**  32:12
**mean**  14:13 18:3
  18:18 21:13
  22:19,23 27:12
  28:17 34:8 35:9
  35:12 36:23
  41:1,9 45:12
  46:9 47:24
  49:21 52:7
  59:10 61:23
  68:13 72:23
  73:21 76:21
  82:15 85:4
  88:10 90:17
**means**  16:20
**meant**  13:13
  20:9,10 30:21
  63:22 68:22
  75:22
**mechanism**
  47:22
**medical**  7:7
  13:10,11,17,18
  16:6 17:23,24
  21:15,19 23:19
  24:11,21,22
  26:24 27:8
  29:20 30:11,23
  32:5,16,21 34:7
  38:17 42:6,7
  43:2,6 44:6 53:8
  55:3,15,20 61:9

  64:24 66:1,2
  70:22,24 71:1,5
  71:9 73:12
  75:18 76:11
  83:4,9,12,16
  86:4 92:3
**medically**  40:5
**medication**
  68:17 69:20
  82:3
**medicine**  5:1
  16:8 17:5 18:14
  22:20 31:2
  56:14,21,23 57:1
  73:13 79:2
  86:18
**meet**  14:17,19
  23:15 24:9 59:5
  63:24 64:4
**meeting**  65:20
  71:14 72:22
  73:3 74:11
  75:19 83:15
**memo**  70:3,9,12
  70:14 80:15,18
**memorandum**
  64:6 70:19
  80:19
**memory**  67:13
  67:14,15
**mention**  69:18
**mentioned**  29:12
  39:10 44:3 55:4
  56:13 81:11
  83:21 88:8
  91:21
**message**  71:2

**met** 76:12
**mia** 2:9 17:16
**mia.buntic** 2:11
**middle** 55:12
58:21
**midwest** 95:17
98:1
**million** 22:22
**mind** 23:3 50:20
**minute** 19:24
25:7 47:2 51:3
54:8 57:24 89:2
**minutes** 47:3
54:12,15 89:1
**misdiagnose**
92:19
**misha** 36:8
**missed** 56:16
79:1
**missing** 59:15
**mission** 33:11,13
33:18,22
**misstates** 46:6
**mistake** 26:8
**misunderstand...**
14:21
**moment** 44:22
51:5 68:11
74:21
**monisha** 36:9
**months** 9:11
13:2
**morning** 4:14
**motion** 81:17
**mouth** 86:19
**move** 52:8 64:11
64:12

**moved** 38:19
**moving** 60:16
83:20
**mri** 40:17 41:17
43:21 44:24
45:4,9,15 46:5
46:16 56:18
61:15,20,24 62:2
62:5,8,12 63:8
69:22,24 70:5,10
70:15,19 80:17
80:22,24 84:15
87:10,13,21,22
88:3
**mris** 19:16 23:20
40:19 41:7,12
87:20 88:16,22
**multiple** 8:3
56:6 61:22
77:21 81:22
90:19
**muscles** 45:23
46:3 48:13
86:17
**musculoskeletal**
63:2 67:3 91:22
**mute** 17:17

**n**

**n** 2:2 3:2 15:19
75:16
**name** 4:14,17
15:18 17:8,13
25:12 30:8 36:7
43:24 53:22
87:17 91:23
95:6 96:3,4,15
97:3,4,21

**named** 36:9
**names** 30:10,13
**necessarily** 46:8
47:21
**necessary** 37:15
**neck** 84:3
**necrosis** 10:17
**need** 14:5 43:22
46:10 48:2
49:23 52:3
**needed** 18:1
80:24 88:13
**needs** 46:16
**nephrology** 8:4
39:15
**nerves** 45:23
46:4
**neurologist**
75:21
**neurology** 75:17
**neurosurgeon**
69:20 73:21,22
73:23 75:15,20
75:22 77:5
81:23
**neurosurgery**
68:8,23,24 69:1
69:4 74:13
75:24 76:10
77:3
**never** 20:11,12
25:6 49:23 74:3
80:23 90:7,9
**new** 56:11
**nice** 58:11
**normal** 46:14
53:1,11

**normally** 56:10
59:20
**northern** 1:1
**notable** 77:1
**notarized** 95:14
**notary** 1:13
95:24 96:10,18
97:15,23 98:23
**note** 52:21,24
53:5,7,12 55:6
57:8 59:10,11
60:5 61:19
62:10 63:6
66:11 67:4 68:7
68:9 70:2,5,6
74:13,16 75:17
77:2 78:17 79:6
80:9,11,20 83:2
83:23 84:11
90:11 95:12
**notes** 23:21,23
23:24 52:19
61:17 65:11
66:16 67:24
68:1,15 73:23
76:4 78:15 81:4
83:4,9,12,16
89:24 90:3,12,16
90:17,19 91:1,21
94:10
**november** 1:18
52:19 55:23
57:6 62:9 64:9
84:8 94:8
**number** 24:7
25:13 95:7,13
**numbers** 97:7

[numerous - page]                                                          Page 12

| | | | |
|---|---|---|---|
| **numerous** 91:22 | **official** 96:15 | 66:20 67:2,15 | 44:23 45:10 |
| **nurse** 6:18,19 | 97:21 | 68:1,20 69:7,11 | 46:19 |
| 7:11 8:8 | **officially** 54:18 | 69:15 70:17,22 | **orthopedics** 10:3 |
| **nurses** 7:7 39:23 | **oh** 12:8,11,21 | 71:13 72:24 | 11:24 12:2 |
| **nursing** 6:20,22 | 14:21 20:17 | 74:21 75:6 76:5 | 16:23 19:9 30:5 |
| 6:24 7:4,12,14 | 31:12 39:16 | 76:7,15 77:7,12 | 39:8,12 |
| 7:23 | 40:22 44:10 | 77:19,23 78:6,23 | **osteoarthritis** |

|   **o**   |
|---|

| | | | |
|---|---|---|---|
| **o** 12:3 94:2,2 | 45:19 54:3 | 79:9,19 80:11,19 | 10:17 84:22,23 |
| **o'clock** 1:18 | 57:12 60:15,19 | 84:2,6 85:4 | 87:1 |
| **ob** 8:4 | 61:17 62:16 | 87:13 89:3 90:6 | **outdated** 31:8 |
| **objection** 14:11 | 67:14 75:22 | 90:11 91:24 | **outpatient** 65:24 |
| 16:7,13,24 18:16 | 82:15 83:22 | **old** 18:3 85:1 | 66:2 75:17,24 |
| 35:4 38:24 | **ohio** 95:2 | **once** 15:1 36:17 | 76:11 |
| 40:23 43:12 | **okay** 5:22 6:15 | 37:6,14 55:5 | **outside** 22:4 |
| 45:21 46:6 | 7:11,18 8:16 | 65:9 | 23:9 34:23 88:2 |
| 48:21 49:7,19,20 | 9:16,21 10:19,23 | **ones** 30:8 | **overseeing** 14:3 |
| 50:6 85:12,19 | 11:2,12,16 12:8 | **online** 33:15 | **overview** 40:18 |
| 87:2 92:4 | 12:13,17,21 13:4 | **operation** 39:18 | |

|   **p**   |
|---|

| | | | |
|---|---|---|---|
| **observation** | 14:7 16:3,17 | 39:20 | |
| 18:23 | 17:12 18:9,13 | **opportunity** | **p** 2:2,2 12:3 |
| **observed** 84:21 | 19:2 20:17 21:4 | 29:13 | **p.m.** 1:18 47:12 |
| **observing** 88:3 | 22:10 23:18,22 | **optometry** 39:16 | 93:24 |
| **occasion** 15:5 | 24:13 32:2,14 | **oral** 4:10 | **pa** 8:18 9:17 |
| 23:18 | 33:13,17,24 38:1 | **order** 19:12,16 | 10:8,11 11:17,22 |
| **occurred** 55:23 | 38:11,19 41:11 | 19:19,23 63:7 | 12:15 19:15,18 |
| 80:7 | 43:1 44:3,10 | 65:17 70:10 | 19:22 20:8 |
| **occurs** 60:8 | 45:7 46:18,24 | **orders** 52:7 | 21:18 36:11 |
| **offer** 86:15 | 47:5,16 48:4,16 | **organ** 44:18 | 40:2,16 42:6,10 |
| **offered** 8:19,22 | 50:24 51:21,22 | **orthopedic** 7:6,9 | 42:17,22 80:12 |
| 86:8,9 91:2,11 | 51:24 52:2 53:4 | 9:24 11:18 15:1 | **pac** 76:4 |
| 92:10 | 53:21 54:3,11 | 18:6 27:23 28:1 | **page** 3:6,10 |
| **offhand** 81:7 | 55:10,14,19 | 28:12,17,21 29:1 | 53:14 54:22 |
| **office** 16:11 | 57:11,22 58:6 | 29:4,14,24 30:3 | 60:8 64:14,15 |
| 29:17,21,24 30:3 | 59:14,17 60:19 | 30:10,16 31:18 | 65:24 66:9,9,16 |
| 30:16,22 38:13 | 61:12 62:18 | 34:22 36:1,4,11 | 74:24 75:11 |
| 38:15,16,17 | 63:3,12,16,20 | 36:15,19 37:12 | 76:6,17 78:16 |
| | 64:6,13,16,20,23 | 37:21 41:8 | 84:6 95:13,15 |
| | 65:3,13,16,23 | 43:21 44:15,20 | 97:7 98:3 |

**pages** 59:15 60:6
60:9,10 66:17
**pain** 44:18 48:17
49:3,12,17 50:11
63:2 69:17
72:17 73:4,9,16
73:16,18 74:2,3
74:4 81:6,8,13
82:2,6,13,16,18
82:18,19 83:19
85:8 86:9,16,22
90:8 91:5,8,16
91:19 92:2,11,13
**painful** 85:11,17
**pandemic** 36:24
37:2,6,9 60:23
**paragraph** 77:6
**pardon** 86:11
**part** 7:4 30:22
31:11 34:9
36:24 40:1,16
53:1 55:2 59:11
97:9
**particular** 10:13
14:2 16:10
41:15 71:19
76:15 83:15
**parts** 46:11 81:8
81:12
**pas** 39:22
**patel** 36:8,9,10
**patient** 5:2 11:18
11:21 18:14
19:4 21:10,14,18
23:8 25:8 31:11
33:10,21 34:1,18
34:21 36:1
37:12,13 43:5,9

43:21,21 44:15
44:15 45:8 46:2
46:9,16 47:11,16
47:19 48:6,10,16
49:5,9,15 50:16
50:23 53:1,4
54:2 55:4 59:1,6
61:5 63:23
66:13 69:23
74:5 76:22 83:5
83:9 85:11,18
**patient's** 49:6
50:21
**patients** 13:19
15:7 17:10
18:15 19:3,8,12
19:16,19 20:3
22:1,7,13,18,22
23:7 26:1,10
27:20 34:5
37:18,20 39:4
41:13,17 44:11
64:1,4 92:23
93:1,4
**pattern** 74:8
**pediatric** 8:3
**people** 17:23
26:4,6 27:9
28:19,20 33:20
35:18,21,23 38:5
41:2,3 49:22
72:12,15,17 74:3
82:15,17,18
90:19
**percent** 87:24
**perform** 53:21
54:3

**period** 12:8
15:20 16:19
20:17,19 21:2
38:23
**periodically**
38:20
**person** 48:4 49:2
50:2,10 56:24
86:21
**personal** 4:24
**personally** 96:11
97:15
**pertaining** 1:16
**phone** 95:3
**phonetic** 15:17
**phrase** 5:20
**physiatrist**
56:24
**physical** 56:14
56:21,23 63:7
79:2 81:20 82:1
82:9,13,16 85:22
85:24 86:4,10,16
86:22
**physician** 5:13
9:8,10 12:20,21
12:23 14:1,4,10
14:10,13,18 15:2
15:10,13,16,21
16:4 18:4 19:2,7
19:11 20:22
21:6 32:10
41:21 49:23
**physician's** 9:6
9:22 12:18
**physicians** 28:8
**picture** 50:21

**place** 24:14 72:6
**plain** 43:23,24
44:13
**plaintiff** 1:5 2:6
4:16
**plan** 51:18 56:16
57:13,17,21,24
60:7,8 62:15,17
62:20,22 63:3,10
63:17 86:15
**please** 4:1,17 5:4
11:20,22 12:14
13:8 27:15 33:4
51:6 56:12 58:7
79:15 90:22
95:11,11
**plenty** 49:21
**point** 68:6 71:15
74:15 87:15
93:15
**policies** 32:20
33:19
**polite** 92:22
**pops** 11:9,9
**population**
33:10
**position** 6:17 8:1
**positions** 8:14
21:1
**possibility** 50:4
**possible** 83:17
**possibly** 32:7
**posterior** 11:8
11:13
**postings** 16:18
16:20,21
**potential** 46:22

**practice** 5:12,20
5:22 16:10 29:2
30:19,23 34:24
34:24 35:3
46:14 53:11
**preber** 2:8 4:6
14:11 16:7,13,24
18:16 23:16
35:4 38:24
40:23 43:12
45:21 46:6
48:21 49:7,19
50:6 51:19,24
52:9 53:14 75:6
79:13,19 85:12
85:19 87:2 92:4
93:7,16,18,20
95:5
**predict** 37:9
**pregnancy** 17:7
**preparing** 53:5
53:11
**prescriptions**
21:12
**present** 2:14
15:23 45:10
46:16 49:3
55:15,18 58:2
61:13 66:21
76:16
**presentation**
74:9
**presented** 23:13
36:1 37:12
46:19,22 48:10
**presently** 12:4
16:17

**presents** 47:16
48:6,16 49:2,15
86:21
**pretrial** 26:10,22
28:5 32:22,24
**pretty** 14:12,15
22:3 31:24,24
35:13 55:4,17
85:9
**previous** 70:2,5
70:6
**previously** 26:23
84:21 91:12
**primarily** 38:7
43:19
**primary** 8:4
10:4 17:4,10,11
17:14,21 52:19
89:18
**printed** 31:9
**prior** 6:19 25:14
74:17
**prison** 26:4,5
**prisoner** 25:18
34:17
**prisoners** 25:24
**probably** 12:11
24:15 33:16
40:19 49:12
56:5 72:16
73:14 76:3
**problem** 48:19
49:11 54:21
58:8 67:5
**problems** 27:13
51:2 55:8 56:4,6
57:2 58:6,7,22

**procedure** 1:15
96:5 97:5
**procedures**
21:17 32:21
33:19,24
**proceedings**
94:11
**produced** 60:22
60:23
**production**
95:15,17,22
**professional**
5:11 6:17
**professionally**
7:23
**program** 8:18,19
8:22,23 9:18
12:15 30:24
31:5,11,14,18
**promise** 5:6
**promised** 92:21
**promises** 5:5
**properly** 92:15
**proportion**
73:10
**provide** 13:18
17:9 22:7,13
23:4,7 28:1,9,13
33:9,9,21 34:8
50:22
**provided** 18:15
53:16
**provider** 5:12,21
5:22 21:15,19
22:2 27:19 33:9
41:16 42:6 71:2
71:4,10

**providers** 32:16
34:6,7 41:16
77:22 92:16
**provides** 29:5,8
**provisions** 1:14
**public** 1:13
96:10,18 97:15
97:23 98:23
**pull** 25:11,14
73:23
**pulled** 79:14
**purpose** 78:23
91:4
**pursuant** 1:14
**push** 65:4,6
**put** 25:12 62:21
68:22 74:18
89:5

**q**

**qualified** 40:4,5
**quality** 18:14
34:5
**question** 5:3
14:6 19:24
23:23 26:21
28:11 31:6 33:3
35:24 37:11
39:9,11 41:23
44:22 51:1
62:11 68:20
73:13 92:5,7
**questioning** 93:4
**questions** 14:14
24:20 41:19
45:16 48:5
70:14

quick  41:20
50:24
quite  17:7 18:20
18:24 30:7
45:13 68:21
71:16 76:21
81:19 87:16,18
quotes  68:23

**r**

r  2:2 75:16
r.p.r.  94:5
radiologist  41:4
41:7
radiologists
40:21 41:2,11
radiology  39:16
40:20 55:6 76:4
raksin  75:15
randall  2:3
randy  4:14
range  28:1 81:17
ray  40:6 43:10
43:24 44:19,24
45:4,8 46:12,15
48:2 63:8 72:8
72:22 73:20
92:18
rays  19:12 23:19
40:2 43:18 59:9
59:12 71:13
72:16 87:20
88:17,22 90:23
reach  74:1
read  40:17 41:3
41:12,17 58:7
67:4,10 73:24
74:15,16,17 77:8

80:3,5 88:7
90:14 96:5,6,12
97:5,6,17
reading  40:2,19
91:7 95:19
reads  41:7
ready  47:14
real  41:19
realize  9:1
really  72:19
reason  5:8 42:20
42:23 53:10
57:23 61:24
83:15 95:14
97:8 98:3
reasons  43:16
recall  30:9 31:20
38:3 43:8 62:7
68:24 69:13
70:4,11,16 81:7
81:15,19 82:22
83:2,3 88:5
receipt  95:18
receive  6:3 10:2
10:13,16 19:8
21:21,23 34:6
40:1 43:10,21
44:11
received  25:15
25:21 27:2
48:12
recess  47:7
recognize  51:3
51:14 67:6
75:13 78:12
89:9
recollect  31:15
37:21

recollection
24:19 58:3
77:23 80:20
83:18
recommend
85:22
recommendati...
56:15
recommended
81:23,24 82:1,1
reconvene  47:3
record  24:3 51:6
51:8 52:24 53:8
55:3,3,16,19,20
61:9 65:1,15
70:23,24 71:1,5
71:9 74:19
75:18 76:1,11
90:4 93:22 97:9
recorded  84:23
recording  64:3
records  23:19
24:1,11,16,21,22
25:14 27:1
29:20 38:4 76:4
recurrence  56:8
recurrent  49:10
88:20
recurring  48:17
49:15 50:2 73:4
81:6
reduce  49:22
refer  19:4 20:3
21:12,13,14,18
22:1,5 27:19
31:7 37:20
41:15 43:20
46:4 58:22

reference  29:23
62:13 95:7 96:2
97:2
referenced  96:11
97:15
referred  34:18
52:15 60:1 75:1
78:8 79:16
89:14
referring  90:16
reflect  91:1
refresh  80:20
refused  81:22
registered  6:18
6:19
regular  14:18
regularly  30:21
regulating  18:18
rehab  57:1 63:7
relevancy  45:21
reliance  84:17
relief  86:9
remarkable  72:9
72:19
remedy  59:17
remember  10:19
24:13 26:19
30:8,13 37:5,7
39:17 57:10
61:16 62:1,4
63:13 67:7,19,22
69:15 70:18
71:20,23 72:7,18
73:2 76:24
77:16 78:2 88:3
88:10,19,21
remind  47:10

**remote** 1:11
**remotely** 4:4
**renew** 42:2
**repair** 28:15
  29:9
**repaired** 29:14
**repeat** 28:11
**rephrase** 5:5
  23:23 39:9
**replacement**
  28:9 29:5 87:6
**replacements**
  28:13
**report** 40:20
  59:14 77:14,24
  78:4 82:12
**reported** 1:21
  73:16,19 90:6
  94:6
**reporter** 4:3
  40:8,12 54:15
  57:14 93:8,11,13
  93:18,22 96:7
**reports** 59:12
**request** 56:19
  69:22 97:9,11
**requested** 56:17
**requesting** 61:20
**require** 49:4
**required** 17:24
  42:7 95:24
**requirements**
  42:9,13
**requires** 47:18
  48:18
**resources** 30:2
**respond** 71:4

**responded** 70:20
**responsibilities**
  47:11 53:2
**responsibility**
  14:9
**responsible** 14:2
**restate** 32:15
  35:22
**results** 71:17,24
  72:2,6,8,22
  77:17 90:24
**resumed** 47:8
**retain** 71:10
**retired** 12:4
**returned** 95:18
**reverse** 88:23
**review** 14:14
  40:5 59:9 71:13
  76:15 95:12
  96:1 97:1
**reviewed** 88:22
**reviewing** 24:11
  76:20
**rhack** 2:5
**right** 8:12 9:2
  12:17 20:14
  25:2 26:13
  34:13 40:14
  42:19 44:1,3
  48:20 51:20
  52:5 54:4,5
  57:19 58:1,6
  59:2 61:6,18
  63:14 64:15,18
  64:21 65:9 66:3
  66:10 68:20
  73:14 74:14,17
  79:3,6 80:3,4,4,7

  80:9 84:11,12
  85:10,16 86:11
  86:20 90:14
  91:1,11
**rights** 43:7
**risk** 8:4 50:13
**road** 87:5
**role** 19:2
**room** 35:11
  63:24 64:4 72:4
**rotation** 8:23
**rotations** 20:12
**rotator** 28:15
  29:9 88:6
**rpr** 1:21
**rules** 1:15 34:21
  96:5 97:5

**s**

**s** 2:2 12:3,19
  75:16 95:15
  97:8,8 98:3
**sachs** 88:23
**sacral** 58:19
**save** 53:7
**saved** 54:13 65:6
**saw** 60:5 73:21
  73:22
**saying** 72:7
  86:14
**says** 33:23 54:3
  55:17 61:18
  83:9
**scale** 39:19
**scan** 43:23 44:3
  44:7,11
**scans** 19:19
  39:16

**schedule** 62:8
  84:17 89:2
**scheduled** 53:19
**scheduling** 78:21
**school** 6:20,22
  7:12 8:15,17
  10:8,11 11:17,22
**science** 6:13,14
  6:15
**sciences** 6:7
**scope** 22:4,5,6
  34:24 35:3 41:5
**screen** 51:17,20
  51:21 52:13
  56:10,10 79:20
**scroll** 52:3 62:14
  62:16 66:22
**seal** 96:15 97:21
**second** 51:19
  54:21 77:6
**section** 31:18,21
  31:24 55:15,19
  62:15,20 66:21
  66:23 76:16
**sections** 55:20
**see** 10:4 15:5
  25:21 27:2
  34:13,18,22
  39:16 43:18
  44:24,24 45:1,2
  45:3,4 46:15
  49:23 51:14,21
  54:6 55:5,6
  57:12 59:13
  60:9,10,16 62:14
  63:7,14 64:14,14
  64:18 66:9
  68:16,22,23 69:3

69:20 72:10 73:20 74:8,24 75:6 79:12,20,23 80:6 84:7,11 88:13,17,19,23 89:7 93:1

**seeing** 35:8

**seen** 12:6 54:2 56:14 68:4

**send** 34:12 43:9 44:14 45:8,9 63:6 71:2

**sense** 34:9 39:19 61:3

**sent** 34:21 37:4 70:3,9,11,14 79:6

**separate** 38:16 67:13,14,15

**separately** 63:12

**sequence** 86:3

**served** 38:11

**server** 25:20

**service** 13:12 38:13,15 53:15 53:16 66:4

**services** 5:15,16 13:16,23 15:6,15 16:1,12 17:9,10 17:22 20:2,15 23:3 27:20 28:2 28:4 31:4 39:7 39:12 66:6,7

**set** 63:17

**sets** 33:19

**seven** 12:12

**severe** 48:4,6,10 85:9,10

**shane** 1:4 2:14 4:15 95:6 96:3 97:3

**share** 51:17,20

**she'll** 60:10

**sheet** 95:13 97:7 97:10,18 98:1

**sheriff** 1:7 95:6 96:3 97:3

**short** 47:1,7

**shorthand** 94:6 94:9

**shortly** 93:1

**shoulder** 10:6,11 10:17 11:3 28:5 28:9,13,19 29:5 31:22 32:3,6 35:2,12,17 40:6 45:18,24 46:4,22 47:17,20 48:1,7 48:13,17 49:3,16 49:22 50:2,5,11 56:7,18 58:23 61:15,20 63:8 69:12,14,16,21 69:22,24 70:15 70:19 73:5,7,11 74:2 80:17,22,24 81:2,6,14,17 82:10,13,24 83:24 84:22 85:17 86:1,5,22 87:1,4,6,11,14 88:4,13,18 90:7 90:8,18,19,23 91:2,4,8,15,16 91:19 92:2

**show** 50:10 60:6 60:10 68:11

**showed** 23:13

**shown** 40:6 62:24 95:16

**shows** 46:15 74:23

**side** 5:17 8:6 54:6

**sign** 65:2

**signature** 60:11 64:20,24 65:10 74:18 94:17 95:14

**signed** 54:14,19 55:6 96:13 97:18

**significant** 39:20 49:17 67:23 73:4 84:21 85:8 85:16

**signing** 95:19

**simple** 62:21

**sincerely** 95:21

**sir** 92:17 95:10

**sit** 62:7

**site** 78:21

**sitting** 25:2

**situation** 81:22

**six** 12:12 42:4

**skeletal** 56:3,6

**skipped** 15:4

**sleeping** 83:1,20

**slowly** 71:22

**smith** 25:8,9,9 25:15,18,21 26:19,22,23

**smith's** 25:12 27:1

**soft** 48:12

**solution** 92:10

**solutions** 95:1 98:1

**solve** 54:20 55:8

**somebody** 35:11 47:24

**soon** 51:4

**sorry** 13:13 17:18 21:22 28:11 34:17 35:22 39:9 40:8 54:15 56:9 57:14 64:8 66:5 68:17 89:23 90:21 93:17

**sort** 14:7

**south** 2:4,9 4:20 5:17 8:6

**speak** 70:7,18 82:7

**speaking** 70:11

**specialist** 21:19 22:2 34:18,22 56:14 62:12 88:13

**specialize** 7:15 28:19,20

**specializes** 57:1

**specialties** 81:19

**specialty** 7:14,18 16:6 17:6 28:21 39:3,8,11,13,23

**specific** 10:24 34:20

specifically
  57:10 58:23
speculation
  14:11 16:7,13,24
  18:17 39:1
  40:23 43:13
  49:8,20 85:13,20
  87:3 92:5
spell  15:18
spent  54:12
  71:16 73:6
spine  58:18,19
  58:19,20 61:21
  69:3,9 84:4
spoken  90:17,18
ss  94:1
staff  17:24
staffs  36:18
standard  22:13
  22:16,19,24 23:2
  23:5,6 33:2
  47:18 48:18
  49:4
start  5:23 80:4,9
started  54:10,17
starts  54:9
state  1:13 8:22
  94:1 96:10
  97:15
state's  2:8
statement  33:12
  33:14,18,22
  41:23 96:13,14
  97:19,19
states  1:1,15
status  50:17
steps  93:2

steroid  86:15
stiff  86:18
stiffness  83:19
stop  72:20 86:11
stored  90:3
story  55:18
street  2:9
strengthen  86:17
stroger  14:24
  19:22 20:8,8,9
  20:11 25:22
  27:3,6,6,18,22
  28:8 29:14 36:3
  37:4 41:11
  61:22 87:22,23
  88:1
structures  45:13
study  6:6 9:9,12
studying  9:22
stuff  52:8 67:23
subjective  55:2
subscribed
  96:10 97:14
  98:21
subsequent  18:5
suffered  48:7
suite  2:4,9 95:2
superior  95:1
supervising
  14:17
support  77:10
supporting
  45:14
suppose  25:7
  80:3
supposed  33:20
  34:5 55:14

sure  21:7 23:12
  28:12 33:11
  39:10 45:13
  47:24 50:15
  68:3,22 74:15
  77:16 79:11
  81:3 87:19,23
surgeon  28:17
  87:5
surgeons  28:12
  29:2,14
surgeries  28:5
  28:10,24 29:6
  32:3
surgery  28:22
  32:7 69:1,2,6,8,8
  69:12,14
surround  45:17
  45:23 46:4
suspected  43:11
  43:14
suspended  42:20
swear  4:1,3,4
sworn  4:7,10
  96:10,13 97:14
  97:18 98:21
symptoms  83:24
system  24:3,21
  24:23 25:6,20
  32:14 53:8 65:7
  70:23,24 71:1,5
  71:9,10 90:4
systems  66:3

**t**

t  12:3
take  8:1 17:6
  18:5 42:7 46:24

47:2 51:3,24
  52:6,12 86:19
taken  1:12,17
  11:17,21 41:7
  87:21 94:10
talk  25:4,5 51:10
talked  61:6
  69:19 80:15
talking  26:19
  41:5 52:1 69:8
  71:16 73:7
talks  76:23
taught  10:7,20
  22:16
teach  57:2
tear  58:11 85:5,7
tech  54:20
technology  51:2
tell  5:4 8:16
  12:14 13:15
  14:9 22:24
  24:10 33:5
  35:13 52:13
  55:14 56:21
  57:8 58:7 64:23
  69:11 71:20,23
  74:4,4 81:1,5,16
  82:19
telling  73:3
tells  55:17
ten  31:16 42:5
tendons  45:22
  46:3 48:14
term  50:5,13
  56:22
terms  35:2 44:20
  62:21 86:24

testicular  44:18
testified  4:11
testify  5:8
testimony  46:7
  94:6 96:6,7 97:6
  97:9,12
textbooks  30:11
  30:22
texts  30:16
thank  9:21 13:14
  15:3,12 17:13
  20:5,10 21:4
  26:16 36:10
  40:12 47:6,14
  55:10 58:17
  60:19 65:16
  75:9,22 89:9
  93:3,6,7,17
therapists  81:24
therapy  81:21
  82:2,9,13,16
  85:22,24 86:4,10
  86:17,23
thing  25:23 29:8
  38:14 44:7 47:1
  48:11 50:3 59:2
  59:21 60:9 67:8
  81:18 82:2
things  23:11
  28:18 29:4 40:7
  40:11 60:24
  68:4 77:21
  83:14
think  8:11 14:21
  15:3 18:20 22:8
  24:16 33:18,22
  35:11 38:6
  44:21 48:11

53:10 88:12
third  58:7 76:6
thirty  95:18
thomas  1:7 95:6
  96:3 97:3
thoracic  58:19
thought  61:1
  76:22
thousand  72:16
three  34:12
time  9:13,13,15
  12:8 15:20,22
  20:19,22 21:2
  30:15 31:8,10,17
  37:17 38:11
  42:13 51:4
  53:18,18,19,20
  53:24 54:1,2
  67:6 70:6 71:16
  73:7 74:18
  84:15 87:24
  91:14 92:24
timeframe  38:1
timely  34:1
times  14:14
  24:12 31:16
  81:22
timing  12:13
tissue  45:2
tissues  45:1,17
  48:13
title  5:11
today  5:9 23:14
  62:7 93:3
told  22:8 49:10
top  30:9 31:20
topics  23:10

torn  29:9
totally  73:9
trained  7:5,8 9:3
  9:23 10:10
  11:12 34:7
  40:16
training  10:2,14
  10:16 11:17,20
  18:5,9 21:21,23
  40:1
transcribed  96:7
transcript  93:10
  94:8 95:11,12
  96:5,12 97:5,11
  97:17
transcription
  94:9
trauma  27:11,16
  47:22 48:4,6,11
traumas  27:17
treat  10:10,14,17
  11:13 15:6
  19:16,20 21:11
  25:8 27:16
treated  19:13
  26:23 34:2
treating  10:20
  19:3 37:17
  44:23 48:6
  92:15
treatment  7:6,8
  13:18 18:6 19:4
  21:14 22:17
  25:14,22 27:2
  29:24 30:4
  31:22 32:6,21
  35:17 36:15
  50:22 63:10

86:1,21
treatments  31:3
  84:20
treats  27:9,11
tried  60:24
  86:12
trok  1:12,21
  94:5,17
true  36:21 46:18
  46:21 55:7
  82:14,15 94:9
truthfully  5:9
try  5:6 33:4
  46:24 48:18
  49:5 51:12
  86:20 92:22
trying  17:12
  22:24 28:23
  33:5,6 39:19
  50:20 54:20
  67:5,10 73:2
  77:9 80:6 82:16
turned  62:10
two  7:1 42:11
  82:8
type  7:18 10:2
  10:21 41:7
  65:14 67:23
typed  54:18 68:7
  93:8
types  11:3
typically  30:18
typing  54:12
  83:4

| u |
|---|
| u  8:2,9 |

**[uh - wrote]**

**uh** 54:7
**ultrasound** 20:4
  44:15,16,19
**unclear** 35:16
**underinsured**
  27:10
**understand** 5:4
  28:23,24 33:6,6
  35:6 61:16 73:6
  73:15,18 77:9
  92:1
**understands**
  22:3
**understood** 69:5
  92:8
**united** 1:1,15
**university** 6:5
  7:24
**unremarkable**
  88:11
**urgency** 35:1
**urgent** 16:14,17
  34:10 36:2
**urology** 39:15
**use** 59:5
**uses** 24:22
**usually** 22:5
  31:6 59:10
  67:23 76:3
  83:13 86:14

**v**

**v** 95:6 96:3 97:3
**vacation** 38:6
**vague** 35:5
**variety** 81:12
**various** 43:15
  81:8

**veritext** 95:1,7
  98:1
**veritext.com.**
  95:17
**vernacular** 14:8
**version** 60:4,21
  61:8
**versus** 45:14
**video** 23:14
  59:20 63:24
**view** 93:15
**violation** 43:6
**vision** 33:11,13
  33:17,22
**visit** 27:1 77:3
  83:5
**visiting** 63:23
**visits** 61:22
**vs** 1:6

**w**

**wacker** 2:4
**wait** 34:12
**waived** 95:19
**walk** 54:23
**walking** 48:1
**walks** 35:11
**want** 17:16
  23:11 25:4,5
  41:9 44:21
  47:10 67:4 69:6
  69:7,12 80:3
  89:3 93:8,19
**wanted** 32:5
  61:15 62:3,12
  68:23 70:9
**wanting** 62:2
  69:20

**wants** 80:21
**way** 14:3,18 20:1
  32:15 52:2 59:1
  59:20 61:1
  68:10
**wear** 58:11 85:5
  85:7
**website** 33:15
**week** 15:1 30:17
  31:13 36:17
  37:6,14,22
**weekly** 14:20
**weeks** 34:12
**went** 8:15 9:5
  12:17 25:20
  37:8 74:12
  87:19
**wide** 31:2 32:1
  41:5
**withdraw** 19:23
  21:22 44:21
  73:17
**witness** 3:3 4:2,7
  4:9 14:12 16:8
  16:14 17:2
  18:18 35:8 39:2
  41:1 43:14
  45:22 46:8 47:5
  48:22 49:9,21
  50:7 51:23
  52:18 54:17
  56:13 75:4,8
  76:7 79:21
  85:14,21 87:4
  89:7,17 92:6
  93:6 95:8,11
  96:1,4,11 97:1,4
  97:15

**witness'** 95:14
**woman** 36:7
**wonder** 92:14
**word** 20:5 40:9
  57:15 58:11
  83:8,11
**words** 21:8
  63:12 80:6
**work** 5:14 8:5
  12:17,24 13:7
  14:3,5 16:22
  17:4 20:8 37:8
  38:2,12 39:23
  42:18
**worked** 7:24 8:3
  11:23 12:9,11
  13:4,22 14:23
  15:15 18:7,10
  20:11,16 25:6
  30:6 36:11 37:8
**working** 9:13,14
  37:23 59:21
**works** 78:21
**worry** 52:9
**worse** 82:11
  83:24 84:5
**write** 21:11 64:6
  70:4
**writing** 33:19
**written** 21:17
  32:20 33:24
  34:4,16,20 52:22
  58:1 68:7
**wrong** 12:13
  68:21 88:6
**wrote** 63:11
  67:18 72:23
  77:6 90:10

    

**[x - zoom]**                                                Page 21

| x |
|---|
| **x**  3:2 19:12 |
| 23:19 40:2,6 |
| 43:10,18,24 |
| 44:19,24 45:4,8 |
| 46:12,15 48:2 |
| 59:9,12 63:8 |
| 71:13 72:8,16,22 |
| 73:20 74:6 |
| 87:20 88:17,22 |
| 90:23 92:18 |

| y |
|---|
| **y**  74:7 |
| **yeah**  61:19 64:17 |
| 72:3 82:10 |
| **year**  7:2 13:3 |
| 22:24 81:10 |
| **years**  7:1 8:10 |
| 11:23 12:2,7,12 |
| 13:23 15:24 |
| 16:4 18:10 |
| 20:15 24:13,15 |
| 30:6 42:4,11 |

| z |
|---|
| **zero**  64:17 |
| **zip**  4:22 |
| **zoom**  1:11 2:14 |
| 17:15 27:13 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.