UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Shane Edward Limbacher, | ) | |
| | ) | 19 CV 7509 |
| Plaintiff, | ) | |
| | ) | Honorable John J. Tharp |
| vs. | ) | |
| | ) | Jury Trial Demanded |
| Sheriff Thomas Dart, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGEMENT**

NOW COME the Defendants, Dr. Yu, Physician Assistant Sims, Physician Assistant Davis, and Dr. McCarthy, ("Defendants") by and through their attorney, Assistant State's Attorney Alexander Preber, who Reply to Plaintiff's Response to Defendant's Motion for Summary Judgement as follows:

**INTRODUCTION**

Plaintiff's Response attempts to frame the treatment that Plaintiff received from Defendants as minimal, suggesting that each Defendant would treat portions of Plaintiff's injuries but would not attempt to treat his left shoulder. Plaintiff implies that each Defendant was attempting to kick the can down the road after performing the bare minimum of treatment. That could not be further from the truth, and Defendants consistently and routinely addressed Plaintiff's medical needs each time he was seen. Defendants responded to Plaintiff's Health Service Request Forms ("HSRF"), examined Plaintiff, and created treatment plans for Plaintiff's presented injuries, and would alter medications as appropriate. The totality of medical care Defendants provided was objectively reasonable.

Between the date of the incident and the filing of Plaintiff's complaint, Plaintiff was routinely being seen by Defendants and medical staff to address his injuries. The table below helps to show a clear picture of Plaintiff's medical care as viewed from the medical records.

**Timeline of Treatment to Plaintiff.**

| Date: | Who Plaintiff Saw | Discussed Injuries | Treatment |
|---|---|---|---|
| October 25, 2017 | HSRF | Plaintiff complains of pain and arthritis in his hands, ankles, and all joints. | |
| November 13, 2017 (Injury) | Medical Staff Nurse | Neck and back | Sent to Urgent Care |
| November 13, 2017 (Urgent Care) | Defendant Dr. Yu. | Neck, back, left hip | X-rays of Neck and Back, pain medication given. |
| November 14, 2017 | HSRF (Health Service Request Form) | Left shoulder | |
| November 15, 2017 | Medical Staff | Left shoulder | Range of Motion exercises given. 2 weeks for follow-up. |
| November 29, 2017. | Defendant Trammell | Left hip, shoulder, lower back | Decreasing in pain, present management to continue. |
| November 29, 2017 – January 30, 2018 | 6 HSRF. (3 HSRF mention left shoulder) | Neck, back, left shoulder | |
| January 30, 2018 | Defendant Sims | Lower back | Referred to Physical Therapy. |
| February 20, 2018 | Medical Staff | Back pain | Physical Therapy evaluation |
| March 2, 2018 | Defendant Trammell | Lateral neck abscess | |
| March 21, 2018 | Medical Staff | Physical Therapy | Plaintiff Refused |
| April 5, 2018 | Medical Staff | Physical Therapy | Plaintiff Refused |
| May 1, 2018 | Medical Staff | Physical Therapy | Plaintiff Refused |
| May 7, 2018 | Defendant Trammell | Neck and lower back | Plaintiff had little relief with physical therapy. Appointment with neurosurgery |

2

| May 29, 2018 | Defendant Trammell | Neck and lower back | Decreasing in pain, Plaintiff has relief with current prescriptions |
| July 25, 2018 | Neurosurgery | Neck and back | Further MRI of neck and back ordered. Physical Therapy recommended. |
| October 2, 2018 | Defendant Dr. McCarthy | Left shoulder | The Physical Exam could not reproduce results. X-ray of Left Shoulder Ordered. Set for follow-up visit. |
| October 9, 2018 | Defendant Trammell | Left shoulder | Followed Dr. McCarthy's Plan. |
| November 13, 2018 | Defendant Davis | Left shoulder | Plaintiff wanted an MRI of left shoulder. |
| December 4, 2018 | Defendant Dr. McCarthy | Left shoulder, neck, lower back. | Plaintiff offered Cortisone Shot, denies it. Plaintiff asks to see neurosurgery again as pain seems to come from the neck. |
| December 12, 2018 | Defendant Davis | Neck, back, left shoulder. | Plaintiff wants stronger medication, and to be seen by neurosurgery again. |
| January 1, 2019 | Neurosurgery | Neck and back | Plaintiff to consider physical therapy again. No surgical intervention at this time. |
| January 29, 2019 | Defendant Davis | Neck, back, left shoulder | Plaintiff reminded that he rejected injections, physical therapy, and not a candidate for neurosurgery. Pain medication continued. |
| May 29, 2019 | Medical Staff | Neck, back, left shoulder | Medication changed upon Plaintiff's request. |
| July 24, 2019 | Defendant Davis | Neck, back, left shoulder | Medication changed back upon Plaintiff request. Plaintiff asked about acupuncture |
| August 19, 2019 | HSRF | Cortisone Injection Request | |

(SOF ¶ 3, 4, 10, 11, 13, 15-18, 20, 21, 25-29, 32, 34, 35, 37, 38, 40-47)

**ARGUMENT**

3

A. **Defendants Were Not Objectively Unreasonable.**

To survive the motion for summary judgement for a medical care claim, Plaintiff must establish that Defendants: (1) acted purposefully, knowingly, or recklessly when considering the consequences of handling Plaintiff's specific medical case; and (2) the Defendants acted in an objectively unreasonable manner. *Miranda v. County of Lake*, 900 F.3d 335, 353-54 (7th Cir. 2018); *Bell v. Sheriff of Cook County*, 2018 U.S. Dist. LEXIS 198178, at *11 (N.D. IL, November 21, 2018) (Tharp, J.) citing *Miranda*. "[N]ot every instance of poor medical treatment amounts to a federal constitutional violation[.]" *Steele v. Choi*, 82 F.3d 175, 176 (7th Cir. 1996) "A showing of negligence or even gross negligence will not suffice." *Miranda*, at 353. Courts must focus on the totality of facts and circumstances faced by the individual defendant to "gauge objectively - without regard to any subjective belief held by the individual - whether the response was reasonable." *Id.* at 886; *Darnell v. Pineiro*, 849 F.3d 17, 36 (2d Cir. 2017) (concluding that "any § 1983 claim for a violation of due process requires proof of a *mens rea* greater than mere negligence")).

As to the totality of care, courts "must examine the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to his serious medical needs." *Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997).

In deliberate indifference cases, "[s]tate-of-mind evidence sufficient to create a jury question might include the obviousness of the risk from a particular course of medical treatment; . . . persistence in a course of treatment known to be ineffective; or proof that the defendant's treatment decision departed so radically from accepted professional judgment, practice or standards that a jury may reasonably infer that the decision was not based on professional judgment." *Walker*, 940 F.3d at 964 (citing *Whiting*, 839 F.3d at 664)). The Seventh Circuit

4

requires that when assessing whether a prisoner has satisfied the burden of proving medical deliberate indifference, the Court must consider the totality of the inmate's medical care by the defendant. *See Dunigan v. Winnebago Cty.*, 165 F.3d 587, 591 (7th Cir. 1999).

In *Dunigan*, the Court reasoned that a plaintiff cannot ask the court to ignore a bulk of medical records on the treatment of a condition and focus only on highlighted sections. (*Id*. at 591). The Court then held that isolated incidents of neglect during an otherwise continuous stretch of adequate medical care is insufficient to support an inference of deliberate indifference. (*Id*.)

The totality of care Plaintiff received shows that he received appropriate, and certainly not objectively unreasonable, care. To the extent there may have been discrete episodes of neglect, the caselaw holds that those discrete episodes cannot outweigh the totality of Plaintiff's appropriate care. The caselaw is similarly clear that negligence falls short of the objectively unreasonable standard. It is clear from the totality of care given to Plaintiff that each one of the Defendants acted objectionably reasonable when it came to addressing and treating Plaintiff injuries from November 17, 2017.

1. **Defendant Dr. Yu**

Plaintiff statement of facts and response mischaracterize and muddy the facts of Dr. Yu's interactions and medical treatment of the Plaintiff on November 13, 1017. Dr. Yu's deposition regarding his medical notes is accurate and in accordance with the medical notes taken at the time of injury. Dr. Yu adequately treated Plaintiff's injuries to his neck, back, and left hip as they were presented to him. Dr. Yu did not address Plaintiff's shoulder because Plaintiff never complained about his shoulder.

Plaintiff tries to show that Dr. Yu in an ill light when stating that his notes do not contain all details from patient examinations, however, Dr. Yu provides context as to why he does not include all details in a medical examination:

> Q. And then do you run through and ask the patient, like, you know, did you hurt your arm? Did you hurt your shoulder or do you just ask what hurts? What is your process?
>
> A. I ask him does he have any pain. Does he have any numbness. Does he have any weakness. And can he move all of his extremities.
>
> Q. And I have seen in some of the other medical reports from Mr. Limbacher where they will take a notation that his pain is on a scale of one to ten. Do you ask patients to give you sort of -- to rate their pain?
>
> A. Yes.
>
> Q. And do you record that when you ask that question in your notes then?
>
> A. If I think it is important, I put it in my notes. If he says that he doesn't have much pain, then I don't put it in.
>
> Q. So on a scale of one to ten, then would you put in your notes the answer to that question and when would you leave it out of your notes?
>
> A. If he does not complain of any pain, then you don't need to put the scale.

(SOF, Ex. 6, at 48:23 -24, 49:1-23)

The process that Dr. Yu explained is logical when seeing the timeline of how Plaintiff was treated. From the medical notes, on November 13, 2017, Plaintiff fell and complained of neck and back pain before being taken to urgent care. (SOF ¶4). When he was seen by Dr. Yu in urgent care that same day, Dr. Yu noted the trauma to Plaintiff's neck back, and left hip. (SOF ¶10). Dr. Yu's medical notes, just like any note, does not include absolutely everything that was said during an interaction. Rather, Dr. Yu's notes are a distillation of important information, made contemporaneously with his interaction with the Plaintiff, his patient. Dr. Yu's notes show that Plaintiff made certain complaints and Dr. Yu treated those complaints. Plaintiff did not complain about a shoulder injury, which is why it is not in Dr. Yu's notes, and which is why it was not treated at that time in urgent care.

6

Plaintiff relies on Peters *v. Bailey,* (No. 17 C 4809, 2020 U.S. Dist. LEXIS Ill. Sep. 18, 2020) to show the materiality of conflicting deposition testimony. However, this case is different from ours because in *Peters* there was no issue of whether plaintiff informed defendants of his shoulder injury. In *Peters*, plaintiff fell and presented in the infirmary with shoulder pain on December 4, 2015. (*Id*. at. 19.) Plaintiff continued to complain of pain and immobility to other defendants that were responsible for his treatment. (*Id*. at. 19, 20). Plaintiff's x-rays were negative, but he contends that he continued to suffer shoulder pain and mobility issues after being discharged on December 16. (*Id*. at. 20).

In contrast, when Plaintiff arrived at urgent care, he did not complain of a shoulder injury to Dr. Yu. (SOF ¶10, 14). Dr. Yu cannot be held liable for failing to treat Plaintiff's shoulder injury when Plaintiff never alerted Dr. Yu to any shoulder injury. No medical notes at the time of injury or the urgent care visit indicate a left shoulder injury from different medical staff in the medical record. Plaintiff's Health Service Request Form from the next day is not proof that he said anything to any medical personal at the time of injury or examination by Dr. Yu.

Moreover, even accepting Plaintiff's unsupported testimony that he did report a shoulder injury to Dr. Yu, Dr. Yu's care was not objectively unreasonable. As Plaintiff admits, Dr. Yu examined and treated Plaintiff's neck, back, and left hip. (SOF ¶10) Injuries to the spinal column that can leave someone paralyzed, such as injuries to the neck or back, are much more critical than injuries to a shoulder. Plaintiff admits that Dr. Yu treated his most serious concerns. Plaintiff has provided no evidence that triaging and treating an individual's most serious concerns in an urgent care environment, while leaving lesser concerns for subsequent appointments, is objectively unreasonable. Dr. Yu provided objectively reasonable care for the injuries that Plaintiff complained of at the time of his examination on November 13, 2017. Even if Plaintiff

7

complained of a shoulder injury and Dr. Yu failed to address that concern, Plaintiff has no evidence that care was objectively unreasonable given that Dr. Yu did address the more serious injuries Plaintiff complained of.

2. **Defendant PA Sims**

Plaintiff saw Defendant Physician's Assistant Sims <u>once</u> during Plaintiff's entire course of treatment, on January 30, 2018. (SOF ¶21). Previous to his visit with Defendant Sims, Plaintiff filed 6 HSRF between November 29, 2017, and January 30, 2018, regarding his neck and back; only 3 of the forms mention his left shoulder. (SOF ¶20). Plaintiff made no mention of his left shoulder to Defendant Sims during the visit. (SOF ¶21, 22). Defendant Sims referred Plaintiff to physical therapy. (SOF ¶25).

Plaintiff attempts to show that Defendant Sims is unable to recall Plaintiff and what happened during the visit on January 30, 2018. However, Defendant Sims does recall the day in question as he refers to his medical record that he recorded around the time of the visit:

> Q. And is it your understanding of the practice at Cermak is that providers are supposed to make a record of their interaction with the patient?
>
> A. I can't speak for other providers. I'll speak for myself. Whenever I have an interaction, I document my interaction.
>
> Q. And do you take your notes contemporaneously or shortly after you interact with a patient?
>
> A. I usually try and get them done during the clinic. If not, I come back to the office to finish them, yes.
>
> Q. And you understand that other people rely on that medical record, people who see that patient next, right?
>
> A. Yes, its on the record.
>
> Q. Right. And so you expect that people rely on that record in the delivery of medical services, correct?
>
> A. Yes.

8

(SOF Ex. 11, at 40:6-16, 41:5-12)

Defendant Sims stated that other medical providers will rely on his notes for further treatment of the Plaintiff, and that they need to be accurate. His notes include discussions on Plaintiff's asthma, thumb numbness, allergies, and his recent visit to Stroger Hospital. (SOF Ex. 11, at 75:8-14). Defendant Sim's notes do not contain any reference to Plaintiff complaining about his shoulder.

While Plaintiff claims Defendant Sims was "surprised that (Mr. Limbacher) had not seen an orthopedic specialist" (Dkt. 123, at 19), the fact is there is nothing of the sort in Defendant Sims' medical notes or in Sims' deposition testimony. Once again, Plaintiff simply did not complain about his shoulder to Defendant Sims, and once again Defendant Sims treated the complaints he was presented with.

Once again, however, even accepting Plaintiff's version of events as true, Defendant Physician's Assistant Sims provided Plaintiff with objectively reasonable care. Defendant Sims knew Plaintiff had been seen by other medical professionals before him, including Dr. Yu, P.A. Trammell, and others. Defendant Sims was in no position to counteract the medical decisions made by those individuals. Physicians Assistants are licensed to practice medicine under a licensed physician. (PSOF, Ex. Y. at 5:9-11) As such, Defendant Sims took action he was authorized to do, and referred Plaintiff to physical therapy as a safe, reliable, non-invasive way to injuries that Plaintiff sustained during his relatively recent fall on November 13, 2017. Plaintiff offers nothing to suggest Defendant Sims could have performed shoulder replacement surgery on Plaintiff or that it was even appropriate at that time without first pursuing a less risky and non-invasive course of physical therapy. Even taking Plaintiff's version of events as true, were left with nothing more than Plaintiff wishing for a different course of treatment, but nothing to

suggest Defendant Sims could have ordered that different course of treatment or that the course of treatment pursued was not prudent and objectively reasonable, even if ultimately unsuccessful. Defendant Sims was objectively reasonable when providing medical treatment to Plaintiff.

3.  **Defendant Dr. McCarthy**

Dr. McCarthy provided Plaintiff with objectively reasonable care at two appointments in October and December 2018, more than a year after the initial incident. After physical examination and x-rays that were taken of Plaintiff's left shoulder, Dr. McCarthy wished to implement a treatment plan that would give Plaintiff relief while also being diagnostic in the form of a cortisone shot. The success, or failure, of the cortisone shot would provide Dr. McCarthy with further information about how to proceed with treatment. As Plaintiff admits, however, Plaintiff refused to take part in that treatment plan. It is hard to see how Plaintiff can argue Dr. McCarthy was objectively unreasonable when he was the one who refused to let her treat him.

Plaintiff first saw Dr. McCarthy on October 2, 2018, and it is important to note that during the physical examination Dr. McCarthy could not reproduce the feeling that Plaintiff said he was experiencing in his left shoulder, but nevertheless ordered an x-ray of his left shoulder, and set up his next visit for a cortisone injection to the left shoulder. (SOF ¶35). Dr. McCarthy explained that the injection was both diagnostic and therapeutic, and that if it did not help, more advanced imaging would be needed. (*Id*.) On December 4, 2018, Dr. McCarthy saw Plaintiff again to review the MRI of his neck and back, as well as his left shoulder x-rays.[1] (SOF ¶40.)

---

[1] Once again, as noted above, Plaintiff ignores the fact that Plaintiff's initial injury caused damage to his neck and back, crucial areas that can lead to debilitating conditions if not treated properly. Plaintiff does not complain about the care he received for his neck and back. Instead, Plaintiff complains about the comparatively minor shoulder pain, which medical records show was treated appropriately with conservative care whenever Plaintiff bothered to report

Dr. McCarthy found degenerative joint disease in the left shoulder, characterized by limited range of motion and pain, but the severity of the pain was moderate. (*Id.*) Dr. McCarthy advised Plaintiff to receive the injection, but Plaintiff refused. (*Id.*)

Under Section 1983, a defendant can be found liable for their own unconstitutional conduct, but not for someone else's. Dr. McCarthy's treatment of Plaintiff was objectively reasonable each time she saw him. Plaintiff arrived complaining of shoulder pain from an old injury, and she gave him a physical examination and ordered x-rays, and scheduled a follow-up appointment. At the follow up Dr. McCarthy wanted to try a cortisone shot to relieve some pain and provide further information in determining next steps. As Plaintiff admits, Plaintiff refused to participate in his own treatment, refused the cortisone shot, refused the pain relief the shot offered, and refused to aid Dr. McCarthy in determining further care. Nevertheless, Dr. McCarthy also treated Plaintiff's neck and back, and Plaintiff has no complaints about that treatment. The fact that Plaintiff wanted something different from what Dr. McCarthy offered does not mean that her care was objectively unreasonable.

4. **Defendant Davis**

Plaintiff saw Defendant Davis on four separate occasions, the first of which was almost a year after his November 13, 2017, fall, about a month after his October 2, 2018, appointment with Dr. McCarthy where Plaintiff's left shoulder was examined, and x-rays were ordered.

Plaintiff attempts to divorce Defendant Daivs from the context of Plaintiff's medical care, but that is improper. At their first meeting Plaintiff asked Defendant Davis for an MRI, Defendant Davis forwarded that request to Dr. McCarthy, but Dr. McCarthy, already had a plan

---

pain. Yet even if Plaintiff's shoulder was ignored, and it was not, that would not constitute objectively unreasonable medical care for injuries from the fall when his significantly more serious injuries were properly cared for.

for Plaintiff, and wanted to see the efficacy of the cortisone shot before ordering an MRI. Physician's Assistant Davis operated under the direction of Dr. McCarthy—checking with the doctor was the correct first step, and the P.A. could not countermand the doctor's plan of care. (*Id.* at ¶39)

Plaintiff's second interaction with P.A. Davis was on December 12, 2018, 8 days after seeing Dr. McCarthy and rejecting the cortisone shot. (SOF ¶ 41, 42.) Plaintiff also informed Dr. McCarthy that he wanted a follow-up with neurosurgery as when he moves his left shoulder, the pain is radiating from his neck. (SOF ¶ 41) Like the proverbial child who asks the other parent when the first one does not give them what they want, Plaintiff requested stronger medication and to see neurosurgery again. (SOF ¶42.) In response, Davis kept Plaintiff on his pain medication and kept the follow-up with neurosurgery as he had a follow-up appointment with them anyways. (*Id.* at Ex. 21)

In fact, on January 1, 2019, doctors from neurosurgery did examine Plaintiff's MRI of his neck and back, finding that the MRI of Plaintiff's lower back showed arthritis, and Plaintiff was told to consider physical therapy because he was not a candidate for surgery. (SOF ¶43.) It is important to note that Plaintiff rejected the cortisone shot to his left shoulder offered by Dr. McCarthy on December 4, 2018, because Plaintiff wanted a follow-up with neurosurgery as he reported the pain in his left shoulder was radiating from his neck. (SOF ¶41)

Plaintiff's third appointment with Defendant Davis is a follow-up for his neck, back, and shoulder pain on January 29, 2019. (SOF ¶44) At this point, Defendant Davis continued Plaintiff's pain medication because that was all she could do—after the appointment with neurosurgery Plaintiff was not a surgical candidate, and Plaintiff had already rejected the cortisone shot which was the first step on the road to additional care. (*Id.*)

Lastly, Defendant Davis saw Plaintiff again on July 24, 2019, when he asked for his pain medication to be adjusted, and it was. (SOF ¶46)

When viewed in proper context, Defendant Davis did not give Plaintiff the "run-around." Rather, P.A. Davis operated under Doctor McCarthy, and when Plaintiff made his first request, Defendant Davis checked with the doctor, who already had a plan. Plaintiff again tried to dictate his care on their second interaction, but that was right after Plaintiff refused Dr. McCarthy's plan, and he was trying to get around her orders. Hamstrung by Plaintiff's own decisions, P.A. Davis responded to Plaintiff's medication requests, but could do no more given Plaintiff's refusals and the fact that he was not a surgical candidate. None of that was unreasonable.

### B. Totality of Care

Plaintiff's attempt to show that each Defendant acted unreasonably in the medical care given to him is not supported by the medical evidence and the totality of care Plaintiff received. The contemporaneous medical records tell a very different story from Plaintiff's cherry-picked, after-the-fact recollections. Plaintiff was seen and treated for his injuries to his neck, back, hip, and shoulder, bearing in mind that some injuries are more serious than others, and medical professionals can only treat the injuries that are reported to them.

Even accepting Plaintiff's version of events as true, Dr. Yu treated the serious, critical injuries to Plaintiff's neck and back. The less critical injury to Plaintiff's shoulder was treated later with pain medication and physical therap. While Plaintiff did complain of shoulder pain to Defendant Trammell on November 29, Plaintiff also indicating that the pain was decreasing, indicating that the conservative course of treatment was working. Defendant Sims made further referrals to physical therapy, but in a pattern that would repeat, Plaintiff refused to participate in

13

more than a single session. When Plaintiff made subsequent complaints about shoulder pain Dr. McCarthy developed a plan of care that included x-rays, a cortisone shot, and, depending on the result of the cortisone shot, further imaging. As Plaintiff admits, he refused to take part in that plan and refused the cortisone shot. Nevertheless, Plaintiff received an examination by neurosurgery on January 1, 2019, where he was told that he was not a surgical candidate and was prescribed physical therapy, a conservative course of treatment. Despite Plaintiff's repeated refusals to participate in his plan of care, subsequent concerns about medication were taken seriously, and his pain medication was adjusted as appropriate.

Time and time again, Plaintiff was offered treatment to address his injuries. The medical record and Plaintiff's own version of events show that this is not a case where each Defendant was merely kicking the can down the road, or persisting in a course of treatment that was shown to be ineffective. Rather, Plaintiff's initial injury was taken seriously, and his neck and back were appropriately treated, with the understanding that less serious problems could be treated at a later date if necessary. Plaintiff was not ignored, but rather he was repeatedly seen by various doctors, physician's assistants, physical therapists, imaging technicians, nurses, and specialists. Instead of persisting in ineffectual treatments, the medical professionals exercised their judgment by recommending a conservative course of care and providing time for that care to bear fruit. Unfortunately, Plaintiff stymied his own recovery by not participating in physical therapy, and by not accepting gateway steps to further care. Regardless, the Defendant medical professionals, and other medical professionals at CCDOC, elevated Plaintiff's care as appropriate. But as the neurosurgeons determined on January 1, 2019, Plaintiff was not a surgical candidate, and a conservative course of physical therapy was best. Even just focusing on Plaintiff's shoulder injury, the totality of care Plaintiff received for his shoulder was not objectively unreasonable.

14

Moreover, it must not be forgotten that Plaintiff's initial injury was not merely an injury to his shoulder. Plaintiff's injury damaged his neck, back, hip, and shoulder. The fact that Plaintiff only focuses on the care for his shoulder demonstrates that the totality of care Plaintiff received for his injury was not objectively unreasonable. Plaintiff's original fall, according to Plaintiff, caused multiple discrete injuries, and the fact that he fails to complain about most of those injuries, including two that were potentially much more serious, shows that the totality of care Plaintiff received was not objectively unreasonable.

## **CONCLUSION**

Defendants are entitled to summary judgment regarding Count I of Plaintiff's Complaint. As a matter of law, even taking Plaintiff's version of events as true, Defendants were not objectively unreasonable to Plaintiff's medical needs, and at all times acted reasonably to address Plaintiff's medical needs. Plaintiff refused medical advice and wished to dictate his own course of treatment while incarcerated.

WHEREFORE, for the foregoing reasons, Defendants Dr. Yu, Physician Assistant Sims, Physician Assistant Davis, Physician Assistant Trammell, and Dr. McCarthy, by and through their respective attorneys, respectfully request that their Motion for Summary Judgment be granted.

Respectfully submitted,
Kimberly M. Foxx
State's Attorney of Cook County
For Defendants Dr. Yu, Dr. McCarthy, PA Sims, and PA Davis only

By: */s/ Alexander Preber*
Alexander Preber
Assistant State's Attorney
Civil Actions Bureau
Richard J. Daley Center, Room 520
Chicago, IL 60602
(312) 603-3141
Alexander.Preber@Cookcountysao.org

**CERTIFICATE OF SERVICE**

    I, Alexander Preber, hereby certify that in accordance with Fed. R. Civ P. 5, LR, 5.5 and the General Order on Electronic Case Filing (ECF), **Defendants' Reply in Support of Defendants Motion for Summary Judgment** was served pursuant to the District Court's ECF system on January 30, 2024.

                                                        */s/ Alexander Preber*
                                                           Alexander Preber