**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SHANE LIMBACHER, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 19 C 7509 |
| | ) | |
| v. | ) | Judge John J. Tharp, Jr. |
| | ) | |
| BARBARA DAVIS, THERESA | ) | |
| MCCARTHY, KEVIN SIMS, GLENN | ) | |
| TRAMMELL, and YAN YU | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Shane Limbacher sustained a fall as a pretrial detainee at the Cook County Department of Corrections on November 13, 2017. Over the next nineteen months, he received medical care for the resulting injuries from Drs. Yan Yu and Theresa McCarthy and Physician Assistants Glenn Trammell, Kevin Sims, and Barbara Davis. Limbacher alleges that he repeatedly complained of shoulder pain and requested to see a specialist, only to be ignored. He has since been diagnosed with long-term post-traumatic glenohumeral arthritis, which requires full shoulder replacement surgery. Limbacher filed suit against each of the above mentioned personnel pursuant to 28 U.S.C. § 1983, alleging violations of his Fourteenth Amendment right to adequate medical care. The defendants moved for summary judgement. *See* Mot. for Summ. J., ECF No. 114. For the reasons set forth below, that motion is denied. A status hearing to discuss next steps will be held on July 21, 2026 at 9:15 a.m. in Courtroom 2303.

**BACKGROUND**

On November 13, 2017, Limbacher took a hard fall that resulted in immediate pain and distress. Several hours later, Dr. Yu treated Limbacher at urgent care. Dr. Yu examined his head and neck, finding tenderness but no swelling. He then ordered x-rays of Limbacher's neck, which

showed "no acute fracture or subluxation." He proscribed pain medication for Limbacher and concluded the visit. Limbacher claims that he complained of shoulder pain several times during the appointment and that Dr. Yu ignored him. Dr. Yu does not recall Limbacher mentioning shoulder pain at any point. *Compare* Pl.'s Statement of Material Facts (PSOF) ¶¶ 7-8, ECF No. 121 *with* Defs.' Statement of Material Facts (DSOF) ¶ 14, ECF No. 115. Dr. Yu contends that, if Limbacher had raised the issue, he would have included it in his notes. But his notes only mention "trauma to left neck, head and left hip." *See* Yu Notes, ECF No. 115-5.

In the days that followed, Limbacher filed several Health Service Request Forms (HSRFs). HSRFs allow detainees to communicate their medical needs to relevant staff and request medical appointments. Once submitted, the request is scanned into a patient's chart, which is available to all treating personnel.[1] The day after the fall, Limbacher wrote: "My lower back, left shoulder**,** left hip, and left knee are in severe pain . . . I do not feel that all my injuries were treated and looked at properly. I feel that my injuries have been carelessly dismissed."  PSOF Ex. V, ECF No. 121-22. He submitted similar requests on November 17 and November 22. *See* PSOF Ex. A, ECF No. 121-1 ("I'm still having severe neck, shoulder, and back pain . . . Something is wrong. PLEASE HELP!"); PSOF Ex. CC, ECF No. 121-29 ("I still have pain in my neck, left shoulder, and back . .  Something is wrong.").

On November 29, 2017, P.A. Glenn Trammell followed up with Limbacher regarding his complaints. Trammell and Limbacher agree that that Limbacher communicated improvement in

---

[1] Defendant Sims testified that if an HSRF "has been scanned into the chart, it will be in the chart." Sims Dep. 43:15-22, ECF No. 121-25. Citing that testimony, Limbacher asserts that HSRFs are readily accessible to Department of Corrections physician assistants. PSOF ¶ 64. The defendants do not dispute this assertion other than to point out a typo in Limbacher's citation. *See* PSOF Resp. ¶ 64, ECF No. 127.

his back and hip, but Trammell claims that Limbacher also expressed improvement in his shoulder. Limbacher denies making that statement. He claims that he reported persistent shoulder pain and that Trammell promised to refer him to an orthopedic specialist. *Compare* DSOF ¶ 19 *with* PSOF ¶ 19. It is undisputed that no referral was made.

Over the next two months, Limbacher proceeded to submit more HSRFs in which he explicitly mentioned pain in his shoulder. On January 30, 2018, Limbacher met with P.A. Kevin Sims. Limbacher asserts that Sims examined his shoulder and expressed surprise that he had not yet been referred to an orthopedic specialist. Sims, however, claims that they only discussed Limbacher's lower back. *Compare* PSOF ¶ 24 *with* DSOF ¶¶ 21-22, 25. Sims referred Limbacher to physical therapy for his back pain. Limbacher attempted the proscribed exercises, but felt that they only exacerbated the problem.

Limbacher saw defendant Trammell again on March 3, 2018, May 7, 2018, and May 29, 2018. According to Trammell, they discussed the ongoing pain in Limbacher's neck, lower back, and bilateral upper extremities (BUE) but did not specifically discuss his shoulder. Again, Limbacher's account differs. He asserts that they discussed his shoulder and that he inquired about the referral that Trammell had promised to make during their initial appointment. *Compare* DSOF ¶¶ 27, 29, 32 *with* PSOF ¶ 27-28. Again, no referral was made.

On July 7, 2018—almost seven months after the instigating injury—Limbacher submitted another HSRF complaint: "I can't handle the pain in my neck, back, and shoulder." PSOF Ex. L, ECF 121-29. On August 3, 2018, he wrote: "My left shoulder pain is unbearable. I need to see an orthopedist." PSOF Ex. M, ECF 121-30.

Limbacher eventually secured an appointment to discuss his shoulder pain with Dr. Theresa McCarthy. She is not an orthopedic specialist. On October 2, 2018, she observed a limited range

of motion and indications of a possible rotator cuff injury. Limbacher told her that he experienced "catching and cracking" in his shoulder between 80 and 100 degrees. Dr. McCarthy ordered an x-ray of the shoulder and recommended that Limbacher receive a cortisone shot to assist with the pain and narrow down its potential causes. Limbacher declined the shot because he did not think it would help. He inquired about the possibility of getting an MRI and seeing an orthopedic specialist, but Dr. McCarthy rejected his requests. The following month, Limbacher asked P.A. Barbara Davis if she could order an MRI of his shoulder. Davis relayed the request to Dr. McCarthy, who told Davis that an MRI was not necessary. She explained that Limbacher's shoulder pain could be caused by osteoarthritis, which a cortisone shot would resolve. Accordingly, Davis did not order an MRI.

Limbacher saw Dr. McCarthy for a second time on December 4, 2018. Again, Dr. McCarthy offered him a cortisone shot, and again, he declined. He told Dr. McCarthy that he would prefer to see an orthopedist to get a diagnosis regarding his shoulder, but she said she would not refer him until he received the shot. In the following months, defendant Davis continued to administer care to Limbacher. During their interactions, Limbacher renewed his requests for an MRI and a referral to an orthopedic specialist. Davis never ordered an MRI for his shoulder or made a referral.

\*       \*       \*

Limbacher's proffered evidence includes expert reports by two orthopedic surgeons, Dr. Sebastian Ko and Dr. Ryan Herrington. *See* Ko Rep., ECF No. 121-18; Herrington Rep., ECF No. 121-19. Dr. Ko examined Limbacher in August 2021. He diagnosed Limbacher with glenohumeral arthritis in his left shoulder and recommended shoulder surgery. Dr. Herrington surveyed Limbacher's medical record, concluding that Limbacher likely dislocated his shoulder when he

fell on November 13, 2017, leading to "chronic instability" and "the development of post-traumatic glenohumeral arthritis." Dr. Herrington further opines and that the MRI and referral to orthopedic surgery "did not occur timely and [were] irresponsibly delayed" and that that "Limbacher's left shoulder was not managed in accordance with prevailing and accepted standards of care." The defendants offer no expert reports or testimony in response.

## DISCUSSION

Motions for summary judgment are governed by Federal Rule of Civil Procedure 56, which directs courts to grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When the nonmovant bears the burden of proof at trial, as Limbacher does here, he must "designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A genuine issue exists when "a reasonable jury could return a verdict for the non-moving party." *Johnson v. Edward Orton, Jr. Ceramic Found.*, 71 F.4th 601, 609 (7th Cir. 2023) (quoting *Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022)). On reviewing a motion for summary judgment, the court views all evidence in the light most favorable to the nonmovant. *Weaver*, 28 F.4th at 820.

In this case, Limbacher asserts a single claim against the defendants: failure to provide constitutionally adequate medical care with respect to his shoulder. A pretrial detainee's right to adequate medical care emanates from their Fourteenth Amendment due process rights, not from the Eighth Amendment's prohibition on cruel and unusual punishment. The Fourteenth Amendment standard for pretrial detainees is "looser" than the Eighth Amendment's "exacting" deliberate indifference standard. *Greene v. Caruana*, No. 3:23 C 50222, 2026 WL 524204, at *4 (N.D. Ill. Feb. 25, 2026). To prevail under the former, a plaintiff must show that (1) the defendant

5

"acted purposefully, knowingly, or perhaps even recklessly," and (2) "the challenged conduct was objectively unreasonable." *McCann v. Ogle Cnty., Ill.*, 909 F.3d 881, 886 (7th Cir. 2018) (citation omitted).[2]  Where, as here, the plaintiff alleges that a delay in medical treatment rose to a constitutional violation, he must also provide "verifying medical evidence" establishing the detrimental effect of the delay. *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996).

The defendants do not seem to argue that they did not possess the requisite state of mind. Nor do they meaningfully challenge the expert reports proffered by Limbacher, which establish the negative effect of the delayed treatment. Instead, they each argue that summary judgment is proper because no reasonable jury could find that they provided objectively unreasonable care.

## I.  Doctor Defendants

### A.  Dr. Yu

Dr. Yu examined Limbacher at urgent care after the fall. He argues that he is entitled to summary judgment because (1) the evidence shows that Limbacher did not mention shoulder pain during the visit, and (2) even if he did, Dr. Yu acted reasonably by focusing his examination on more critical areas like the head and neck. That argument fails on both counts.

First, Limbacher has put forth enough evidence to raise a genuine dispute as to whether he informed Dr. Yu of his shoulder pain on November 13, 2017.  It is true that Dr. Yu's notes do not

---

[2] Unlike in the Eighth Amendment context, the plaintiff does not need to prove subjective awareness of the risk of harm. "Instead, [courts] ask 'whether a reasonable officer in the defendant's shoes would have recognized that the plaintiff was seriously ill or injured and thus needed medical care.'" *Zemlick v. Burkhart*, 164 F.4th 1004, 1010 (7th Cir. 2026) (quoting *Pittman v. Madison Cnty., Ill.*, 108 F.4th 561, 564, 167 (7th Cir. 2024)). The defendants occasionally seem to confuse the Fourteenth Amendment and Eighth Amendment standards, suggesting that Limbacher must show that they "actually knew of and disregarded substantial risk of harm." *See, e.g.*, Mot. 9. Because the Fourteenth Amendment does not require a showing of subjective knowledge, those arguments are misplaced.

reflect such complaints. However, "[a] doctor's notes are not inherently more authoritative than [a patient's] recollection." *Cirves v. Syed*, No. 19 C 725-JDP, 2022 WL 7458760, at *6 (W.D. Wis. Oct. 13, 2022). Furthermore, "[o]ral testimony if admissible will normally suffice to establish a genuine issue of material fact." *Randolph v. Ind. Reg'l Council of Carpenters & Millwrights*, 453 F.3d 413, 416 (7th Cir. 2006).

Here, Limbacher testifies that he mentioned pain in his shoulder both before and after Dr. Yu sent him to get x-rays of his spine, and that Dr. Yu ignored him. That testimony is corroborated by the HSRFs Limbacher submitted immediately after his urgent care appointment complaining that his injuries (including his shoulder injury) had not been adequately addressed. Whether to believe Limbacher's version of events or Dr. Yu's version of events is an issue of credibility that this Court cannot resolve. *See Peters v. Bailey*, No. 17 C 4809, 2020 WL 5593754, at *6 (N.D. Ill. Sept. 18, 2020) (plaintiff's testimony that he "informed all three defendants about his persistent, painful shoulder condition . . . is sufficient to permit a reasonable jury to find that each of these defendants knew yet disregarded a substantial risk to [his] health").

If a jury concludes that Limbacher did raise his shoulder pain with Dr. Yu, it could also find that Dr. Yu was objectively unreasonable in failing to examine his shoulder or order any kind of follow up treatment. Dr. Yu argues that he acted reasonably by focusing his attention on Limbacher's neck and back, because injuries to the spine are generally more serious than injuries to the shoulder. However, checking Limbacher for critical injuries does not preclude liability. As Dr. Ko explains, "[w]hile priority is the head, neck and back, after confirming there are no injuries to the spine, a provider must address the shoulder injury." Ko Rep. 2. Moreover, medical personnel cannot simply ignore a detainee's complaints of severe pain. *Gonzalez v. Feinerman*, 663 F.3d 311, 314-15 (7th Cir. 2011). Dr. Yu has not offered any evidence that urgent care resources were

so constrained as to render a brief, preliminary shoulder exam infeasible. Because a jury could find that his failure to even acknowledge Limbacher's complaints was objectively unreasonable, summary judgment for Dr. Yu is not appropriate. [3]

### B. Dr. McCarthy

Unlike Dr. Yu, Dr. McCarthy generally agrees with Limbacher as to what occurred during their appointments: she examined his shoulder and recognized some kind of chronic injury, but she did not reach a formal diagnosis and declined to refer him to a specialist or order an MRI until he received a cortisone shot. Dr. McCarthy claims that the cortisone shot was an important diagnostic step in her treatment plan. During her first appointment with Limbacher, she was not able to reproduce the feeling that he was experiencing in his shoulder and could not determine the cause of his pain. If Limbacher's condition did not improve with the shot, she would order advanced imagining and refer him to an orthopedic specialist.

As a general matter, jailhouse physicians' medical decisions are entitled to a high degree of deference so long as they "[are] based on the physician's professional judgment and [do] not go against accepted professional standards." *Holloway v. Del. Cnty. Sheriff*, 700 F.3d 1063, 1074 (7th Cir. 2012). However, doctors "cannot simply resort to an easier course of treatment that they know is ineffective." *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). And a delay in treatment

---

[3] Failure to examine Limbacher's shoulder at this early juncture may have had a downstream effect. "Appropriate attention to the left shoulder by Dr. Yu on 11/13/17, as required by standard of care, on a more likely than not basis would have resulted in a left shoulder dislocation being either confirmed or at least clinically suspected," putting Limbacher "in a better position of having his shoulder dislocation timely treated with the development of glenohumeral arthritis potentially delayed or even prevented." Harrington Rep. 16.

may constitute a constitutional violation if it "exacerbated the injury or unnecessarily prolonged an inmate's pain." *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010).

The record here contains sufficient evidence to convince a jury that Dr. McCarthy's conduct was objectively unreasonable. By the time she treated Limbacher, his medical record reflected months of consistent, escalating shoulder pain. In August 2018, he described his pain as "unbearable." Even so, Dr. McCarthy refused to refer Limbacher to a specialist or order an MRI until he received a cortisone shot, which—she admits—was "a temporary fix at best." McCarthy Dep. 66:16-19, ECF No. 121-26. And according to Limbacher's experts, that course of action was not clinically sound. Dr. Herrington explains that the shot may have been appropriate immediately after the fall, but because the injury had persisted for more than a year, the "standard of care required timely advanced imaging of the left shoulder [] along with plans to refer to orthopedic surgery." Harrington Rep. 19. Dr. Ko echoes those sentiments. *See* Ko Rep. 4 ("A patient should be referred to an orthopedic specialist if conservative treatment fails after three to six months.").

It is true that detainees do not have a right to their preferred course of treatment. But as another court in this district has recognized, a request to see a specialist is not a request for any specific treatment; it is general request for a medical solution that aligns with a specialist's recommendation. *See Foster v. Ghosh*, 4 F. Supp. 3d 974, 981 (N.D. Ill. 2013). "That request . . . is not expensive, unconventional, esoteric, or experimental." *Id.* (citing *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010)). In *Hayes v. Snyder*, 546 F.3d 516 (7th Cir. 2008), the Seventh Circuit remarked that "[t]he very reason why a specialist would be called in is that a generalist is unable to identify the cause of a particular ailment." *Id.* at 526. Failure to settle on a diagnosis is no reason to refrain from making a referral—"indeed, [] it suggests just the opposite." *Id. See also Pyles v. Fahim*, 771 F.3d 403, 412 (7th Cir. 2014) (where "the need for specialized expertise either

9

was known by the treating physicians or would have been obvious to a lay person," refusal to engage a specialist could amount to constitutional violation).

Dr. McCarthy argues that Limbacher cannot hold her liable for a treatment plan in which he refused to participate. She does not cite any case law for that proposition, and this Court is not obligated to do her research for her. *LINC Fin. Corp. v. Onwuteaka*, 129 F.3d 917, 921 (7th Cir. 1997). Nevertheless, the Court recognizes that the Seventh Circuit has foreclosed Eighth Amendment claims of deliberate indifference where the plaintiff refused care. But in those cases, the treatment that was offered and rejected was plainly reasonable. *See, e.g.*, *Pinkston v. Madry*, 440 F.3d 879, 892 (7th Cir. 2006) (refused to get x-rays done to determine whether bones were broken); *Walker v. Peters*, 233 F.3d 494, 500 (7th Cir. 2000) (refused to take an HIV test required for the dispensation of a HIV drug). Here, Limbacher has presented expert reports concluding that Dr. McCarthy's treatment plan did not meet professional standards. That evidence, in conjunction with Limbacher's testimony and his medical record, is enough to convince a reasonable jury that Dr. McCarthy failed to provide constitutionally adequate care. She is not entitled to summary judgment.

## II.    Physician Assistant Defendants

### A.    P.A. Sims and P.A. Trammell

P.A. Kevin Sims saw Limbacher once in January 2018.[4] P.A. Glenn Trammell saw him five times between November 2017 and October 2018. Both defendants disagree with Limbacher as to what occurred during their interactions. They claim that Limbacher never mentioned having

---

[4] Sims emphasizes that he only saw Limbacher one time. It is unclear what implication he asks this court to infer from that fact. In any event, he cites no authority that a medical professional cannot be held liable for providing constitutionally deficient care in a single instance.

severe shoulder pain, while Limbacher asserts that he raised the issue with each of them and that they promised to refer him to an orthopedic specialist. Like Dr. Yu, defendants Sims and Trammell argue that their notes, which generally comport with their versions of events, settle the facts in their favor. That argument fails for the same reasons articulated above: a jury could reasonably believe Limbacher's account based on his contrary testimony and contemporaneously-submitted HSRFs.

If a jury makes that finding, it could also conclude that the defendants' failure to escalate Limbacher's complaints or refer him to a specialist was objectively unreasonable. *See Berry*, 604 F.3d at 443 (neglecting to notify an attending physician of a detainee's persistent pain can rise to the level of constitutional injury). Limbacher insists that he complained to both defendants about continuing shoulder pain. And despite repeated pleas to see an orthopedic specialist, no referral was made. The Seventh Circuit has found summary judgment inappropriate on similar facts. *See, e.g.*, *id.* at 442 (prisoner "was forced to endure nearly two months of serious pain despite the availability of an obvious treatment . . . that [he] had specifically requested numerous times"); *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005) (practitioner refused to make a referral despite repeated complaints of severe pain and requests to see a specialist).

Sims and Trammell emphasize that they are physician assistants, not doctors. Sims asserts that he "knew Plaintiff had been seen by other medical professionals before him" and "was in no position to counteract the medical decisions made by those individuals." Defs.' Reply 9, ECF No. 128. Trammell similarly argues that he was "not expected to devise a treatment plan for complex ailments, like Plaintiff's shoulder issue" and thus "rightly deferred to the treating Defendant Physicians." Trammell Reply 3, ECF No. 129. Those arguments are not persuasive. It is true that nurses and physician assistants may generally defer to a treating physician's instructions. *Reck v.*

11

*Wexford Health Sources, Inc.*, 27 F.4th 473, 485 (7th Cir. 2022). But here, no relevant instructions had yet been given. It is undisputed that Dr. Yu—the only defendant physician to have treated Limbacher before Sims—did not examine Limbacher's shoulder, much less institute a treatment plan for that injury. The same is true for Trammell with respect to his first four interactions with Limbacher. The notion that Sims and Trammell treated his shoulder in accordance with a physician's directions is simply implausible.

Although they provided Limbacher with some care by referring him to physical therapy, the provision of basic treatment does not shield practitioners from liability where the need for specialist expertise is obvious. *Pyles*, 771 F.3d at 412. Moreover, Limbacher claims that he told Trammell that physical therapy was not improving his pain on several occasions. Medical professionals may not "doggedly persist[] in a course of treatment known to be ineffective." *Greeno*, 414 F.3d at 655. At the very least, Trammell should have changed his approach or escalated the issue when Limbacher's pain persisted. *See Hernandez v. Hain*, No. 19 C 5147, 2021 WL 3618276, at *6 (N.D. Ill. Aug. 16, 2021) (jury could find that a practitioner's "failure to adjust her treatment plan once [] continued complaints of pain . . . indicated the plan's ineffectiveness was objectively unreasonable"). Because a reasonable jury could find that Sims and Trammell provided Limbacher with objectively unreasonable care, they are not entitled to summary judgment.

### B.     P.A. Davis

P.A. Barbara Davis presents a closer case. She saw Limbacher four times between November 2018 and July 2019. They generally agree on what occurred during those appointments: Limbacher requested that an MRI be taken of his shoulder and that he be referred to an orthopedic specialist; Davis denied those requests, instead employing conservative pain management

strategies and adjusting medications where appropriate. Unlike defendants Sims and Trammell, defendant Davis treated Limbacher **after** Dr. McCarthy evaluated his shoulder and developed a treatment plan. Davis closely adhered to Dr. McCarthy's instructions, declining Limbacher's first request for an MRI only after Dr. McCarthy confirmed an MRI was not appropriate. The Court cannot conclude that Davis's deference to Dr. McCarthy in that instance was so "blind or unthinking" as to be constitutionally deficient. *See Berry*, 604 F.3d at 443.

However, the record casts doubt on the objective reasonableness of Davis's treatment on other occasions. For example, during her third appointment with Limbacher, he told her that his shoulder issue had never been addressed. *See* Davis Notes, ECF No. 115-23. He claims that Davis dismissed his complaints and ignored his renewed request for an MRI. *See* Limbacher Dep. 87:15-88:18, ECF No. 121-28. At this point, is not clear that Davis was acting under the guidance of any treating physician. Almost two months had passed since Dr. McCarthy's last appointment with Limbacher, and more than three months had passed since Dr. McCarthy instructed Davis to decline his MRI request. That is a sufficient passage of time for a reasonable jury to conclude that Davis was acting independently. *See Berry*, 604 F.3d at 442 (nurse acted independently where last physician examination occurred six weeks prior). Limbacher's comments during this appointment would arguably alert any reasonable physician assistant that prior treatments were ineffective and that a referral to a specialist was necessary. But Davis did not make a referral or even alert Dr. McCarthy to Limbacher's continued pain. In light of that evidence, she is not entitled to summary judgment.

*       *       *

13

For the aforementioned reasons, the motion for summary judgment is denied with respect to all named defendants.

Date: June 29, 2026

John J. Tharp, Jr.
United States District Judge

14